No. 16-1059

_____

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

_____

Smartflash LLC, Smartflash Technologies Limited,

*Plaintiffs-Appellees*,

v.

Apple Inc.,

*Defendant-Appellant*.

_____

Appeal From The United States District Court For The Eastern District Of Texas
Case No. 6:13-cv-447-JRG-KNM | Hon. J. Rodney Gilstrap

_____

**PRINCIPAL BRIEF FOR APPLE**

_____

James R. Batchelder
ROPES & GRAY LLP
1900 University Avenue, 6th Floor
East Palo Alto, California 94303
(650) 617-4000

Ching-Lee Fukuda
Kevin J. Post
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 596-9000

Douglas H. Hallward-Driemeier
ROPES & GRAY LLP
700 12th Street NW Suite 900
Washington, D.C. 20005
(202) 508-4600

Mark A. Perry
  *Principal Attorney*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
MPerry@gibsondunn.com

Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000

*Counsel for Defendant-Appellant Apple Inc.*

**Claim 13 of U.S. Patent No. 7,334,720**

**Claim 32 of U.S. Patent No. 8,118,221**

3. A data access terminal for retrieving data from a data supplier and providing the retrieved data to a data carrier, the terminal comprising:

- a first interface for communicating with the data supplier;
- a data carrier interface for interfacing with the data carrier;
- a program store storing code; and
- a processor coupled to the first interface, the data carrier interface, and the program store for implementing the stored code, the code comprising:

code to read payment data from the data carrier and to forward the payment data to a payment validation system;

code to receive payment validation data from the payment validation system;

code responsive to the payment validation data to retrieve data from the data supplier and to write the retrieved data into the data carrier; and

code responsive to the payment validation data to receive at least one access rule from the data supplier and to write the at least one access rule into the data carrier, the at least one access rule specifying at least one condition for accessing the retrieved data written into the data carrier, the at least one condition being dependent upon the amount of payment associated with the payment data forwarded to the payment validation system.

13. A data access terminal according to claim 3 integrated with a mobile communication device, a personal computer, an audio/video player, and/or a cable or satellite television interface device.

32. A data access terminal for retrieving data from a data supplier and providing the retrieved data to a data carrier, the terminal comprising:

- a first interface for communicating with the data supplier;
- a data carrier interface for interfacing with the data carrier;
- a program store storing code; and
- a processor coupled to the first interface, the data carrier interface, and the program store for implementing the stored code, the code comprising:

code to read payment data from the data carrier and to forward the payment data to a payment validation system;

code to receive payment validation data from the payment validation system;

code responsive to the payment validation data to retrieve data from the data supplier and to write the retrieved data into the data carrier;

code responsive to the payment validation data to receive at least one access rule from the data supplier and to write the at least one access rule into the data carrier, the at least one access rule specifying at least one condition for accessing the retrieved data written into the data carrier, the at least one condition being dependent upon the amount of payment associated with the payment data forwarded to the payment validation system; and

code to retrieve from the data supplier and output to a user-stored data identifier data and associated value data and use rule data for a data item available from the data supplier.

25. A handheld multimedia terminal for retrieving and accessing protected multimedia content, comprising:

a wireless interface configured to interface with a wireless network for communicating with a data supplier;

non-volatile memory configured to store multimedia content, wherein said multimedia content comprises one or more of music data, video data and computer game data;

a program store storing processor control code;

a processor coupled to said non-volatile memory, said program store, said wireless interface and

a user interface to allow a user to select and play said multimedia content;

a display for displaying one or both of said played multimedia content and data relating to said played multimedia content;

wherein the processor control code comprises:

code to request identifier data identifying one or more items of multimedia content available for retrieving via said wireless interface;

code to receive said identifier data via said wireless interface, said identifier data identifying said one or more items of multimedia content available for retrieving via said wireless interface;

code to request content information via said wireless interface, wherein said content information comprises one or more of description data and cost data pertaining to at least one of said one or more items of multimedia content identified by said identifier data;

code to receive said content information via said wireless interface;

code to present said content information pertaining to said identified one or more items of multimedia content available for retrieving to a user on said display;

code to receive a first user selection selecting at least one of said one or more items of multimedia content available for retrieving;

code responsive to said first user selection of said selected at least one item of multimedia content to transmit payment data relating to payment for said selected at least one item of multimedia content via said wireless interface for validation by a payment validation system;

code to receive payment validation data via said wireless interface defining if said payment validation system has validated payment for said selected at least one item of multimedia content; and

code responsive to said payment validation data to retrieve said selected at least one item of multimedia content via said wireless interface from a data supplier and to write said retrieved at least one item of multimedia content into said non-volatile memory, code to receive a second user selection selecting one or more of said items of retrieved multimedia content to access;

code to read use status data and use rules from said non-volatile memory pertaining to said second selected one or more items of retrieved multimedia content; and

code to evaluate said use status data and use rules to determine whether access is permitted to said second selected one or more items of retrieved multimedia content,

wherein said user interface is operable to enable a user to make said first user selection of said selected at least one item of multimedia content available for retrieving,

wherein said user interface is operable to enable a user to make said second user selection of said one or more items of retrieved multimedia content available for accessing, and

wherein said user interface is operable to enable a user to access said second user selection of said one or more item of retrieved multimedia content responsive to said code to control access permitting access to said second selected one or more items of retrieved multimedia content.

26. A handheld multimedia terminal as claimed in claim 25, further comprising code to present said second selected one or more items of retrieved multimedia content to a user via said display if access is permitted.

## Claim 32 of U.S. Patent No. 8,336,772

30. A data access terminal for controlling access to one or more content data items stored on a data carrier, the data access terminal comprising:

a user interface;

a data carrier interface;

a program store storing code implementable by a processor; and

a processor coupled to the user interface, to the data carrier interface and to the program store for implementing the stored code, the code comprising:

  code to request identifier data identifying one or more content data items available for retrieving;

  code to receive said identifier data identifying said one or more content data items available for retrieving;

  code to request content information pertaining to at least one of said one or more content data items identified by said identified data;

  code to receive said content information;

  code to present said content information to a user via said user interface pertaining to said identified one or more content data items available for retrieving;

  code to receive a first user selection selecting at least one of said one or more of said content data items available for retrieving;

  code responsive to said first user selection of said selected at least one content data item to transmit payment data relating to payment for said selected at least one content item for validation by a payment validation system;

  code to receive payment validation data defining if said payment validation system has validated payment for said selected at least one content data item;

  code responsive to the payment validation data to retrieve said selected at least one content data item from a data supplier and to write said retrieved at least one content data item into said data carrier;

  code to receive a second user selection selecting one of said one or more of said retrieved content data items to access;

  code to read use status data and use rules from said data carrier pertaining to said second selected one or more retrieved content data items; and

  code to evaluate said use status data and use rules to determine whether access is permitted to said second selected one or more retrieved content data items.

32. A data access terminal as claimed in claim 30, wherein said data access terminal is integrated with a mobile communications device and audio/video player.

## CERTIFICATE OF INTEREST

Counsel for Apple Inc. certifies the following:

1.      The full name of every party or amicus represented by me is:

Apple Inc.

2.      The name of the real party in interest (if the party in the caption is not the real party in interest) represented by me is:  N/A.

3.      All parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by me are:  None.

4.      The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are:

**Gibson, Dunn & Crutcher LLP**
Brian M. Buroker
William B. Dawson
Blaine H. Evanson
H. Mark Lyon
Mark A. Perry
Jennifer J. Rho
Brett S. Rosenthal
Robert A. Vincent

**Albritton Law Firm**
Eric M. Albritton *(terminated)*
Shawn A. Latchford *(terminated)*

**Ropes & Gray LLP**
James R. Batchelder
Ching-Lee Fukuda
Douglas H. Hallward-Driemeier
Daniel Keese *(terminated)*
Sharon Lee
Kevin J. Post
Megan F. Raymond
Daniel W. Richards
Lauren N. Robinson
Josef B. Schenker

**Gilliam & Smith LLP**
Melissa Richards Smith

Dated:  January 22, 2016

/s/ Mark A. Perry
Mark A. Perry

# TABLE OF CONTENTS

<u>Page</u>

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION.......................................................1

STATEMENT OF THE ISSUES............................................................4

STATEMENT OF THE CASE ...............................................................4

SUMMARY OF ARGUMENT .............................................................15

STANDARD OF REVIEW ...................................................................18

ARGUMENT ........................................................................................19

    I.    The Asserted Claims Are Not Patent-Eligible ....................................19

        A.    The Asserted Claims Recite an Abstract Idea .........................20

        B.    The Asserted Claims Lack Any Inventive Concept ................24

            1.    The Asserted Claims Recite Nothing More Than Using Generic Computer Hardware and Software to Implement the Abstract Idea in a Particular Technological Environment ...........................................25

            2.    The District Court Erred in Identifying an Inventive Concept ...................................................................28

    II.    The Means-Plus-Function Limitations Render the Asserted Claims Invalid or Not Infringed..........................................35

        A.    The Asserted Claims Are Governed by Section 112, Paragraph 6 .........................................................36

        B.    Application of Section 112, Paragraph 6 Requires Reversal.................................................................................43

            1.    The '772 Claims Are Invalid as Indefinite Because No Corresponding Structure Is Disclosed ............................43

   2.    The Accused Devices Do Not Infringe the Algorithm
         Corresponding to the '221 and '720 Claims ..................45

III.  The Accused Devices Do Not Infringe the Asserted
      Claims Properly Construed ...................................................46

      A.   The District Court Erred in Construing the
           "Payment" Terms ......................................................46

           1.    "Payment Data" ..............................................47

           2.    "Payment Validation System" / "Payment Validation
                 Data" ..............................................................50

      B.   Correcting the Erroneous Constructions Requires
           Reversal ...................................................................52

IV.   The District Court Committed Reversible Error in
      Refusing to Give an *i4i* Instruction ...................................55

CONCLUSION ...........................................................................60

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013) .........................................................33

*Alice Corp. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014)................. 9, 16, 19, 20, 21, 24, 25, 26, 27, 28, 31, 32, 33

*Apple Computer, Inc. v. Articulate Sys., Inc.*,
  234 F.3d 14 (Fed. Cir. 2000) ...............................................................51

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
  788 F.3d 1371 (Fed. Cir. 2015) .....................................................20, 32

*Aristocrat Techs. Aust. Pty Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008) .....................................................38, 44

*Bilski v. Kappos*,
  561 U.S. 593 (2010).........................................................16, 21, 25, 26

*Blackboard, Inc. v. Desire2Learn, Inc.*,
  574 F.3d 1371 (Fed. Cir. 2009) ...........................................................45

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
  977 F.2d 1555 (Fed. Cir. 1992) ...........................................................59

*buySAFE, Inc. v. Google, Inc.*,
  765 F.3d 1350 (Fed. Cir. 2014) .....................................................21, 24, 33

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
  438 F.3d 1374 (Fed. Cir. 2006) ...........................................................51

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011) ...........................................................22

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014) .................................16, 26, 28, 29, 31

*Eon Corp. IP Holdings LLC v. AT&T Mobility LLC*,
  785 F.3d 616 (Fed. Cir. 2015) .....................................................39, 43, 44

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
    673 F.3d 1361 (Fed. Cir. 2012) .........................................................38

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014) .........................................................18

*Ex parte Erol*,
    2013 WL 1341107 (P.T.A.B. Mar. 13, 2013) ...................................37

*Gasoline Prods., Co. v. Champlin Ref. Co.*,
    283 U.S. 494 (1931)............................................................................2

*Gen. Mills, Inc. v. Hunt-Wesson, Inc.*,
    103 F.3d 978 (Fed. Cir. 1997) ...........................................................52

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
    792 F.3d 1363 (Fed. Cir. 2015) .................................... 21, 25, 26, 27, 29, 31, 33

*In re Katz Interactive Processing Patent Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011) ...................................................38, 41

*Ex parte Lakkala*,
    2013 WL 1341108 (P.T.A.B. Mar. 13, 2013) ...................................37

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    132 S. Ct. 1289 (2012)........................................................20, 25, 26, 27

*Media Rights Techs, Inc. v. Capital One Fin. Corp.*,
    800 F.3d 1366 (Fed. Cir. 2015) ...................................................38, 43

*Microsoft Corp. v. i4i Ltd. P'ship*,
    131 S. Ct. 2238 (2011)...........................................14, 18, 56, 57, 58

*Mortg. Grader, Inc. v. First Choice Loan Servs.*,
    — F.3d — (Fed. Cir. Jan. 20, 2016) ...............................................29

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014)........................................................................42

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008) .........................................................44

*Noah Sys., Inc. v. Intuit, Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012) ......................................38, 40, 42, 44

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015) ......................................18, 21, 29, 31

*Paice LLC v. Toyota Motor Corp.*,
    504 F.3d 1293 (Fed. Cir. 2007) ...........................................................3

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .........................................................47

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
    719 F.3d 1305 (Fed. Cir. 2013) .................................................1, 2, 3

*Samsung Elecs. Am., Inc. v. Smartflash LLC*,
    2015 WL 1535809 (P.T.A.B. Apr. 2, 2015).......................................10

*Smartflash LLC v. Apple Inc.*,
    621 F. App'x 995 (Fed. Cir. 2015) ..................................................2, 6

*SmartGene, Inc. v. Advanced Biological Labs., SA*,
    555 F. App'x 950 (Fed. Cir. 2014) ....................................................33

*Ex parte Smith*,
    2013 WL 1341109 (P.T.A.B. Mar. 14, 2013) ...................................37

*Sony Corp. of Am. v. Univ. City Studios, Inc.*,
    464 U.S. 417 (1984).........................................................................30

*TriMed, Inc. v. Stryker Corp.*,
    514 F.3d 1256 (Fed. Cir. 2008) ........................................................36

*Ultramercial, Inc. v. Hulu, Inc.*,
    772 F.3d 709 (Fed. Cir. 2014) ................................ 16, 19, 20, 21, 24, 26, 27, 33

*United States v. McClatchy*,
    249 F.3d 348 (5th Cir. 2001) ............................................................59

*Vault Corp. v. Quaid Software Ltd.*,
    847 F.2d 255 (5th Cir. 1988) ............................................................30

*Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*,
— F. App'x —, 2015 WL 9461707 (Fed. Cir. Dec. 28, 2015) .........................31

*Williamson v. Citrix Online LLC*,
792 F.3d 1339 (Fed. Cir. 2015) ....... 11, 16, 18, 35, 36, 37, 39, 40, 41, 42, 44, 45

*WMS Gaming, Inc. v. Int'l Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999) ........................................................................38

**Statutes**

28 U.S.C. § 1292(c)(2)................................................................................2, 3

28 U.S.C. § 1295(a)(1) ...................................................................................1

35 U.S.C. § 101 ................................... 1, 4, 9, 10, 15, 18, 19, 20, 22, 32, 33, 34, 60

35 U.S.C. § 112, ¶ 2 .....................................................................................41

35 U.S.C. § 112, ¶ 6 .............................................. 1, 4, 5, 10, 11, 16, 17, 18, 19, 35,
36, 37, 38, 39, 40, 41, 42, 43, 45, 46, 60

35 U.S.C. § 282 ..........................................................................................56

**Other Authorities**

S. Rep. No. 69-1319 (1927) ........................................................................3, 5

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Apple states that a previous appeal in this action (*Smartflash LLC v. Apple Inc.*, 621 F. App'x 995 (Fed. Cir. 2015)) was decided by a panel of this Court comprised of Judges Newman, Linn, and O'Malley. The cases known to counsel that will directly affect or be directly affected by this Court's decision in the pending appeal are:

1. *Samsung Elecs. Am., Inc. v. Smartflash LLC*, No. CBM2014-00190 (P.T.A.B.) (CBM review instituted April 2, 2015).

2. *Samsung Elecs. Am., Inc. v. Smartflash LLC*, No. CBM2014-00194 (P.T.A.B.) (CBM review instituted Mar. 30, 2015).

3. *Apple Inc. v. Smartflash LLC*, No. CBM2015-00033 (P.T.A.B.) (CBM review instituted May 28, 2015).

4. *Smartflash LLC v. Samsung Elecs. Co.*, No. 6:13-cv-448-JRG-KNM (E.D. Tex.) (filed May 29, 2013).

5. *Smartflash LLC v. Google, Inc.*, No. 6:14-cv-435-JRG-KNM (E.D. Tex.) (filed May 7, 2014).

6. *Smartflash LLC v. Amazon.com, Inc.*, No. 6:14-cv-992-JRG-KNM (E.D. Tex.) (filed Dec. 29, 2014).

7. *Smartflash LLC v. Apple Inc.*, No. 6:15-cv-145-JRG-KNM (E.D. Tex.) (filed Feb. 25, 2015).

## INTRODUCTION

If the Court does not dismiss this appeal for want of jurisdiction, then it should reverse or vacate the liability judgment. The asserted claims are directed to the basic economic concept of paying for and controlling access to content yet they include no inventive concept, and thus are not eligible for patenting under 35 U.S.C. § 101. The asserted claims also include means-plus-function limitations, and proper application of 35 U.S.C. § 112, ¶ 6 renders two of them invalid and the other two not infringed. The infringement verdict cannot stand for the additional reason that it rests on erroneous constructions of the "payment" terms in the asserted claims. And the district court erred in refusing to give a jury instruction on obviousness that the Supreme Court has held "most often should be given" when requested (as both parties did here).

## STATEMENT OF JURISDICTION

This appeal should be dismissed for lack of appellate jurisdiction.

This Court does not have jurisdiction under 28 U.S.C. § 1295(a)(1) because the "judgment" entered below is not final—the district court ordered a new trial on damages and deferred ruling on other remedial issues. *See* Appx10228–46; Appx145. Under Section 1295(a)(1), "a party may not take an appeal until there has been a decision by the district court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Robert Bosch, LLC*

*v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1308 (Fed. Cir. 2013) (en banc) (citation omitted).

Nor does this Court have jurisdiction under 28 U.S.C. § 1292(c)(2), which authorizes an "appeal from a judgment in a civil action for patent infringement which … is final except for an accounting." This unique provision "confer[s] jurisdiction on this court to entertain appeals from patent infringement liability determinations when a trial on damages has not yet occurred." *Bosch*, 719 F.3d at 1320.

This Court previously raised the possibility of a liability-only appeal in this case. *See Smartflash LLC v. Apple Inc.*, 621 F. App'x 995, 1001 n.2 (Fed. Cir. 2015). Smartflash then asked the district court to "bifurcate [the] final liability determinations from the still-required damages proceedings (*including proceedings related to any subsequent ongoing royalty or injunction*) such that the Federal Circuit can quickly reach ultimate resolution of those highly disputed, final or near-final aspects of the case." Appx10864 (emphasis added). Over Apple's objection that this proposed procedure was not authorized under *Bosch* (Appx10886; *see also* Appx29102),[1] the district court bifurcated liability from all remedial issues, includ-

---

[1] Apple also argued that bifurcation was improper because, under the circumstances, damages and liability are intertwined and must be tried to the same jury. *See* Appx10886–87; *Gasoline Prods., Co. v. Champlin Ref. Co.*, 283 U.S.

ing the requested royalty and injunctive relief, and entered a purported "judgment" as to liability.  Appx115–16.

The independent remedy of a permanent injunction is *not* part of an "accounting," as the "issues which were historically decided in accountings are the same as those decided during damages trials today."  *Bosch*, 719 F.3d at 1313.  The pertinent legislative history—which gives "the term 'accounting' its judicially settled meaning"—indicates that injunctive relief must be resolved (and appealed) along with the liability issues.  *See id.* at 1312 (discussing S. Rep. No. 69-1319, at 1 (1927)).  The independent remedy of an ongoing royalty is likewise not "properly characterized as 'damages.'"  *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1315–16 (Fed. Cir. 2007).

Because the district court did not resolve the requests for a royalty or injunctive relief, reviewing the liability issues here under Section 1292(c)(2) would be a jurisdictional bridge too far.  Out of an abundance of caution, Apple filed a timely notice of appeal (Appx10915–19) and briefs below its arguments on the merits. But because the Court lacks jurisdiction at this juncture, the appeal should be dismissed.

---

494, 500–01 (1931); *Bosch*, 719 F.3d at 1346 n.10 (O'Malley, J., dissenting). The district court deferred resolution of this issue (Appx83); Apple will raise it again, if necessary, if there are further proceedings in the district court.

## STATEMENT OF THE ISSUES

I.  Whether the asserted claims are ineligible under 35 U.S.C. § 101 because they recite the abstract idea of paying for and controlling access to multimedia content but contain no inventive concept.

II.  Whether certain computer operations recited in the asserted claims are means-plus-function limitations governed by 35 U.S.C. § 112, ¶ 6, such that two of the asserted claims are invalid as indefinite because no corresponding algorithm is disclosed in the specification, and the other two claims are not infringed because the accused devices do not practice the corresponding algorithm disclosed in the specification.

III.  Whether the district court erred in construing the "payment" limitations of the asserted claims in a manner that cannot be reconciled with the intrinsic evidence.

IV.  Whether the district court erred in refusing to instruct the jury that, in considering obviousness, it could give greater weight to prior art that the PTO did not consider during prosecution.

## STATEMENT OF THE CASE

1.a.  Apple develops and sells commercially successful consumer products, including the iPhone, iPad, and iPod Touch, which allow users to purchase and download apps and multimedia content, such as movies, songs, books, and games.

Appx27953–54. Apple distributes apps through its App Store, and it distributes other multimedia content through its iTunes Store. Appx28073–74.

Users of Apple products may establish an account with Apple by creating an Apple ID and associating a password with that Apple ID. Appx28076–77. During the set-up process, the user enters his or her credit card or gift card information, which is then stored on a secure Apple server. Appx28076–77. Apple's server then sends the user's device an account identifier called the DSID (directory services identifier), along with security information known as a "secure token." Appx28080, 28084. In addition to the DSID account identifier, Apple devices have a unique device identifier called the GUID (globally unique identifier) and a fraud-prevention identifier called the MID (machine identifier), which links the GUID and the user's account. Appx28078.

Once an Apple user has created an account, the user can download content, including free content, by pressing the "Buy" button associated with the item in either the App Store or iTunes Store. Appx28080, 28082, 28087–88. The device then transmits to Apple a buy request containing several pieces of information, including the DSID, GUID, and MID. Appx28083–85. Apple's systems check that the MID matches with the other two identifiers, and then open a "buy session" associated with the user's account to record the user's requested transactions. Appx28083–86. When that session closes, a separate Apple system eventually

charges the user's account.  Appx28087.  The user's credit card and gift card information used to make that payment is not transmitted between the user's device and Apple's servers.  Appx28083.

This transaction operates on credit.  Apple does not charge the user's account until the buy session closes.  Appx28087–89.  Apple's systems deliver the requested app or multimedia content to the user's device immediately after the fraud-prevention verification, but the payment process occurs (often days) later in a separate operation.  Appx28087–89.  If the user's credit card does not settle when the session closes, Apple does not receive payment.  Appx28088–89.

b.  Smartflash was founded for the purpose of bringing patent-infringement lawsuits, and it does not practice its patents or make any products.  Appx27432.  Smartflash sued Apple, as well as Samsung, Google, HTC, and Amazon, accusing an array of platforms and devices of infringing various claims in a family of patents pertaining to "Data Storage and Access Systems" that share a common specification.  *See Smartflash*, 621 F. App'x at 997.

In this lawsuit, Smartflash ultimately accused certain versions of Apple's iPhone, iPad, and iPod Touch of infringing four claims from three of those patents—claim 13 of U.S. Patent No. 7,334,720; claim 32 of U.S. Patent No. 8,118,221; and claims 26 and 32 of U.S. Patent No. 8,336,772.  *See* Appx1267–85; Appx9975–79.  The asserted claims recite a method of "storing and paying for data

and ... computer systems for providing access to data to be stored." Appx168 ('720 Patent, 1:7–8).

The asserted claims of the '720 Patent and the '221 Patent are nearly identical. Both recite a "data access terminal for retrieving data from a data supplier and providing the retrieved data to a data carrier." Appx180 ('720 Patent, 26:41–43); Appx315 ('221 Patent, 28:23–24). The terminal interfaces with a data supplier and data carrier. Appx180 ('720 Patent, 26:44–46); Appx315 ('221 Patent, 28:25–27). The terminal includes a "processor" running "stored code" to implement the following operations:

- forwarding "payment data" to a "payment validation system";

- receiving "payment validation data" from that system;

- retrieving data in response to the payment validation data;

- writing the retrieved data onto the data carrier; and

- receiving an "access rule" that makes access to the retrieved data "dependent upon the amount of payment."

Appx180 ('720 Patent, 26:47–67); Appx315 ('221 Patent, 28:28–50). Claim 13 of the '720 Patent adds that the terminal is "integrated with a mobile communications device" (Appx181 ['720 Patent, 28:1–2]), while claim 32 of the '221 Patent adds code to retrieve unspecified "value data and use rule data" associated with the retrieved data (Appx31 ['221 Patent, 28:48–49]).

The asserted claims of the '772 Patent recite more steps, but no more substance. Claim 26 recites a "handheld multimedia terminal" that operates over wireless networks. The terminal has a "user interface to allow a user to select and play" multimedia content, along with a display for showing such content to the user. The terminal includes a "processor" that implements "code" for:

- requesting data identifying items of multimedia content;

- receiving the identifying data;

- requesting content information about the identified items;

- receiving such information;

- presenting the content information to the user;

- receiving the user's selection of the presented content items;

- sending "payment data" to a "payment validation system";

- receiving from that system "payment validation data" and "defining if said payment validation system has validated payment";

- receiving and writing the selected content on the data carrier in response to the payment validation data;

- receiving the user's selection of content to access;

- reading unspecified "use status data and use rules" for the content;

- "evaluat[ing] said use status data and use rules to determine whether access is permitted"; and

- presenting the content to the user if access is permitted.

Appx349 ('772 Patent, 29:40–30:51). Claim 32 omits the last step and instead recites that the terminal is part of a mobile device and audio/video player. Appx350 ('772 Patent, 31:47–49).

2.a. Apple moved for summary judgment, arguing (among other things) that Smartflash's patents are ineligible under 35 U.S.C. § 101. Appx2940 (citing *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014)).

The magistrate judge agreed with Apple that Smartflash's claims are directed to the abstract idea of "conditioning and controlling access to data based on payment," which is "a fundamental building block of the economy in the digital age." Appx69–70. But the magistrate judge went on to conclude that the asserted claims were patent-eligible because they "contain meaningful limitations that transform the abstract idea of the general purpose of the claims into a patent-eligible invention." Appx70. Specifically, the magistrate judge identified as inventive concepts certain claim terms reciting "distinct memory types" and "evaluating the use data according to the use rule." Appx72. The district court overruled Apple's objections and denied the motion for summary judgment. Appx74–75.

Before trial, Smartflash dropped the claims that recite "distinct memory types." Appx9975. Further, named inventor Patrick Racz admitted in his trial testimony that he did not invent "use rules in connection with online sales of content." Appx27437–48. In addition, the Patent and Trial Appeal Board ("PTAB") institut-

9

ed CBM review of all four claims asserted at trial, having found that they are more likely than not ineligible under Section 101 because they are directed to an abstract idea and do not "add an inventive concept sufficient to ensure that the patent in practice amounts to significantly more than a patent on the abstract idea itself." *See*, *e.g.*, *Samsung Elecs. Am., Inc. v. Smartflash LLC*, No. CBM2014-00190, 2015 WL 1535809, at *9 (P.T.A.B. Apr. 2, 2015) (discussing claim 13 of the '720 Patent).[2]

On the basis of these intervening developments, Apple moved after trial for judgment as a matter of law that the tried claims are ineligible under Section 101, but the district court declined to revisit its pre-trial ruling. Appx10260–77.

b. Apple also urged the district court to construe the asserted claims as including means-plus-function limitations subject to 35 U.S.C. § 112, ¶ 6. Appx1637–814.

The magistrate judge recommended rejecting Apple's argument that the claims were drafted in means-plus-function format, expressly relying on the "strong presumption" against construing claims as subject to 35 U.S.C. § 112, ¶ 6

---

[2] Argument on claim 32 of the '221 Patent was held on November 9, 2015, and a final written decision is due by March 30, 2016. Argument on claim 13 of the '720 Patent and claims 26 and 32 of the '772 Patent was held on January 6, 2016. A final written decision is due on claim 13 of the '720 Patent by April 4, 2016, and on claims 26 and 32 of the '772 Patent by May 30, 2016.

in the absence of the word "means." *See* Appx32–33. The district court adopted this recommendation, likewise invoking the "strong presumption" in overruling Apple's objections. Appx45, 50. Subsequently, however, this Court overruled that "strong presumption" and made clear that many claims without the word "means" are nonetheless subject to Section 112, paragraph 6. *See Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348–49 (Fed. Cir. 2015) (en banc). Accordingly, Apple moved for reconsideration of the district court's pre-*Williamson* rulings on claim construction, indefiniteness, and non-infringement. *See* Appx10811–18. The district court denied this motion, concluding that "*Williamson* does not warrant modification of the decisions and conclusions challenged by Apple." Appx93.

c. The parties disputed the meaning of three "payment" terms that appear in all of the asserted claims. The magistrate judge recommended construing these terms as follows: "payment data" means "data that can be used to make a payment for content"; "payment validation system" means "system that returns payment validation data based on an attempt to validate payment data"; and "payment validation data" has its "plain meaning." Appx8, 14, 15. The magistrate judge rejected Apple's contention that "payment data" excludes identification data, and that the "payment validation" terms require authorization data. Appx15. The district court adopted the recommended constructions over Apple's objections. Appx43–52.

d. At trial, Apple's technical expert, Anthony Wechselberger, described a crowded field of prior art, most of which was not considered by the PTO during prosecution of the patents-in-suit, including: (1) U.S. Patent No. 6,389,538, entitled "System for Tracking End-User Electronic Content Usage" ("Gruse") (Appx11077); (2) several references describing an IBM project for Internet music delivery (the "IBM System") (Appx11149; Appx11155; Appx11157; Appx11561; Appx11564; Appx12150); (3) U.S. Patent No. 5,629,980, entitled "System for Controlling the Distribution and Use of Digital Works" ("Stefik") (Appx11182); (4) U.S. Patent No. 5,915,019, entitled "Systems and Methods for Secure Transaction Management and Electronic Rights Protection" ("Ginter") (Appx11227); and (5) U.S. Patent No. 6,367,019, entitled "Copy Security for Portable Music Players" ("Ansell") (Appx11052). Wechselberger opined that these prior art references rendered the asserted claims obvious. Appx28254–55, 28264–65, 28270; Appx28301–04.

Gruse disclosed a "data access terminal" with a "program store" and "processor," and its memory was a "data carrier"—all of which are elements of the asserted claims. Appx28320–24. In addition, similar to the asserted claims, the Gruse device used various "code" and applied usage conditions "dependent upon the amount of payment associated with the payment data." Appx28324–29. The device also included the additional elements of claim 32 of the '221 Patent: that

the terminal comprises "code to retrieve" and "output" certain data.  Appx28345–48.  Wechselberger opined that other elements in claims 26 and 32 of the '772 Patent, such as a handheld multimedia terminal, wireless interface, or mobile communication, would have been obvious in view of U.S. Patent No. 6,223,291 (entitled "Secure Wireless Electronic-Commerce System With Digital Product Certificates and Digital License Certificates"), which disclosed those elements.  Appx28356–62, 28373–75, 28313–14.

The IBM System was developed as a "piracy protected Internet music delivery system."  Appx28255–56; Appx28318–31, 28346–48, 28357–62, 28374–75.  IBM had collaborated with Sony to implement the technology using portable devices like Sony's Memory Stick Walkman.  Appx11155; Appx11561; Appx11564; Appx12150; Appx28262–63.  Wechselberger explained at trial that the IBM system had "similar types of processing components as [those] that were described in the [Gruse] patent," and met the limitations of the asserted claims.  Appx28322.  For instance, the IBM system contained a "data carrier interface for interfacing with the data carrier" (Appx28323) and used "code to read payment data from the data carrier … and forward the payment data to a payment validation system" (Appx28323–25).

The Stefik, Ginter, and Ansell references each disclosed the flow of protected information like the asserted claims recite.  For instance, Ginter disclosed con-

trolling access to content and the corresponding flow of payment information, content, and rules. Appx28272–73; Appx28298–300. Stefik also disclosed that fees can be paid for content either later as a credit system or in real-time during a transaction like a debit card. Appx28267–69. And Ansell disclosed a system that transfers purchased content in the form of secure portable tracks that allow the content to be played on portable devices, such as MP3 players, while addressing the problems of unauthorized copying. Appx28132–34, 28136–41. Wechselberger opined that these references also rendered the asserted claims obvious.

Apple asked the Court to instruct the jury that, in assessing whether the asserted claims would have been obvious to a person of skill in the art, it could give greater weight to references not considered by the PTO, such as those discussed above. *See* Appx8933–37 (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011)). Even though Smartflash conceded that this instruction "may be necessary" and proposed a similar instruction itself (Appx9001; Appx28760), the district court refused to give it (Appx28759–60).

3. Trial was held in February 2015. The jury found that Apple had willfully infringed all four tried claims; that Apple had not demonstrated by clear and convincing evidence that the asserted claims were obvious; and that Smartflash should be awarded $532.9 million in damages. Appx10192–96.

After trial, the district court granted judgment as a matter of law on willfulness, concluding that no reasonable jury could conclude that any infringement had been willful. Appx76–77. The court also vacated the $532.9 million award and ordered a new trial on damages. Appx10228–46; *see also* Appx132–46 (explaining flaws in Smartflash's damages model). The court, however, denied Apple's remaining post-verdict motions. *See* Appx95–96 (patent-ineligibility); Appx97–114 (infringement and invalidity). The court did not rule on Smartflash's post-verdict motion seeking an ongoing royalty and a permanent injunction. Appx10278–326; *see also* Appx83 (deferring ruling on Apple's objection that a new trial limited to damages would be unconstitutional).

At Smartflash's request, and over Apple's objection, the district court then entered a purported judgment on the jury's verdict as to infringement and validity. Appx97–114; Appx145. The court later stayed further proceedings pending the resolution of Apple's appeal. Appx147–48. Smartflash has not cross-appealed.

## SUMMARY OF ARGUMENT

**I.** The four asserted claims are not patent-eligible under 35 U.S.C. § 101 because they are directed towards an abstract idea but lack any inventive concept.

**A.** The asserted claims recite the abstract idea of controlling access to various types of content data primarily through the mechanism of receiving and validating payment from the user. Paying for and controlling access to products, in-

cluding content, are fundamental economic practices akin to other basic economic principles that both the Supreme Court and this Court have held constitute abstract ideas. *See, e.g., Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2356 (2014) (intermediated settlement); *Ultramercial, Inc. v. Hulu, Inc.*, 772 F.3d 709, 715 (Fed. Cir. 2014) (using advertising as currency).

**B.** The asserted claims do not "contain an 'inventive concept' to 'transform' the claimed abstract idea[s] into patent-eligible subject matter." *Ultramercial*, 772 F.3d at 715 (quoting *Alice*, 134 S. Ct. at 2357). The limitations describe using generic, well-understood, routine, and conventional computer hardware and software to implement the abstract idea in a "particular technological environment" (*Bilski v. Kappos*, 561 U.S. 593, 610–12 (2010) (citation omitted)), which is insufficient to render claims eligible. In concluding otherwise, the district court adopted an erroneous and overly broad reading of *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), and focused on limitations that Smartflash abandoned before or during trial.

**II.** The asserted claims recite means-plus-function limitations and are therefore governed by 35 U.S.C. § 112, ¶ 6.

**A.** The district court expressly applied the "strong presumption" against deeming claims means-plus-function that was overruled in *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 (Fed. Cir. 2015) (en banc). And the court

erred in concluding that the asserted claims are not governed by Section 112, paragraph 6. The claims each recite computer functions requiring special programming of a processor but do not provide a corresponding algorithm for implementing those functions.

**B.** Accordingly, the means-plus-function elements must be limited to the structure disclosed in the specification. The specification does not disclose any algorithm corresponding to the "evaluate … and determine" computer operations, and therefore the asserted claims of the '772 Patent are invalid as indefinite. The specification discloses an algorithm corresponding to the "responsive" operation recited in claim 32 of the '221 Patent and claim 13 of the '720 Patent, but Apple's devices do not practice that algorithm or its equivalents, and thus do not infringe those claims.

**III.** The district court's constructions of the "payment" terms in the asserted claims were erroneous because they cannot be reconciled with the intrinsic evidence. The court's construction of "payment data" included "identification data," even though the specification distinguishes between those distinct types of data. The court's constructions also ignored that the claimed "payment validation system" must *authorize* payment. The accused functionalities of Apple's devices do not infringe the asserted claims under a proper construction of the "payment" terms.

**IV.** The district court erred in refusing to instruct the jury that it could give greater weight to prior art that the PTO did not consider during prosecution, even though *both* parties requested such an instruction. The Supreme Court has already ruled that such an instruction "most often should be given" upon request (*Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2251 (2011)); the court's refusal to do so here prejudiced Apple because the jury was left without sufficient guidance on Apple's invalidity defense. Therefore, a new trial on obviousness is required to the extent Apple is not entitled to judgment on other grounds.

## STANDARD OF REVIEW

"Patent eligibility under 35 U.S.C. § 101 is an issue of law reviewed de novo." *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015). "Regarding questions of claim construction, including whether claim language invokes 35 U.S.C. § 112, para. 6, the district court's determinations based on evidence intrinsic to the patent, as well as its ultimate interpretations of the patent claims, are legal questions that [this Court] review[s] de novo." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015). The Court "review[s] de novo the legal sufficiency of a jury instruction on an issue of patent law." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1225 (Fed. Cir. 2014).

# ARGUMENT

The Court should reverse and direct entry of judgment for Apple because the asserted patent claims are ineligible under 35 U.S.C. § 101, the correct application of 35 U.S.C. § 112, ¶ 6 to the means-plus-function limitations in the four asserted claims renders two of the claims invalid and the other two not infringed, and correction of the district court's construction of the "payment" terms also requires judgment of non-infringement. If the Court does not order entry of judgment for Apple on all of the asserted claims, then a new trial is warranted due to the district court's claim construction errors and its refusal to give a necessary jury instruction regarding the prior art.

## I.     The Asserted Claims Are Not Patent-Eligible

The Supreme Court has established a two-step "'framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts.'" *Ultramercial, Inc. v. Hulu, Inc.*, 772 F.3d 709, 714 (Fed. Cir. 2014) (quoting *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014)). First, the Court must "'determine whether the claims at issue are directed to one of those patent-ineligible concepts.'" *Ibid.* (quoting *Alice*, 134 S. Ct. at 2355). If so, the Court must then "determine whether the claims contain 'an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the

[ineligible concept] itself.'" *Ibid.* (quoting *Alice*, 134 S. Ct. at 2355). This second step entails "a search for an 'inventive concept,'" and therefore "'well-understood, routine, conventional activit[ies]'" do not suffice. *Alice*, 134 S. Ct. at 2355, 2359 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012)). "[N]o presumption of eligibility attends the section 101 inquiry." *Ultramercial*, 772 F.3d at 720–21 (Mayer, J., concurring).

The claims asserted at trial recite an abstract idea—paying for and controlling access to goods (here, multimedia content)—that is a "fundamental economic practice long prevalent in our system of commerce." *Alice*, 134 S. Ct. at 2355–56 (citation omitted). This unpatentable idea is not accompanied by any "inventive concept" that amounts to "significantly more" than the abstract idea itself. *Ibid.* Accordingly, the asserted claims are not patent-eligible under 35 U.S.C. § 101.[3]

## A. The Asserted Claims Recite an Abstract Idea

"[F]undamental economic practice[s]" and other "method[s] of organizing human activity" are not patent-eligible because they are abstract ideas. *Alice*, 134 S. Ct. at 2356–57 (citation omitted). As the district court correctly concluded, the

---

[3] Because "questions on preemption are inherent in and resolved by the § 101 analysis[,] … [w]here a patent's claims are deemed only to disclose patent ineligible subject matter under the *Mayo* framework, … preemption concerns are fully addressed and made moot." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015); *see also Mayo*, 132 S. Ct. at 1302–03.

asserted claims here recite abstract ideas. Appx69–70; Appx74–75. Indeed, in the PTAB proceedings, Smartflash is not even challenging the initial determination that the asserted claims recite abstract ideas. *See, e.g.*, Patent Owner's Response at 15–16, *Apple Inc. v. Smartflash LLC*, No. CBM2015-00033 (P.T.A.B.) (Paper No. 23).

In *Bilski v. Kappos*, 561 U.S. 593 (2010), the Supreme Court held that the "concept of hedging risk and the application of that concept to energy markets" was an attempt to patent an abstract idea because it was a "fundamental economic practice long prevalent in our system of commerce." *Id.* at 611 (citation omitted). The Court in *Alice* held for that same reason that the "concept of intermediated settlement"—"a building block of the modern economy"—was an abstract idea. 134 S. Ct. at 2356. This Court has likewise held that a variety of other basic economic concepts constitute abstract ideas:

- Using advertising as currency. *Ultramercial*, 772 F.3d at 715.

- Guaranteeing performance of a transaction. *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014).

- Optimizing prices based on offers. *OIP*, 788 F.3d at 1362.

- Tracking financial transactions to determine whether they exceed a pre-set spending limit. *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015).

- Verifying credit card transactions over the Internet. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369–71 (Fed. Cir. 2011).

The claims asserted here are directed to similarly fundamental economic tools, and are therefore ineligible under Section 101. The patents themselves describe the invention as relating to "storing and paying for data and ... computer systems for providing access to data to be stored," and assert that the "invention is particularly useful for managing stored audio and video data, but may also be applied to storage and access of text and software, including games, as well as other types of data." Appx168 ('720 Patent, 1:7–14).

The asserted claims recite methods of paying for and controlling access to various types of data. Claim 26 of the '772 Patent recites "code" to "present ... retrieved multimedia content to a user ... if access is permitted" and "code to control access ... to one or more items of retrieved multimedia content," including by "transmit[ing] payment data relating to payment ... of multimedia content ... for validation by a payment validation system" and "receiv[ing] payment validation data." Appx349 ('772 Patent, 30:9–51). Similarly, claim 32 of the '772 Patent recites "code" to "transmit payment data relating to payment for" a "selected ... content item" to a "payment validation system," "code" to "receive payment validation data defining if said payment validation system has validated payment" for a "content data item," and "code" to "determine whether access is permitted to ...

retrieved content data items." Appx350 ('772 Patent, 31:23–49). And the asserted claims of the '221 Patent and '720 Patent, which are nearly identical, recite "code to read payment data ... and to forward the payment data to a payment validation system," "code to receive payment validation data from the payment validation system," and "code" to "receive" an "access rule specifying at least one condition for accessing" data in which "at least one condition [is] dependent upon the amount of payment associated with the payment data forwarded to the payment validation system." Appx315 ('221 Patent, 28:31–46); Appx180 ('720 Patent, 26:51–67).

The asserted claims are thus directed to the idea of controlling access to various types of content data (e.g., music, television shows, movies, apps, books) primarily through the mechanism of receiving and validating payment from the user for these products. As the district court correctly concluded, the "asserted claims recite abstract ideas" because "the general purpose of the claims—conditioning and controlling access to data based on payment—is abstract and a fundamental building block of the economy in the digital age." Appx69–70. The court explained that "the asserted claims recite methods and systems for controlling access to content data, such as various types of multimedia files, and receiving and validating payment data." Appx69.

Paying for and controlling access to goods are perhaps the most fundamental of all economic practices, as they form the basis for the vast majority of commercial transactions. *See*, *e.g.*, *buySAFE*, 765 F.3d at 1355 ("long-familiar commercial transactions" constitute abstract ideas). Likewise, the more specific concepts of paying for and controlling access to multimedia content has long been a basic feature of the economy; those concepts pre-dated the Internet, and have appeared in a wide variety of circumstances (e.g., concert tickets, pay-per-view movies, video tape rentals, sales of books and newspapers, software programs unlocked with a key code, region-locked DVDs).

In sum, the "ordered combination of steps" here "recite[s] an abstraction— an idea, having no particular concrete or tangible form." *Ultramercial*, 772 F.3d at 715.

### B.    The Asserted Claims Lack Any Inventive Concept

Because the asserted claims recite an abstract idea, the Court "must examine the limitations of the claims to determine whether the claims contain an 'inventive concept' to 'transform' the claimed abstract idea[s] into patent-eligible subject matter." *Ultramercial*, 772 F.3d at 715 (quoting *Alice*, 134 S. Ct. at 2357). "[S]tep two of the analysis [is] a search for ... an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to *significantly more* than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S. Ct. at 2355 (quoting

*Mayo*, 132 S. Ct at 1294) (emphasis added).  The asserted claims here add nothing inventive to the abstract idea of controlling access to various types of multimedia content, but simply apply the abstract idea in a particular field of use.

> **1.    The Asserted Claims Recite Nothing More Than Using Generic Computer Hardware and Software to Implement the Abstract Idea in a Particular Technological Environment**

Claim 32 of the '772 Patent limits the claimed method to use "with a mobile communications device and audio/video player."  Appx350 ('772 Patent, 31:46–49).  Claim 13 of the '720 Patent similarly limits the claimed method to use "with a mobile communication device, a personal computer, an audio/video player, and/or a cable or satellite television interface device."  Appx181 ('720 Patent, 28:1–4).  And the patents describe the invention as one related not to paying for and controlling access to products in general, but specifically to "storing and paying for data," such as "audio and video data," "text and software, including games," and "other types of data."  Appx168 ('720 Patent, 1:7–14).

These limitations do nothing more than describe the use of generic computer hardware and software to apply the abstract idea in a "particular technological environment," and such limitations cannot "make [a] concept patentable."  *Bilski*, 561 U.S. at 610–12 (citation omitted).  "An abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as the Internet."  *Intellectual Ventures*, 792 F.3d at 1366 (citing *Al-*

*ice*, 134 S. Ct. at 2358; *Bilski*, 561 U.S. at 612); *see also Ultramercial*, 772 F.3d at 716 ("Narrowing the abstract idea of using advertising as a currency to the Internet is an 'attempt[ ] to limit the use' of the abstract idea 'to a particular technological environment,' which is insufficient to save a claim") (citation omitted).

The only other "additional features" recited in the asserted claims are "[s]teps that do nothing more than spell out what it means to 'apply it on a computer,'" and "cannot confer patent-eligibility" on an abstract idea. *Intellectual Ventures*, 792 F.3d at 1370 (quoting *Alice*, 134 S. Ct. at 2359); *see also, e.g.*, *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) ("after *Alice*, there can remain no doubt: recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible"). "Given the ubiquity of computers, ... wholly generic computer implementation is not generally the sort of 'additional feature[]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Alice*, 134 S. Ct. at 2358 (quoting *Mayo*, 132 S. Ct. at 1297).

The asserted claims recite generic hardware commonly found in nearly every computer, such as a "processor," "memory," a "program store," a "user interface," a "display," and a "wireless interface." *E.g.*, Appx349 ('772 Patent, 29:40–54). But this hardware is indistinguishable from the hardware recited by the *Alice* claims, which included a "data processing system," a "communications controller,"

and a "data storage unit." 134 S. Ct. at 2360. Such hardware "is purely functional and generic," and cannot confer patent-eligibility, because "[n]early every computer will include a 'communications controller' and 'data storage unit' capable of performing the basic calculation, storage, and transmission functions required by the method claims." *Ibid.* Indeed, the patents' specification itself states that the "physical embodiment of the system is not critical" and thus "the terminals, data processing systems and the like can all take a variety of forms." Appx340 ('772 Patent, 12:37–40).

Moreover, the asserted claims recite the performance of "computer functions [that] are 'well-understood, routine, conventional activit[ies]' previously known in the industry." *Alice*, 134 S. Ct. at 2359 (quoting *Mayo*, 132 S. Ct. at 1294); *see also*, *e.g.*, *Intellectual Ventures*, 792 F.3d at 1371 ("entry of data into a computer database, the breakdown and organization of that entered data according to some criteria, ... and the transmission of information derived from that entered data to a computer user" did "not confer patent eligibility"); *Ultramercial*, 772 F.3d at 715–16. The various "code" limitations in the asserted claims call for implementation of conventional computer functions, such as "request[ing]," "receiv[ing]," "transmit[ing]," "read[ing]," and "writ[ing]" data. *E.g.*, Appx349 ('772 Patent, 29:55–30:34). These limitations are akin to using "a computer to obtain data," perform "adjust[ments]" to data, and to "issue automated instructions"—none of which is

an inventive concept.  *Alice*, 134 S. Ct. at 2359.  The remaining "code" limitations are no more inventive or transformative.  For example, claim 26 of the '772 Patent calls for "evaluat[ing] use status data and use rules to determine whether access is permitted" (Appx349 ['772 Patent, 30:31–35]), without requiring any innovative steps for implementing that routine function.

Because the asserted claims do not recite a sufficient "inventive concept" that adds "significantly more" to the abstract idea of controlling access to various types of multimedia content, they fail step two of *Alice*.

## 2. The District Court Erred in Identifying an Inventive Concept

The district court adopted the magistrate judge's conclusion that the "asserted claims contain meaningful limitations that transform the abstract idea of the general purpose of the claims into a patent-eligible invention."  Appx70; *see* Appx74–75.  This conclusion was both legally deficient and factually unsupported.

a. The magistrate judge erroneously viewed the patentability issue in this case solely through the lens of *DDR Holdings*, which she over-read as supporting the eligibility of *any* patent that "resolv[es] a particular 'Internet-centric problem.'" Appx72 (quoting *DDR Holdings*, 775 F.3d at 1259).

The claims at issue in *DDR Holdings* did not "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet."  773 F.3d at 1257.  Rather, "the claimed

solution" there was "necessarily rooted in computer technology in order to over-

come a problem specifically arising in the realm of computer networks" and "ad-

dress[ed] a business challenge (retaining website visitors)" that was "particular to

the Internet." *Ibid.*  Indeed, this Court has made clear that *DDR Holdings* applies

only where an invention "address[es] problems unique to the Internet." *Intellectu-

al Ventures*, 792 F.3d at 1371; *see also Mortg. Grader, Inc. v. First Choice Loan

Servs.*, No. 2015-1415, — F.3d —, slip op. 16 (Fed. Cir. Jan. 20, 2016).

In solving an Internet-specific problem, the claims in *DDR Holdings*

"over[rode] the routine and conventional sequence of events ordinarily triggered

by the click of a hyperlink."  773 F.3d at 1258.  As the Court explained, "[i]nstead

of the computer network operating in its normal, expected manner by sending the

website visitor to the third-party website that appears to be connected with the

clicked advertisement, the claimed system generates and directs the visitor to [a]

hybrid web page that presents product information from the third-party and visual

'look and feel' elements from the host website." *Id.* at 1258–59.  This modifica-

tion of the way in which websites normally operate was the basis of the Court's

conclusion that the "claims recite an invention that is *not* merely the routine or

conventional use of the Internet." *Id.* at 1259 (emphasis added); *see also Intellec-

tual Ventures*, 792 F.3d at 1371; *OIP*, 788 F.3d at 1363.

The patents-in-suit are not directed to a problem unique to the Internet, as controlling access to multimedia content (and ensuring payment for that content) is a problem that existed long before the emergence of the Internet. Video recorders allowed for easy copying of movies and television programs years before the Internet came into widespread use. *See*, *e.g.*, *Sony Corp. of Am. v. Univ. City Studios, Inc.*, 464 U.S. 417 (1984). Likewise, software piracy has been a problem since the introduction of personal computers. *See*, *e.g.*, *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 261 n.13 (5th Cir. 1988). And unauthorized copying, made possible by Gutenberg's 15th Century printing press or 20th Century Xerox machines, is a problem long pre-dating the computer era.

Indeed, the patents make clear that, while "specific embodiments of the invention" described in the specifications "use communication over the internet and web-based technology," this feature "is not essential," as "the invention may be implemented using any electronic communications network, such as a wide area network, local area network, wireless network, or conventional land line network." Appx180 ('720 Patent, 26:5–10). Accordingly, the asserted patents are not aimed at overcoming a problem arising in computer networks generally or the Internet specifically.

But even if the asserted claims concerned a problem unique to the Internet, they do not "recite a specific manipulation of a general-purpose computer such that

the claims do not rely on a computer network operating in its normal, expected manner." *OIP*, 788 F.3d at 1363 (citation omitted); *see also Intellectual Ventures*, 792 F.3d at 1371; *Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*, No. 2015-1411, — F. App'x —, 2015 WL 9461707, at *5 (Fed. Cir. Dec. 28, 2015). Nothing along the lines of "overrid[ing] the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink" (*DDR Holdings*, 773 F.3d at 1258) is recited by the asserted claims here.

Rather, the asserted claims primarily recite basic computing tasks, such as reading, writing, transmitting, and receiving data. And the claims' remaining limitations do not recite a specific manipulation that overrides a computer's routine and conventional operation, let alone disclose how to implement such a manipulation. Therefore, the asserted claims add nothing inventive to the abstract idea and, accordingly, are ineligible. *See Alice*, 134 S. Ct. at 2354–55, 2358.

b. Neither of the specific limitations that the magistrate judge identified in denying summary judgment can suffice to render patentable the abstract idea of paying for content.

*First*, the magistrate judge emphasized that some of the claims initially asserted by Smartflash recite the use of "distinct memory types," specifically "parameter memory" and "content memory." Appx70–72. But the idea of using a computer to store data was held not to be an "inventive concept" in *Alice*. *See* 134

S. Ct. at 2360. Thus, the use of distinct memory types cannot transform the abstract idea into a patent-eligible invention.

Moreover, on the eve of trial, Smartflash dropped the only claims containing the distinct memory types limitation (Appx9975), and this element therefore cannot support the eligibility of the claims that actually were asserted against Apple and form the basis for the liability judgment. *See*, *e.g.*, *Alice*, 134 S. Ct. at 2355; *Ariosa*, 788 F.3d at 1376 (limiting Section 101 analysis to the "claims at issue" and "examin[ing] the element of [each] claim to determine whether the claim contains an inventive concept").

*Second*, the magistrate judge concluded that the claims were sufficiently inventive because they "address specific ways of managing access to digital content data based on payment validation through storage and retrieval of use status data and use rules" and "evaluating the use data according to the use rules." Appx72. But this cannot be reconciled with the trial testimony of the named inventor, who admitted that he did *not* invent "using payment data in connection with the online sale of content," "payment authorization in connection with the online sale of content," "DRM [digital rights management] in connection with the online sale of content," "use rules in connection with online sales of content," or "access rules in connection with the online sale of content." Appx27437–48. If a patentee concedes that he did not actually invent a concept, that concept surely cannot consti-

tute the "*inventive* concept" that makes a claim patentable. *Alice*, 134 S. Ct. at 2355 (emphasis added).

Even setting aside the named inventor's admissions, the "storage and re-trieval of use status data and use rules" and the evaluation of "use data according to the use rules" (Appx72) are conventional concepts that are as old as commerce and have been applied in various contexts long before the Internet (e.g., a theater or sports arena stamping tickets to control when a patron may be permitted entry and must leave; video stores where fees are based on the duration of rentals). *See*, *e.g.*, *Ultramercial*, 772 F.3d at 715–16; *buySafe*, 765 F.3d at 1355; *Intellectual Ven-tures*, 792 F.3d at 1371. And the claims' vague instruction to apply an unspecified set of rules to perform the commonplace function of determining whether or not access to data is allowed, without disclosing some unique or innovative way to im-plement that instruction, cannot possibly be inventive or transformative. *See Ac-centure Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344–46 (Fed. Cir. 2013) (claim reciting use of "generalized software components" for "generating tasks [based on] rules … to be completed upon the occurrence of an event" was not eligible under Section 101); *SmartGene, Inc. v. Advanced Biologi-cal Labs., SA*, 555 F. App'x 950, 954 (Fed. Cir. 2014) (claim reciting the use of a "computing device" to apply "expert rules for evaluating and selecting" medical treatments was "outside the eligibility standards of section 101").

Moreover, the array of prior art that Apple presented at trial makes evident that others had previously applied this well-established concept to the context of controlling access to digital content. *See*, *e.g.*, Appx11104 ("If the requested use of the content does not comply with the usage conditions, e.g., the number of copies has been exhausted, the End-User Device(s) will not perform the request"); Appx11167 ("rental products are formatted to include a time bomb or other disabling device which will disable the product at the end of the rental period").

Apple asked the district court to reassess its pre-trial Section 101 decision in its post-trial motion for judgment as a matter of law. *See* Appx10260–77. The district court, however, "decline[d] to revise or revisit its Rule 56 Order" because it believed that "[t]he § 101 issue ha[d] already received full and fair treatment." Appx96. The district court thus did not consider the impact of these significant factual developments on its Section 101 ruling, and never considered the correctness of its ruling in light of this Court's clarification of *DDR Holdings* in *OIP* and *Intellectual Ventures* or the PTAB's institution of CBM review.

\* \* \*

The asserted claims purport to monopolize basic economic concepts—i.e., business methods—that are not eligible for patenting under Section 101. The Court should reverse the judgment, hold that the asserted claims are not patent-eligible, and order entry of judgment for Apple.

## II.    The Means-Plus-Function Limitations Render the Asserted Claims Invalid or Not Infringed

The asserted claims do not recite sufficient structure for certain claimed computer operations that require special programming.  Specifically, claims 26 and 32 of the '772 Patent recite a "processor" implementing "code *to evaluate* use status data and use rules *to determine* whether access is permitted."  Appx349–50 ('772 Patent, 30:31–32, 31:40–41) (emphases added).  Similarly, claim 13 of the '720 Patent and claim 32 of the '221 Patent recite a "processor" implementing "code *responsive to* the payment validation data to retrieve data from the data supplier and to write the retrieved data into the data carrier."  Appx180 ('720 Patent, 26:56–58) (emphasis added); Appx315 ('221 Patent, 28:36–38) (same); *see also* Appx349–50 ('772 Patent, 30:19–23, 31:30–34).

Because the general purpose processor recited in the *claims* is not sufficient structure for performing these particular functions, these limitations are governed by Section 112, paragraph 6, and limited to the corresponding structure (if any) disclosed in the *specification*.  35 U.S.C. § 112, ¶ 6; *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (en banc).  The common specification, however, does not disclose a corresponding algorithm for the "evaluate … to determine" operations; accordingly, claims 26 and 32 of the '772 Patent are invalid as indefinite.  And while the specification does disclose a corresponding algorithm for the "responsive" operation in claim 32 of the '221 Patent and claim 13 of the

35

'720 Patent, Apple's accused systems do not implement that algorithm or its equivalent, and so do not infringe.

## A.    The Asserted Claims Are Governed by Section 112, Paragraph 6

The Patent Act provides that "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recitation of structure, material, or acts in support thereof."  35 U.S.C. § 112, ¶ 6. This provision offers a tradeoff:  It "allow[s] patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function," but also "plac[es] specific constraints on how such a limitation is to be construed, namely, by restricting the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof."  *Williamson*, 792 F.3d at 1347.

The absence of the word "means" in the claim text creates a rebuttable presumption that it is not drafted in means-plus-function format.  *Williamson*, 792 F.3d at 1348.  But that presumption can be overcome without any "heightened evidentiary showing" when "the claim term fails to recite *sufficiently* definite structure or else recites function without reciting *sufficient structure for performing that function*."  *Ibid.* (citation omitted) (emphases added); *see also TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259–60 (Fed. Cir. 2008) ("Sufficient structure exists when the claim language specifies the exact structure that performs the func-

tion in question without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure").

Like the "module" in *Williamson*, the general purpose "processor" recited in the asserted claims here is insufficient structure for performing the claimed "evaluate … to determine" and "responsive" functions.  792 F.3d at 1351.  The "evaluate … to determine" and "responsive" limitations "recit[e] a function to be performed rather than ... structure for performing that function" because they do not disclose the specific steps, or algorithms, that the computer would use to carry out these operations.  *Id.* at 1347.  As such, these limitations "set[] forth the same black box recitation of structure for providing [these] specified function[s] as if the term 'means' had been used."  *Id.* at 1350.  For this reason, the PTAB has held that the recital of a generic "processor" or "computer" is insufficient structure for performing most computer operations and thus invokes Section 112, paragraph 6.  *See Ex parte Erol*, No. 2011-001143, 2013 WL 1341107, at *8 (P.T.A.B. Mar. 13, 2013); *Ex parte Lakkala*, No. 2011-001526, 2013 WL 1341108, at *7 (P.T.A.B. Mar. 13, 2013); *Ex parte Smith*, No. 2012-007631, 2013 WL 1341109, at *8 (P.T.A.B. Mar. 14, 2013).

Because computers can be programmed "in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to 'the corresponding structure, material, or acts'

that perform the function." *Aristocrat Techs. Aust. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) (quoting 35 U.S.C § 112, ¶ 6).  As this Court has repeatedly held, the requisite structure for functions that require programming is "not the general purpose computer, but rather the special purpose computer programmed to perform [a] disclosed algorithm." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999); *Aristocrat*, 521 F.3d at 1333; *Media Rights Techs, Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1374 (Fed. Cir. 2015); *Noah Sys., Inc. v. Intuit, Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012).  The requisite algorithm can be expressed "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure," but "[s]imply disclosing software … without providing some detail about the means to accomplish the function[] is not enough." *Noah*, 675 F.3d at 1312 (citation omitted).

To be sure, there is "a narrow exception to the requirement that an algorithm must be disclosed for a general-purpose computer to satisfy the disclosure requirement." *In re Katz Interactive Processing Patent Litig.*, 639 F.3d 1303, 1315–17 (Fed. Cir. 2011).  But that exception applies only in the "rare circumstances" where the patent recites basic computer functions—such as "receiving" and "storing" data—that can be performed by "merely plugging in a general-purpose computer" *without* any specific programming.  *Ergo Licensing, LLC v. CareFusion*

*303, Inc.*, 673 F.3d 1361, 1364–65 (Fed. Cir. 2012); *see also Eon Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 621–23 (Fed. Cir. 2015) (rejecting "broad" reading of *Katz* and explaining that a "microprocessor or general purpose computer lends sufficient structure only to basic functions of a microprocessor").

The *Katz* exception does not apply to the "evaluate … to determine" and "responsive" operations here because an off-the-shelf computer cannot perform these operations simply by being plugged in.  Rather, a processor must be specially programmed with rules and conditions, and an algorithm for evaluating those rules and conditions, if it is to "evaluate use status data and use rules to determine whether access is permitted."   Appx349–50 ('772 Patent, 30:31–32, 31:40–41).  Likewise, an off-the-shelf processor cannot be "responsive to the payment validation data" (Appx180 ['720 Patent, 26:56–58]; Appx315 ['221 Patent, 28:36–38]) without being specially programmed regarding when and in what way to respond.

Even though the claims recite no algorithm for the "evaluate … to determine" and "responsive" operations, the district court nonetheless concluded that Section 112, paragraph 6 did not apply.  This conclusion was premised on a series of legal errors reflecting the "heavy thumb," repudiated by *Williamson*, that tips the "balanced analytical scale."  792 F.3d at 1349.

The court first erred by relying on the "strong presumption" regarding use of the word "means" that was overruled in *Williamson*.  *See* Appx32–33; Appx45, 50.

Apple moved for reconsideration after this Court decided *Williamson*, but the district court held that *Williamson* did "not warrant modification" of its prior decision, because its prior decision "did not turn, explicitly or implicitly, upon [the] characterizations of the presumption." Appx92, 94. Both the magistrate judge and the district court, however, relied *explicitly* on the strength of the pre-*Williamson* presumption. *See* Appx33 ("The presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome"); Appx50 ("Defendants failed to overcome the strong presumption that § 112, ¶ 6 does not apply to the 'processor' claim limitations, none of which include the term 'means'").

The district court also erroneously ruled that the "standard used to prove sufficient structure to avoid means-function treatment is not identical to the standard for identifying corresponding structure to a means-plus-function claim." Appx48. But absent the "strong presumption," both inquiries are the same: Whether sufficient structure for performing the claimed functions is disclosed, either in the claim or in the specification. *Compare Williamson*, 792 F.3d at 1349 ("§ 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function") (citation omitted), *with Noah*, 675 F.3d at 1313 (for corresponding structure, "the question is whether the disclosed algorithm [in

the specification], from the viewpoint of a person of ordinary skill, is sufficient to define the structure and make the bounds of the claim understandable").

The district court's view that different standards apply to the two prongs of the Section 112, paragraph 6 inquiry is a vestige of the now-defunct "strong presumption" against construing claims lacking the word "means" as functional claims. *See Williamson*, 792 F.3d at 1349. By attaching undue significance to the absence of the word "means," the district court overlooked that generic computer components lend insufficient structure to special programming operations unless an algorithm is disclosed. The district court missed the key point: The patent must *somewhere* disclose sufficient structure for performing the claimed functions, and the claim must be limited to that structure, or else it is indefinite. *See* 35 U.S.C. § 112, ¶ 2 (requiring applicants to "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention").

The district court further concluded that Section 112, paragraph 6 does not apply because it viewed the terms "processor" and "code" as "refer[ring] to a particular type of structure." Appx89–90. But while such terms *can* in limited circumstances amount to sufficient structure—i.e., when used in relation to basic computer functions (*see Katz*, 639 F.3d at 1315–17)—they are *not* sufficient structure when used in relation to "specialized functions." *Williamson*, 792 F.3d at 1352 (for functions that require a special purpose computer, "an algorithm for per-

41

forming the claimed function" is required). The district court thus erred as a matter of law in holding that claims are not functional if they simply recite elements that can *sometimes* be structural, without regard to the actual claimed functions. *See id.* at 1349 ("overrul[ing] the strict requirement of a showing that the limitation essentially is devoid of anything that can be construed as structure") (citation omitted).

In short, a claim does not fall outside the scope of Section 112, paragraph 6 simply because it recites words—like "processor" and "code"—that could *potentially* constitute sufficient structure for *some* functions. Rather, what matters is whether the claim *actually* "recite[s] sufficiently definite structure" to perform the *claimed* functions. *Williamson*, 792 F.3d at 1349 (citation omitted).

The district court's approach, under which merely reciting "processor" and "code" always constitutes sufficient structure no matter what the claimed computer operations are, cannot be reconciled with the Patent Act's limited allowance of means-plus-function claiming. The algorithm requirement helps ensure that the patent is "precise enough to afford clear notice of what is claimed." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014); *see also Noah*, 675 F.3d at 1318 ("Requiring the disclosure of a corresponding structure … confines the breadth of protection otherwise permitted by purely functional claiming") (citation omitted). The district court's approach, on the other hand, would allow patentees to broadly claim computer operations without explication, and thus preclude others

from inventing and using new and better means of accomplishing those same operations.

### B.    Application of Section 112, Paragraph 6 Requires Reversal

The specification in the asserted patents is an empty cupboard with respect to the "evaluate … to determine" operations of claims 26 and 32 of the '772 Patent.  Because there is no corresponding algorithm to give sufficient structure to these claims, they are invalid as indefinite.  And although the specification does provide a corresponding algorithm for the "responsive" operation, Apple's accused systems do not infringe claim 32 of the '221 Patent and claim 13 of the '720 Patent when those claims are limited to that algorithm and its equivalents, as Section 112, paragraph 6 requires.

### 1.    The '772 Claims Are Invalid as Indefinite Because No Corresponding Structure Is Disclosed

Patents claiming computer functions that go beyond the "basic functions of a microprocessor" must disclose an algorithm for performing the claimed functions. *EON*, 785 F.3d at 623.  The algorithm may be expressed in any understandable terms including "as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Media Rights*, 800 F.3d at 1374. And "a means-plus-function claim for which the only disclosed structure is a general purpose computer is invalid if the specification fails to disclose an algorithm

for performing the claimed function." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008).

The specification of the '772 Patent does not disclose, in any of these ways, an algorithm corresponding to the "evaluate … and determine" operations, and the asserted claims of the '772 Patent are therefore invalid as indefinite. *See Noah*, 675 F.3d at 1319 ("Computer-implemented means-plus-function claims are indefinite unless the specification discloses an algorithm to perform the function associated with the limitation"). In fact, the specification mentions that term only once, noting that an aspect of the invention provides a "data access device" that includes "code to evaluate the use status data using the use rules data to determine whether access is permitted to the stored code." Appx339 ('772 Patent, 9:12, 22–24). This "type of purely functional language, which simply restates the function associated with the means-plus-function limitation, is insufficient to provide the required corresponding structure." *Noah*, 675 F.3d at 1317; *see also Aristocrat*, 521 F.3d at 1334 (insufficient structure where the language "describes an outcome, not a means for achieving that outcome").

Nothing in the specification explains how the processor "evaluate[s] use status data and use rules to determine whether access is permitted." Therefore, the specification of the '772 Patent does not provide "sufficient structure to the means-plus-function terms at issue" (*EON*, 785 F.3d at 624; *see also Williamson*, 792 F.3d

at 1352; *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009)), and claims 26 and 32 are invalid as indefinite.

### 2.  The Accused Devices Do Not Infringe the Algorithm Corresponding to the '221 and '720 Claims

Although the specification discloses an algorithm that corresponds to the "responsive" operation (*see* Appx164, 169, 178 ['720 Patent, Fig. 12c (S55–S57); 3:4–12; 21:41–22:9]), the district court refused to limit claim 32 of the '221 Patent and claim 13 of the '720 Patent to that algorithm and its equivalents. *See* Appx32–35. This was erroneous because the statute "plac[es] specific constraints on how [a means-plus-function] limitation is to be construed, namely, by 'restricting the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof.'" *Williamson*, 792 F.3d at 1339 (quoting 35 U.S.C. § 112, ¶ 6).

With the claims limited to the disclosed algorithm and its equivalents, Apple is entitled to judgment of non-infringement. The disclosed algorithm requires that the content access terminal forward "payment record data received from e-payment system" to the "scheme owner." Appx164 ('720 Patent, Fig. 12C). But there is no dispute that the accused Apple devices do not forward a message back to Apple's servers after receiving the download response. *See* Appx27533–42 (Smartflash's expert explaining his view on how Apple's systems operate). Further, the algorithm in the specification provides that the content access terminal itself "authenti-

cates a payment" (Appx178 ['720 Patent, 21:37–39]), but Apple's devices do not perform such payment authentication on the device itself (Appx27534 (Smart-flash's expert identifying MZ Buy, a remote system, as Apple's "payment valida-tion system")).  The accused functionalities therefore do not infringe these claims as limited to the disclosed structure.

<div align="center">* * *</div>

The asserted claims recite means-plus-function limitations subject to Section 112, paragraph 6.  The district court erred as a matter of law in holding that this provision did not apply, and that error warrants reversal and entry of judgment for Apple because claims 26 and 32 of the '772 Patent are invalid as indefinite and Apple does not infringe claim 32 of the '221 Patent or claim 13 of the '720 Patent. At minimum, the Court should order a new trial on infringement.

## III. The Accused Devices Do Not Infringe the Asserted Claims Properly Construed

Each of the four asserted claims requires the transmission of "payment data" for validation by a "payment validation system," which then may return "payment validation data."  The district court misconstrued these "payment" terms.  Correc-tion of this error requires reversal or, at minimum, a new trial on infringement.

### A. The District Court Erred in Construing the "Payment" Terms

The district court erroneously construed "payment data" so broadly as to in-clude data that merely identifies a user or a user's device, even though the specifi-

cation distinguishes between "payment data" and "identification data." The court's constructions also ignored that payment authorization is a required aspect of the claimed "payment validation system." These erroneous constructions led to a finding of infringement even though Apple's accused products do not transmit data that actually effectuates payment when a user selects and receives content, and Apple's systems do not validate and authorize payment before allowing the user to receive that selected content. These constructions cannot be reconciled with the intrinsic evidence and should be reversed. *See*, *e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc).

### 1.    "Payment Data"

The district court construed "payment data" as "data that can be used to make a payment." Appx11. But this construction was erroneous because it swept in as "payment data" different types of data relating to a purchase, such as consumer identification information, even though the patents distinguish such other data from the more limited subset of "payment data."

Both the claims and the specification of the asserted patents consistently distinguish between "payment data" and "identification data," such as "access control data" and "user identity data." Indeed, in explicating that distinction, the specification describes "payment data" as *linked to* or *included with* "identification data," but not as *comprising* that data. *See*, *e.g.*, Appx168 ('720 Patent, 1:66–2:2)

("Binding the data access and payment together allows the legitimate owners of the data to make the data available themselves over the internet without fear of loss of revenue"); Appx174 ('720 Patent, 13:46–63) ("payment data" may still be transmitted and validated by a payment validation system, but "payer identification is not essential"). The district court acknowledged the patents' separate treatment of "payment data" and "identification data." Appx9–10 ("the Summary of the Invention discusses 'payment data' and 'identification data' in relation to one another"). Yet despite the specification's distinction between "payment data" and "identification data," the district court refused to exclude "access control data" and "user identity data" from "payment data." *See* Appx9–11. This was error.

Apple's proposed construction included the critical guidance from the specification that "payment data" is data "representing either actual payment made or record of payment made for requested content." Appx170 ('720 Patent, 6:58–63) (payment data is "data relating to an *actual* payment made to the data supplier or it may be a record of a payment made to an e-payment system relating either to a payment to the data supplier, or to a payment to a third party") (emphasis added). Claim 32 of the '221 patent similarly confirms that the "payment data" is associated with an "amount of payment," requiring that access to the purchased content be dependent upon the "amount of payment associated with the payment data forwarded to the payment validation system." Appx315 ('221 Patent, 28:23–50).

48

The district court observed that the "specification discloses using payment data to 'make a payment' through an e-payment system or through the 'system owner's data supply computer,'" and thus concluded that "'payment data' can do more than just represent payments." Appx9. But Apple's construction of "payment data" covers data that either represents actual payment *or* a record of payment, and therefore it *includes* data that can be used to "make a payment." Thus, limiting "payment data" to data that effectuates payment or a record of payment made is entirely consistent with the specification. By contrast, the district court's construction improperly sweeps within this term's scope categories of data that the intrinsic evidence specifically distinguishes from "payment data," such as "access control data" and "user identity data." (Indeed, as explained below, this is how Smartflash proceeded to prove infringement at trial.) This additional, distinguished data may be used as part of the purchase *process*, but is not what effectuates an *actual payment*.

The district court's construction of "payment data" should be reversed and this claim term should be construed—as Apple proposed below—to mean "data, distinct from access control data and user identity data, representing either actual payment made or record of payment made for requested content." Appx8. This construction is consistent with every aspect of the claims and specification.

### 2. "Payment Validation System" / "Payment Validation Data"

The district court construed "payment validation system" as a "system that returns payment validation data based on an attempt to validate payment data," and construed "payment validation data" to have "its plain meaning." Appx14–15. These constructions are erroneous because they do not give effect to the patents' teaching that validation means a process in which payment is *authorized* for requested content data.

The district court determined that "'authorizing' is distinct from 'validating'" because of embodiments where, for example, "a purchase [could be made] on credit, with actual payment to occur at a later time." Appx13. The court further concluded that "payment validation data" should be accorded its plain meaning because it is "merely data received from a payment validation system and relates to whether a payment has been validated." Appx14–15.

The intrinsic evidence, however, shows that the "validation" process referenced by these terms includes an authorization process, whether directly or through a third-party system. Uniformly throughout the specification, such authorization process must occur before—and as part of the process for—any return of "payment validation data" by a "payment validation system."

Indeed, the specification's *only* passage explicitly describing the function of the "payment validation system" states that "authorizing the payment" is part of

that function:  "The terminal reads payment data from the data carrier and transmits this to a payment validation system for *validating the data and authorizing the payment*."  Appx171 ('720 Patent, 8:21–25) (emphasis added).  Similarly, the specification explains that for a terminal that "can directly validate payment," "in the case of a smart card charged with electronic cash it can deduct a cash value from the card … [or] communicate with a bank or other financial services provider to control payment."  Appx169 ('720 Patent, 3:41–44).  The specification elsewhere describes transmitting data to a "payment validation authority" to "check and authorize the user's or payer's payment."  Appx173 ('720 Patent, 11:66–12:9).  The purported invention uniformly requires a payment validation system to conduct an authorization of the payment, either itself or indirectly through a third party.

The patents are focused on "[b]inding the data access and payment together" so as to "allow[] the legitimate owners of the data to make the data available themselves over the internet without fear of loss of revenue, thus undermining the position of data pirates."  Appx168 ('720 Patent, 1:66–2:3).  Construing the "payment validation system" and "payment validation data" to exclude an authorization aspect, as the district court did below, improperly obviates this purpose in a manner not contemplated by the intrinsic evidence.  *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1382 (Fed. Cir. 2006); *Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 25 (Fed. Cir. 2000).

The Court should reverse the district court's constructions and hold that "payment validation system" means a "system to validate payment data and authorize payment," and "payment validation data" means "data received from payment validation system representing that payment was authorized for requested content data." Appx1831–36. These constructions, which Apple proposed below, are consistent with the claims and intrinsic evidence.

### B.    Correcting the Erroneous Constructions Requires Reversal

Under a proper construction of each of the "payment" terms, the accused devices do not infringe. "Where the parties do not dispute any relevant facts regarding the accused product," as is true here, "the question of literal infringement collapses into claim construction and is amenable to summary judgment." *Gen. Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997).

The operation of Apple's accused system is undisputed. As Smartflash's expert agreed, when a user chooses to select a content item for download (whether for free or for a price) on an accused Apple product, the user's product sends a "buy product" request to Apple's servers. *See* Appx27533–34, 27560–62; Appx28223–26. The "buy product" request includes data identifying the selected content as well as three data components—the "DSID," "GUID," and "MID"—identifying the "Apple ID" account and Apple product of the user making the selection. *See* Appx27533–34, 27560–62; Appx28223–26. Smartflash maintained

(and the district court agreed) that these data types constituted "payment data" under the overly broad construction of this term, but they are not "payment data" under that term if properly construed. Thus, the infringement verdict turns on the propriety of this construction.

As Smartflash's expert admitted upon cross-examination, these data components cannot be used to pay for anything. Appx27560–63. Although Smartflash and its expert pointed to the DSID, GUID, and MID as meeting the "payment data" limitation (*see* Appx27560), these three data types are only access control and user identity data: The DSID identifies the user account for the user making the purchase in question, the GUID identifies the device being used by the user to make the purchase in question, and the MID links the DSID and GUID together for security purposes. *See* Appx27533–34, 27560–62; Appx28223–26. Indeed, these identifiers are used even when no payment is made, such as when the content being "purchased" is free (Appx27563–64). And Apple is not paid at the time that it receives such DSID, GUID, and/or MID information in a buy request (Appx27651). Moreover, the DSID, GUID, and MID cannot be used to effectuate payment within the iTunes ecosystem, nor can they be used to effectuate the transfer of payment by themselves or by being presented to a credit card company in order to effectuate payment. *See* Appx27560–63. Instead, Apple receives payment in a separate

transaction from the user's selection and download of content.   Appx27565; Appx28087–89.

Moreover, if Apple's accused products do not transmit "payment data," they cannot infringe the "payment validation system" and "payment validation data" limitations, whether under the district court's erroneous constructions or the proper constructions.  Each of the asserted claims requires that the "payment data" be sent to the "payment validation system," which returns "payment validation data," or "data representing that payment was authorized for requested content data."

Smartflash's expert identified Apple's "MZ Buy" system as the "payment validation system" because it checks the incoming DSID, GUID, and MID, and testified that the message sent after processing by the MZ Buy system is the "payment validation data."  Appx27534–35, 27544; Appx28230.  But the MZ Buy system merely authenticates the DSID, GUID, and MID; the MZ Buy system does *not* validate or authorize payment, nor confirm payment.  Appx28230–31; Appx27534, 27544.   Indeed, the MZ Buy system transmits the credentials for downloading "purchased" content often days *before* the user's session for that transaction closes and payment is made, if it is made at all.  Appx28234–35; Appx27952–56.

To the extent Apple performs any payment validation and authorization process for a user's purchase of content, such validation and authorization occurs in an independent transaction that takes place *after* the user receives the message con-

taining the URL and download key for the selected content.  In other words, validation and authorization are not tied to a single content purchase, nor to the "payment data" that is eventually used to pay for that content.  Similarly, the "price paid" for a content item at the time of selection cannot, in Apple's system, reflect actual payment because the user can download the purchased item before Apple charges the user's payment mechanism (such as a credit card) when the user's buy session ultimately closes (potentially days after having selected and downloaded the "purchased" content).  Apple's MZ Buy system and the responsive message it sends, containing a URL and download key, thus cannot meet the claimed "payment validation system" and "payment validation data" limitations under a proper construction.

* * *

The district court's constructions of the critical "payment" terms in the asserted claims contradict the intrinsic record and should be reversed.  The Court should order entry of judgment of non-infringement for Apple, or at minimum a new trial on infringement under a proper construction of those terms.

## IV.    The District Court Committed Reversible Error in Refusing to Give an *i4i* Instruction

The district court erred in refusing to instruct the jury that, in deciding whether the asserted claims were invalid as obvious, it could give greater weight to prior art that the PTO did not consider during prosecution.  Apple's requested in-

struction, which the Supreme Court in *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011), held "most often should be given" upon request (*id.* at 2251), was both legally correct and factually supported, and addressed an important issue on which the jury was not otherwise instructed.  Indeed, Smartflash below conceded such an instruction "may be necessary."  Appx28760.  The court's error in refusing to give an *i4i* instruction was prejudicial and requires a new trial on obviousness to the extent Apple is not entitled to judgment as a matter of law on any asserted claim.

An invalidity defense asserted under 35 U.S.C. § 282 typically must "be prove[n] by clear and convincing evidence" due to the "presumption of validity of patents" and "the basic proposition that a government agency such as the [PTO] was presumed to do its job." *i4i*, 131 S. Ct. at 2242–43, 2246.  Although the Supreme Court in *i4i* rejected the argument that a lower burden of proof should apply where the PTO did not review certain prior art during prosecution, the Court nevertheless recognized that "if the PTO did not have all material facts before it," its "considered judgment may lose significant force," and thus the "challenger's burden to persuade the jury of its invalidity defense by clear and convincing evidence may be easier to sustain." *Id.* at 2249–51.  Evidence never considered by the PTO therefore "may 'carry more weight' in an infringement action than evidence previously considered by the PTO." *Ibid.*  Accordingly, the Supreme Court expressly

held that "a jury instruction on the effect of" invalidity evidence that the PTO never considered "can, and when requested, most often should be given." *Id.* at 2251.

At trial, Apple presented as evidence a number of prior art references that were not considered by the PTO during prosecution. *See*, *e.g.*, Appx28255 (Gruse/IBM); Appx28269 (Stefik/Xerox); Appx28302 (Ginter/Intertrust); Appx28304 (Ansell/Liquid Audio). These references all employed similar methods as the patents-in-suit to facilitate the payment for data or other content, and Apple's expert opined that the asserted claims would have been obvious in light of these prior art references, in various combinations. Appx28314–19. The references not considered by the PTO constituted substantial evidence of obviousness, and thus a jury properly instructed under *i4i* could have found that the asserted claims were invalid as obvious.

Smartflash, however, repeatedly stressed during trial that the PTO rigorously "scrutinize[s]" a patent application before granting a patent. *See*, *e.g.*, Appx27356. Smartflash emphasized that PTO examiners "were charged with examining Smartflash's applications and determining whether … they thought the inventions claimed in the patent applications were new, novel, and unique." Appx27311. And Smartflash specifically pointed out that the examiners are "trained to look at the prior art" and "determine whether or not there can be a combination of references to render claims invalid because they're obvious." Appx27924.

Because the examiners who reviewed the asserted claims never considered the significant prior art that Apple presented at trial, Apple asked the district court to instruct the jury that it could afford greater weight to evidence not considered by the PTO in determining obviousness. Appx9001. Apple pointed out that an *i4i* instruction was required under the circumstances here and Smartflash *conceded* that the instruction "may be necessary" and, indeed, included a similar *i4i* instruction in its own set of proposed jury instructions. Appx9000; Appx28760. Nevertheless, the district court refused to give either party's *i4i* instruction. *See* Appx28760. The jury returned a verdict of non-obviousness. Appx10195.

In denying Apple's new trial motion, the district court stated that "neither party presented 'evidence previously considered by the PTO' or explained how the prior art that was presented was or was not cumulative to the evidence evaluated by the PTO." Appx112. But the district court thereby answered the wrong question. The relevant question was whether the jury had been presented with prior art that the PTO did *not* consider (as this jury undisputedly was), because under *i4i* a jury can permissibly conclude based on such evidence that "the PTO did not have all material facts before it" and thus give less "force" to the PTO's "considered judgment." 131 S. Ct. at 2251. Without an *i4i* instruction, this jury had no way to know the weight it could properly place on evidence that was *not* before the PTO.

The district court's failure to give an *i4i* instruction constituted reversible error here because it frustrated the jury's ability to "fully underst[and] the legal issues" and properly assess the compelling prior art presented at trial. *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1570 (Fed. Cir. 1992); *see also, e.g.*, *United States v. McClatchy*, 249 F.3d 348, 356 (5th Cir. 2001) (failure to give instruction constitutes reversible error where it "(1) was a substantially correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense"). The court's refusal to instruct the jury on an important aspect of the law pertaining to Apple's invalidity case prejudiced Apple because a properly instructed jury could (and likely would) have reached a contrary conclusion on obviousness. The verdict rendered by this improperly instructed jury cannot stand.

\* \* \*

To the extent Apple is not otherwise entitled to judgment as a matter of law, the Court should vacate the judgment of non-obviousness and order that the jury in the new trial should be instructed that it can afford greater weight to prior art evidence never considered by the PTO.

# CONCLUSION

The Court should dismiss this appeal for lack of jurisdiction.  If the Court reaches the merits of the liability judgment, the Court should:

I.  Section 101:  Reverse and order entry of judgment of ineligibility (all asserted claims);

II.  Section 112, paragraph 6:  Vacate and order entry of judgment of invalidity (claims 26 and 32 of the '772 Patent) and judgment of non-infringement (claim 32 of the '221 Patent and claim 13 of the '720 Patent), or in the alternative a new trial on infringement;

III.  Construction of the "payment" terms:  Vacate and order entry of judgment of non-infringement (all asserted claims) or in the alternative a new trial on infringement; and/or

IV.  *i4i* instruction:  Order a new trial on obviousness as to any of the asserted claims on which Apple is not otherwise entitled to judgment.

Dated:  January 22, 2016                Respectfully submitted.

By:  ___/s/ Mark A. Perry_____
Mark A. Perry

James R. Batchelder
ROPES & GRAY LLP
1900 University Avenue, 6th Floor
East Palo Alto, California  94303
(650) 617-4000

Ching-Lee Fukuda
Kevin J. Post
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York  10036
(212) 596-9000

Douglas H. Hallward-Driemeier
ROPES & GRAY LLP
700 12th Street NW Suite 900
Washington, D.C.  20005
(202) 508-4600

Mark A. Perry
  *Principal Attorney*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
MPerry@gibsondunn.com

Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California  90071
(213) 229-7000

*Counsel for Defendant-Appellant Apple Inc.*

# ADDENDUM

# TABLE OF CONTENTS

Report and Recommendation re: Claim Construction / Application of 35 U.S.C. § 112, ¶ 6 (Sept. 24, 2014) (Dkt. 229) ...........................................Appx1

Order Adopting Report and Recommendation re: Claim Construction / Application of 35 U.S.C. § 112, ¶ 6 (Dec. 4, 2014) (Dkt. 351).....................Appx43

Report and Recommendation re: Eligibility Under 35 U.S.C. § 101 (Jan. 21, 2015) (Dkt. 423) ................................................................Appx53

Order Adopting Report and Recommendation re: Eligibility Under 35 U.S.C. § 101 (Feb. 13, 2015) (Dkt. 484) ........................................Appx74

Order Granting Apple's Motion for Judgment of No Willful Infringement (July 2, 2015) (Dkt. 580)...........................................Appx76

Order Granting Apple's Motion for a New Trial on Damages (July 7, 2015) (Dkt. 581)..................................................................Appx78

Opinion and Order Denying Apple's Motion for Reconsideration of 35 U.S.C. § 112, ¶ 6 Rulings (July 7, 2015) (Dkt. 582) .......................Appx85

Order Denying Apple's Motion for Judgment re: Eligibility Under 35 U.S.C. § 101 (July 8, 2015) (Dkt. 585)............................................Appx95

Opinion and Order Denying Apple's Omnibus Motion for Judgment and/or Motion for New Trial (Sept. 2, 2015) (Dkt. 605)................................Appx97

Judgment (Sept. 2, 2015) (Dkt. 606) ..........................................................Appx115

Order Granting Smartflash's Request for Bifurcation of Liability from Damages (Sept. 2, 2015) (Dkt. 608) .............................................Appx132

Order Granting Stay Pending Appeal (Sept. 17, 2015) (Dkt. 617) ..............Appx147

U.S. Patent No. 7,334,720 (Feb. 26, 2008)..................................................Appx149

U.S. Patent No. 8,118,221 (Feb. 21, 2012)..................................................Appx283

U.S. Patent No. 8,336,772 (Dec. 25, 2012) .................................................Appx316

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **SMARTFLASH LLC,** *et al.,* | § | |
| | § | |
| **Plaintiffs,** | § | CIVIL ACTION NO. 6:13cv447 |
| | § | |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **APPLE INC.,** *et al.,* | § | |
| | § | |
| **Defendants.** | § | |
| | | |
| | § | |
| **SMARTFLASH LLC,** *et al.,* | § | |
| | § | |
| **Plaintiffs,** | § | CIVIL ACTION NO. 6:13cv448 |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **SAMSUNG ELECTRONICS CO., LTD.** | § | |
| *et al.,* | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## REPORT AND RECOMMENDATION

This Memorandum Opinion construes the disputed claim terms in United States Patent Numbers: (1) 7,334,720; (2) 7,942,317; (3) 8,033,458; (4) 8,061,598; (5) 8,118,221; and (6) 8,336,772. Also before the Court are Defendants Apple, Inc., Robot Entertainment, Inc., KingIsle Entertainment, Inc., Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC, HTC Corporation, HTC America, Inc., Exedea, Inc. and Game Circus LLC's (collectively "Defendants") Motions for Summary Judgment of Indefiniteness (6:13-cv-447 Doc. No. 161 & 6:13-cv-448 Doc. No. 177) ("Motions for Summary Judgment"). On July 17, 2014, the parties presented arguments on the disputed claim terms and the Motions for Summary Judgment at the *Markman* hearing. For the reasons discussed below,

1

**Appx1**

the Court resolves the claim term disputes as stated below and recommends that Defendants' Motions for Summary Judgment of Indefiniteness be **DENIED**.

## BACKGROUND

On May 29, 2013, Plaintiffs Smartflash LLC and Smartflash Technologies Limited (collectively "Smartflash") filed two separate actions, one against Defendants Apple, Inc., Robot Entertainment, Inc., KingIsle Entertainment, Inc., and Game Circus LLC (6:13-cv-447), and one against Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC, HTC Corporation, HTC America, Inc., Exedea, Inc. and Game Circus LLC (6:13-cv-448). Smartflash alleges Defendants infringe the following patents: U.S. Patent No. 7,334,720; U.S. Patent No. 7,942,317; U.S. Patent No. 8,033,458; U.S. Patent No. 8,061,598; U.S. Patent No. 8,118,221; and U.S. Patent No. 8,336,772. All patents are titled "Data Storage and Access Systems." The patents-in-suit all stem from a common specification and share a common written description and figures. In the interest of simplicity, the '720 Patent is cited unless otherwise specified.

## APPLICABLE LAW

### *Claim Construction*

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The Court examines a patent's intrinsic evidence to define the patented invention's scope. *Id.* at 1313–1314; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). Intrinsic evidence includes the claims, the rest of the specification and the prosecution history. *Phillips*, 415 F.3d at 1312–13; *Bell Atl.*

*Network Servs.*, 262 F.3d at 1267. The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms. *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.* Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). In the specification, a patentee may define his own terms, give a claim term a different meaning that it would otherwise possess, or disclaim or disavow some claim scope. *Phillips*, 415 F.3d at 1316. Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001). This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of

3

**Appx3**

the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct." *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent. *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent"). The well-established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002); *see also Springs Window*, 323 F.3d at 994 ("The disclaimer . . . must be effected with 'reasonable clarity and deliberateness.'") (citations omitted)). "Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover." *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378–79 (Fed. Cir. 1988) (quotation omitted). "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice

function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g, Inc.*, 334 F.3d at 1324.

Although, "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted). Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent. *Id.* at 1318. Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The patent in suit may contain means-plus-function limitations that require construction. Where a claim limitation is expressed in means-plus-function language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112 ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, § 112 mandates that "such a claim limitation be construed to cover the corresponding structure . . . described in the specification and equivalents thereof." *Id.* (citing 35 U.S.C. § 112 ¶ 6.). Accordingly, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

Construing a means-plus-function limitation involves two inquiries. The first step requires "a determination of the function of the means-plus-function limitation." *Medtronic, Inc.*

5

*v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Medtronic*, 248 F.3d at 1311. A structure is corresponding "only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id*. Moreover, the focus of the corresponding structure inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id*.

### Summary Judgment

"Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Nike, Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994); FED. R. CIV. P. 56(c). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the nonmoving party must then set forth "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(c), *see also T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking to invalidate a patent must overcome a presumption that the patent is valid. *See* 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2243 (2011); *United States Gypsum Co. v. National Gypsum Co.*, 74 F.3d 1209, 1212 (Fed. Cir. 1996). This presumption places the burden on the challenging party to prove the patent's invalidity by clear and convincing evidence. *Microsoft*, 131 S. Ct. at 2243; *United States Gypsum Co.*, 74 F.3d at

1212. Close questions of indefiniteness "are properly resolved in favor of the patentee." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1348 (Fed. Cir. 2005); *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1380 (Fed. Cir. 2001).

Claims must particularly point out and distinctly claim the invention. "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 ¶ 2. The primary purpose of the requirement of definiteness is to provide notice to those skilled in the art of what will constitute infringement. *See United Carbon Co. v. Binney Co.*, 317 U.S. 228, 236 (1942). The definiteness standard is one of reasonableness under the circumstances, requiring that, in light of the teachings of the prior art and the invention at issue, the claims apprise those skilled in the art of the scope of the invention with a reasonable degree of precision and particularity. *See Shatterproof Glass Corp. v. LibbeyOwens Corp.*, 758 F.2d 613, 624 (Fed. Cir. 1985). To rule "on a claim of patent indefiniteness, a court must determine whether one skilled in the art would understand what is claimed when the claim is read in light of the specification." *Bancorp. Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1372 (Fed. Cir. 2004). "A determination of indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims, [and] therefore, like claim construction, is a question of law." *Amtel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999).

## I. Claim Construction

### A. Agreed Terms

The parties have agreed to the construction of one term. Doc. No. 180 at 6.

| Claim Terms | Agreed Claim Construction |
|---|---|
| Supplementary data | Advertising data, customer reward management data, and/or hot links to web sites |

7

In view of the parties' agreements on the proper construction of this term, the Court **ADOPTS AND APPROVES** this construction.

### B. Disputed Terms

### 1. "payment data"

| Smartflash's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Data that can be used to make payment for content" | "data, distinct from access control data and user identity data, representing either actual payment made or record of payment made for requested content data" |

The parties dispute two key issues: (1) whether "payment data" makes payments or represents payments; and (2) whether "payment data" is distinct from other forms of data.

Smartflash proposes that "payment data" is merely any data that can be used to pay for content. Smartflash argues that the patents-in-suit make it clear that the purpose of "payment data" is to make payments, not to represent a payment that has been made. Opening Brief at 5. Smartflash relies on Figure 12c, which diagrams a process beginning with "payment data for making a payment." *Id.* at 5 (citing '720 21:15–21:16). Smartflash argues that Defendants' construction is inappropriate because it would make certain claims nonsensical. *Id.* For example, Claim 30 of the '772 patent requires a device to transmit payment data for an item in response to a user selection for the item. '772 at 31:19–26. According to Smartflash, Defendants' construction would mean this claim requires a user to pay for an item before even selecting it. Opening Brief at 5. Smartflash also contends that "access control data" or "user identity data" may act as payment data if either is used to pay for content. *Id.* at 6.

Defendants contend that "payment data" can only be one of two things: (1) data representing an actual payment; or (2) data recording such payment. Apple Resp. at 2–3. In support, Defendants point to specification language stating, "payment data received may either

8

be data relating to an actual payment made to the data supplier or it may be a record of a payment made . . . ." *Id..* at 2 (citing '720 Patent at 6:58–63). Defendants argue that their proposal is not nonsensical because it is not limited to prior payments. *Id.* at 3. According to Defendants, their construction only requires that "payment data" reflect actual payment, whether past or present. *Id.* Thus the claim language would not be nonsensical because payment would only be made after a user selects the content. *Id.* Additionally Defendants argue that "[t]he specification consistently describes 'payment data' as being distinct from access control data and user identity data." Samsung Resp. at 3–4 (citing '720 Patent at 4:31–33 & 17:62–18:5). According to Defendants, "access control data" and "user identity data" are independent of "payment data" and thus, may be used to access payment data, which is the only type of data the patents ever describe as being "used to pay for content." Samsung Resp. at 4–5 (citing '720 Patent at 5:30–33 & 14:57–61).

The specification discloses using payment data to "make a payment" through an e-payment system or through the "system owner's data supply computer." '720 Patent at 20:8–10 & 21:15–26 ("[P]ayment data for making a payment to the system owner is received . . . and forwarded to an e-payment system . . . . Payment record data, validating payment by the card to the system owner, is then received back from the e-payment system . . . ."). This disclosure shows that "payment data" can do more than just represent payments as Defendants contend.

Defendants' proposal also seeks to import a negative limitation into the construction of "payment data" that would exclude "user identity data" and "access control data." As Defendants note, the Summary of the Invention discusses "payment data" and "identification data" in relation to one another. '720 Patent at 4:31–33 ("The payment data will normally be linked to a card or card holder identification data for payment by the card holder."). Statements that describe

the invention as a whole, rather than preferred embodiments, are more likely to support a limiting definition of a claim term. *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004). This type of statement is more likely to be found in certain sections of the specification, such as the Summary of the Invention. *Id.*

Turning to the claims of the patent, Claim 30 of the '772 patent is representative and states:

> 30. A data access terminal for controlling access to one or more content data items stored on a data carrier, the data access terminal comprising:
>     a user interface;
>     a data carrier interface;
>     a program store storing code implementable by a processor; and
>     a processor coupled to the user interface, to the data carrier interface and to the program store for implementing the stored code, the code comprising:
>       . . .
>         code responsive to said first user selection of said selected at least one content data item to transmit *payment data* relating to payment for said selected at least one content item for validation by a payment validation system;
>         code to receive payment validation data defining if said payment validation system has validated payment for said selected at least one content data item;
>       . . . .

'772 Patent at 30:65–31:7 & 31:22–29 (emphasis added). Claim 30 does not refer to user identification data, nor does it preclude "payment data" from being user identification data.

In support of their argument, Defendants cite to Claim 12 of the '598 Patent, which does recite both "payment data" and "identification data":

> 12. a portable data carrier as claimed in claim 10, wherein the code to provide payment to the payment validation system comprises code to provide the *payment data* and/or *identification data* to the network operator.

The recitation of both "payment data" and "identification data" in the same claim suggests that these terms do refer to different, distinct data. *See Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements

**Appx10**

separately, the clear implication of the claim language is that those elements are distinct components of the patented invention.") (citations and internal quotation marks omitted). However, Claim 12 of the '598 Patent also suggests that identification data itself may be used for payment. This reading is consistent with the claims from which Claim 12 depends, such as Claim 8. Claim 8 recites:

> 8. A portable data carrier as claimed in Claim 7, wherein code to provide payment to the payment validation system comprises code to provide the identification data identifying the user of the portable data carrier to the payment validation system."

'598 Patent at 26:29–33.

Given this claim language, Defendants' proposed negative limitation is not warranted. Similarly, Defendants' proposal that "payment data" can only represent "actual payment made or record of payment made" is too narrow. The specification and cited claim language uses payment data broadly to refer to whatever data is being used "for making a payment." '720 Patent at 21:15; '598 Patent at Cl. 8. Accordingly, **"payment data"** is construed to mean **"data that can be used to make a payment for content."**

### 2. "payment validation system"

| Smartflash's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>Alternatively:<br>"system that returns payment validation data in response to valid payment data" | "system to validate payment data and authorize payment" |

The parties agree that the "payment validation system" is a system that validates payment data. The parties dispute whether "payment validation system" should have the additional limitation that it authorizes payment.

11

**Appx11**

Smartflash argues that the claim language is clear and that no construction is necessary. Opening Brief at 7. Smartflash contends that Defendants' proposal would exclude certain embodiments. *Id.* at 7–8. According to Smartflash, Defendants' construction relies on certain embodiments in the specification where a user device transfers payment data to a data supplier that relies on a third party payment authority to process and authorize the payment. *Id.* at 8 (citing '720 Patent at 11:66–12:4). Smartflash argues that other portions of the specification directly contradict this construction because "payment validation system" is also used to refer to a system that validates payment data without performing the additional functions of a banking process system. *Id.* (citing '720 Patent at 13:53–13:62).

Defendants contend that the specification teaches that the "payment validation data" both validates and authorizes payment. Apple Resp. at 5 (citing '720 Patent at 8:21–23). Defendants argue that this is the only portion of the specification that describes the role of the "payment validation system." *Id.* According to Defendants, their construction only requires that the payment validation system be capable of validating payment data and authorizing payment in response to receipt of payment data, thus infringement is not tied to a particular use as Smartflash contends. *Id.* at 6–7 (citing *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1344 (Fed. Cir. 2014)). Defendants argue that this is consistent with the inventors' stated goal of reducing data piracy by "binding the data access and payment together." Samsung Resp. at 5 (citing '720 Patent at 1:66–2:3).

The Summary of the Invention states:

> The combination of the payment validation means with the data storage means allows the access to the downloaded data[,] which is to be stored by the data storage means, to be made conditional upon *checked and validated payment* being made for the data. *Binding the data access and payment together* allows the legitimate owners of the data to make the data available themselves over the

internet without fear of loss of revenue, thus undermining the position of data pirates.

. . .

The terminal reads payment data from the data carrier and transmits this to a payment validation system for *validating the data and authorizing payment*. This may be part of the data supplier's computer system or it may be a separate system such as an e-payment system.

. . .

The payment validation system may be part of the data supplier's computer systems or it may be a separate e-payment system. In one embodiment the method further comprises receiving payment validation data from the payment validation system; and transmitting at least a portion of the payment validation data to the data supplier.

'720 Patent at 1:62–2:3, 8:21–25 & 8:64–9:2 (emphasis added).

Smartflash is correct that "[t]he fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives." *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908 (Fed. Cir. 2004). Indeed, the specification also discloses e-payment systems where payment authentication is performed at a later stage. *See* '720 Patent at 23:22-33 ("[p]ayment may be made directly to the system owner, and either concurrently with the content access and download process, or *at some later stage . . . .*") (emphasis added). In such a system, the content supplier could "validate" the payment by allowing a purchase on credit, with actual payment to occur at a later time. Thus, the specification is not as clear as Defendants have argued. Indeed the specification disclosure of "validating the data and authorizing the payment" suggests that "authorizing" is distinct from "validating." *See* '720 Patent at 8:21–25.

However, Smartflash's proposed construction is not complete. The payment validation system is not limited to returning data in response to only valid payment data. The system must

**Appx13**

return whatever data results from an *attempt* to validate payment data. *See* '772 Patent at Claim 30 ("code to receive payment validation data defining if said payment validation system has validated payment for said selected at least one content data item"). The purpose of a validation system would be moot if it only worked when valid payment data was sent. Accordingly, **"payment validation system"** is construed to mean **"system that returns payment validation data based on an attempt to validate payment data."**

3.  **"payment validation data"**

| Smartflash's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>Alternatively:<br>"data indicating that payment data is valid" | "data received from payment validation system representing that payment was authorized for requested content data" |

The dispute for this term is similar to the previous dispute for "payment validation system." Smartflash argues that "payment validation data" is data returned from a payment validation system indicating that payment data is valid. Opening Brief at 11. Smartflash contends that "payment validation data" is not required to authorize payment as Defendants' construction would require. *Id.* According to Smartflash, Defendants' construction is inconsistent with the plain language of the term, which refers to validation data, not authorization data. *Id.* at 12.

Defendants' construction requires that the "payment validation data" represent that payment data was both validated and authorized. Defendants rely on the same arguments discussed previously for "payment validation system." *See* Apple Resp. at 5–7; Samsung Resp. at 5–8. Thus, if the "payment validation system" must authorize the payment data, then the "payment validation data" must represent that authorization.

As previously discussed, the parties' constructions for this term are too narrow. *See* '772 Patent Claim 30 ("code to receive payment validation data *defining if* said payment validation

**Appx14**

system has validated payment for said selected at least one content data item."). Thus, "payment validation data" is merely data received from a payment validation system and relates to whether a payment has been validated. Such a construction would add little clarity to the plain language of the term. Accordingly, **"payment validation system"** is construed to have its **plain meaning**.

4. **"content data memory" / "non-volatile data memory" / "memory . . . for storing data" / "memory configured to store . . . content" / "parameter memory" / "use rule memory"**

| Smartflash's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>These terms do not require "physically separate" memories | Each of (1) "content data memory," "data memory," "memory . . . for storing data," and "memory configured to store . . . content" is physically separate from each of (2) "parameter memory" and "use rule memory" |

These terms all deal with types of memory for storing content. Smartflash contends that these "memory" terms do not need to be construed because the plain and ordinary meaning is sufficient. Opening Brief at 12. According to Smartflash, "the mere fact that some claims use two different phrases to identify required memory does not imply that those claims require 'physically' separate memories" because a single component may satisfy multiple elements of a claim. *Id.* at 13 (citing *Cannon Rubber Ltd. v. First Years, Inc.*, No. 05-1063, 163 F. App'x 870, 877 (Fed. Cir. Dec. 28, 2005) & *Intellectual Property Development, Inc. v. UAColumbia Cablevision*, 336 F.3d 1308, 1320 n.9 (Fed. Cir. 2003)). Smartflash argues that many of the asserted claims recite memory used to store different things, but that none of the claims require the memories be "physically separate." *Id.* at 12–13. Smartflash contends that Defendants' argument is flawed because the claims in the '772 Patent require "non-volatile memory configured to store multimedia content," but do not require any "parameter memory" or "use rule

15

**Appx15**

memory." *Id.* at 13. Thus, according to Smartflash, Defendants' construction would require that "parameter memory" and "use rule memory" be physically separate from the claimed memory, even though "parameter memory" and "use rule memory" are not actually required by the claims. *Id.*

Defendants respond that the use of the conjunction "and" in a claim indicates that an inventor intended to claim distinct, separate components. Apple Resp. at 16 (citing *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1375–76 (Fed. Cir. 2008) & *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004)). Defendants also rely on the prosecution history for the '720 Patent. Defendants point to a response to a 2007 office action, where the applicants amended their claims to include "parameter memory" separate from the "content memory" as well as a requirement that "use rules" and "use status data" be read "from the parameter memory." Apple Resp. at 18. Defendants argue that these amendments require separate memory, stored on separate chips, because the prior art *Hiroya* "disclosed that the ticket information and the electronic signature would be stored separately on the same chip." *Id.* at 19. According to Defendants, this separate storage is needed to achieve the goals of the invention, otherwise "use status data" could not be updated as described in the patents. Samsung Resp. at 11 (citing '720 Patent at 4:53–5:24).

Distinctly recited limitations are usually interpreted as distinct structures. *See Becton*, 616 F.3d at 1254 ("Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention.") (citations and internal quotation marks omitted). The specification discloses distinct memory structures. *See* '720 Patent at 17:40–42, 18:8–10, & 18:18–20. Likewise, Figure 9 in the specification illustrates the "content data memory 214" and "non-volatile data memory 218" separately.

16

**Appx16**

Defendants rely on the prosecution history to argue that these distinct memories must also be "physically separate." The patentee's statements regarding the *Hiroya* prior art reference are as follows:

> 22. (Currently Amended) A method of controlling access to <u>content</u> data on a data carrier, the data carrier comprising non-volatile data memory <u>storing content memory</u> and non-volatile parameter memory storing use status data and use rules, the method comprising:
>    receiving a data access request <u>from a user for at least one content item of the content data stored in the non-volatile data memory</u>;
>    reading the use status data and use rules from <u>the parameter</u> memory <u>that pertain to use of the at least one requested content item</u>; ~~and~~
>    evaluating the use status data using the use rules to determine whether access to the ~~stored data~~ <u>at least one requested content item stored in the content memory</u> is permitted<u>; and</u> [[.]]
>       <u>displaying to the user whether access is permitted for each of the at least one requested content item stored in the non-volatile data memory</u>.
>
> . . .
>
> Claims 22, 23, 35-50, and 59-62 are rejected under 35 U.S.C. § 102(b) as being anticipated by Hiroya (U.S. Patent No. 5,754,654). Applicants respectfully submit that Hiroya does not disclose each element of these claims.
>
> For example, Applicants' claim 22 as amended recites a method of controlling access to content data on a data carrier, *the data carrier comprising non-volatile data memory storing content memory and non-volatile parameter memory storing use status data and use rules*, the method comprising:
>    receiving a data access request from a user for at least one content item of the content data stored in the non-volatile data memory;
>    reading the use status data and use rules from the *parameter memory* that pertain to use of the at least one requested content item;
>    evaluating the use status data using the use rules to determine whether access to the at least one requested content item stored in the *content memory* is permitted; and
>    displaying to the user whether access is permitted for each of the at least one requested content item stored in the non-volatile data memory
> . . . Such limitations are not disclosed by Hiroya.
>
> Hiroya discloses an electronic ticket vending and refunding system wherein a ticket purchaser can purchase a ticket to an event, etc., through a man-machine interface, whereby the ticket information is transferred to an electronic ticket storage device (col. 11, lines 36-49). In this system, the electronic ticket is stored in the electronic ticket storage device and includes ticked [*sic*, ticket] information data and an electronic signature (col. 15, lines 62-67), and *the ticket can be*

17

**Appx17**

> redeemed by decrypting the electronic signature and ticket information data so that a man-machine interface can verify the validity of the electronic ticket (col. 23, line 64-col. 24, line 18). Hiroya does not disclose status data and use rules stored in a *parameter memory*, wherein the use rules stored on the non-volatile memory are used to analyze the use status data stored on the non-volatile memory to determine whether access to *separately-stored requested content* is permitted as required in Applicants' claim 22 as amended. Hiroya discloses that electronic ticket information itself includes *both the ticket data and the validity data*, and that the electronic ticket information must be decrypted to be validated. *Hiroya does not disclose use status data stored separately from associated content data*, and since ticket data is either valid or not valid in and of itself and does not include *separate use data*, Hiroya does not suggest or provide motivation to store use data as recited in claim 22. Further, as Hiroya discloses only ticket information that can be redeemed, and not content that can be accessed multiple times, partially used, used at different times, etc., such that there would be no motivation to include use data with the device of Hiroya. As Hiroya does not disclose such limitations, Hiroya cannot anticipate Applicants' claim 22 or the claims that depend therefrom.

Doc. No. 160, Ex. G, 2/6/2007 Amendment at 2 & 9–10 (emphasis and formatting modified). Defendants interpret these statements as applicant arguing that content data being stored in a separate chip is what distinguishes it from the prior art.

Reading the statements in their entirety, the applicant was not arguing that the content data must be physically separate from other data. Instead, the applicant relied on evaluating "separate use data" according to use rules. The applicant contrasted the invention with the electronic ticket information of *Hiroya*, which was validated by an electronic signature, not use rules. The applicants' remarks do not rise to the level of "definitive statements" or a "clear and unmistakable" disclaimer that warrants importing Defendants' limitation. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution.") (emphasis added); *see also SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286–87 (Fed. Cir. 2006) ("There is no 'clear and unmistakable' disclaimer if a prosecution argument is

subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term.") (citations and internal quotation marks omitted).

Additionally, Defendants rely on corporate documents created by Smartflash's predecessor that refer to a "Smartflash card" with a "second flash memory chip which can store downloaded music." Apple Resp. at 13 (quoting Ex, K at SF00031496; citing Ex. H at SF00015316). However, relying on extrinsic evidence to import a limitation is disfavored. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) ("[W]hile extrinsic evidence can shed useful light on the relevant art, we have explained that it is less significant than the intrinsic record in determining the legally operative meaning of claim language.") (citations and internal quotation marks omitted); *id.* at 1319 ("[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence."). Defendants' proposed limitation is rejected. Accordingly, **"content data memory," "non-volatile data memory," "memory . . . for storing data," "memory configured to store . . . content," "parameter memory," and "use rule memory"** are construed to have their **plain meaning**. The patent does not require that these be physically separate.

### 5. "data carrier"

| Smartflash's Proposed Construction | Apple's Proposed Construction | Samsung's Proposed Construction |
|---|---|---|
| No construction necessary<br><br>Alternatively:<br>"Medium capable of storing information" | "Removable smart card or integrated circuit (IC) card, distinct from data access terminal, data access device, and handheld multimedia terminal, having two or more separate nonvolatile memories, for storing both payment data and content data" | "A removable smart card or integrated circuit (IC) card, distinct from a data access device, a handheld multimedia terminal and a data access terminal, incorporating a processor and two or more separate nonvolatile memories for storing both payment data |

19

| | | and content data" |
|---|---|---|

The dispute over "data carrier" is whether the data carrier can be a general data storage medium, as Smartflash proposes, or whether it must be a smart card or integrated circuit card.

Smartflash believes no construction is necessary for "data carrier." Smartflash argues that Defendants' proposals improperly import new limitations into the claims. Opening Brief at 17 (citing *Phillips*, 415 F.3d at 1324–27, 1329–30). According to Smartflash, some, but not all, embodiments of a data carrier are removable smart cards or IC cards. *Id.* at 18. In support, Smartflash cites to portions of the specification it contends disclose data carriers integrated with other apparatuses. *Id.* (citing '720 Patent at 16:6–10). Additionally, Smartflash argues that the "data carrier" does not require separate non-volatile memories for the same reasons as the previous "memory" terms. Opening Brief at 20. Finally, Smartflash contends that the construction should not define what must be stored on all data carriers because each claim specifies what must be on the carrier. *Id.* at 21.

Defendants respond that the patents' descriptions and embodiments uniformly describe the "data carrier" as a removable smart card or IC card. Apple Resp. at 7. Defendants also note that Smartflash has proposed that another disputed term—"the card"—be construed to mean "the data carrier." *Id.* at 8. In support of their proposal to require separate memories, Defendants argue that "applicants expressly disclaimed a data carrier with only one memory" by "distinguish[ing] the Hiroya reference because it lacked separate memories for respectively[] storing (1) use status data and (2) content storage memory." *Id.* at 11.

The first issue is whether to require a "removable smart card." The Summary of the Invention states:

20

> The data memory for storing content data may be optic, magnetic or semiconductor memory, but preferably comprises Flash Memory. . . . Preferably *the card* is configured as an IC card or smart card and has a credit card-type format, although other formats such as the "memory stick" format may also be used. This provides a small and convenient portable format and facilitates removable interfacing with a variety of devices.

'720 Patent at 6:17–31 (emphasis added); *see id.* at 4:62–64 ("use rules may be linked to payments made from the *card* . . . .") (emphasis added). Defendants are correct that consistent usage of a claim term in a particular manner could warrant a narrower construction than would otherwise be appropriate based on the claim language. *AstraZeneca*, 633 F.3d at 1052 ("[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term by implication.").

The specification does disclose a "portable data carrier (30)" that is illustrated as a card in Figure 2 and states that it is "based on a standard smart card . . . ." '720 Patent at 11:36–40. The same paragraph refers to the "card (30)" using the same numeral (30) that the specification used to refer to the data supplier. *Id.* at 11:40. Thus, "data carrier" and "card" are used interchangeably to some degree. However, the specification refers to "a data carrier *or* smart Flash card." *See* '720 Patent at 18:55–58 ("FIGS. 11a and 11b show a flow diagram of a process for registering a *data carrier or smart Flash card* with a data supplier or system owner operating a data supply system as illustrated in FIG. 6.") (emphasis added). The usage of "or" could either imply that "data carrier" and "smart Flash card" are synonyms, or that a "data carrier" can be something broader than a smart card.

Additionally, the specification also shows that "data carrier" need not be removable. '720 Patent at 16:1–10 ("*In most embodiments* of the terminal the SFC interface allows the smart Flash card data carrier to be inserted into and removed from the terminal, *but in some embodiments the data carrier may be integral with the terminal*.") (emphasis added); *see id.* at

21

**Appx21**

4:42–43 ("the data carrier may also be *integrated* into other apparatus, such as a mobile communications device.") (emphasis added). An integrated data carrier would be contrary to the idea of a removable card.

Considering the specification in its entirety, Defendants' proposed construction would improperly limit "data carrier" to a preferred embodiment. *See Constant v. Advanced Micro-Devices, Inc.*, 848 f.2d 1560, 1571 (Fed. Cir. 1998) ("Although the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims."). None of the extrinsic evidence offered by Defendants warrants limiting the generic term "data carrier" to the specific physical structure of a removable card.[1] Additionally, Defendants' proposal requiring "separate" memories is rejected for the same reasons discussed in the previous term.

Although Smartflash contends that no construction is necessary, "data carrier" will be construed so as to clarify that the "carrier" portion of the term does not refer to a signal carrier wave, such as for wireless communications. Accordingly, **"data carrier"** is construed to mean **"medium capable of storing information."**

6. **"portable data carrier"**

| Smartflash's Proposed Construction | Apple's Proposed Construction | Samsung's Proposed Construction |
|---|---|---|
| No construction necessary<br><br>Alternatively:<br>"Portable medium capable of storing information" | "Removable smart card or integrated circuit (IC) card that interfaces with a variety of devices, distinct from data access terminal, data access device, and handheld multimedia terminal, | "A removable smart card or integrated circuit (IC) card, distinct from a data access device, a handheld multimedia terminal and a data access terminal, |

---

[1] Following the deposition of inventor Patrick Racz, the Apple Defendants filed supplemental briefing arguing that the Mr. Racz's testimony confirms their proposed construction. Supp. Brief at 1. Nothing in the supplemental briefing changes the analysis for this term. The inventor testimony cited by Defendants merely highlights that the specification refers to the "data carrier" as being a card. As previously discussed, using a card is merely a preferred embodiment. Defendants also cite to the inventor's testimony regarding an e-mail that was part of a prior business negotiation. This extrinsic evidence is given minimal weight during claim construction. *See Phillips*, 415 F.3d at 1318.

**Appx22**

| | having two or more separate nonvolatile memories, for storing both payment data and content data" | incorporating a processor and two or more separate nonvolatile memories for storing both payment data and content data that interfaces with a variety of devices" |
|---|---|---|

The dispute over this term is similar to the dispute over the "data carrier" term. The key difference is the dispute over the term portable. Smartflash contends that the word "portable" is commonly understood and thus does not need to be construed. Opening Brief at 22.

The Apple Defendants respond that the specification equates portability with the ability to interface with a variety of devices." Apple Resp. at 14–15 (citing '720 Patent at 6:26–31). The Samsung Defendants contend that "data carrier" and "portable data carrier" are used synonymously throughout the patents. Samsung Resp. at 20 (citing '720 Patent at 8:10–15, 9:61–63, 10:66, 11:36, 16:4, & 16:7–8). Alternatively, the Samsung Defendants agree with the Apple Defendants that the only difference between a "data carrier" and a "portable data carrier" is that a "data carrier" is a removable card that interfaces with a single or dedicated device, whereas a "portable data carrier" can interface with a variety of devices. Samsung Resp. at 21.

The Summary of the Invention refers to portability as allowing the data carrier to "access content or, in the example, play music without the need to be linked to a communications system or to be on-line to the internet." '720 Patent at 5:12–15. Additionally, it states that the "'memory stick' format may be used. . . . [to] provide[] a small and convenient *portable* format [that] facilitates removable interfacing with a variety of devices." *Id.* at 6:17– 31 (emphasis added). These disclosures don't warrant giving "portable" a special meaning beyond its ordinary meaning of being readily moveable. *See Constant*, 848 F.2d at 1571; *see also Phillips*, 415 F.3d

at 1323. Based on the previous construction of the term "data carrier," **"portable data carrier"** is construed to have its **plain meaning**.

### 7. "use rule(s)" / "use rule(s) data" / "data use rule data"

| Smartflash's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>Alternatively:<br>"Regulation (or rule) related to the use of content" | "Rule/data, associated with a separately stored content data item, indicating permissible use of the content data item" |

### 8. "access rule(s)"

| Smartflash's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>Alternatively:<br>Regulation (or rule) related to access to content | Rule, associated with a separately stored content data item, specifying under what conditions a user is allowed access to the content data item |

Smartflash contends that there is no basis in the patents or prosecution history for the proposition that "use rules" or "access rules" must be "physically separate" from content. Opening Brief at 24. Smartflash argues that there was no clear disavowal in the in the prosecution history, and that any disavowal would not apply to different claim terms appearing in later continuation applications. *Id.* at 25. Smartflash contends that Defendants' proposed "indicating permissible use . . ." and "specifying under what conditions . . ." limitations are taken directly from certain claims and placed into the claim term definitions. *Id.* at 26. According to Smartflash, this would force language into other claims where it would not make sense. *Id.*

For "access rule(s)," Defendants respond that the applicant argued that access rules and content data were written in physically separate memories in order to overcome *Hiroya*. Apple Resp. at 21. Defendants contend that their construction "aligns with the teachings of the patent to

**Appx24**

explain that these 'access rules' are used to control access to specific content data items . . . ." *Id.* (citing '720 Patent at 7:31–33 & 23:59–24:8.).

Defendants argue that their proposed construction for the "use rule(s)" terms, use both the specification' disclosures and the applicant's statements to the PTO to assist the jury's understanding of the terms. Apple Resp. at 21. According to Defendants, the applicant "specifically disclaimed being able to read 'use status data' and 'use rules' from anything but a memory that is physically separate from the content memory." *Id.* at 22.

For the reasons previously discussed for the "memory" terms, Defendants' proposal of requiring "separately stored content" is rejected.[2]

Once the separately stored issue is resolved, Smartflash's alternative proposals for these terms are very similar to Defendants' proposals. Both constructions are supported by the specification, which states that "[t]he carrier may . . . store content use rules pertaining to allowed use of stored data items" and that "use rules data indicat[e] permissible use data stored on the carrier." '720 Patent at 4:62–64 & 9:16–17. Additionally, Claim 3 of the '720 Patent recites "at least one access rule specifying at least one condition for accessing the retrieved data written into the data carrier, the at least one condition being dependent upon the amount of payment associated with the payment data forwarded to the payment validation system." Similarly, Claim 6 of the '458 Patent recites "use rules data indicating permissible use of data stored on the carrier."

This intrinsic evidence shows that the disputed terms are being used in accordance with their plain and ordinary meaning. Further construing the terms would only lead to confusion

---

[2] As additional support for this conclusion, claim 6 of the '458 Patent recites "use status data," "use rules data," and "stored data" without reciting any specific memory.

**Appx25**

instead of clarification. Accordingly, **"use rule(s),"** **"use rule(s) data,"** **"data use rule data,"** and **"access rule(s)"** are construed to have their **plain meaning**.

**9. "use status data"**

| Smartflash's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>Alternatively:<br>"indication of use status" | "data, associated with a separately stored content data item, indicating past use of the content data item" |

Smartflash argues that "use status data" need not be stored separately from content for the same reasons it set forth in the "use rules" terms above. Opening Brief at 27. Smartflash also contends that Defendants' construction is incorrect because it would limit asserted claims to only covering use rules that rely on tracking the past use of a content data item. *Id.*

Defendants respond that the patent makes it clear that "use status data" indicates "past use of stored data." Apple Resp. at 23 (citing '720 Patent at 9:35–38). Defendants cite to an embodiment of Claim 1 where a user's past use of a content item is compared with a specific use rule. *Id.* (citing '720 Patent Claim 1(c)).

For the same reasons discussed in the "memory" terms, Defendants' proposed requirement of "separately stored content" is rejected.

As to the issue of whether "use status data" should be limited to "indicating past use," the Summary of the Invention states:

> The invention also provides a related method of controlling access to data from a data carrier, comprising retrieving *use status data from the data carrier indicating past use of the stored data*; retrieving use rules from the data carrier; evaluating the use status data using use rules to determine whether access to data stored on the carrier is permitted; and permitting access to the data on the data carrier dependent on the result of said evaluating.

26

'720 Patent at 9:35–38 (emphasis added). The specification also refers to "use status data" being updated *after* content has been accessed. *Id.* at 25:51–56 ("*Once play is complete* the process moves to step S85 where updated content use data is written to the smart Flash card. . . . This record can then be used in steps S81 and S83 to determine, on a *subsequent occasion*, whether *further* use of the content data item is permitted.") (emphasis added). However, Smartflash cites to portions of the specification it contends refer to use status data in situations other than past use. For example, the specification states that:

> The carrier may also store content use rules pertaining to allowed use of stored data items. These use rules may be linked to payments made from the card to provide payment options such as access to buy content data outright; *rental access to content data for a time period* or for a specified number of access events . . . .

*Id.* at 4:59–5:3 (emphasis added); *id.* at 3:17–18 ("access to part of the data set might thereafter be controlled by payments made by a user at a later stage"). The specification also provides for rules that "could provide access for, say, *one month from the download date*" or "unlimited plans but only on *specified players, for example set top boxes owned by a particular cable TV network* . . . ." *Id.* at 23:59–24:2 (emphasis added). Defendants contend that these disclosures refer to "content use rules" and "content access rules" rather than "use status data." However, these rules must be applied to something in order to be operative. The claims show that the rules are applied to use status data. For example, Claim 1 of the '720 Patent recites: "reading the use status data and use rules from the parameter memory that pertain to use of the at least one requested content item; / *evaluating the use status data using the use rules* to determine whether access to the at least one requested content item stored in the content memory is permitted." Given this context, and the disclosures cited by Smartflash, "use status data" is not limited to

27

only past use. Defendants' proposed construction would improperly limit the disputed term to particular embodiments. Accordingly, **"use status data"** is construed to have its **plain meaning.**

**10. "said code to control access permitting access to said second selected one or more items of retrieved multimedia content"**

| Smartflash's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>Alternatively:<br>"code to evaluate use status data and use rules to determine whether access is permitted to second selected one or more items of retrieved multimedia content items" | indefinite |

Smartflash contends that the antecedent basis for this term is "code to evaluate said use data and use rules to determine whether access is permitted to said second selected one or more items of retrieved multimedia content." Opening Brief at 29–30. Smartflash also submits an expert declaration in support of this position. *Id.*, Ex. 1, 6/13/2014 Declaration of Mark T. Jones.

Defendants respond that Claim 1 also contains this phrase, and that the only reasonable interpretation is "code to control access," and thus, the lack of any such antecedent support for this phrase in claim 25 renders the claim indefinite. Apple Resp. at 25; Samsung Resp. at 34. Defendants also cite to Claim 6 of the '772 Patent which uses both the phrase "said code to control access" and "code to evaluate," but not referring to each other. Apple Resp. at 26. According to Defendants, this negates Smartflash's argument that they should be interpreted as referring to the same code in Claim 25. *Id.* Defendants also offer their own expert opinion stating that one of ordinary skill in the art would not understand "code to evaluate" to be the antecedent basis for "said code to control access." *Id.* (citing Doc. No. 163-1, 6/27/2014 Cromarty Decl. at ¶ 57). Defendants contend that "code to control access" is the code that allows access, whereas

"code to evaluate use status data and use rules to determine whether access is permitted" is the code that determines whether access should be allowed in the first place. Apple Resp. at 26.

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 ¶ 2. If a claim does not satisfy this requirement, it is indefinite, and thus invalid. "A determination of indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims" and "therefore, like claim construction, is a question of law." *Atmel Corp. v. Info Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999) (citation and internal quotation marks omitted).

The Supreme Court of the United States has recently interpreted 35 U.S.C. § 112 ¶ 2 "to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). However, antecedent basis may be implicit rather than explicit. *Energizer Holdings Inc. v. Int'l Trade Comm'n*, 435 F.3d 1336, 1371 (Fed. Cir. 2006) (holding that "an anode gel comprised of zinc as the active anode component" provided implicit antecedent basis for "said zinc anode"); *see also* Manual for Patent Examining Procedure § 2173.05(3) (8th ed., rev. 9, Mar. 2014) (noting that "the failure to provide explicit antecedent basis for terms does not always render a claim indefinite").

Looking at Claim 25 in its entirety, the implicit antecedent basis for "said code to control access" is the "code to evaluate said use status data and use rules to determine whether access is permitted to said second selected one or more items of retrieved multimedia content." *See Energizer*, 435 F.3d at 1371. The implicit antecedent basis language states that the purpose of the "evaluation" is "to determine whether access is permitted to said second selected one or more

items of retrieved multimedia content." '772 Patent Claim 25. The disputed term refers to "code to control access permitting access to said second selected one or more items of retrieved multimedia content." *Id.* Reading the plain language of the claim, a person of ordinary skill would understand with reasonable certainty that the second statement is referencing the first. Thus, Defendants' indefiniteness argument is rejected and **no further construction is necessary**.

**11. "the card"**

| Smartflash's Proposed Construction | Apple's Proposed Construction | Samsung's Proposed Construction |
|---|---|---|
| "the data carrier" | "the data carrier" | indefinite |

Smartflash argues the "the card" in Claim 13 of the '317 Patent "is an obvious clerical drafting mistake that should read 'the data carrier.'" Opening Brief at 31.

The Apple Defendants agree that "the card" should be construed as "the data carrier," but contend that it was not a clerical error on the part of the drafter. Apple Resp. at 25. According to the Apple Defendants, "[t]he fact that 'the card' was substituted for 'the data carrier' in the claim suggests not that the draftsman made a mistake, but that a data carrier is, in fact, a smart card." *Id.*

The Samsung Defendants argue that the more plausible explanation is that the phrase "the card" should have been "a card." Samsung Resp. at 35. According to the Samsung Defendants, this would: (1) be a less drastic change to the existing claim language; (2) eliminate the need for an antecedent basis; and (3) be consistent with the patent's extensive discussion of data cards. *Id.* The Samsung Defendants conclude that because "[t]here is no way of knowing which (if either) correction to claim 13 should apply. . . . claim 13 cannot be corrected, and claim 13 is invalid as indefinite." *Id.*

30

A court may correct an error in a patent claim "only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *See Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003). Judicial correction of a claim is retroactive. *Advanced Medical Optics, Inc. v. Alcom Inc.*, 361 F. Supp. 2d 370, 384 (D. Del. 2005).

Because the purported error is more than a misspelling or a missing letter, Smartflash's request to modify the plain language is inappropriate. *See LG Elecs., Inc. v. Quanta Computer Inc.*, 566 F. Supp. 2d 910, 913 (W.D. Wis. 2008) (noting the "nearly impossible standard for judicial correction of a patent" and citing *Novo*, which the court noted "refus[ed] to correct 'a' to 'and' because other possibilities for correction existed"). This decision is consistent with the principle that "[c]ourts do not rewrite claims; instead, we give effect to the terms chosen by the patentee." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999); *see Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (noting that "courts may not redraft claims, whether to make them operable or to sustain their validity"). Unlike the "said code to control access . . ." term addressed above, the antecedent basis for "the card" is not reasonably certain. *Nautilus*, 134 S. Ct. at 2129. The Samsung Defendants' theory is a reasonable interpretation. Indeed, it would be consistent with the patent to have a dependent claim that further narrowed the "data carrier" to an embodiment where it was "a card." Since the Court cannot know what correction is appropriate, Claim 13 must be found **invalid as indefinite**. *See Novo*, 350 F.3d at 1358.

### 12. Terms Defendants Argue Are Means-Plus-Function Terms

As a threshold matter, the parties dispute whether the remaining terms for construction are means-plus-function terms under 35 U.S.C. § 112 ¶ 6. Defendants contend that twelve of the terms are means-plus-function terms that require construction to determine the proper structure. Defendants argue that the rest of the terms are means-plus-function terms that lack sufficient structure.[3] If the terms are not means plus function terms then no construction is necessary.

Title 35 U.S.C. § 112, ¶ 6 provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." Further, "[t]he scope of a claim under [35 U.S.C.] section 112, paragraph 6 . . . must be limited to structures *clearly linked or associated* with the claimed function in the specification or prosecution history and equivalents of those structures." *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir. 2003) (emphasis added); *see Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369-70 (Fed. Cir. 2001) ("Section 112 paragraph 6 does not permit incorporation of structure from the written description beyond that necessary to perform the claimed function.") (citation and internal quotation marks omitted).

When a claim term does not use "means," there is a "rebuttable presumption that [35 U.S.C.] § 112 ¶ 6 does not apply." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004). This presumption can be overcome if it is demonstrated that the claim term fails to recite sufficiently definite structure or else recites function without

---

[3] These terms are briefed in Defendants' Motions for Summary Judgment of Indefiniteness and are listed in Appendix C of this Order.

reciting sufficient structure for performing that function. *Id.* at 1359–60. The presumption flowing from the absence of the term "means" is a strong one that is not readily overcome. *Id.*

Here, the claims at issue do not use the term "means." To overcome the presumption, Defendants argue that the claims recite only the word "processor," without any other structure. Samsung MSJ at 3. According to Defendants, the recitation of a "processor" and "code", without any specialized structure for performing the claimed functions, is insufficient. *Id.* at 5.

Some courts have found that reciting a "computer" can warrant means-plus-function treatment:

> A reference to a "computer" provides no basis to distinguish the structure from any other general purpose computer; thus, "computer" does not adequately describe a specific structure. The same logic applies here—if "computer" is insufficient structure for a "means" limitation, the naked term "computer" cannot describe sufficient structure when recited directly in the claim limitation.

*Soque Holdings Bermuda Ltd. v. Keyscan, Inc.*, No. 09-2651, 2010 WL 2292316, at *12 (N.D. Cal. June 7, 2010) (Patel, J.) (citations omitted). However, the present case is more analogous to *Linear Technology Corp. v. Impala Linear Corp.*, in which the Court of Appeals for the Federal Circuit found that "when the structure-connoting term 'circuit' is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 ¶ 6 presumptively will not apply." 379 F.3d 1311, 1320 (Fed. Cir. 2004). Here, in each of the disputed terms in Appendix C, "code" and "processor" are coupled with a description of the code's or processor's operation.

Courts in this district have reached the same conclusion under similar circumstances. *See, e.g., Eolas Techs., Inc. v. Adobe Sys., Inc.*, 810 F. Supp. 2d 795, 810 (E.D. Tex. 2011) (Davis, J.) (finding sufficient the patentee's argument that "virtually every element asserted by Defendants includes a phrase containing either the words 'computer readable program code for . . .' or 'software comprising computer executable instructions [to] . . .' followed by a description of the

33

**Appx33**

code's (or software's) operation"), *aff'd sub nom. Eolas Techs. Inc. v. Amazon.com, Inc.*, 521 F. App'x 928 (Fed. Cir. 2013), *opinion withdrawn in part on reconsideration as to another term*, 6:09-cv-446, 2011 WL 11070303 (E.D. Tex. Sept. 23, 2011); *Aloft Media, LLC v. Adobe Sys. Inc.*, 570 F. Supp. 2d 887, 898 (E.D. Tex. 2008) (Love, J.) ("[W]hen the structure-connoting term 'computer code' is coupled with a description of the computer code's operation, as provided by the 'wherein' clauses, sufficient structural meaning is conveyed to persons of ordinary skill in the art.") (footnote omitted), *adopted*, No. 6:07-CV-355, 2008 WL 5784443 (E.D. Tex. Sept. 24, 2008) (Davis, J.); *Versata Software, Inc. v. Sun Microsystems, Inc.*, No. 2:06-cv-358, 2008 WL 3914098, at *14 (E.D. Tex. Aug. 19, 2008) (Ward, J.) (holding that the presumption against means-plus-function treatment was not overcome as to claims reciting "computer readable program code configured to cause a computer to").

Additionally, several Federal Circuit opinions support this conclusion. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) ("[W]here a claim is not drafted in means-plus-function format, the reasoning in the *Aristocrat* line of cases does not automatically apply, and an algorithm is therefore not necessarily required."); *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1374 (Fed. Cir. 2012) ("When the claim drafter has not signaled his intent to invoke § 112, ¶ 6 by using the term 'means,' we are unwilling to apply that provision without a showing that the limitation essentially is devoid of anything that can be construed as structure."); *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) (finding that "detent mechanism" was not a means-plus-function term because it denotes a type of device with a generally understood meaning in the mechanical arts).

Finally, other district courts have reached similar conclusions. *See, e.g., Affymetrix, Inc. v. Hyseq, Inc.*, 132 F. Supp. 2d 1212, 1232 (N.D. Cal. 2001) (Fogel, J.) (finding that "'computer

34

**Appx34**

code' is not a generic term, but rather recites structure that is understood by those of skill in the art to be a type of device for accomplishing the stated functions"); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 04 C 5312, 2006 WL 3147697, at *11-13 (N.D. Ill. Oct. 31, 2006) (similar as to "program code" terms); *Wi-LAN USA, Inc. v. Alcatel-Lucent USA, Inc.*, No. 12-23568, 2013 WL 4811233, at *41–42 (S.D. Fla. Sept. 9, 2013) (similar as to "processor" terms).

Defendants have failed to overcome the presumption that the disputed terms, which do not use the word "means," are not means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6. Thus, these disputed terms need not be construed. *See* Doc. No. 174 at 1–2 (Smartflash submits that "neither side has alleged that the terms at issue require construction if the Court finds that § 112 ¶ 6 is inapplicable.").

## II. Motion for Summary Judgment

Similar to the previous terms, Defendants argue that several terms are means-plus-function terms and are indefinite because they lack adequate corresponding structure. For the same reasons discussed above, Defendants have failed to show that these terms lack structure so as to overcome the presumption against being treated as means-plus-function terms. Accordingly, it is recommended that Defendants' Motions for Summary Judgment of Indefiniteness be **DENIED**.

## RECOMMENDATION

The Court hereby **ADOPTS** the above claim constructions for the patents-in-suit. For ease of reference, the Court's claim interpretations are set forth in a table in Appendix A & B. Additionally, the Court recommends that Defendants' Motions for Summary Judgment for Invalidity be **DENIED**. The Court's determinations for the terms in the Motion for Summary Judgment are set forth in Appendix C.

Within fourteen days after receipt of the Magistrate Judge's report, any party may serve and file written objections to the findings and recommendations of the Magistrate Judge.

A party's failure to file written objections to the findings, conclusions, and recommendations contained in this Report within fourteen days after service shall bar that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Services Auto. Assn.*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*) (*superseded on other grounds*, 28 U.S.C. § 636(b)(1)) (extending the time to file objections from ten to fourteen days).

So ORDERED and SIGNED this 24th day of September, 2014.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

36

**Appx36**

**APPENDIX A**

| Non-Means-Plus-Function Terms | Court's Construction |
|---|---|
| Payment data | "data that can be used to make payment for content" |
| Payment validation system | "system that returns payment validation data based on an attempt to validate payment data" |
| Payment validation data | Plain meaning |
| Data carrier | "medium capable of storing information" |
| Portable data carrier | Plain meaning |
| Content data memory / data memory / memory . . . for storing data / memory configured to store . . . content / parameter memory / use rule memory | Plain meaning |
| Use rules(s) / use rule(s) data / data use rule data | Plain meaning |
| Access rule(s) | Plain meaning |
| Use status data | Plain meaning |
| Said code to control access to said second selected one or more items of retrieved multimedia content | Not indefinite. No further construction necessary |
| The card | Invalid as indefinite |

37

**APPENDIX B**

| Alleged Means-Plus-Function Terms for Construction | Court's Construction |
|---|---|
| Code responsive to the payment validation data to retrieve data from the data supplier and to write the retrieved data into the data carrier | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code responsive to the payment validation data to retrieve said selected at least one content data item from a data supplier and to write said retrieved at least one content data item into said data carrier | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code responsive to said payment validation data to retrieve said selected at least one item of multimedia content via said wireless interface from a data supplier and to write said retrieved at least one item of multimedia content into said non-volatile memory | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code responsive to the payment validation data to receive at least one access rule from the data supplier and to write the at least one access rule into the data carrier, the at least one access rule specifying at least one condition for accessing the retrieved data written into the | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |

38

| | |
|---|---|
| data carrier, the at least one condition being dependent upon the amount of payment associated with the payment data forwarded to the payment validation system | |
| Code responsive to the request and to the received payment data, to read data for the requested data item from a content provider | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code, responsive to the request and to the received payment data to output the item data to the requester over the communication interface | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code to output payment data for a data item for making payments for the item when the item is supplied to a said requester | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code to write updated use status data to the carrier after user access to the stored data | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code to write partial use status data to the data carrier when only part of a stored data item has been accessed | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code to present said second selected one or more items of retrieved multimedia content to a user via said display if access is permitted | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| "electronic payment system for confirming an | Not subject to 35 U.S.C. § 112 ¶ 6. No further |

39

| electronic payment . . . wherein the electronic payment system makes payments according to data in the payment distribution store associated with the forwarded data on confirmation of the payment and/or provision of the forwarded data to the card" | construction required. |
|---|---|
| Electronic payment system for confirming an electronic payment | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |

**APPENDIX C**

| Alleged Means-Plus-Function Terms Lacking Adequate Structure | Court's Construction |
|---|---|
| A processor . . . for implementing . . . code, the code comprising | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Processor for controlling access to data | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Processor control code comprises | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code responsive to said user selection of said at least one selected item of multimedia content to transmit payment data relating to payment for said at least one selected item of multimedia content via said wireless interface for validation by a payment validation system | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |

40

| Code responsive to said user selection of said selected content data item to transmit payment data relating to payment for said selected content item for validation by a payment validation system | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
|---|---|
| Code to control access to said selected content data item responsive to the payment validation data | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code to control access to said at least one selected item of multimedia content on said terminal responsive to said payment validation data | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code to retrieve supplementary data in response to said characterizing data | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code to output the supplementary data | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code to evaluate said use status data and use rules to determine whether access is permitted to said second selected one or more items of retrieved multimedia content | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code to evaluate said use status data and use rules to determine whether access is permitted to said second selected one or more retrieved | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |

41

| content data items | |
|---|---|
| Code to evaluate the use status data using the use rules data to determine whether access is permitted to the stored data | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code to access the stored data when access is permitted | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Code to provide access to the at least one content data item in accordance with the at least one use rule | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Processor for controlling access to data | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |
| Content synthesis code to generate substantially complete item data from partial item data provided from two or more sources | Not subject to 35 U.S.C. § 112 ¶ 6. No further construction required. |

**Appx42**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **SMARTFLASH LLC**, *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | CIVIL ACTION NO. 6:13cv447 |
| | § | |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **APPLE INC.**, *et al.*, | § | |
| | § | |
| **Defendants.** | § | |
| | | |
| | § | |
| **SMARTFLASH LLC**, *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | CIVIL ACTION NO. 6:13cv448 |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **SAMSUNG ELECTRONICS CO., LTD.** | § | |
| *et al.*, | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

<u>**ORDER ADOPTING REPORT AND RECOMMENDATION**</u>
<u>**OF UNITED STATES MAGISTRATE JUDGE**</u>

The above entitled and numbered civil action was referred to United States Magistrate Judge K. Nicole Mitchell pursuant to 28 U.S.C. § 636. The Report and Recommendation of the Magistrate Judge ("R&R"), which recommends adoption of the Court's claim construction and denial of Defendants' Motions for Summary Judgment for Invalidity, has been presented for consideration (6:13cv447, Doc. No. 229; 6:13cv448, Doc. No. 270). Defendants filed objections (6:13cv447, Doc. No. 251; 6:13cv448, Doc. Nos. 303, 304) to the R&R.

Defendants' objections assert that the R&R violated the "Federal Circuit's clear directions" by not applying 35 U.S.C. § 112, ¶ 6 to apparatus claims reciting the word "processor." 6:13cv448, Doc. No. 304 at 2 (citing *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328 (holding that under § 112, ¶ 6, a "control means" claim limitation was indefinite because the patent did not disclose an algorithm); *Noah Sys. Inc. v. Intuit Inc.*, 675 F.3d 1302 (holding that under § 112, ¶ 6, an "access means" claim limitation was indefinite because the patent disclosed an algorithm that failed to enable one skilled in the art)); *see also* 6:13cv447 Doc. No. 251 at 5. Additionally, Defendants point out that the R&R did not address the *Personal Audio* case from this District that construed limitations reciting a "processor" as means plus function claims subject to § 112, ¶ 6. 6:13cv448, Doc. No. 304 at 2; 6:13cv447, Doc. No. 251 at 5; *Personal Audio, LLC v. Apple, Inc.*, No. 9:09-cv-111, 2011 WL 11757163 (E.D. Tex. Jan. 30, 2011). The Court addresses Federal Circuit guidance on this issue and the *Personal Audio* case below.

### Federal Circuit Guidance

Section 112, ¶ 6(now § 112(f)) allows a patentee to claim a "means or step for" a function without reciting structure to support that function, but the "claim shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof." Accordingly, "[m]eans-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1311 (Fed. Cir. 2005). Thus, the court must first determine whether the limitation invokes § 112, ¶ 6. *Rodine PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999). A limitation that actually uses the word "means"

raises a rebuttable presumption that § 112, ¶ 6 applies. *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004). By contrast, when a claim limitation lacks the term "means," it creates a rebuttable presumption that § 112, ¶ 6 does not apply. *Id.* "The use of the term 'means' is 'central to the analysis,' because the term 'means,' particularly as used in the phrase 'means for,' is 'part of the classic template for functional claim elements,' and has come to be closely associated with means-plus-function claiming." *Id.* (internal citations omitted).

The presumption that §112, ¶ 6 does not apply can be "overcome if the claim fails to recite sufficiently definite structure, or else recites function without sufficient structure for performing that function." *Id.* (internal citation and quotation marks omitted). However, the Federal Circuit has "repeatedly characterized this presumption as 'strong' and 'not readily overcome' and, as such, ha[s] 'seldom' held that a limitation without recitation of 'means' is a means-plus-function limitation." *Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1297 (Fed. Cir. 2014) (citing *Lighting World*, 382 F.3d at 1358; *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1374 (Fed. Cir. 2012) ("When the claim drafter has not signaled his intent to invoke § 112 ¶ 6 by using the term 'means,' we are unwilling to apply that provision without a showing that the limitation is essentially devoid of anything that can be construed as structure.")). "The correct inquiry, when 'means' is absent from a limitation, is whether the limitation read in light of the remaining claim language, specification, prosecution history, and relevant extrinsic evidence, has sufficiently definite structure to a person of ordinary skill in the art." *Id.* at 1298.

**Appx45**

In computer implemented inventions, one of ordinary skill in the art can understand "structure" through an outline of an algorithm, a flowchart, or set of instructions or rules, rather than traditional physical structure. *Id.* (citing *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011) ("[T]he patent need only disclose sufficient structure for a person of skill in the field to provide an operative software program for the specified function.")). Section 112, ¶ 6 will not apply to terms "used in common parlance of by persons of ordinary skill in the pertinent art to designate structure." *Lighting World*, 382 F.3d at 1359. Additionally, the Federal Circuit has held that terms such as "detector" and "circuit" are structural terms while generic terms such as "means," "element," and "device" are nonstructural. *Apple*, 757 F.3d at 1299 (citing *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998); *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1373 (Fed. Cir. 2003)). Even if a term covers a broad class of structures and identifies structures by their function, it is sufficient to avoid means-plus-function treatment. *Lighting World*, 382 F.3d at 1360. What is important is whether the term is understood to describe structure and is not simply a substitute for "means for." *Id.*

As a preliminary matter, in two cases cited by Defendants as providing clear directions to the Court, *Aristocrat* and *Noah*, the asserted claims included the term "means." There were no disputes that means-plus-function claim construction applied. Thus, neither case analyzed the presumption against the applicability of § 112, ¶ 6 where a claim does not recite "means."

4

In *Aristocrat*, the court determined that the specification's disclosure for "control means" of a standard microprocessor with appropriate programming did not sufficiently define the scope of the means-plus-function claim. 521 F.3d at 1331, 1338. Noting its clear applicability because the claim explicitly recited "means," the court applied § 112, ¶ 6, which requires the scope of the claim limitation to be defined by the structure disclosed in the specification plus any equivalents thereof. *Id.* at 1331. The court noted that "[i]n cases in which the inventor has invoked means-plus-function claiming, this court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor." *Id.* at 1333. Additionally, the court stated that allowing the "patentee to claim a means for performing a particular function and then to disclose only a general purpose computer as the structure designed to perform that function amounts to pure functional claiming." *Id.*; *see also Personal Audio,* 2011 WL 11757163, at *22.

Defendants' argument essentially applies *Aristocrat* in reverse. Defendants argue that because "processor" does not adequately define the scope of a means-plus-function limitation, it also cannot describe sufficient structure to avoid means-plus-function treatment when recited in the claim itself. 6:13cv448, Doc. No. 304 at 2; *see also* Doc. No. 177-1 ¶¶ 38–45 (asserting "the identified claims fail[] to disclose sufficient structure" because "the identified claims do not disclose the specialized algorithms that would be required to enable a general purpose processor to perform any of the claimed high-level functions."). However, in light of the Federal Circuit's guidance in *Apple*, Defendants' reasoning fails; *Aristocrat* does not apply here, where the claim is not drafted in means-

plus-function format.  *See* 757 F.3d at 1298; *see also Wi-Lan USA, Inc. v. Alcatel-Lucent USA, Inc.*, No. 12-23568-CIV, 2013 WL 4811233, at *40 (S.D. Fla. Sept. 9, 2013).  The standard used to prove sufficient structure to avoid means-function-treatment is not identical to the standard for identifying corresponding structure to a means-plus-function claim.  *See* 757 F.3d at 1298; *see also Wi-Lan*, 2013 WL 4811233, at *40–41.  Similarly, *Noah* does not apply here because it also analyzes the adequacy the specification's disclosure for defining claim scope where a patentee has explicitly invoked means-plus-function claiming.  675 F.3d at 1314–18.  It does not address the standard for overcoming the presumption against means-plus-function treatment.  *Id.*

Defendants' expert report also fails to address the legal requirements for overcoming the presumption against means-plus-function treatment when the claims themselves do not recite the term "means."  In fact, Defendants' expert begins with the presumption that the disputed claims contain "'means-plus-function' terms governed by 35 U.S.C. § 112, ¶6."  Doc. No. 177-1 ¶ 38.  Further, the report states that a processor "available for purchase during the relevant [] time period is designed to interpret and execute instructions that are provided to it as compiled machine code."  *Id.* at ¶ 40.  According to Defendants' expert, even a "general purpose processor" without specific instructions can perform "maintenance functions (like stopping, selftesting, or restarting.)"

Federal Circuit precedent requires only that the claim recite some structure.  *Lighting World*, 382 F.3d at 1359–60.  Although "processor" may not define a specific structure, it describes a class of structures.  *See Apple*, 757 F.3d at 1300 (citing *Personalized Media*, 161 F.3d at 705 (finding that "detector" did not evoke particular

6

**Appx48**

structure but conveyed to one knowledgeable in the art the variety of structures known as "detectors"); *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1374–75 (Fed. Cir. 2012) (finding that "height adjustment mechanism" designates "a class of structures that are generally understood to persons of skill in the art")). Like "circuit" in *Linear*, "processor" is a structure-connoting term. *See* 379 F.3d at 1320. It is not a generic nonstructural term such as "means," "element," and "device" that typically do not connote sufficient structure. *Apple*, 757 F.3d at 1299–1300. As Defendants' expert noted, a processor can be purchased, can perform certain functions even without specific instructions, and has a design for interpreting and executing instructions. Thus, the term "processor," even on its own, recites at least some structure.

Moreover, the Court must not analyze the term "processor" on its own; limitations should be examined as a whole. *See Wi-Lan*, 2013 WL 4811233, at *42 (citing *Apex*, 325 F.3d at 1372). When a structure connoting term accompanies a description of its operation, sufficient structural meaning is conveyed to persons of ordinary skill in the art. *Linear Tech*, 379 F.3d at 1320 (finding language describing the objective of a "circuit" such as "monitoring a signal" suggested sufficient structure to a person of ordinary skill in the art); *see also Eolas Techs., Inc. v. Adobe Sys., Inc.*, 810 F. Supp. 2d 795, 810 (E.D. Tex. 2011); *Aloft Media, LLC v. Adobe Sys. Inc.*, 570 F. Supp. 2d. 887, 898 (E.D. Tex. 2008), *adopted*, No. 6:07-CV-355, 2008 WL 5784443 (E.D. Tex. Sept. 24, 2008). Additionally, the limitations must be read in light of the "remaining claim language, specification, prosecution history, and relevant extrinsic evidence." *Apple*, 757 F.3d at 1298. "Structure may also be provided by describing the claim limitation's operation such

7

**Appx49**

as its input, output, or connections." *Id.* at 1300. Here, the "processor" terms at issue are coupled to "controlling acess to data" and "implementing . . . code." These accompanying phrases describe the processor's objective and operation. The patents further describe the processor's connections where, in one example, it is "coupled to said non-volatile memory, said program store, said wireless interface, and a user interface . . . ." '772 Patent col. 27:62–63; *see also id.* col 31:5–7 ("a processor coupled to the user interface, to the data carrier interface and to the program store for implementing the stored code . . . ."). Contrary to Defendants' assertions, the patent need not disclose a specific algorithm for performing claimed functions. *Apple*, 757 F.3d at 1298. Accordingly, Defendants failed to overcome the strong presumption that § 112, ¶ 6 does not apply to the "processor" claim limitations, none of which include the term "means."

### Personal Audio

In *Personal Audio*, another court in this District found that the strong presumption against means-plus-function treatment flowing from the absence of "means" had been rebutted. *Personal Audio,* 2011 WL 11757163, at \*21–22. As in this case, the claim limitations recited a "processor." *Id.* However, the reasoning in *Personal Audio* relied heavily on *Aristocrat. Id.* Since *Personal Audio*, the Federal Circuit clarified that "where the claim is not drafted in means-plus-function format, the reasoning in the *Aristocrat* line of cases does not automatically apply, and an algorithm is not necessarily required." *Apple*, 757 F.3d at 1298. The *Aristocrat* reasoning applies where a patentee has expressly invoked means-plus-function claiming to determine whether the patentee has disclosed

sufficient structure to define the scope of such a claim.   Accordingly, the analysis of recited structure in *Personal Audio* differs from the Federal Circuit's guidance in *Apple*.

Moreover, *Personal Audio* differs further from this case.   In *Personal Audio*, both asserted patents shared a common specification and nearly identical claims were at issue. 2011 WL 11757163, at *1–2, *21–22.   The second-issued patent was a divisional of the first-issued patent.   *Id.* at *1.   The court noted that "[t]he claim terms at issue in the [second-issued] patent are nearly identical to the means-plus-function terms found in the [first-issued] patent, except that 'means for' and 'means responsive' have been replaced with "processor for" and "said processor responds."   *Id.* at *21.   Accordingly, there was support for finding that the "processer" terms did not describe structure and were simply a substitute for "means for," which overcame the presumption.   *See Lighting World*, 382 F.3d at 1360.   In this case, "processor" has not simply replaced "means" in otherwise identical claim language between asserted patents.   Therefore, *Personal Audio* is even less persuasive in this situation.

### Conclusion

The R&R's reasoning on the "processor" terms follows Federal Circuit precedent on the strong presumption against applying § 112 ¶ 6 where claims do not recite "means." Defendants cite case law instead addressing the adequacy the specification's disclosure for defining claim scope where a patentee has explicitly invoked means-plus-function claiming.   Even though *Personal Audio* is from this District, it does not control here for the

reasons above.[1]  Accordingly, Defendants failed to overcome the presumption against treating the "processor" limitations as means-plus-function claims.

Having also made a *de* novo review of the other objections filed by Defendants, the Court finds that the findings, conclusions, and recommendation of the Magistrate Judge are correct and Defendants' objections are without merit.  Therefore, the Court hereby **ADOPTS** the Report and Recommendation of the United States Magistrate Judge as the findings and conclusions of this Court.  Accordingly, all objections are overruled.

　　**It is SO ORDERED.**

　　**SIGNED this 4th day of December, 2014.**

_____
MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE

---

[1]  Neither does *Robert Bosch, LLC v. Snap-On Inc.,* No. 2014-1040, 2014 WL 5137569, *1 (Fed. Cir. Oct. 14, 2014) apply here.  *Bosch* involved claims reciting "device," a term that the Federal Circuit explicitly recognizes as a non-structural "nonce" word. *Id.* at 4; *see also* Apple, 757 F.3d at 1299.  Thus, *Bosch's* analysis differs significantly from this case, where "processor" connotes at least some structure, and does not affect the Court's outcome.

10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| SMARTFLASH LLC, et al., | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | **CASE NO. 6:13-CV-447-JRG-KNM** |
| | § | |
| APPLE, INC., et al., | § | |
| | § | |
| **Defendants.** | § | |

| | | |
|---|---|---|
| | § | |
| SMARTFLASH LLC, et al., | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | **CASE NO. 6:13-CV-448-JRG-KNM** |
| | § | |
| SAMSUNG ELECTRONICS CO. LTD, | § | |
| et al., | § | |
| | § | |
| **Defendants.** | § | |

## REPORT AND RECOMMENDATION

Defendants filed Motions for Summary Judgment of Invalidity Pursuant to 35 U.S.C. § 101 (6:13CV447, Doc. No. 266; 6:13CV448, Doc. No. 320).  For the reasons set forth below, the Court recommends that the Motions be **DENIED**.

## BACKGROUND

Plaintiffs Smartflash LLC and Smartflash Technologies Limited (collectively "Smartflash") filed these actions against Apple, Inc. ("Apple"), Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC (collectively "Samsung"), HTC Corporation, HTC America, Inc., and Exedea, Inc. (collectively "HTC") (collectively "Defendants") alleging infringement of the following patents: U.S. Patent No.

7,334,720 ("the '720 Patent"); U.S. Patent No. 7,942,317 ("the '317 Patent"); U.S. Patent No. 8,033,458 ("the '458 Patent"); U.S. Patent No. 8,061,598 ("the '598 Patent"); U.S. Patent No. 8,118,221 ("the '221 Patent"); and U.S. Patent No. 8,336,772 ("the '772 Patent").

The patented technology relates generally to data storage and access systems for paying for and downloading digital content such as audio, video, text, software, games and other types of data. The asserted patents share a common specification. The '720 patent issued from a continuation of U.S. Patent Application No. 10/111716. The '317 Patent issued from a continuation of the application that led to the '720 Patent. The '458 Patent, the '598 Patent, and the '221 Patent all issued from continuations of the application that led to the '317 Patent. The '772 Patent issued from a continuation of U.S. Application No. 12/943,872, which was also a continuation of the application that led to the '317 Patent.

Across both cases, Smartflash asserts the following claims: Claims 1, 13, 14, and 15 of the '720 Patent; Claim 18 of the '317 Patent; Claims 8, 10, and 11 of the '458 Patent; Claims 2, 7, 15, and 31 of the '598 Patent; Claims 2, 11, and 32 of the '221 Patent; and Claims 5, 10, 14, 22, 26, 32 of the '772 Patent.

Asserted Claim 26 of the '772 Patent depends on Claim 25. As one example, Claim 25 recites:

> 25. A handheld multimedia terminal for retrieving and accessing protected multimedia content, comprising:
>
> a wireless interface configured to interface with a wireless network for communicating with a data supplier;
>
> non-volatile memory configured to store multimedia content, wherein said multimedia content comprises one or more of music data, video data and computer game data;
>
> a program store storing processor control code;

a processor coupled to said non-volatile memory, said program store, said wireless interface and

a user interface to allow a user to select and play said multimedia content;

a display for displaying one or both of said played multimedia content and data relating to said played multimedia content;

wherein the processor control code comprises:

code to request identifier data identifying one or more items of multimedia content available for retrieving via said wireless interface;

code to receive said identifier data via said wireless interface, said identifier data identifying said one or more items of multimedia content available for retrieving via said wireless interface;

code to request content information via said wireless interface, wherein said content information comprises one or more of description data and cost data pertaining to at least one of said one or more items of multimedia content identified by said identifier data;

code to receive said content information via said wireless interface;

code to present said content information pertaining to said identified one or more items of multimedia content available for retrieving to a user on said display;

code to receive a first user selection selecting at least one of said one or more items of multimedia content available for retrieving;

code responsive to said first user selection of said selected at least one item of multimedia content to transmit payment data relating to payment for said selected at least one item of multimedia content via said wireless interface for validation by a payment validation system;

code to receive payment validation data via said wireless interface defining if said payment validation system has validated payment for said selected at least one item of multimedia content; and

code responsive to said payment validation data to retrieve said selected at least one item of multimedia content via said wireless interface from a data supplier and to write said retrieved at least one item of multimedia content into said non-volatile memory, code to receive a second user selection selecting one or more of said items of retrieved multimedia content to access;

code to read use status data and use rules from said non-volatile memory pertaining to said second selected one or more items of retrieved multimedia content; and

code to evaluate said use status data and use rules to determine whether access is permitted to said second selected one or more items of retrieved multimedia content,

wherein said user interface is operable to enable a user to make said first user selection of said selected at least one item of multimedia content available for retrieving,

wherein said user interface is operable to enable a user to make said second user selection of said one or more items of retrieved multimedia content available for accessing, and

wherein said user interface is operable to enable a user to access said second user selection of said one or more item of retrieved multimedia content responsive to said code to control access permitting access to said second selected one or more items of retrieved multimedia content.

'772 Patent, Claim 25.

Asserted Claim 13 of the '720 Patent depends on Claim 3. As another example, Claim 3 recites:

3. A data access terminal for retrieving data from a data supplier and providing the retrieved data to a data carrier, the terminal comprising:

a first interface for communicating with the data supplier;

a data carrier interface for interfacing with the data carrier;

a program store storing code; and

a processor coupled to the first interface, the data carrier interface, and the program store for implementing the stored code, the code comprising:

code to read payment data from the data carrier and to forward the payment data to a payment validation system;

code to receive payment validation data from the payment validation system;

code responsive to the payment validation data to retrieve data from the data supplier and to write the retrieved data into the data carrier; and

code responsive to the payment validation data to receive at least one access rule from the data supplier and to write the at least one access rule into the data carrier, the at

least one access rule specifying at least one condition for accessing the retrieved data written into the data carrier, the at least one condition being dependent upon the amount of payment associated with the payment data forwarded to the payment validation system.

'720 Patent, Claim 3.

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(a) provides for summary judgment when "there is no genuine dispute as to any material fact." A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the summary judgment movants demonstrate the absence of a genuine dispute over any material fact, the burden shifts to the non-movant to show there is a genuine factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). A court must draw all reasonable inferences in favor of the non-moving party. *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007).

### *Patentable Subject Matter*

Section 101 of the Patent Act defines patentable subject matter: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. "Congress took this permissive approach to patent eligibility to ensure that ingenuity should receive liberal encouragement." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010) (internal quotations omitted). Supreme Court precedent carves out three specific exceptions to § 101's broad patentability principles: laws of nature, physical phenomena, and abstract ideas. *Id.* These exceptions represent "the basic tools of scientific and

technological work." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354, (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)). "'Monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it,' thereby thwarting the primary object of the patent laws." *Id.* (quoting *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289, 1303 (2012). Accordingly, courts must distinguish between patents that claim the "building blocks of human ingenuity and those that integrate the building blocks into something more." *Id.* (quoting *Mayo*, 132 S. Ct. at1303).

The Supreme Court set forth a two part test for patent eligibility. *Id.* at 2355. First, the court determines whether the claims at issue are directed towards one of the patent-ineligible concepts. *Id.* If so, then the court asks "what else is there in the claims before us?" *Id.* (quoting *Mayo*, 132 S. Ct. at 1296–97). To answer the question, the court considers "the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* (internal quotations omitted). The Court has described the second step as a search for an "inventive concept"—"an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1298).

## DISCUSSION

The Supreme Court's most recent and relevant guidance comes from its *Alice* decision. Although the Court extended the test it set forth in *Mayo*, *Alice* dealt with computer implemented inventions as does the present case.

### Alice

In *Alice*, the asserted patent claimed a computer-implemented means of mitigating settlement risk by using a third-party intermediary. *Id.* at 2351–52. The Supreme Court affirmed a divided Federal Circuit holding that the asserted method, system, and computer-readable media claims were not directed toward eligible subject matter under § 101. *Id.* at 2352. The Court held that the claims at issue were drawn to an abstract idea, and implementing the idea on a computer failed to "transform that abstract idea into a patent-eligible invention." *Id.* The Court determined that the two-step test from *Mayo* governed eligibility questions. *Id.* at 2355. The Court explained that the second step cannot be satisfied by implementing an abstract idea on a computer. *Id.* at 2358 ("[M]ere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention".) Further, the Court clarified that restating method claims as apparatus claims similarly fails to cure eligibility problems when the apparatus includes only generic computer components. *Id.* at 2360 (citing *CLS Bank Int'l v. Alice Corp. Pty.*, 717 F.3d 1269, 1290 (Fed. Cir. 2013) (Lourie, J., concurring) ("[N]one of the hardware recited by the system claims 'offers a meaningful limitation beyond generally linking the use of the [method] to a particular technological environment that is, implementation via computers.'") (internal quotations omitted)). However, the Court confirmed that "many computer-implemented claims are formally addressed to patent-eligible subject matter" and left open the possibility that claims which "improve the functioning of the computer itself" or "any other technology" are patent eligible. *Id.* at 2359.

### Recent Federal Circuit Precedent

Since filing these Motions, both Smartflash and Defendants filed notices of supplemental authority and submitted supplemental briefing, drawing the Court's attention to the following

Federal Circuit decisions made in light of *Alice*: *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) ("*Ultramercial II*"); *DDR Holdings, LLC v. Hotels.com, L.P.*, No. 2013-1505, 2014 WL 6845152 (Fed. Cir. Dec. 5, 2014); and *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, No. 2013-1112, 2014 WL 7272219 (Fed. Cir. Dec. 23, 2014).

1. *Ultramercial II*

In *Ultramercial II*, the asserted patent claimed a "method for distributing copyrighted media products over the Internet where the consumer receives a copyrighted media product at no cost in exchange for viewing an advertisement, and the advertiser pays for the copyrighted content." 772 F.3d at 712.[1] The Federal Circuit held that the claims were drawn to the abstract

---

[1] Claim 1 of the asserted patent was representative and read as follows:

1. A method for distribution of products over the Internet via a facilitator, said method comprising the steps of:

a first step of receiving, from a content provider, media products that are covered by intellectual property rights protection and are available for purchase, wherein each said media product being comprised of at least one of text data, music data, and video data;

a second step of selecting a sponsor message to be associated with the media product, said sponsor message being selected from a plurality of sponsor messages, said second step including accessing an activity log to verify that the total number of times which the sponsor message has been previously presented is less than the number of transaction cycles contracted by the sponsor of the sponsor message;

a third step of providing the media product for sale at an Internet website;

a fourth step of restricting general public access to said media product;

a fifth step of offering to a consumer access to the media product without charge to the consumer on the precondition that the consumer views the sponsor message;

a sixth step of receiving from the consumer a request to view the sponsor message, wherein the consumer submits said request in response to being offered access to the media product;

a seventh step of, in response to receiving the request from the consumer, facilitating the display of a sponsor message to the consumer;
an eighth step of, if the sponsor message is not an interactive message, allowing said consumer access to said media product after said step of facilitating the display of said sponsor message;

a ninth step of, if the sponsor message is an interactive message, presenting at least one query to the consumer and allowing said consumer access to said media product after receiving a response to said at least one query;

idea of using "an advertisement as an exchange or currency" and the claim limitations did not

transform the abstract idea into patent eligible subject matter. *Id.* at 714–15. The court noted

that adding "routine additional steps" to the abstract idea did not transform it into patentable

subject matter, including "updating an activity log, requiring a request from the consumer to

view the ad, restrictions on public access, and use of the Internet." *Id.* at 716. Moreover, the

court explained that because of the "prevalence of the Internet, implementation of an abstract

idea on the Internet . . . is not sufficient to provide any 'practical assurance that the process is

more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* (quoting *Mayo*,

132 S. Ct. at 1297). Finally, the court determined that the claimed method also failed both

prongs of the machine-or-transformation test, which can provide a "useful clue" in the second

step of the *Alice* framework. *Id.* 716–17. The Internet "is a ubiquitous information-transmitting

medium, not a novel machine. And adding a computer to otherwise conventional steps does not

make an invention patent-eligible." *Id.* The claims also failed the transformation prong because

manipulations of "public or private legal obligations or relationships, business risks, or other

such abstractions cannot meet the test because they are not physical objects or substances, and

they are not representative of physical objects or substances." *Id.* (quoting *Bilski*, 545 F.3d at

963).

> 2. *DDR Holdings*

In *DDR Holdings,* the asserted patents claimed a system and method of generating a

composite web page that combined certain visual elements of a "host" website with content of a

> a tenth step of recording the transaction event to the activity log, said tenth step including updating the total number of times the sponsor message has been presented; and
>
> an eleventh step of receiving payment from the sponsor of the sponsor message displayed.

*Id.* (internal citation omitted)

third-party merchant. 2014 WL 6845152 at *1.[2] The Federal Circuit held that the asserted claims "clear[ed] the § 101 hurdle." *Id.* at *8. The court noted that the claims did not recite a mathematical algorithm or a fundamental economic practice. *Id.* at *10 ("Although the claims address a business challenge (retaining website visitors), it is a challenge particular to the Internet."). The court determined that even though the asserted claims might be characterized as an allegedly abstract idea, the "claims satisf[ied] *Mayo/Alice* step two." *Id.* Even though the claims involved both the Internet and a computer, they stood "apart because they [did] not merely recite the performance of some business practice known from the pre-Internet world

---

[2] Claim 19 of the asserted patent at issue was representative and read as follows:

19. A system useful in an outsource provider serving web pages offering commercial opportunities, the system comprising:

(a) a computer store containing data, for each of a plurality of first web pages, defining a plurality of visually perceptible elements, which visually perceptible elements correspond to the plurality of first web pages;

(i) wherein each of the first web pages belongs to one of a plurality of web page owners;

(ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and

(iii) wherein the selected merchant, the out-source provider, and the owner of the first web page displaying the associated link are each third parties with respect to one other;

(b) a computer server at the outsource provider, which computer server is coupled to the computer store and programmed to:

(i) receive from the web browser of a computer user a signal indicating activation of one of the links displayed by one of the first web pages;

(ii) automatically identify as the source page the one of the first web pages on which the link has been activated;

(iii) in response to identification of the source page, automatically retrieve the stored data corresponding to the source page; and

(iv) using the data retrieved, automatically generate and transmit to the web browser a second web page that displays: (A) information associated with the commerce object associated with the link that has been activated, and (B) the plurality of visually perceptible elements visually corresponding to the source page.

*Id.* at 2–3.

along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* The claims called for an "outsource provider" that directed a website visitor to a hybrid web-page that combined the "look and feel" elements of the host website and information from a third-party advertiser's website. *Id.* at *11. When the visitor clicked the third party's advertisement, the hybrid page kept the visitor from leaving the host site. *Id.* There is no "brick and mortar" "analog of what ordinarily occurs in 'cyberspace' after the simple click of a hyperlink" where a customer could be completely transported outside of a store and relocated to a separate physical venue. *Id.* The claims addressed "the challenge of retaining control over the attention of the customer in the context of the Internet . . . ." *Id.* The claims were distinguishable from those in *Ultramercial II* because they did not "broadly and generically claim 'use of the Internet' to perform an abstract business practice" when the limitations were taken together as an ordered combination. *Id.* at *12. Further, the claims did not preempt every application of an idea, but instead recited a specific way of solving a problem faced by websites on the Internet. *Id.*

    3. *Content Extraction*

In *Content Extraction*, the four asserted patents claimed a method of extracting and digitizing data from hard copy documents, recognizing specific information in the data, and storing that information in memory.[3] 2014 WL 7272219 at *1. The Federal Circuit held that the

---

[3] Claim 1 of the first of the four asserted patents recited:

    1. A method of processing information from a diversity of types of hard copy documents, said method comprising the steps of:

        (a) receiving output representing a diversity of types of hard copy documents from an automated digitizing unit and storing information from said diversity of types of hard copy documents into a memory, said information not fixed from one document to the next, said receiving step not preceded by scanning, via said automated digitizing unit, of a separate document containing format requirements;

asserted claims were drawn to patent-ineligible subject matter. *Id.* at *5. As an example of one embodiment, automated teller machines that accept and scan checks for deposit practice the claimed method. *Id.* at *1. Applying step one of *Mayo/Alice*, the court found that the asserted patents claimed the well-known and long-practiced abstract idea of collecting data, recognizing certain data with the collected set, and storing that data in memory. *Id.* at *3. The court rejected the plaintiff's argument that the claims were not abstract because they required a scanner and human minds cannot process the stream of bits output by a scanner. *Id.* The court likened the claims to similar requirements in *Alice*. *Id.* Applying step two, the court found no limitations that transformed the claims into a patent-eligible application, individually or as an ordered combination. *Id.* The court noted that the plaintiff conceded that using a scanner or other device to extract data from documents and using computers to transform shapes on a page into typeface characters were well-known practices. *Id.* at *4. Therefore, the court determined these were routine, conventional activities insufficient to "save a claim in this context." *Id.* Further, the court stated that addressing each asserted claim was unnecessary where the district court identified two as representative and the plaintiff never identified claims that were not fairly represented. *Id.*

### The Parties' Positions

Defendants argue that the claims at issue are directed towards an abstract idea. 6:13CV447, Doc. No. 266 at 2. According to Defendants, patent claims for "long-familiar commercial transactions" and relationships, no matter how narrow, are directed to abstract ideas as a matter of law. *Id.* at 3. (citing *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1353–55 (Fed.

> (b) recognizing portions of said hard copy documents corresponding to a first data field; and
>
> (c) storing information from said portions of said hard copy documents corresponding to said first data field into memory locations for said first data field.

*Id.*

Cir. 2014)). Defendants assert that the two concepts at the heart of the asserted claims are payment and controlling access. *Id.* at 3–4. Further, Defendants assert that these are age-old concepts and the combination of the two—exchanging payment for access—is a building block of the modern economy. *Id.* at 4. Accordingly, Defendants assert that the claims recite an abstract idea under the first step of the *Mayo/Alice* test. *Id.* at 5.

For step two of *Mayo/Alice*, Defendants argue the asserted claims do not disclose an "inventive concept" that is "significantly more" than the abstract idea. *Id.* Defendants assert that limits on the claims to the ideas of payment for data and controlling access to data are field of use limitations that do no transform abstract ideas into patent eligible inventions. *Id.* at 5–6 (citing *Bilski*, 130 S.Ct. at 3230–31; *Parker v. Flook*, 98 S.Ct. 2522, 2528–29 (1978); *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, No. 2:13-CV-655, 2014 WL 4364848, at *5 (E.D. Tex. Sept. 3, 2014) (Bryson, J.)). Defendants further assert that the method steps and "code to" limitations simply instruct that abstract ideas of payment for data and controlling access should be implemented on a generic computer in software code that does not transform the abstract ideas into patent eligible inventions. *Id.* at 6–7. (citing *Alice*, 134 S.Ct. at 2358 ("[R]ecitation of a generic computer cannot transform a patent ineligible abstract idea into a patent eligible invention."); *buySAFE*, 765 F.3d at 1355 (finding that "sending" and "receiving" data over a network is "not even arguably inventive"); *Loyalty*, 2014 WL 4354848, at *10 (finding that "data recording, storage, and calculation" are "conventional functions that can be performed by a generic computer")). Moreover, Defendants contend that the hardware recited in the asserted claims is purely functional and generic because nearly every computer will include "a medium capable of storing information, a processor, a user interface, a display, wireless capabilities, internal and external facing interfaces." *Id.* at 8. Defendants argue the claims disproportionately

foreclose future innovation (preemption) because the "code to" functional claims do not provide a significant description of the particular means by which the various recited functions are performed. *Id.* at 11. Defendants' expert opined that the claims compare to "calling someone up and buying a DVD" in a different context. *Id.* at 13. Further, Defendants assert that the claims also fail the machine-or-transformation test. *Id.* at 14.

Smartflash responds that the claims are not directed to an abstract idea. *Id.* at 4. According to Smartflash, the claims are directed to particular devices with payment capabilities for digital content, access control capabilities for stored digital content, and, in some claims, to particular control access capabilities based on particular payment. *Id.* at 4–5 (citing *Ultramercial Inc. v. Hulu LLC*, 772 F.3d 1335, 1344 (Fed. Cir. 2013) ("*Ultramercial II*"), *cert. granted, judgment vacated sub nom. WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014) ("The Court has long-recognized that any claim can be stripped down, simplified, generalized, or paraphrased to remove all of its concrete limitations, until at its core, something that could be characterized as an abstract idea is revealed. A court cannot go hunting for abstractions by ignoring the concrete, palpable, tangible limitations of the invention the patentee actually claims."). Smartflash points to Claim 26 (dependent on Claim 25) of the '772 Patent and Claim 13 (dependent on Claim 3) of the '720 Patent and asserts that neither is drawn to the abstract ideas of payment for or controlling access to something. *Id.* at 5–6. Smartflash further asserts that other claims are directed toward data retrieval only after payment validation data has been received, which is useful to protect distributors from users who cannot pay for purchased content and an advancement over prior art. *Id.* at 7. Smartflash argues that claims for computer-implemented inventions may be somewhat generic because of the nature of the person having ordinary skill in the art ("PHOSTIA"). *Id.* at 8. (citing *TQP Development, Inc. v. Intuit Inc.,*

2014 WL 651935, at *1, *7 (E.D. Tex. Feb. 9, 2014) (Bryson, J.) (noting the generic nature of the claim language and determining it did not "involve a method of doing business that happens to be implemented on a computer; instead, it involves a method for changing data in a way that will affect the communication system itself, by making it more secure.").

Moreover, Smartflash contends that the asserted claims do not give rise to preemption concerns because both Smartflash and Defendants identified numerous non-infringing alternatives, such as those employed by Netflix and Spotify. *Id.* at 9. As to the machine-or-transformation test, Smartflash contends that its claims are tied to a particular machine and that the invention transforms data. *Id.* at 12. Smartflash argues that even though generic computers have storage mediums and store data, the asserted claims use the storage in a particular way that ties the invention to a particular machine. *Id.* On step two of *Mayo/Alice*, Smartflash maintains that Defendants fail to discharge their burden to show that all the limitations of the asserted claims are simply generic computer or field of use limitations. *Id.* at 3, 13. Smartflash asserts that instead, Defendants overly generalize the patents-in-suit as claiming too much without showing how the patents would preempt basic tools of technological work. *Id.* at 4.

### Supplemental Briefing

After the Federal Circuit decided *Ultramercial II*, the Court granted the parties leave to file supplemental briefing. In their supplemental briefing, Defendants assert that Smartflash relied on *Ultramercial I* and pointed out that the Federal Circuit held *Ultramercial I* is inconsistent with the Supreme Court's *Alice* decision. 6:13CV447, Doc. No. 329 at 1. Defendants compare the invalidated patents in *Ultramercial II* to the patents-in-suit, asserting that the patents in *Ultramercial II* recited the similar capability of permitting access to content after a user views advertising. *Id.* According to Defendants, *Ultramercial II* rejected

Smartflash's argument that the claims are valid because they are directed toward computer-specific problems and improving the function of the computer itself. Defendants further assert that *Ultramercial II* stands for the proposition that even where claims were directed toward a particular transaction structure, the patent claims may impermissibly preempt that particular business method and be invalid. *Id.* at 3.

Smartflash responds that the data-storage limitations are not generic computer limitations because they equip a generic computer with specific capabilities to ensure proprietary digital content is appropriately distinguished from other generic data. 6:13CV447, Doc. No. 339 at 1–4 (comparing *Diamond v. Diehr*, 450 U.S. 175, 188–89 (1981)). According to Smartflash, the combination and implementation of three generic or abstract steps—data storage, retrieving and transmitting data, and access rules—results in patent eligible claims when analyzed as a whole like in *Diehr. Id.* Smartflash contends that the claims in *Ultramercial II* did not purport to solve a computer or technological problem, but simply an economic one with no use of any particular hardware. *Id.* at 5. In contrast, Smartflash argues that the claimed inventions solve a computer-specific problem: "storing use and access rules with the proprietary digital content such that content providers could protect their otherwise generic data from the copying effects of digital networks, while still allowing consumers of digital content the ability to store the digital content permanently." *Id.* at 2. Smartflash asserts that, under *Alice*, once insignificant pre- and post-solution activity and generic implementation—"token activit[ies]"—are ignored, "nothing less than complete preemption of the 'abstract idea' is required." *Id.* at 7. Smartflash distinguishes the asserted patents from those in *Alice*, *Bilski*, and *Loyalty*, arguing that the claims solve a computer-specific problem rather than simply implementing a business method on a computer. *Id.* at 9–10.

### *Applying Mayo/Alice Step One*

The asserted claims recite abstract ideas. "The Supreme Court has not 'delimited the precise contours of the abstract idea category." *Content Extraction*, 2014 WL 7272219, at *3 (quoting *Bilski*, 561 U.S. at 606, 608) (internal citation omitted). Although there is no categorical exception for business methods, "claims directed to the mere formation and manipulation of economic relations may involve an abstract idea." *Id.*

The court must first determine the purposes of the claimed inventions. Applying the Supreme Court's guidance, the Federal Circuit has identified claims directed toward certain financial transactions as claiming abstract ideas. *Id.* (citing *buySAFE, Inc. v. Google, Inc.,* 765 F.3d 1350, 1355 (Fed.Cir.2014) ("creating a transaction performance guaranty for a commercial transaction on computer networks such as the Internet"); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.,* 728 F.3d 1336, 1338 (Fed.Cir.2013) ("generating rule-based tasks for processing an insurance claim"); *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.),* 687 F.3d 1266, 1278 (Fed.Cir.2012) ("managing a stable value protected life insurance policy"); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 ("processing loan information through a clearinghouse")). Here, the asserted claims recite methods and systems for controlling access to content data, such as various types of multimedia files, and receiving and validating payment data. Although not each and every asserted claim explicitly recites a process or system related to payment, the patents' common specification makes it clear that one of the purposes of the claimed invention is to reduce the risk of unauthorized access to content data. *See e.g.*, '720 Patent, Abstract. Payment is one of the primary ways a user becomes authorized, and the patents are directed toward validating payment data, which affects the "use rules" that determine whether access is permitted.

Therefore, the general purpose of the claims—conditioning and controlling access to data based on payment—is abstract and a fundamental building block of the economy in the digital age. Although these patents claim specific methods and systems of applying this purpose, the Court follows the examples in *Mayo* and *Alice* and only looks at the general purpose at step one. The Court considers specific limitations at step two.

### Applying Mayo/Alice Step Two

The asserted claims contain meaningful limitations that transform the abstract idea of the general purpose of the claims into a patent-eligible invention. Defendants attempt to boil down the claims to simply "payment for something" and "controlling access to something" with generic implementation. While discussing the patents-in-suit broadly, Defendants never assert that any claim or claims are representative of the asserted claims. Although exchanging access to something for payment for something is unquestionably a long-standing economic practice, the asserted claims recite more than Defendants' over-generalized characterizations. Defendants highlight Claim 11 of the '458 Patent (which depends on Claim 6), but asserted Claim 1 of the '720 Patent recites more specific limitations. For example, the claim recites reading "status data" and evaluating such data according to stored "use rules" that determine whether access to previously stored content is permitted. '720 Patent Claim 1. The claims also recites "parameter memory" and "content memory." Even Claim 11 of the '458 Patent recites specific types of information and how it should be used in a particular way in the claimed system.

In *Ultramercial II*, the court characterized the limitations as merely distributing media over the Internet with the condition of viewing an advertisement and recording events in an activity log. In *Content Extraction*, the claims simply recited the long-practiced abstract idea of collecting data, recognizing certain data, and storing that data with already well-known methods.

By contrast, the asserted claims here recite specific ways of using distinct memories, data types, and use rules that amount to significantly more than the underlying abstract idea. Although in some claims the language is functional and somewhat generic, the claims contain significant limitations on the scope of the inventions.

Additionally, the court's reasoning for upholding the patent-at-issue in *DDR Holdings*—where the representative claim recited less-specific limitations and largely functional language—applies here. As in *DDR Holdings*, the patents here do not simply apply a known business practice from the pre-Internet world to computers or the Internet. "The claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *See DDR Holdings*, 2014 WL 6845152, at *10. Digital Rights Management is a technology that was developed after widespread use of the Internet. Entry into the Internet Era presented new and unique problems for digital content providers in combatting unauthorized use and reproduction of protected media content. Digital content became easy to reproduce for anyone with access to a computer. Piracy of digital content became widespread through means unknown to the pre-Internet world. The patents claim methods and systems designed to prevent such easy and unauthorized reproduction and access while allowing the access to be nearly instantaneous and the storage to be permanent.

The patents also address the unique problem of controlling a user's access to data that the user already possesses by tracking use data and restricting access according to use rules. This sort of access control was also unknown in the pre-Internet era, even though Defendants' expert opined that the patents can be likened to ordering a DVD over the telephone. Extending the illustration, once a DVD is shipped to and in the possession of the user, the user has unlimited access to the data on the DVD. However, in addition to allowing instant access to content, the

asserted patents claim technology that allows a user to download content data that may come with certain access restrictions, such as the number of times a user may watch a movie, the length of time the user has access to it, and restrictions on reproducing it. For example, Claim 1 of '720 Patent—one of the most basic and general of the asserted claims—recites a method of: (1) receiving access requests for stored content data in non-volatile memory; (2) reading use status data and use rules from parameter memory; (3) evaluating the use status data according to the use rules to determine if access is permitted; and (4) displaying whether access to the content data is permitted. This sort of access control would not be possible with a DVD already in possession of the user. Thus, the patents do not "broadly and generically claim use of the Internet to perform an abstract business practice." Instead the claims solve problems faced by digital content providers in the Internet Era and "improve the functioning of the computer itself" by providing protection for proprietary digital content.

Further, the claims do not risk preempting all future inventions related to exchanging access to data for payment on the Internet. Instead, when taken as ordered combinations, the claims recite specific ways of combining system components and method steps beyond the routine use of the Internet. The claims address specific ways of managing access to digital content data based on payment validation through storage and retrieval of use status data and use rules in distinct memory types and evaluating the use data according to the use rules. The patents' claims include meaningful limitations that "ensure the claims are more than a drafting effort designed to monopolize the abstract idea." *DDR Holdings*, 2014 WL 6845152, at \*12. As in *DDR Holdings*, the claims recite an inventive concept for resolving a particular "Internet-centric problem." *Id.*

The asserted claims are unlike the claims in *Alice*, *Ultramerical II*, and *Content*

*Extraction* that claimed little more than abstract concepts. The claims do not "recite a commonplace business method aimed at processing business information, applying a known business process to the technological environment of the Internet," or collecting, recognizing, and storing data on a generic computer as did the claims in those cases. *See id.* Thus, the claimed methods and systems are patent-eligible under § 101.

## CONCLUSION

Defendants failed to show that the asserted patents claim ineligible subject matter. Accordingly, the Court recommends that Defendants' Motions for Summary Judgment of Invalidity Pursuant to 35 U.S.C. § 101 (6:13CV447, Doc. No. 266, 6:13CV448, Doc. No. 320) be **DENIED**.

Within fourteen days after receipt of the Magistrate Judge's report, any party may serve and file written objections to the findings and recommendations of the Magistrate Judge. 28 U.S.C. § 636(b).

A party's failure to file written objections to the findings, conclusions, and recommendations contained in this Report within fourteen days after service shall bar that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations, and except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Services Auto. Assn.*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superseded by statute on other grounds*; 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

So ORDERED and SIGNED this 21st day of January, 2015.

K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **SMARTFLASH LLC,** *et al.,* | § | |
| | § | |
| **Plaintiffs,** | § | CASE NO. 6:13cv447-JRG-KNM |
| | § | |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **APPLE INC.,** *et al.,* | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| **SMARTFLASH LLC,** *et al.,* | § | |
| | § | |
| **Plaintiffs,** | § | CASE NO. 6:13cv448-JRG-KNM |
| | § | |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **SAMSUNG ELECTRONICS CO., LTD.** | § | |
| *et al.,* | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**<u>ORDER</u>**

Before the Court are Defendants' Motions for Summary Judgment Regarding Invalidity

Pursuant to 35 U.S.C. § 101 (6:13CV447, Doc. Nos. 266; 6:13CV448, Doc. No. 320) and the

Magistrate Judge's Report and Recommendation (6:13CV447, Doc. No. 423; 6:13CV448; Doc. No.

454) recommending that the Motions be denied.  Having considered Defendants' Objections to the

Report and Recommendation Regarding Apple's and Defendants' Motions for Summary Judgment

Regarding Invalidity Pursuant to 35 U.S.C. § 101 (6:13CV447, Doc. No. 457; 6:13CV448, Doc.

No. 477), and having conducted a *de novo* determination of those portions of the Report and

Recommendation as to which objection was made, the Court finds no error therein.

Defendants assert that the Court's claim construction that not all asserted claims require

"logically separate" memories for certain types of data directly contradicts the Court's reliance on

the patents' recitations of distinct memory types.  However, in ruling on the instant motion, the Court recognized that the patents recite several different memory types throughout the claims—as opposed to simply generic computer memory.  This is one element among the combination of limitations that provides an inventive concept.  Recognizing that the claims do more than recite generic computer memory does not contradict a finding that some claims require "logically separate" storage of certain data types.

The Court hereby adopts the findings and recommendations of the Magistrate Judge. Accordingly,

IT IS ORDERED that Defendants' Motions for Summary Judgment Regarding Invalidity Pursuant to § 101 (6:13CV447, Doc. Nos. 266; 6:13CV448, Doc. No. 320) are DENIED.

**So ORDERED and SIGNED this 13th day of February, 2015.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| SMARTFLASH LLC, et al., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Case No. 6:13-cv-447-JRG |
| APPLE INC., et al., | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## <u>ORDER</u>

Before the Court is the Renewed Motion for Judgment of No Willful Infringement as a Matter of Law under Rule 50(b) (Dkt. No. 549) filed by the Defendant Apple Inc. ("Apple"). Plaintiff Smartflash LLC, et al. ("Smartflash") responds as part of an omnibus response (Dkt. No. 555) and requests the Court to enter judgment in accordance with the jury verdict (Dkt. No. 551, Dkt. No. 503). On July 1, 2015, the Court held a hearing regarding both parties' motions. For the reasons set forth, the Court hereby **GRANTS** Apple's Motion.

"A finding of willful infringement allows an award of enhanced damages under 35 U.S.C. § 284." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs, Inc.*, 682 F.3d 1003, 1005 (Fed. Cir. 2012) (citing *In re Seagate Tech., LLC*, 497 F.3d 1360, 1368 (Fed. Cir. 2007) (en banc)). "[T]o establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc). This standard contains both an objective prong and a subjective prong. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs, Inc.*, 682 F.3d 1003, 1005 (Fed. Cir. 2012).

Based on a review of the totality of the trial record before the Court and the evidence presented to the jury during the trial, but without expressly adopting any of Apple's arguments in its Rule 50(b) motion, the Court finds that no reasonable jury could have concluded that Apple's infringement was willful. Specifically, no reasonable jury could have concluded that the subjective prong was met with respect to Apple's pre-suit conduct in this case.[1] Accordingly, based on the particular circumstances of this case, the Court finds no willful infringement, *see In re Seagate Tech. LLC,* 497 F.3d 1360, 1374 (Fed. Cir. 2007) (en banc); *Affinity Labs of Tex., LLC v. Alpine Electrs. Of Am., Inc.*, 2009 WL 9091275, at *1 (E.D. Tex. Sept. 2, 2009).

The Court therefore **GRANTS** Apple's Rule 50(b) Renewed Motion for Judgment of No Willful Infringement as a Matter of Law (Dkt. No. 549). The Court hereby directs the entry of judgment as a matter of law for Apple on the issue of willfulness.

**So ORDERED and SIGNED this 2nd day of July, 2015.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

---

[1] Plaintiff's primary witness through which it sought to establish willful infringement by Apple was Augustin Farrugia, an Apple employee. Though examined adversely by Plaintiff, the Court finds nothing in his testimony which even approximates the clear and convincing evidence necessary to establish willfulness. The full transcript of his testimony can be found in Dkt. No. 516 at 46:1–108:25.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| SMARTFLASH LLC, et al., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 6:13-cv-447-JRG |
| | § | |
| APPLE INC., et al., | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## <u>ORDER</u>

Before the Court is the Renewed Motion for Judgment as a Matter of Law on the Issue of

Damages under Rule 50(b) and/or a New Trial under Rule 59(e) (Dkt. No. 548) filed by the

Defendant Apple Inc. ("Apple"). Plaintiff Smartflash LLC, et al. ("Smartflash") responds in an

omnibus response (Dkt. No. 555). On June 24, 2015, the Court notified the parties pursuant to

Rule 59(d) that it was considering granting a motion for a new trial for a reason not stated in

Apple's original motion (Dkt. No. 571). On July 1, 2015, the Court held a hearing regarding

Apple's Motion and the Rule 59(d) notification. The Court previously addressed the issue of

willfulness (Dkt. No. 580). For the reasons set forth below, the Court **GRANTS** a new trial on

the issue of damages.

## I.      BACKGROUND

At trial in this case and at Apple's request,[1] the Court instructed the jury on the

substantive legal rule known as the entire market value rule. (2/24 AM TT (Jury Instructions)

---

[1] *Smartflash* objected to the inclusion of this jury instruction. Apple urged that this instruction be included. *See* (Third Joint Proposed Final Jury Instructions at 39–40, Dkt. No. 499-1); (7/1 Hr'g Tr. 39:16–18 (responding to the Court's question about whether the "instruction came from Apple," Apple responded, "That's correct. The language in the instruction.")).

62:9–17, Dkt. No. 521). Smartflash argues that it did not employ the entire market value rule at trial. (Pl.'s Resp. at 26, Dkt. No. 555). At the July 1, 2015, post-trial hearing on the issues, the Court asked Apple: "In your view, is this an entire market value rule case, or is this an apportionment case?" (7/1 Hr'g Tr. 36:25–37:2). Apple did not respond to the Court's question with any certainty as to whether it believed Smartflash presented an entire market value rule damages case at trial;[2] instead, Apple stated that "[e]ither this is not an entire market value case, which is the Smartflash current position. . . . If that's true, Your Honor, then a new trial is required because the jury was instructed on entire market value and . . . there is no basis for that jury instruction."[3] (7/1 Hr'g Tr. 38:12–19). The Court finds that Smartflash did not attempt to apply the substantive legal rule known as the entire market value rule, and the Court agrees with

---

[2] Apple has made previous comparisons of Smartflash's damages model to the entire market value rule in this case. *See, e.g.*, (Def.'s JMOL on Damages at 3–6, Dkt. No. 548 ("Smartflash's evidence was not only unreliable, but it violated the entire market value rule . . .")); (Def.'s Reply at 1, Dkt. No. 563 ("Thus, by definition, [Smartflash's damages expert] employed the EMVR for that subset of devices. Smartflash's claim that it does not rely on the EMVR also contradicts its earlier argument that the "alone motivate" question satisfies *LaserDynamics*' requirements.")); *id.* at 2 ("Mr. Mills' reliance on the 'alone motivate' surveys violated the EMVR.")); (Second Daubert Hr'g Tr. 30:9–10, Dkt. No. 459 (Apple's Counsel: "[Smartflash's damages expert] relied on that [survey question] as establishing predicate for the entire market value rule."); *id.* 30:24–31:1 ("[T]he way that [Smartflash's damages expert] relied upon [the survey question] still does not justify invocation of the entire market value rule, which is what he relies upon it to do."); *id.* 31:8–9 ("[T]here has to be a coterminous relationship between an EMVR-type issue and the patented feature.")); (First Daubert Hr'g Tr. 192:15–19, Dkt. No. 418 (Apple's Counsel: "Neither of the survey questions nor the responses are consistent with the *LaserDynamics* test, the sole motivation test. They've got the wrong question.")); (Def.'s Mot. to Exclude Test. of Mills at 1, 4–7, Dkt. No. 279 ("Mr. Mills' damages analysis violates Rule 702 and Federal Circuit law by employing a royalty base that is contrary to the entire market value rule, by failing to apportion . . . .")); (Def.'s Reply at 1–3, Dkt. No. 315); (Def.'s Mot. to Exclude Test. of Wecker at 7–8, Dkt. No. 280); (Def.'s Second Mot. to Exclude Test. of Mills at 5–8, Dkt. No. 434).

[3] *See supra* text accompanying footnote 1.

Apple's argument that a new trial on damages is necessary in light of the instruction the Court provided to the jury.

## II.    DISCUSSION

"[T]he classic way to determine the reasonable royalty amount is to multiply the royalty base, which represents the revenue generated by the infringement, by the royalty rate, which represents the percentage of revenue owed to the patentee." *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 27 (Fed. Cir. 2012); *Cornell Univ. v. Hewlett–Packard Co.*, 609 F.Supp.2d 279, 286 (N.D.N.Y. 2009) (Rader, J.) ("Calculation of a reasonable royalty . . . requires determination of two separate quantities—a royalty base, or the revenue pool implicated by the infringement, and a royalty rate, the percentage of that pool adequate to compensate the plaintiff for that infringement."); *see also  Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1339 (Fed. Cir. 2009) ("[A]ll running royalties have at least two variables: the royalty base and the royalty rate." (internal quotation marks and alterations omitted)).

"[T]he governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). To accomplish this, in the Supreme Court's words, the patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative . . . ." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). Otherwise, the patentee "must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." *Id.*

### i. Apportionment

As Apple noted at the July 1, 2015, hearing on the post-trial issues, the Supreme Court case of "*Garretson* sets forth two approaches, apportionment or entire market value." (7/1 Hr'g Tr. (Apple) 39:20–21). In the present case, Smartflash attempted to take salable, multi-component products and "apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features" of those products. *Garretson v. Clark*, 111 U.S. 120, 121 (1884). For example, if the Court assumes (for this purpose) that the jury defined the entire market as only the sales of certain iPhone, iPad, and iPod Touch devices,[4] which are all salable units that—based on the jury verdict—practice the patented software invention, then Smartflash subtracted from the royalty base a portion (77%) of the total value of these sales based on the answer to particular consumer survey questions.[5] *See, e.g.*, (2/17 PM TT (Mills) (Sealed Portion #3) 21:11–14). At its root, then, Smartflash's royalty base encompassed about 23% of the total revenue generated by the sales of the accused products, not 100% of it. Smartflash then multiplied a royalty rate (also based on a consumer survey) with this royalty base to calculate its ultimate reasonably royalty estimate. (2/17 PM TT (Mills) 152:13–14).

---

[4] Despite Smartflash's evidence to the contrary. *See* (2/17 PM TT (Mills) (Sealed Portion #3) 24:3–6 (excluding from the royalty base revenue associated with the sales of content within the App Store and iTunes store; revenue that Smartflash presented evidence tending to show is attributable to its invention); *id.* 10:1–4 (excluding from the royalty base revenue associated with the sales of other Apple products such as Mac computers)).

[5] By way of example, one of those survey questions applied to the royalty base calculation told consumers to "consider the capability to purchase apps from Apple's App Store" and then asked the consumers whether they were "motivated to buy" the multi-component device because of the infringing technology. (2/17 PM TT (Wecker) 52:16–22). Only 23% of people responded "yes" to that survey question, meaning those purchasers were "motivated to buy" based on the survey's description of the patented features, while nearly 77% of purchasers—those that answered "no"—were "motivated to buy" based on some other features—namely, the unpatented features. At this time, the Court does not comment on the sufficiency of Smartflash's survey questions.

Smartflash's damages model—with a degree of oversimplification—apportions familiar inputs to the royalty base and rate calculations by using the results of two consumer surveys (one that asks about whether the consumers were motivated to purchase[6] the accused products because of the infringing features). In other words, through the use of survey questions, Smartflash attempted to apportion for the jury "the incremental value that the patented invention adds to the end product." *Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *Virnetx v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features."); *id.* at 1329 (faulting damages expert under the entire market value rule for failing "to subtract any other unpatented elements from the [royalty] base."); *id.* at 1329 ("[A] patentee's obligation to apportion damages only to the patented features does not end with the identification of the smallest salable unit if that unit still contains significant unpatented features."); *see also Garretson v. Clark*, 111 U.S. 120, 121 (18840 ("[T]he patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features."); *Sentius Int'l, LLC v. Microsoft Corp.*, No. 5:13-CV-00825, 2015 WL 451950, at *11 (N.D. Cal. Jan. 27, 2015) (the plaintiff's damages "theory is not a hidden attempt to avoid the entire market value rule because [the damages expert] did not derive damages using [the defendant's] revenue and profit from all sales of the accused products").

### ii.    Jury Instruction

While the Court has separate and material concerns about the "ultimate combination of royalty base and royalty rate" which Smartflash used during trial to identify the "value

---

[6] At the Court's direction, Smartflash included the word "alone" in its motivate question.

attributable to the infringing features of the [accused] product[s]," *Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014), the confusion created by the instruction noted above warrants a new trial on damages in this case. The Court is persuaded, in the clarity of post-trial hindsight, that such instruction[7] may have created a skewed damages horizon for the jury. It is the Court's duty to view any and all proposed instructions critically and with an eye toward accurate compliance with the law coupled with effective and fair guidance for the jury. Post-trial motion practice exists to provide an opportunity to correct (and when necessary retry) matters not properly tried in the first place.

In addition, Apple has argued that Smartflash's damages model is inextricably intertwined with issues of liability and infringement. (7/1 Hr'g Tr. 42:7–14). In light of the separate concerns about Smartflash's damages model, the Court anticipates that Smartflash will present a different model in the new trial. As Apple's counsel noted at the hearing, there are "many, many ways to calculate a royalty that have nothing to do with liability and have nothing to do with infringement." (7/1 Hr'g Tr. 42:25–43:2). Given that the Court expects Smartflash to present, at the new trial, a damages model that moots this issue as raised by Apple, the Court declines to address Apple's argument at this time.

Thus, the Court hereby **ORDERS** that a new trial only on the issue of damages be **GRANTED**. Accordingly, the jury's verdict finding damages of $532, 900,000.00 is **SET ASIDE** and **VACATED**. The Court hereby **ORDERS** that jury selection for a new trial concerning the issue of damages be set for **Monday, September 14, 2015, at 9:00 a.m** in Tyler, Texas**.**

---

[7] The instruction was not an incorrect statement of law. However, it was inapplicable to the facts of this case.

So **ORDERED and SIGNED** this 7th day of July, 2015.

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

**Appx84**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| SMARTFLASH LLC, et al., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Case No. 6:13-CV-447-JRG-KNM |
| | § | |
| APPLE INC., et al., | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the Court is Defendant Apple Inc.'s ("Apple's") "Motion for Reconsideration of the Court's Orders Adopting Claim Constructions and Denying Summary Judgment on Indefiniteness (Dkt. No. 351) and Denying Partial Summary Judgment of Noninfringement (Dkt. No. 482), or in the Alternative for a New Trial." (Dkt. No. 573.) Also before the Court is the response of Plaintiffs Smartflash LLC and Smartflash Technologies Ltd. (collectively, "Plaintiff") as well as Apple's reply thereto. (Dkt. Nos. 574 & 577.)

The Court held a hearing on this motion in conjunction with a hearing on various post-trial motions on July 1, 2015. (*See* Dkt. No. 576, 6/26/2015 Order.)

**BACKGROUND**

Prior to trial, the assigned United States Magistrate Judge received claim construction briefing, held a claim construction hearing on July 17, 2014, and entered a Report and Recommendation on claim construction on September 24, 2014. (Dkt. No. 229.) The Court analyzed and overruled objections in an Order Adopting Report and Recommendation of United States Magistrate Judge on December 4, 2014. (Dkt. No. 351.)

In addition, prior to trial the assigned United States Magistrate Judge received briefing on, and entered a Report and Recommendation recommending denial of, Apple's Motion for Partial Summary Judgment of Non-Infringement (Dkt. No. 271) on January 5, 2015.  (Dkt. No. 390.)  The Court overruled objections in an Order adopting the Report and Recommendation on February 13, 2015.  (Dkt. No. 482.)

The above-captioned case proceeded to a jury trial that resulted in a verdict on February 24, 2015.  (*See* Dkt. No. 503, Jury Verdict).

Apple now moves for reconsideration of the above-mentioned Orders in light of *Williamson v. Citrix Online, LLC*, --- F.3d ----, 2015 WL 3687459 (Fed. Cir. June 16, 2015), in which the Court of Appeals for the Federal Circuit abrogated certain prior statements regarding the presumption against applying 35 U.S.C. § 112, ¶ 6 means-plus-function treatment to claim language that does not use the word "means."  *See id.*, at *7.

## LEGAL PRINCIPLES

Motions to reconsider serve a very limited purpose: "to permit a party to correct manifest errors of law or fact, or to present newly discovered evidence."  *Krim v. pcOrder.com, Inc.*, 212 F.R.D. 329, 331 (W.D. Tex. 2002); *accord Tex. Instruments, Inc. v. Hyundai Elecs Indus., Co.*, 50 F. Supp. 2d 619, 621 (E.D. Tex. 1999).  Only three grounds permit granting a motion to reconsider: "(1) an intervening change in controlling law; (2) the availability of new evidence not previously available; or (3) the need to correct a clear error of law or to prevent manifest injustice."  *In re Benjamin Moore & Co.*, 318 F.3d 626, 629 (5th Cir. 2002).

Mere disagreement with a district court's order does not warrant reconsideration of that order.  *Krim*, 212 F.R.D. at 332.  A party should not restate, recycle, or rehash arguments that were previously made.  *Id.* at 331.  Rather, "litigants are expected to present their strongest case

when the matter is first considered." *Louisiana v. Sprint Commc'ns. Co.*, 899 F. Supp. 282, 284 (M.D. La. 1995).

## THE PARTIES' POSITIONS

Apple submits that "[i]n *Williamson*, the *en banc* Federal Circuit held that the 'heightened burden' of the 'strong presumption' was 'unjustified.'" (Dkt. No. 573, at 3 (quoting 2015 WL 3687459, at *7).) Apple urges that "[e]ach of the four claims asserted at trial recites at least one element that, under the *Williamson* standard, should have been construed under § 112, paragraph 6. . . . [S]uch a construction would have resulted in a finding of indefiniteness and/or noninfringement." (Dkt. No. 573, at 3.) Apple concludes that *Williamson* warrants reconsideration of the Court's claim constructions and denial of summary judgment of non-infringement. (*Id.*, at 5 (citing *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990) ("a new decision clarifying the applicable substantive law may justify reexamining a denial of summary judgment"), *overruled on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 n.14 (5th Cir. 1994)).)

Plaintiff responds that "[i]n *Williamson v. Citrix Online LLC*, the Federal Circuit overruled the characterization of the presumption (as a 'strong' one) that a limitation lacking the word 'means' is not subject to § 112 ¶ 6. The presumption, itself, is still intact. While *Williamson* may impact rulings in other cases, it changes nothing here. . . . None of the prior rulings in this case hinged on the strength of the presumption that § 112 ¶ 6 does not apply to [Plaintiff's] claims." (Dkt. No. 574, at 1 (citations omitted).) Plaintiff argues that the Court did not rely on characterizations of the presumption as "strong" but rather cited principles set forth in cases reaffirmed by *Williamson* and in cases that predate the *Lighting World* decision abrogated by *Williamson*. (*Id.*, at 2-4 (discussing, *inter alia*, *Lighting World, Inc. v. Birchwood Lighting*,

*Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) & *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d

1580 (Fed. Cir. 1996)).)  Plaintiff urges that the Court "correctly recognized that the terms

'processor' and 'code' are structural elements."  (Dkt. No. 574, at 4.)  Plaintiff explains:

> The terms "processor" and "code" are not nonce terms that could refer to any
> possible structure.  The structure of the term "processor" can only be a processor.
> The structure of the term "code" can only be code.  A person of skill in the art
> understands exactly what structure is required by these terms immediately upon
> reading them.

(*Id.*, at 5.)

Apple replies that reconsideration is appropriate because "[t]he Court previously applied

the 'strong presumption' that *Williamson* has now eliminated."  (Dkt. No. 577, at 2.)  Apple

argues that Plaintiff "fails to provide any explanation as to why 'processor' and 'code' are not

identical in substance to 'means' and fails to explain how these terms are any different from

'module,' which the Federal Circuit [in *Williamson*] held was a nonce term invoking § 112, ¶ 6."

(*Id.*, at 4.)  Finally, Apple reiterates that summary judgment should be revisited and, "[a]t a

minimum, reconstruing the claims requires a new trial on all issues because the constructions on

which the verdict was rendered were erroneous, and this error was not harmless."  (*Id.*, at 5.)

In sur-reply, Plaintiff argues that "Apple still fails to show how *Williamson* changes

*anything* in the analysis of the prior rulings or how *Williamson* demands a different outcome."

(Dkt. No. 578, at 1.)  Plaintiff reiterates that "processor" and "code" are not "nonce" words.  (*Id.*,

at 2-3.)  Plaintiff further argues that Apple improperly relies upon cases relating to lack of

corresponding structure, which Plaintiff submits are applicable if and only if a term is found to

be a means-plus-function term.  (*Id.*, at 3.)

**ANALYSIS**

*Williamson*, in an *en banc* portion of the decision, abrogated prior statements that the absence of the word "means" gives rise to a "strong" presumption against means-plus-function treatment. 2015 WL 3687459, at *7 (citation omitted). *Williamson* also abrogated prior statements that this presumption "is not readily overcome" and that this presumption cannot be overcome "without a showing that the limitation essentially is devoid of anything that can be construed as structure." *Id.* (citations omitted). Instead, *Williamson* found, "[h]enceforth, we will apply the presumption as we have done prior to *Lighting World . . . .*" *Id.* (citing 382 F.3d 1354). In a subsequent part of the decision not considered *en banc*, *Williamson* affirmed the district court's finding that the term "distributed learning control module" was a means-plus-function term that was indefinite because of lack of corresponding structure, and in doing so *Williamson* stated that "'module' is a well-known nonce word." *Id.*, at *8-*9.

The parties dispute whether the findings in *Williamson* warrant reconsideration of the Court's findings that certain "code" and "processor" terms are not means-plus-function terms. (*See* Dkt. No. 229 at 32-35; *see also* Dkt. No. 351.)

The terms "code" and "processor" as used here are distinguishable from the word "module" in *Williamson* because, for example, Apple's own expert has opined that the word "processor" connotes structure to a person of ordinary skill in the art as "a general-purpose processor that can be programmed to carry out specific functions." (Dkt. No. 161-1, 6/20/2004 Cromarty Decl., at ¶ 29; *see id.*, at ¶ 32 ("a person o[f] ordinary skill in the art, when reading the claims and intrinsic record of the patents-in-suit, would have understood that the term 'processor' itself refers to a general-purpose processor, as opposed to a specialized microprocessor designed to provide specific functionality").) Plaintiff has also submitted a

technical dictionary definition[1] reinforcing that the word "processor" connotes structure to a person of ordinary skill in the art. (Dkt. No. 174, Ex. 1, *The Authoritative Dictionary of IEEE Standards Terms* 872 (7th ed. 2000) (defining a "processor" as, for example, "[a] device that interprets and executes instructions, consisting of at least an instruction control unit and an arithmetic unit").)

Similarly, the word "code" refers to a particular type of structure, as discussed by expert declarations submitted by defendants in a companion case. (*See Smartflash LLC, et al. v. Samsung Elecs. Co., Ltd., et al.*, No. 6:13-CV-448, Dkt. No. 177-1, 6/20/2014 Wolfe Decl., at ¶ 40 ("A general purpose processor of the type available for purchase during the relevant time period (or, for that matter, available for purchase now) is designed to interpret and execute instructions that are provided to it as compiled machine code. The machine code is generated from a computer program written by a human programmer that contains one or more algorithms, each of which is a set of steps to be carried out by the processor in order to perform an intended function."); *see also id.* at ¶¶ 41-42; *id.*, Dkt. No. 521-1, 6/30/2015 Wolfe Decl., at ¶ 42 (similar).)

Thus, at least in the present context, "processor" and "code" are not "nonce" words. *See Williamson*, 2015 WL 3687459, at *6 ("What is important is . . . that the term, as the name for structure, has a reasonably well understood meaning in the art.") (quoting *Greenberg*, 91 F.3d at 1583).

Further, *Williamson* found that the claim at issue did not "describe how the 'distributed learning control module' interacts with other components in the distributed learning control

---

[1] *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("We have especially noted the help that technical dictionaries may provide to a court to better understand the underlying technology and the way in which one of skill in the art might use the claim terms.") (citations and internal quotation marks omitted).

server in a way that might inform the structural character of the limitation-in-question or otherwise impart structure . . . ." *Id.*, at 8. Here, the terms at issue are not merely "code" and "processor" but rather include substantial additional language[2] describing the operation of the components at issue and their interaction with other components.[3] (*See* Dkt. No. 351, at 7-8.)

Finally, although Apple again cites *Personal Audio, LLC v. Apple, Inc.*, No. 9:09-CV-111, 2011 WL 11757163, at *21 (E.D. Tex. Jan. 30, 2011),[4] the Court adequately addressed Apple's arguments upon overruling objections to the Report and Recommendation on claim construction. (*See* Dkt. No. 351, *esp.* at 8-9.)

---

[2] *See Williamson*, 2015 WL 3687459, at *8 ("We begin with the observation that the claim limitation in question is not merely the introductory phrase 'distributed learning control module,' but the entire passage 'distributed learning control module for receiving communications transmitted between the presenter and the audience member computer systems and for relaying the communications to an intended receiving computer system and for coordinating the operation of the streaming data module.'"); *see also Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003) ("[T]he primary source of . . . error lies in the district court's reliance on single words of the limitations . . . as opposed to the limitations as a whole . . . .").

[3] Apple submits that the relevant terms recited in the claims that were asserted at trial ('720 Patent, Claim 13; '221 Patent, Claim 32; '772 Patent, Claims 26 and 32) are: "code responsive to the payment validation data to receive at least one access rule from the data supplier and to write the at least one access rule into the data carrier, the at least one access rule specifying at least one condition for accessing the retrieved data written into the data carrier, the at least one condition being dependent upon the amount of payment associated with the payment data forwarded to the payment validation system" ('720 Patent, Claim 13; '221 Patent, Claim 32); "code responsive to the payment validation data to retrieve data from the data supplier and to write the retrieved data into the data carrier" ('720 Patent, Claim 13; '221 Patent, Claim 32); "code responsive to said payment validation data to retrieve said selected at least one item of multimedia content via said wireless interface from a data supplier and to write said retrieved at least one item of multimedia content into said nonvolatile memory" ('772 Patent, Claim 26); "code responsive to the payment validation data to retrieve said selected at least one content data item from a data supplier and to write said retrieved at least one content data item into said data carrier" ('772 Patent, Claim 32); "code to evaluate said use status data and use rules to determine whether access is permitted to said second selected one or more items of retrieved multimedia content" ('772 Patent, Claim 26); and "code to evaluate said use status data and use rules to determine whether access is permitted to said second selected one or more retrieved content data items" ('772 Patent, Claim 32). (Dkt. No. 573, at 4-5.)

[4] (*See* Dkt. No. 577, at 4.)

In sum, although *Williamson* abrogated any characterization of the presumption as "a strong one that is not readily overcome" or any requirement of finding that "the limitation essentially is devoid of anything that can be construed as structure,"[5] in the above-captioned case the Court's analysis did not turn, explicitly or implicitly, upon such characterizations of the presumption. (*See* Dkt. No. 229 at 32-35; *see also* Dkt. No. 351.)

Instead, the Court applied long-standing principles articulated prior to the abrogated *Lighting World* decision. *See id.*; *see, e.g., Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004) ("when the structure-connoting term 'circuit' is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 ¶ 6 presumptively will not apply"; noting "language reciting [the circuits'] respective objectives or operations"); *Apex*, 325 F.3d at 1372 ("While we do not find it necessary to hold that the term 'circuit' by itself always connotes sufficient structure, the term 'circuit' with an appropriate identifier such as 'interface,' 'programming' and 'logic,' certainly identifies some structural meaning to one of ordinary skill in the art."); *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998) ("Even though the term 'detector' does not specifically evoke a particular structure, it does convey to one knowledgeable in the art a variety of structures known as 'detectors.' We therefore conclude that the term 'detector' is a sufficiently definite structural term to preclude the application of § 112, ¶ 6."); *Greenberg*, 91 F.3d at 1583 (finding that "detent mechanism" was not a means-plus-function term because it denotes a type of device with a generally understood meaning in the mechanical arts);[6] *Affymetrix, Inc. v. Hyseq, Inc.*, 132 F.

---

[5] 2015 WL 3687459, at *7 (citation omitted).

[6] *Greenberg*, 91 F.3d at 1583 ("'detent' denotes a type of device with a generally understood meaning in the mechanical arts, even though the definitions are expressed in functional terms");

Supp. 2d 1212, 1232 (N.D. Cal. 2001) (finding that "'computer code' is not a generic term, but rather recites structure that is understood by those of skill in the art to be a type of device for accomplishing the stated functions").[7]

The Court concludes that *Williamson* does not warrant modification of the decisions and conclusions challenged by Apple. Because the Court thus rejects Apple's request to modify the Court's claim construction rulings, the Court accordingly rejects Apple's request to revisit summary judgment or for a new trial.

## CONCLUSION

For the reasons set forth above, the Court hereby **DENIES** Apple's "Motion for Reconsideration of the Court's Orders Adopting Claim Constructions and Denying Summary Judgment on Indefiniteness (Dkt. 351) and Denying Partial Summary Judgment of Noninfringement (Dkt. 482), or in the Alternative for a New Trial" (Dkt. No. 573).

---

*id.* ("It is true that the term 'detent' does not call to mind a single well-defined structure, but the same could be said of other commonplace structural terms such as 'clamp' or 'container.' What is important is not simply that a 'detent' or 'detent mechanism' is defined in terms of what it does, but that the term, as the name for structure, has a reasonably well understood meaning in the art.")

[7] Apple has cited apparently contrary decisions by the Patent Trial and Appeal Board. *See Ex Parte Lakkala*, No. 2011-001526, 2013 WL 1341108, at *7 (P.T.A.B. Mar. 13, 2013); *see also Ex Parte Erol*, No. 2011-00143, 2013 WL 1341107, at *9 (P.T.A.B. Mar. 13, 2013); *Ex Parte Smith*, No. 2012-007631, 2013 WL 1341109, at *8 (P.T.A.B. Mar. 14, 2013). These decisions, which are not binding authority upon this Court, are unpersuasive, particularly in light of the above-cited pre-*Lighting World* decisions of the Court of Appeals for the Federal Circuit. *See Williamson*, 2015 WL 3687459, at *7 ("[h]enceforth, we will apply the presumption as we have done prior to *Lighting World*") (citing 382 F.3d 1354).

So **ORDERED and SIGNED** this 6th day of July, 2015.

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| SMARTFLASH LLC, et al., §<br>§<br>    *Plaintiff,* §<br>§<br>    v. §<br>§<br>APPLE INC., et al., §<br>§<br>    *Defendants.* §<br>§ | Case No. 6:13-cv-447-JRG |

## ORDER

Before the Court is the Renewed Motion for Judgment as a Matter of Law on the Issue of § 101 under Rule 50(b) (Dkt. No. 550) filed by the Defendant Apple Inc. ("Apple"). Plaintiff Smartflash LLC, et al. ("Smartflash") responds in an omnibus response (Dkt. No. 555). On July 1, 2015, the Court held a hearing regarding all post-trial issues. The Court previously addressed the issue of willfulness (Dkt. No. 580) and the issue of damages (Dkt. No. 581). For the reasons set forth below, the Court declines to revise its Rule 56 summary judgment order on the issue of § 101.

### I.    DISCUSSION

On January 21, 2015, Magistrate Judge Nicole Mitchell issued a substantial Report and Recommendation denying Apple's Motion for Summary Judgment pursuant to 35 U.S.C. § 101. (Dkt. No. 423). On February 13, 2015, after hearing the parties' objections, the Court adopted the Report and Recommendation. (Dkt. No. 484). After trial was complete and a verdict had been returned, Apple field a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) seeking to reopen the § 101 issue.

The Court, exercising its discretion, declines to revise or revisit its Rule 56 Order. *See F.D.I.C. v. Massingill*, 24 F.3d 768, 774 (5th Cir.) (noting that the decision to revisit a Rule 56(d) Order is within the discretion of the district court) *opinion supplemented on denial of reh'g*, 30 F.3d 601 (5th Cir. 1994). The § 101 issue has already received full and fair treatment. To allow parties, in post-trial motions, to entirely reargue the merits of issues that have already been fully addressed during the case would potentially throw open the flood gates to repetitive post-trial motions. This Court has concerns about materially increasing the burden of post-trial motion practice on the parties and the Court, should this procedure be welcomed and made routine. Applying regional circuit law (cited above) to this procedural issue, the Court exercises its discretion, for the reasons noted above, and accordingly declines to reconsider the § 101 issue in the context of a post-trial JMOL when the same as been heard and fully addressed pre-trial, as it has here under Rule 56.

**So ORDERED and SIGNED this 8th day of July, 2015.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| SMARTFLASH LLC, et al., | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Case No. 6:13-cv-447-JRG |
| APPLE INC., et al., | § § § | |
| *Defendants*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is the Motion and Memorandum in Support of its Omnibus Rule 50(b) Renewed Motion for Judgment as a Matter of Law and/or Rule 59 Motion for New Trial (Dkt. No. 547) filed by Defendant Apple Inc. For the reasons set forth below, the Court finds that Apple's Motion should be and hereby is **DENIED**.

## I.     BACKGROUND

The Court held a jury trial in this case and the jury returned a unanimous verdict on February 24, 2015. The jury found that that the asserted claims were not invalid; that the asserted claims were infringed; that Apple had willfully infringed; and that approximately $532,900,000 was the "sum of money, if paid now in cash" which "would fairly and reasonably compensate Smartflash for Apple's infringement of Smartflash's patents." (Dkt. No. 503 ("Verdict").) Apple asserts that in the approximately 29 hours of testimony presented at trial that the jury did not have sufficient evidence for its findings.

## II.     Applicable Law

Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court asks whether "the state of proof is such that reasonable and impartial minds could

reach the conclusion the jury expressed in its verdict." Fed. R. Civ. P. 50(b); *Am. Home Assur. Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

Under Fifth Circuit law, a court is to be "especially deferential" to a jury's verdict, and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden* 393 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that

[the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013) (citation omitted). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151 (citation omitted).

### III.     Analysis

#### A.     Infringement

To prove infringement under 35 U.S.C. § 271, a plaintiff must show the presence of every element, or its equivalent, in the accused product or service. *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985). First, the claim must be construed to determine its scope and meaning; and second, the construed claim must be compared to the accused device or service. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) (citing *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)). "A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007).

#### 1) Smartflash Showed Sufficient Evidence of the Existence of "Payment Data"

Apple argues that Smartflash failed to show that the accused devices transmitted "payment data"—"data used to make payment." (Mot. at 4.) Apple argues that while the "three components—the 'DSID,' 'GUID,' and 'MID'" are "involved when users make purchases," this does not mean that they can be "used to make payment," as required by this Court's claim

construction. (*Id.* at 3.) Instead, Apple argues that "only information stored at Apple's servers is used to make payment." (*Id.*) Smartflash responds by arguing that the jury has already rejected Apple's argument that "DSID, GUID, and MID are 'merely identifiers.'" (Resp. at 2.) Further, Smartflash argues that the construction for "payment data" merely requires "data that can be used to make payment for content," not that the "payment data" is the only data that is used to make a payment. *See* (Sur-reply at 1.)

Smartflash is correct. The construction for "payment data" only requires that the data can be used to make a payment. Apple, in its briefing, admits that the three components identified are "involved when users make purchases," (Mot. at 3), and that the "DISD is used in the purchase process," (Reply at 1.) The jury was properly instructed on the law, was free to judge the credibility of witnesses, and weigh competing evidence. After consideration of the evidence presented at trial, including evidence that other data was used in the purchase process and that the three identifiers were used even when the content was free, the jury found that Apple had infringed the patents-in-suit. *See, e.g.,* (2/17/2015 A.M. Trial Tr. (Jones), Dkt. No. 513, at 37:20–38:18.) The Court will not supplant the judgment of the jury, where under the preponderance of the evidence on this disputed issue of fact, the jury reached a reasoned and supportable decision. The Court does not find that no reasonable jury could have found that Apple had infringed the patents-in-suit, and consequently must deny the motion for judgment as a matter of law on this issue.

### 2) Smartflash Showed Sufficient Evidence of the Existence of "Payment Validation Data" and a "Payment Validation System"

Apple's arguments regarding the absence of "payment validation data" and "payment validation data" essentially resolve into the following points: 1) Smartflash did not show the existence of "payment data" and so there can be no "payment validation system" that returns

"payment validation data;" and 2) the "payment validation data" must be sent "only after the 'payment validation system has validated payment' for the selected content." (Mot. at 4–5.) Apple argues, just as with the "payment data," that the "URL and download key [are] transmitted regardless of whether payment is made" and thus cannot constitute "payment validation data." (*Id.* at 4.)  Similarly, Apple argues that because there is no "payment data," there is no "system that returns payment validation data based on an attempt to validate payment data." (*Id.*) Smartflash responds by arguing that the MZ Buy server "returns payment validation data in the form of a success code, the price paid, a URL location from which the user's device will download the content, and a download key." (Resp. at 4.)

*First*, the Court finds that Apple has waived its temporal argument that the "claim language requires that 'payment' must occur prior to receiving purchased content." (Mot. at 5.) Apple raised this particular argument for the first time in its Rule 50(b) motion. As a result, the Court finds this argument is untimely. In its Rule 50(a) motion, Apple only argued that the "payment validation data" limitation was not met because the "same information [was] sent whether or not payment is made," (Dkt. No. 501, at 5), not that "payment is not made until after the user device downloads content," (Mot. at 6).  New arguments presented for the first time at the Rule 50(b) stage are improper.

*Second*, the jury agreed with Smartflash's expert's testimony on the issue.  After consideration of the evidence presented, including evidence from Dr. Jones—Smartflash's technical expert—that "Apple uses the DSID to make sure that [a] customer's account is in good standing and in a position to purchase the content" and that the MZ Buy system returns the "success code" and "the price paid," the jury found that Apple had infringed the patents-in-suit. *See* (2/17/2015 A.M. Trial Tr. (Jones), Dkt. No. 513, at 39:6–19; 2/18/2015 P.M. Trial Tr.

(Mirrashidi), Dkt. No. 516, at 141:2–5.) The jury reached a reasoned and supportable decision, and the Court fails to find that no reasonable jury could have found that Apple had infringed the patents-in-suit.

### 3) Smartflash Showed Sufficient Evidence of the Existence of "Use Rules"

Apple argues that Smartflash failed to show the "claimed use rules in the Apple devices." (Mot. at 7.) In particular, Apple argues that the "use rules" identified by Smartflash in regard to movie rentals "were contained within two data fields called 'rental duration' and 'playback duration' and that the purported rule itself was nothing more than a number in Apple's system." (Mot. at 8.) Similarly, Apple argues that, for the "use rules" Smartflash identified for parental controls and Fairplay, Smartflash's expert "did not say what 'rule' was being used to evaluate 'use status data' in the context of [the identified] features." (*Id.*)

Smartflash responds by arguing that the "trial record establishes that Apple's products have three types of use rules" and that Smartflash's expert "explained how each type of rule works." (Resp. at 7.) For example, Smartflash cites to Dr. Jones testimony, who stated:

Q. Once the content is downloaded on the Apple device, is it subject to use rules?

A. Yes, it is.

. . .

A. [T]here are three different types of use rules. There -- in the case of movie rentals, rental keybag that governs the rental time periods.
   In the case of what are known as parental controls, we'll go through those in a second, as well as FairPlay rules that help encrypt and decrypt the information.

(2/17/15 Trial Tr. (Jones) 39:24–41:8, Dkt. No. 513.) With respect to the rules relating to movie rentals, Dr. Jones explained:

A. The rental keybag contains both rules and use status data, and the rules govern a couple of time periods. One is a 30-day time period, and another is a 24-hour time period.

Q. And what is the use status data?

A. The use status data is -- relates to those rules; and for the 30-day limit, the use status data is the date on which you rented the item. And that 30-day limit says you have 30 days from that date to view the movie.

Q. And how does the use status data and the use rules work together?

A. Well, as an example, the 24-hour limit, there's use status data for that that indicates when you started watching. And if you have started -- if you have started watching it, it will indicate the time and date that you started watching.

And taken together, what that will -- will do is enforce a limit of 24 hours from the time you actually start watching the movie during which you can watch that movie. After that limit has expired, you're no longer able to view or watch the movie.

(*Id.* 41:15–42:9). For parental controls use rules, Dr. Jones explained:

A. . . . So there are use rules for parental controls that a parent can set on a device through the settings and restrictions capabilities on the device to -- to limit the type of content that can be viewed.

For example, for movies, you could set a maximum rating of movies that they watch on the device; for example, nothing that is any higher than PG.

Similarly, you can set ratings for music, for TV, books, and apps. And apps, for example, you can say: I don't want anything more than apps rated for ages 9 and lower.

Q. What is the use status data for parental rules?

A. So the use status data is associated with particular items of content.

For example, for a given movie -- so a particular movie, it's the rating. Does that movie say PG-13, or for a particular app, what's the age rating? Is that app 4 plus? That would be the rating, and that would be the use status data.

Those are evaluated together to determine whether or not a particular app or movie can be watched on the device when the restrictions are in effect.

(*Id.* 42:12–43:10.) Similarly, Dr. Jones testified about the use and status rules associated with Fairplay. (*See id.* 43:12–45:19).

The jury heard all of this evidence and agreed with Dr. Jones. The Court will not substitute its judgment for that of the jury, and the Court does not find that no reasonable jury could have found that Apple had infringed the patents-in-suit.

### 4) Smartflash Showed Sufficient Evidence of the Existence of an "Access Rule"

Apple argues that Smartflash failed to show that Apple's devices meet the "access rule"

limitation because Smartflash "failed to identify any rule that is to be transmitted to the accused devices. Instead, Smartflash pointed only to mere integers that are transmitted between Apple's iTunes servers and the accused Apple device. But a number standing alone is not a rule." (Mot. at 9.) Smartflash responds by arguing that "computers traditionally represent permissions, rights, and rules as numbers." (Resp. at 7.) Smartflash notes that Dr. Jones explained this to the jury:

> Q. Can you please explain to the jury why a number -- a use rule can be represented in a computer as a number?
>
> A. Well, first of all, computers represent everything as some type of a number. But, additionally, computers traditionally represent things like permissions, rights, and rules as numbers.
>       If we look at computer file systems, they represent the -- the rights that a user has for access as individual bits and fields, which are just numbers.

(2/17/15 PM Trial Tr. (Jones) 31:9–20).

The jury was free to take Smartflash's infringement expert at his word and reject Apple's argument to the contrary. In this, the jury found that Apple had infringed the patents-in-suit. *See, also* (2/19/2015 A.M. Sealed Trial Tr. (Ligler), Dkt. No. 524, at 6:20–7:4.) The Court will not substitute its judgment for that of the jury. Further, the Court fails to find that no reasonable jury could have found that Apple had infringed the patents-in-suit.

**B.       Validity**

An issued patent is presumed valid. 35 U.S.C. § 282; *Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1304 (Fed. Cir. 2012). Apple has the burden to show by clear and convincing evidence that the asserted claims were anticipated by or obvious over the prior art. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). To prevail on judgment as a matter of law, moreover, Apple must show that no reasonable jury would have a legally sufficient evidentiary basis to find for the Plaintiff. Fed. R. Civ. P. 50. "Generally, a party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled

artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so.'' *In re Cyclobenzaprine Hydrochoride*, 676 F.3d 1063 (Fed. Cir. 2012) (internal quotation marks omitted).

### 1) The Poggio Combinations

Apple argues that its expert, Mr. Wechselberger, provided clear and convincing evidence "that each of the asserted claims was anticipated and/or obvious." (Mot. at 11.) In particular, Apple argues that it presented clear and convincing evidence of obviousness regarding various combinations involving the Stefik/Xerox Patent, the Ginter/InterTrust Patent, and the Ansell/Liquid Audio Patent combined with the Poggio/Sun Patent Application Publication (DX-APL 042) that, they say, went unrebutted by Smartflash. *See* (Mot. at 15–18.) Smartflash responds by arguing that all of those particular combinations rely upon a flawed analysis of the Poggio/Sun reference. (Resp. at 14–15.) Smartflash argues that Dr. Jones testified that the Poggio/Sun reference did not disclose the "payment data," "payment validation data," and "payment validation system" limitations, as construed by the Court, and which it was relied upon to disclose. (*Id.* at 15;)

For example, with respect to the Poggio reference, Dr. Jones testified:

Q. Well then, please explain how payment works in Poggio.

A. All right. So as a first step, the client makes a request to the server that arrives at the web server, and that's on the virtual vending machine. In response, back comes an invoice.

Q. And what does that look like from the user's perspective?

A. Well, what the user will be shown is -- is a web page, a form that gives them the opportunity to fill out, for example, the payment information, like a credit card.

Q. So what -- what does the user do after receiving that web form?

A. Well, the user would fill out the form with their payment information; and then that form, when they submit it, would be sent back to the web server on the virtual vending machine.

Q. And before we get to the next step, does filling out a form with all your payment information meet the payment terms of the claims of Smartflash's patents?

A. No, it doesn't. It fails to meet the repayment data of the '720 and '221 claims. It fails to meet the payment in response to a first user selection of the '772 claims.

(2/23/2015 P.M. Trial Tr. (Jones), Dkt. No. 520, at 68:5–69:1.)

Dr. Jones also testified that he disagreed with Apple's witness on the same point:

Q. All right. Did Mr. Wechselberger mispresent the Poggio reference?

A. Yes, he did in several ways.

Q. How many ways?

A. Four -- four ways, at least, that I'll represent here.

Q. Referencing both Mr. Wechselberger's screen, please explain to the jury the ways that the Poggio reference was mispresented to the jury.

A. Well, one example would be you can see in the upper left-hand corner, there's something colored purple there, the library of vendor products. That's actually something that's part of the virtual vending machine here I've circled as Item 112 in this diagram. It's not part of or associated with the vendor.
     Another way is the payment validation data or the payment validation that's coming back here, this is actually happening and taking place at the virtual vending machine, this digital cache interface.

Q. And what did Mr. Wechselberger show in his slide to the jury about where that was happening?

A. Well, he's showing it -- that it's -- it's coming back to the web server; but when he applies it to the claims, he's actually showing something quite different.

(*Id.* 70:8–72:10.)

Finally, Smartflash argues that "Mr. Wechselberger failed to show that [the Poggio/Sun reference] would have been combined with the other asserted references" and that "a person of

ordinary skill in the art would have had no motivation to combine those references with [the Poggio/Sun reference]." (*Id.*)

The jury agreed with Dr. Jones, and the Court agrees that Smartflash's evidence shows that a reasonable jury could find that Apple has not met its burden under the clear and convincing standard. The Court will not substitute its judgment for that of the jury, and the Court does not find that no reasonable jury could have found that the asserted patents were valid in view of the combinations set forth above.

### 2) The Gruse/IBM Patent

In addition to the Poggio/Sun combinations, Apple also argues that it presented clear and convincing evidence of anticipation by the Gruse/IBM Patent (DX-APL 023) and obviousness regarding Gruse/IBM Patent in combination with Puhl/Motorola Patent that ultimately went unrebutted by Smartflash. *See* (Mot. at 11–14.) Smartflash responds that Dr. Jones testified that the Gruse/IBM Patent does not disclose the "payment data" or "payment validation data" limitations, as required by the Court's construction. *See* (Resp. at 16;)

For example, Dr. Jones testified that Apple's witness did not paint a complete picture of the references:

Q. And what -- what is on screen, Dr. Jones?

A. Now, this is another one of Mr. Wechselberger's slides, and this one is addressing the Gruse/IBM patent.

Q. Dr. Jones, did Mr. Wechselberger accurately present what's taught in Gruse?

A. Well, he actually gave two descriptions of it. First, he walked through it at the beginning and walked through the elements of Figure 6; but then when he turned to the claim analysis, he changed his description. And at that point it became inaccurate.

Q. And now what's on the screen here has a citation to Column 77 and a text highlighted in green. And then also it's showing Figure 6 with that arrow

highlighted in green; is that accurate?

A.  No, sir, it's not. What -- what's -- what he discussed and what he was -- what's being implied here is that the arrow that proceeds from the end-user device to the clearinghouse, that that is somehow what's represented in the discussion in Column 77, when, in fact, what's described in Column 77 is not part of the embodiment that's described in Figure 6. That's just simply incorrect.

(2/23/2015 P.M. Trial Tr. (Jones), Dkt. No. 520, at 81:24–83:25.)  Further, Smartflash argues that the Gruse/IBM Patent does not disclose the "fully functional handheld multimedia terminal covered by Smartflash's claims."  (Resp. at 16.)

The jury was free to weigh the competing testimony and weigh the credibility of the witnesses. Ultimately, the jury agreed with Smartflash's expert.  After consideration of the admitted evidence, including evidence regarding whether the Gruse/IBM Patent disclosed the limitations for which it was being relied upon, the jury found that the asserted patents were valid. *See, e.g.,* (2/23/2015 P.M. Trial Tr. (Jones), Dkt. No. 520, at 81:24–83:25.)  The Court will not substitute its judgment for that of the jury, where under the clear and convincing standard, the jury found the patents-in-suit were not invalid.  The Court does not find that no reasonable jury could have found the asserted patents were valid based on the presented evidence.

### 3) The IBM System

Apple argues that it presented clear and convincing evidence of obviousness regarding "an IBM project that aimed to develop a 'piracy protected Internet Music delivery system.'" (Mot. at 14;) *see* (DX-APL 026.)  Specifically, Apple argues that Mr. Wechselberger testified that "it would have been obvious to use mobile phones to implement the IBM technology" and that "an executive at Sony recognized the benefits of using a mobile phone to do so long before the patents-in-suit."  (*Id.* at 14.)  First, Smartflash responds by arguing that Mr. Wechselberger relied upon the Gruse/IBM Patent for certain information regarding the operation of the IBM

System and that such reliance fails for the same reasons that the obviousness combinations involving the Gruse/IBM Patent discussed above fail. (Resp. at 16–17.) Second, Smartflash argues that Mr. Wechselberger "admitted under cross examination that he had no evidence that IBM ever designed the system to work with a single cell phone." (*Id.* at 17.)

Like the above, the jury agreed with Smartflash's expert after weighing the testimony and judging the credibility of the witnesses. After consideration of the presented evidence, including that IBM had never designed the system to work with a single cell phone, the jury found that the asserted patents were valid. *See, e.g.,* (2/19/2015 P.M. Trial Tr. (Wechselberger), Dkt. No. 518, at 103:10–104:5.) The Court will not substitute its judgment for that of the jury where the jury reached a result supported by reasonable evidence. The Court does not find that no reasonable jury could have found the asserted patents were valid in view of the presented evidence and will not overturn the jury's finding based on this. To the extent Apple raises other obviousness arguments in its Motion, the Court similarly does not find that no reasonable jury could have found the asserted patents were valid in view of the evidence presented during the trial.

### C.     Induced Infringement

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "[L]iability for inducing infringement attaches only if the defendant knew of the patent and that 'the induced acts constitute patent infringement.'" *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S.Ct. 1920, 1926 (2015). "[I]nduced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 131 S.Ct. 2060, 2068 (2011).

Apple argues that the Court should find for Apple on the issue of induced infringement because "Smartflash presented no evidence that Apple had knowledge of Smartflash's patents

prior to suit or knowledge of any acts that might 'constitute patent infringement.'" (Mot. at 9 (citing *Global-Tech*, 131 S.Ct. at 2068).) Apple argues that, based on the evidence presented, "no reasonable jury could have found that Apple knew about Smartflash's patents." (Mot. at 10). Further, Apple argues that it "holds good faith beliefs in its strong invalidity and non-infringement defenses, which establishes a lack of the requisite intent for active inducement." (*Id.* (citing *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1367-68 (Fed. Cir. 2013)).[1])

Smartflash responds by first arguing that the jury found willful infringement, which requires a showing of pre-suit knowledge by clear and convincing evidence.[2] (Resp. at 8.) Smartflash next argues that the jury was presented with testimony from Mr. Farrugia regarding Mr. Farrugia's prior work experience at Gemplus, a company that, at one point, had access to Smartflash's technology. (Resp. at 9.) Smartflash also argues that the jury was presented with evidence regarding Apple's good-faith beliefs in regards to non-infringement, considered it, and returned a willfulness verdict, which required the jury to find that Apple did not have any "reasonable basis to have believed that it did not infringe." (*Id.*)

As Smartflash notes, the jury was presented with evidence that Apple's employee, Mr. Farrugia, was previously employed at Gemplus; that employees at Gemplus may have had knowledge of Smartflash's technology; and that Gemplus may have previously attempted to copy portions of Smartflash's technology. *See, e.g.,* (2/16/2015 P.M. Trial Tr., Dkt. No. 511, at 98:12–99:21; 2/18/2015 P.M. Trial Tr., Dkt. No. 516, at 60:1–2.) Further, the jury was presented with evidence regarding whether Apple had a good-faith belief that it did not infringe

---

[1] The Court notes that the Federal Circuit's *Commil* decision was vacated by the Supreme Court. *Commil*, 135 S.Ct. at 1931.

[2] Subsequent to the completion of the briefing on this Motion, the Court granted Apple's Motion for Judgment as a Matter of Law as to willfulness. (Dkt. No. 580).

Smartflash's patents.[3]   The jury was properly instructed on the law, was free to judge the credibility of the witnesses, and weigh competing fact questions.   After consideration of the presented evidence, the jury found that Apple had induced infringement of the patents-in-suit.[4] The Court will not substitute its judgment for that of the jury under the preponderance of the evidence standard on the disputed issues of fact underlying this decision.   The Court does not find that no reasonable jury could have found that Apple had induced infringement of the patents-in-suit.   Accordingly, Apple's Motion in regard to induced infringement is **DENIED**.

### D.     The *i4i* Instruction

Apple argues this Court committed reversible error by declining to provide an instruction regarding the relative weight of evidence not considered by the Patent and Trademark Office according to the guidance handed down by the Supreme Court in *Microsoft Corporation v. i4i Ltd. Partnership*, 131 S.Ct. 2238, 2251 (2011).   In particular, Apple argues that the "jury should have been instructed that it could give greater weight to prior art that the PTO did not consider in deciding whether Apple had met the clear and convincing standard."   (Mot. at 18.)   Smartflash responds by arguing that Apple's instruction was "entirely permissive" and "would have shed no light on how the jury was to deliberate."   (Resp. at 18–19.)

The Supreme Court clearly articulated the principle underlying the appropriateness of an *i4i* instruction: "new evidence supporting an invalidity defense may 'carry more weight' in an infringement action than evidence previously considered by the PTO."   *i4i*, 131 S.Ct. at 2251 (citations omitted).   That principle is predicated upon comparing two different types of evidence:

---

[3] The Supreme Court recently held that "belief regarding validity [of the asserted patent] cannot negate the scienter required under § 271(b)." *Commil*, 135 S.Ct. at 1928.

[4] The Court previously granted Apple's Motion for Judgment as a Matter of Law as to Willfulness after finding that Smartflash had not met its burden with regards to willful infringement.  (Dkt. No. 580).  The Court notes that, in the willfulness inquiry, the standard of proof required that Smartflash show that Apple had pre-suit knowledge of the patents-in-suit by clear and convincing evidence.  The induced infringement inquiry, however, does not require that heightened standard, but instead merely requires a showing by the preponderance of the evidence.

1) "new evidence" and 2) "evidence previously considered by the PTO." *Id.* Further, the jury's discretion to give more weight to one category versus the other requires the jury to be able to "evaluate whether the evidence before it is materially new." *Id.* In the present case, neither party presented "evidence previously considered by the PTO" or explained how the prior art that was presented was or was not cumulative to the evidence evaluated by the PTO. (2/24/2015 A.M. Trial Tr., Dkt. No. 521, at 81:2–5.) Therefore, both the jury and the Court lacked the practical ability to "evaluate whether the evidence before it is materially new." *i4i*, 131 S.Ct. at 2251 (citations omitted). Accordingly, the Court concluded it was improper to suggest that more weight should be given, especially when no comparison was possible given the lack of evidence about what was previously considered by the PTO. As a result, the Court believed that, in this limited situation, an *i4i* instruction would not have helped the jury in its deliberations, and the Court declined to give one.

Finally, to the extent that any instruction would have been given, the Court, at most, would have instructed the jury that it could "consider that it ha[d] heard evidence that the PTO had no opportunity to evaluate before granting the patent." [5] *Id.* The Court does not find that the lack of that instruction affected the outcome of the case. *Hartsell v. Doctor Pepper Bottling Co.*, 207 F.3d 269, 272 (5th Cir. 2000). Accordingly, Apple's Motion in regard to the issue of the *i4i* instruction is **DENIED**.

### E. Ownership/Standing

The Court has previously addressed the issues of Ownership and Standing. (Dkt. No. 455). For the reasons set forth below, the Court declines to revise its ruling on these issues.

On February 3, 2015, Magistrate Judge Nicole Mitchell issued a substantial and fully-

---

[5] Apple had ample opportunity to make this point, which it did on multiple occasions. For example, in closing, Apple argued that the invalidity references it presented had not been provided to the PTO. (2/24/2015 A.M. Trial Tr., Dkt. No. 521, at 81:2–5.)

reasoned Order granting Smartflash's motion *in limine* regarding the proffer of evidence on the issue of standing and ownership. (Dkt. No. 455). In that opinion, the Court found that "Smartflash ha[d] met its burden to show that it own[ed] all the rights to patents-in-suit" and that "Apple ha[d] not met its burden to show a break in the chain-of-title." (*Id.* at 16.) On February 13, 2015, after considering Apple's objections (Dkt. No. 464), the Court adopted the Magistrate Judge's Order. (Dkt. No. 479.) Now, after trial has been completed and a verdict returned, Apple seeks to reopen the ownership and standing issues by arguing in its motion that these issues should have been presented to the jury.

These issues have received full and fair treatment, and the Court declines to revisit its previous Orders. To allow parties, in post-trial motions, to entirely reargue the merits of issues that have already been fully addressed during the case would potentially throw open the flood gates to repetitive post-trial motions. Accordingly, Apple's Motion in regard to the issues of ownership and standing is **DENIED**.

## F.        Indefiniteness

The Court previously addressed the issues of indefiniteness of the terms, "data carrier" and "temporary memory," as raised by Apple in this Motion. (Dkt. No. 391). For the reasons set forth below, the Court declines to revise its ruling on the issues of indefiniteness.

On January 5, 2015, Magistrate Judge Nicole Mitchell issued a substantial and carefully reasoned Report and Recommendation recommending the Court deny Apple's Motion for Summary Judgment pursuant to 35 U.S.C. § 101. (Dkt. No. 391). On February 13, 2015, the Court adopted the Magistrate Judge's Report and Recommendations. (Dkt. No. 485.) Now, after trial has completed and a verdict had been returned, Apple seeks to reopen the indefiniteness issues previously addressed.

These issues have also received full and fair treatment, and the Court declines to revisit

its previous Orders.  Accordingly, Apple's Motion in regard to its alleged indefiniteness as to the terms, "data carrier" and "temporary memory," is **DENIED**.

## IV.     Conclusion

For the reasons set forth above, the Court finds that the jury's verdict of validity and infringement should stand. The jury's verdict in these respects is supported by adequate evidence presented at trial and should not be disturbed. Accordingly, Apple's Motion and Memorandum in Support of its Omnibus Rule 50(b) Renewed Motion for Judgment as a Matter of Law and/or Rule 59 Motion for New Trial (Dkt. No. 547) should be and hereby is **DENIED**.

**So ORDERED and SIGNED this 2nd day of September, 2015.**

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| SMARTFLASH LLC, et al., | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Case No. 6:13-cv-447-JRG |
| APPLE INC., et al., | § § | |
| *Defendants.* | § § § | |

## <u>JUDGMENT</u>

A jury trial commenced in this case on February 16, 2015, and the jury reached and returned its unanimous verdict on February 24, 2015 (Dkt. No. 503). Pursuant the Federal Rules of Civil Procedure, the jury's verdict, and the entirety of the record available to the Court, the Court—believing that judicial resources can be spared and seeing no just cause for delaying entry of judgment on all adjudicated patent claims except for those associated with an accounting—hereby **ORDERS** and **ENTERS JUDGMENT** as follows:

1.     Defendant Apple Inc. infringes claim 13 of U.S. Patent No. 7,334,720. Defendant Apple Inc. infringes claim 32 of U.S. Patent No. 8,118,221. Defendant Apple Inc. infringes claims 26 and 32 of U.S. Patent No. 8,336,772.

2.     Claim 13 of U.S. Patent No. 7,334,720 is not invalid. Claim 32 of U.S. Patent No. 8,118,221 is not invalid. Claims 26 and 32 of U.S. Patent No. 8,336,772 are not invalid.

3.     Claim 13 of U.S. Patent No. 7,334,720 is not ineligible for patent protection under 35 U.S.C. § 101. Claim 32 of U.S. Patent No. 8,118,221 is not ineligible for patent protection under 35 U.S.C. § 101. Claims 26 and 32 of U.S. Patent No. 8,336,772 are not ineligible for patent protection under 35 U.S.C. § 101.

4.      As a matter of law, Smartflash did not prove by clear and convincing evidence that Apple Inc.'s infringement was willful.

5.      As the prevailing party, Smartflash is awarded costs, pre-judgment interest, and post-judgment interest, but a full accounting, including damages associated with infringement, are bifurcated and set for a new trial on November 2, 2015.

**So ORDERED and SIGNED this 2nd day of September, 2015.**

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | |
|---|---|
| SMARTFLASH LLC, et al., §<br>§<br>*Plaintiff,* §<br>§<br>v. §<br>§<br>APPLE INC., et al., §<br>§<br>*Defendants.* §<br>§ | Case No. 6:13-cv-447-JRG |

## ORDER

Before the Court is Smartflash's Motion for Reconsideration (Dkt. No. 597) of this Court's Order Granting Apple a New Trial (Dkt. No. 581). The Court **GRANTS-IN-PART** and **DENIES-IN-PART** the relief requested in Smartflash's Motion for Reconsideration.

## I.    Background

Smartflash and Apple completed a six-day jury trial on February 24, 2015. The jury returned a verdict in favor of Smartflash, finding Apple liable for $532,900,000 in damages. (Jury Verdict, Dkt. No. 503.) After considering the post-trial briefing in this case, the Court granted a new trial on the issue of damages, finding, among other things, that Smartflash had inadequately attempted to apportion its royalty base, the Court had instructed the jury on an area of the law when the instruction should not have been given, and additionally, the Court had separate, material, and overarching concerns about Smartflash's damages model. (New Trial Order, Dkt. No. 581.) While the Court was principally concerned about the manner in which Smartflash presented its damages case to the jury, the Court also determined that its instruction injected an element of confusion and compounded a situation that could (and may likely) have inflated the jury award. (*Id.*)

Smartflash has now asked the Court to reconsider that ruling. (Pl.'s Mot., Dkt. No. 597). In the Court's prior ruling, the Court agreed with what was then Smartflash's first substantive argument (in response to Apple's motion for judgment as a matter of law), where Smartflash argued, "First, because Mr. Mills did not employ the entire market value rule ("EMVR"), he *per se* cannot violate its requirements." (Pl.'s Resp. to JMOL at 26, Dkt. No. 555.) Smartflash went on to say: "Because Mr. Mills' royalty base was not the total revenues Apple made selling all infringing products, he did not apply the EMVR." (*Id.*) In a footnote, Smartflash continues: "In order to apply the EMVR the royalty base must contain the *entire market value* of the infringing products. . . . Because Mr. Mills applied no royalty rate to over 75% of Defendants' accused sales, he did not employ the EMVR." (*Id.* at 26 n.12 (emphasis in original).) Given that Smartflash's royalty base equation multiplied a percentage value by (i.e., took a portion of) the number of sales, the price of the phone, or some combination of both, the Court agreed that Smartflash had engaged in an attempt at apportionment and had not invoked the entire market value rule—a noted exception to the principle of apportionment. (New Trial Order at 4–5, Dkt. No. 581.)

In its motion to reconsider this ruling, Smartflash now argues that it did, in fact, ask the jury to award damages based on the entire market value of Apple's accused devices. (Pl.'s Mot. at 5, Dkt. No. 597.) As an alternative to its request that the Court reinstate its damages award from the earlier trial, Smartflash "requests, consistent with Judge O'Malley's suggestion at oral argument on Apple's appeal of its Motion to stay, that the Court bifurcate those final liability determinations from the still-required damages proceedings (including proceedings related to any subsequent ongoing royalty or injunction) such that the Federal Circuit can quickly reach ultimate resolution of those highly disputed, final . . . aspects of the case (including subject

**Appx133**

matter eligibility under 35 U.S.C. § 101)." (Pl.'s Resp. at 13, Dkt. No. 597.)   The Court
addresses Smartflash's second request first.

## II.   Judgment Final Except for an Accounting: 28 U.S.C. § 1292(c)(2)

### A. Applicable Law

The Federal Circuit, in an opinion affirming this Court's order on an earlier issue, noted
that the damages proceedings may be bifurcated from the liability determination such that the
Federal Circuit could review an appeal from this Court even though the damages determination
is still outstanding.[1] *Smartflash LLC v. Apple Inc. et al.*, Nos. 2015-1701, 2015-1707, 2015 WL
4603820, at *5 n.2 (Fed. Cir. July 30, 2015).

Under the statutory language of the Patent Act, the Federal Circuit, in a broad exception
to the finality rule, has appellate jurisdiction over judgments in patent infringement actions that
are final except for an accounting:

> The United States Court of Appeals for the Federal Circuit shall have exclusive
> jurisdiction . . . of an appeal from a judgment in a civil action for patent
> infringement which would otherwise be appealable to the United States Court of
> Appeals for the Federal Circuit and is final except for an accounting.

28 U.S.C. § 1292(c)(2); *see Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1316–17
(Fed. Cir. 2013).

The Federal Circuit has held that an "accounting" under § 1292 includes a damages trial
under § 284. *Robert Bosch*, 719 F.3d at 1316–17 (citing *In re Calmar, Inc.*, 854 F.2d 461, 464

---

[1] A panel of the Federal Circuit, hearing oral argument in this case on another issue, explicitly
discussed the Parties' right to appeal from the liability determination despite the pending new
trial on damages. *Oral Argument, Smartflash LLC v. Apple Inc. et al.*, Nos. 2015-1701, 2015-
1707 (July 9, 2015), http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2015-1707.mp3, at
17:01 ("If we're talking about what is most efficient at getting to the ending as quickly as
possible, given our jurisprudence . . . you have a right to appeal as of right from the liability
determination even without a damages trial having occurred.").

(Fed. Cir. 1988) ("[I]t is clear that the purpose of the legislation, § 1292(c)(2), allowing interlocutory appeals in patent cases was to permit a stay of a damages trial."); *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1558 (Fed. Cir. 1984) (following a jury verdict that did not reach the question of damages, "[t]he court entered a judgment, final except for an accounting, that the '497 patent was 'invalid, void and unenforceable,' and that the '099 patent was valid and infringed . . . . [The court] ordered a new trial to determine the damages from infringement of the '099 patent, but postponed such trial pending this appeal."); *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1337 (Fed. Cir. 2009); *Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1353 (Fed. Cir. 2007); *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1343 n.2 (Fed. Cir. 2001).

**B. Analysis**

This case is ripe for appeal to the Federal Circuit under 28 U.S.C. § 1292(c)(2): this Court has entered judgment in this action for patent infringement, has ruled on the parties' matters under Federal Rule of Civil Procedure 50(b) and 59, and its judgment is final but for the pending new trial on damages (i.e., accounting). *See* 28 U.S.C. § 1292(c)(2); *Robert Bosch*, 719 F.3d at 1316–17.

**III. Smartflash's Damage's Model**

The Court now turns to Smartflash's damages model. Despite its inconsistent positions at differing times, Smartflash chose to employ a damages model based on apportionment and not the entire market value rule. Smartflash also chose a traditional way to present its apportionment model to the jury by setting up a royalty rate and a royalty base and calculating damages by multiplying those two values together. (2/17/15 PM Trial Tr. (Mills) 152:16–19, Dkt. No. 514.)

4

### A. Substance of Smartflash's Damages Model

The Court now considers the substance of Smartflash's damages model. The ultimate combination of Smartflash's damages model is driven by multiplying the following familiar inputs together:

(1) the number of accused devices (e.g., iPhones) sold;

(2) Apple's profit margin on those accused devices;

(3) the Alone Motivate survey, which in simplified form asked consumers whether Smartflash's definition of its patented features "alone motivate[d]" consumers to purchase the accused devices, (2/17/15 PM Trial Tr. (Wecker) 66:9–12, Dkt. No. 514), of which on average 23% of responding consumers agreed;

(4) the NIA survey, which in simplified form asks whether users of the accused devices "would not buy [their accused device] without the [accused] functionality" and instead implemented the next-best non-infringing alternative, (2/17/15 PM Trial Tr. (Mills) (Sealed Portion #3) 25:13–15, Dkt. No. 523); and

(5) the market price of the accused device.

i.    *How Smartflash presented its damages model to the jury*

The Court now turns to the manner in which this ultimate combination was presented to the jury. In its presentation to the jury, Smartflash divided the above inputs into the base and rate in the following way:

$$Royalty\ BASE = \binom{Alone\ Motivate}{Survey}(Price)\binom{Number\ of}{Units\ Sold}$$

$$Royalty\ RATE^2 = \binom{NIA}{Survey}\binom{Apple's\ Profit}{Margin}$$

---

[2] In his example calculation to the jury of the royalty <u>rate</u>, Mr. Mills spent multiple pages of trial testimony explaining how to multiply these two numbers together. As Mills explains: "Well, I

**Appx136**

In explaining the royalty <u>base</u> to the jury, the following exchange took place:

> Q. And how did you use the surveys from Dr. Wecker in your analysis?
> A. Well, I used them in multiple ways, but the first way is to determine a royalty base.

(2/17/15 PM Trial Tr. (Mills) (Sealed Portion #3) 19:16–19, Dkt. No. 523.) Mills went on to explain that he looked at "the number of iPhones that were sold" "[a]nd then [he] multiplied that by the share that were motivated to buy due to the infringing functionality alone. And this comes from Dr. Wecker's survey [which the Court has labeled the Alone Motivate Survey]." (*Id.* 20:2–10.) He then testified that he determines "the revenue related to" the above by multiplying it by "the average price for the iPhone . . . and that results in the royalty base, which is revenue." (*Id.* 21:22–22:2.)

Mills further explained:

> Q. Okay. And so what is the revenue just for the people that were alone motivated by the feature in this case?
>
> A. I think it works to – yeah – \$43.4 billion during the damages period.

(*Id.* 23:10–13.)

---

started by calculating the at-risk profit, which is another way of saying the profit that Apple would stand to lose if it took out the accused feature from its devices." (2/17/15 PM Trial Tr. (Mills) (Sealed Portion #3) 24:22–25, Dkt. No. 523). He accounts for the "share that would not buy without the functionality" by relying on the NIA survey.( *Id.* 25:13–15); (PX203.001 (noting the "share that would not buy without functionality" equals **10.8%**).) He then, in detail, explains how he calculated the related figures of at-risk sales, at-risk revenue, and at-risk profit. *Id.* 25:3–26:4. Mills then reveals that he multiplies his number "by the profit margin for the iPhone, which during this period was ██%." (*Id.* 26:5–6); (PX203.001-5.) He then comes up with "total at-risk profit for Apple." (*Id.* 27:12–15.) However, Mills needs to convert this into a percentage royalty rate, so he then re-divides his total at-risk profit by the total revenue for all accused devices. (2/17/15 PM Trial Tr. (Mills) 151:21–152:15). He reveals "the full analysis" he has done is located in PX 203.002. (*Id.* 151:23.) When looking to PX203.002-4, it is apparent that, in the example he presents, the "royalty rate," in column (7), is ██%. Thus, his calculation is actually quite straightforward:

$$Royalty\ RATE\ (example) = (10.8\%)(██\%) = 3.7\%$$

In its motion, Smartflash notes that when the average of these values is taken, the effective overall royalty rate is 1.96%. (Pl.'s Mot. at 2.)

Thus, as Smartflash told the jury:

$$Royalty\ BASE = \begin{pmatrix} Alone\ Motivate \\ Survey \end{pmatrix} (Price) \begin{pmatrix} Number\ of \\ Units\ Sold \end{pmatrix} = \$43,420,637,265$$

Furthermore, in connection with its explanation of its damages calculation, Smartflash also showed the following demonstrative to the jury:



"The court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer . . . ." (35 U.S.C. § 284)



### A. Court's Analysis

Given that Smartflash's royalty base calculation took a portion of the number of sales, the price of the phone, or some combination of both, the Court maintains its agreement with Smartflash's original substantive argument that Smartflash did not employ the exception to the principle of apportionment known as the entire market value rule. (Pl.'s Resp. to JMOL at 26, Dkt. No. 555.)

However, Smartflash now argues that this is not the case. Smartflash now argues that the entire market value rule exception is "actually a dual-natured doctrine, referring to two distinct (though often overlapping) concepts." (Pl.'s Mot. at 3, Dkt. No. 597.) Smartflash argues that the doctrine allows for a situation where the entire market value rule exception to the principle of apportionment is not "an alternative to apportionment; it *is* apportionment." (*Id.* at 4 (emphasis in

original).) In this, Smartflash divides the entire market value rule exception into two separate and distinct concepts. "[F]irst of these concepts is a prohibitive one: a patentee may not calculate a royalty as a percentage of the total revenue derived from all sales of complex, multi-component infringing products unless the patented invention drives demand for all of those products." (*Id.*) Smartflash calls this concept the "Total Revenue Application" of the entire market value rule. (*Id.*) Smartflash then says that the "Total Revenue Application is the 'important evidentiary principle'" from *Ericsson, Inc. v. D–Link Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); (Pl.'s Mot. at 3–4.) Second, Smartflash argues that courts have "also used the term 'Entire Market Value Rule' to allow for recovery of damages 'based on' the value of a single entire multicomponent product—including a product containing unpatented features—if the patented feature 'substantially creates the value' of any unpatented ones," citing to *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013); (Pl.'s Mot. at 4.) Smartflash calls this concept the "Sub-Population Application" of the entire market value rule. Smartflash goes on to state: "This Sub-Population Application is not an alternative to apportionment; it *is* apportionment." (*Id.* at 4.)

After seeing all the evidence presented at trial, as well as the manner in which Smartflash presented its damages model, the Court disagrees with Smartflash's formulation and characterization of its damages model.

i.      *The exception to apportionment cannot be used to apportion.*

Neither the Supreme Court of the United States nor the Federal Circuit have drawn or otherwise adopted the "Sub-Population" distinction in the entire market value rule exception that Smartflash now says exists. (Def.'s Resp. at 4, Dkt. No. 600). In fact, for the past 130 years, our higher federal Courts have consistently articulated that the entire market value rule is the exception to the principle of apportionment: to quote from *Garretson*, "The patentee . . . must in

8

every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features . . . ; **or** he must show by equally reliable and satisfactory evidence that the profits and damages are to be calculated on the whole machine." *Garretson v. Clark*, 111 U.S. 120, 121 (1884) (emphasis added); *see also Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014) ("The law requires patentees to apportion the royalty down to a reasonable estimate of the value of its claimed technology, **or else** establish that its patented technology drove demand for the entire product." (emphasis added)); *id.* at 1326 ("[W]hen claims are drawn to an individual component of a multi-component product, it is the **exception**, not the rule, that damages may be based upon the value of the multi-component product."); *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255 (Fed. Cir. 2013) ("Furthermore, the award cannot violate the entire market value rule. The entire market value rule is a **narrow exception** to the general rule that royalties are awarded based on the smallest salable patent-practicing unit."); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (calling the "entire market value rule" a "narrow exception" to the general rule requiring the patentee to reduce the value of its invention down to the smallest salable infringing unit).[3]

---

[3] The Court expressly rejects the argument that the entire market value rule is invoked merely because a patentee mentions the market price of the product during the presentation of its damages case to the jury. For some "apportionment" equations, the first step towards proper apportionment is taking a portion of value from the market price of the product. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014) ("Where the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature . . ., the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology."). On the one hand, the patentee should be able to present its evidence of how it estimated the isolated value of its patented feature to the jury. On the other hand, the patentee cannot place an *undue emphasis* on the market price of the entire multi-component product and thereby inflate the royalty base in its presentation to the jury. *Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1226–27 (Fed. Cir. 2014). Smartflash engaged in the latter when it presented its damages case to the jury during this trial.

9

However, Smartflash now argues that it in its apportionment equation, it never needed to apportion out the unpatented features from the royalty base. (Pl.'s Mot. at 5.) Yet, Smartflash also argues that it is simultaneously apportioning the royalty base by multiplying the results of the alone motivate survey question to product sales instead of product price. (*Id.*) Under the Federal Circuit and Supreme Court's guidance, the Court believes this is improper. *Virntex, Inc. v. Cisco Sys., Inc.*, 767 F.3d at 1327–28 ("To hold otherwise would permit the entire market value rule exception to swallow the rule of apportionment."); (2/17/15 AM Trial Tr. (Mills) 20:17–21:1, Dkt. No. 515 (Mills acknowledging that his equation seeks to apportion).)

ii. *Even if a party could use the entire market value rule to apportion, Smartflash's evidence does not meet the higher degree of proof required to do so.*

Even if Smartflash's apportionment argument was correct, and it is not, the Federal Circuit has offered guidance on the "higher degree of proof" required to invoke the entire market value rule exception in the first place. As articulated, this proof must show that the "[patented feature] alone drives *the market* for [the devices]." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012) (emphasis added). "It is not enough to merely show that the [patented feature] is viewed as valuable, important, or even essential to the use of [a multi-component device]." *Id.* The question is whether "the presence of [the patented feature] is what motivates consumers to buy [the multi-component device] in the first place." *Id.*

Here, 77% of consumers surveyed said that the patented feature was *not* the feature that drove them to purchase the accused device. Thus, Smartflash's "dual nature" approach to its hybrid entire market value rule/apportionment question does not meet this higher level of proof. *LaserDynamics, Inc.*, 694 F.3d at 68.

**Appx141**

iii.     *Under its proposed model, Smartflash uses the Alone Motivate survey question for two purposes, only one of which is a proper fact question for the jury.*

Smartflash, during trial, showed the following demonstrative to the jury on multiple occasions:





The Court finds that it was improper for Smartflash to present its ultimate royalty equation in this way because Smartflash's question did not meet the "higher degree of proof" for the entire market value rule exception. *See supra*. Stated differently, Smartflash now says that it invoked the alone motivate question for two principles: (1) apportionment; and (2) proving up the entire market value rule exception. The role that the alone motivate question played as an apportionment question was a proper fact question, but the role that the alone motivate question played in invoking the entire market value rule exception—and therefore allowing Smartflash to include complete product revenue in its demonstrative pie chart in that form—never could have been a proper fact question for the jury. *LaserDynamics, Inc.*, 694 F.3d at 68 ("Regardless of the chosen royalty rate, one way in which the error of an improperly admitted entire market value

11

rule theory manifests itself is in the disclosure of the revenues earned by the accused infringer associated with a complete product rather than the patented component only.").

Smartflash never isolated the value of the patented feature in the royalty base.[4] In fact, Smartflash never attempted to isolate the patented feature in its royalty base. This is improper. *See LaserDynamics, Inc.*, 694 F.3d at 68; *see also Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("It is not that an appropriately apportioned royalty award could never be fashioned by starting with the entire market value of a multi-component product . . . it is that reliance on the entire market value might mislead the jury, who may be less equipped to understand the extent to which the royalty rate would need to do the work in such instances.").

### iv. The Court's jury instruction further compounded the problem.

Finally, but in this limited context, importantly, the Court placed *further* emphasis on the unjustified use of the revenue of Apple's products with its jury instruction. Interestingly, it was Apple that argued for inclusion of this instruction in the final jury instructions. The Court quotes the relevant section of that instruction:

> The law allows for the recovery of damages based on the value of an entire product containing several features or components only when the patented invention constitutes the basis for consumer demand for the entire product.
> Accordingly, if you find that Smartflash has proven by a preponderance of the evidence that the demand for Apple's accused products is alone motivated by the patented invention, then you may award damages based on the entire value of those accused products.

(2/24/15 AM (Jury Instructions) 62:9–17, Dkt. No. 521.) First, Smartflash did not prove, through the evidence that it presented, that *the* demand for Apple's accused products is alone motivated by the patented features. Second, the Court did not distinguish between the sub-population or

---

[4] Smartflash acknowledges this: "To be sure, Smartflash isolated the value of this incremental improvement over prior or non-infringing modes in its calculation of its ultimate royalty rate .. . ." (Pl.'s Mot. at 6 n.7, Dkt. No. 597 (emphasis added).)

**Appx143**

sub-market as Smartflash suggests. Furthermore, not only did Smartflash emphasize the value of the entire product, but the instruction indicated that the jury may do so as well. Given the Federal Circuit's emphasis on tying the royalty base to the patented components only, this instruction was misguided, and in this limited instance, when combined with the above, justifies a new trial on damages.

### B. Smartflash's Alternative Royalty Calculation

First (and most importantly), Smartflash's alternative royalty calculation cannot save the skewed damages horizon that was created by Smartflash's primary model. Second, the alternative royalty calculation has its own flaws. For example, none of the survey respondents who answered "yes" to the "alone motivate" question were even asked the "percent value" question. (2/17/15 PM Trial Tr. (Mills) 154:3–8, Dkt. No. 514). Yet, Mills assumed these same people—people who Smartflash now argues attributed 100% of the iPhone's value to the patented invention, *see* (Pl.'s Reply at 1, Dkt. No. 601)—attributed an arbitrary value (that was not 100% of the value) to the patented invention. (2/17/15 PM Trial Tr. (Mills) 154:5–8, Dkt. No. 514); (PX 223). This assumption by Mills was based on no evidence presented, and Wecker, who designed the survey, agreed that this specific valuation was not possible based on the survey question he designed. (2/17/15 PM Trial Tr. (Wecker) 100:9–16).

### IV. Order

First, consistent with the Court's prior ruling, the Court hereby **ORDERS** that a new trial only on the issue of damages is **GRANTED**. Accordingly, the jury's verdict finding damages of $532,900,000.00 is **SET ASIDE** and **VACATED**. The Court hereby **ORDERS** that jury selection for a new trial concerning the issue of damages be re-set for **Monday, November 2, 2015, at 9:00 a.m.** in Tyler, Texas. The Court **ORDERS** that the parties meet and confer and

13

**Appx144**

submit a joint proposed Docket Control Order regarding such new damages trial within five (5) days of the date of this Order.

Second, the Court **DENIES-IN-PART** Plaintiff's Motion for Reconsideration of the Court's July 7, 2015, New Trial Order (Dkt. No. 581) to the extent that it asks this Court to reverse its prior ruling or to certify its new trial motion for interlocutory appeal. (Dkt. No. 597.) However, the Court **GRANTS-IN-PART** Plaintiff's Motion for Reconsideration to the extent that Smartflash requests the following relief: "Smartflash requests, consistent with Judge O'Malley's suggestion at oral argument on Apple's appeal of its Motion to stay, that the Court bifurcate those final liability determinations from the still-required damages proceedings (including proceedings related to any subsequent ongoing royalty or injunction) such that the Federal Circuit can quickly reach ultimate resolution of those highly disputed, final . . . aspects of the case (including subject matter eligibility under 35 U.S.C. § 101)." (Pl.'s Resp. at 13, Dkt. No. 597.)

Third, in this limited context and in order to preserve the Court's resources in this particular case, the Court will seriously entertain a motion to stay the new trial for damages if one of the parties chooses to promptly pursue such an appeal in accordance with 28 U.S.C. § 1292(c)(2).

Finally, having considered Smartflash's motion for reconsideration, the Court feels that in this limited context a more reasoned explanation of its prior Order Granting a New Trial is warranted and therefore **VACATES** the Court's prior ruling (Dkt. No. 581) and replaces it with this more reasoned opinion.

## V.      Conclusion

Ultimately the jury—not the Court—determines whether the combination of royalty base and royalty rate is reasonable in this context. However, this does not mean that a party can

14

include the complete product revenue in the royalty base if such an inclusion is not supported by the evidence. If Smartflash seeks to invoke the evidentiary benefit described above, the Court believes that Smartflash must reliably show the "higher degree of proof" required by the Federal Circuit: proof that Smartflash's patent "alone drives the market for [those devices]." Smartflash's unreliable proof that the patented invention alone drives some subsidiary portion of the market is not enough. It is not nearly enough to avoid the skewed damages which *Ericsson* warned against and which regrettably manifested themselves in the original jury verdict returned in this case.

**So ORDERED and SIGNED this 2nd day of September, 2015.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

**Appx146**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

SMARTFLASH LLC, and
SMARTFLASH TECHNOLOGIES
LIMITED,

        Plaintiffs

        v.

APPLE INC.,

        Defendant.

CIVIL ACTION NO. 6:13-CV-447-JRG

**JURY TRIAL DEMANDED**

## ORDER

Before the Court is Defendant Apple Inc.'s Motion to Stay Damages Retrial.  As part of this motion, Apple informed the Court that it will promptly appeal by October 2, 2015, the liability judgment in this case entered on September 2, 2015, (Dkt. 608), pursuant to 28 U.S.C. § 1292(c)(2).  In light of this information, the Court finds that the damages retrial currently scheduled for jury selection on November 2, 2015, should be postponed pending resolution of the appeal on liability issues.

Accordingly, IT IS ORDERED that this matter is hereby STAYED pending the Federal Circuit's resolution of the appeal on liability and invalidity issues, and the trial currently set for jury selection on November 2, 2015, is REMOVED form the trial docket.

The parties are ORDERED to file a joint notice with the Court within ten (10) days after any  final decision from the Federal Circuit alterting the Court of the subsequent determination.

**So ORDERED and SIGNED this 16th day of September, 2015.**


_____
RODNEY   GILSTRAP
UNITED STATES DISTRICT JUDGE

US007334720B2

(12) **United States Patent**
Hulst et al.

(10) Patent No.:     **US 7,334,720 B2**
(45) Date of Patent:        **Feb. 26, 2008**

(54) **DATA STORAGE AND ACCESS SYSTEMS**

(75) Inventors: **Hermen-ard Hulst**, Amsterdam (NL);
**Patrick Sandor Racz**, St. Heller (GB)

(73) Assignee: **Smart-Flash Limited**, East Sussex
(GB)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/336,758**

(22) Filed: **Jan. 19, 2006**

(65) **Prior Publication Data**

US 2006/0118619 A1     Jun. 8, 2006

**Related U.S. Application Data**

(63) Continuation of application No. 10/111,716, filed as
application No. PCT/GB00/04110 on Oct. 25, 2000,
now abandoned.

(30) **Foreign Application Priority Data**

Nov. 25, 1999    (GB) ................................. 9925227.2

(51) **Int. Cl.**
**G06K 5/00**        (2006.01)

(52) **U.S. Cl.** ...................... **230/380**; 235/382; 235/492;
235/451

(58) **Field of Classification Search** ................ 235/380,
235/382, 492, 451; 711/100, 101, 103
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,226,145 A | 7/1993 | Moronaga et al. | |
| 5,367,510 A | 11/1994 | Kitta et al. | |
| 5,406,619 A | * 4/1995 | Akhteruzzaman et al. | ...................... 379/93.02 |

| | | | |
|---|---|---|---|
| 5,457,746 A | 10/1995 | Dolphin | |
| 5,588,146 A | 12/1996 | Leroux | |
| 5,677,953 A | 10/1997 | Dolphin | |
| 5,703,951 A | 12/1997 | Dolphin | |
| 5,754,654 A | * 5/1998 | Hiroya et al. ................. | 705/76 |
| 5,794,202 A | 8/1998 | Kim | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP            0195098       10/1990

(Continued)

*Primary Examiner*—Steven S. Paik
(74) *Attorney, Agent, or Firm*—Townsend and Townsend
and Crew LLP

(57)          **ABSTRACT**

Data storage and access systems are described for down-
loading and paying for data such as audio and video data,
text, software, games and other types of data. A portable data
carrier has an interface for sending and receiving data,
non-volatile data memory for storing received content data
and non-volatile payment validation memory for providing
payment validation data to an external device. The carrier
may also store a record of access made to the stored content,
and content use rules for controlling access to the stored
content. Preferred embodiments store further access control
data and supplementary data such as hot links to web sites
and/or advertising data. A complementary data access ter-
minal, data supply computer system and data access device
are also described. The combination of payment data and
stored content data and, in preferred embodiments, use rule
data, helps reduce the risk of unauthorized access to data
such as compressed music and video data, especially over
the Internet.

**18 Claims, 17 Drawing Sheets**



**US 7,334,720 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,809,241 A | 9/1998 | Hanel et al. |
| 5,847,372 A | 12/1998 | Kreft |
| 5,889,860 A | 3/1999 | Eller et al. |
| 5,901,330 A | 5/1999 | Sun et al. |
| 5,918,213 A | 6/1999 | Bernard et al. |
| 5,923,884 A | 7/1999 | Peyret et al. |
| 6,012,634 A | 1/2000 | Brogan et al. |
| 6,078,917 A | 6/2000 | Paulsen et al. |
| 6,119,945 A | 9/2000 | Muller et al. |
| 6,202,056 B1 | 3/2001 | Nuttall |
| 6,385,731 B2 | 5/2002 | Ananda |
| 6,424,975 B1 | 7/2002 | Walter et al. |
| 6,442,570 B1 | 8/2002 | Wu |
| 6,473,829 B1 | 10/2002 | Dahman et al. |
| 6,510,236 B1 | 1/2003 | Crane et al. |
| 6,553,413 B1 | 4/2003 | Leighton et al. |
| 6,574,643 B2 | 6/2003 | Walter et al. |
| 6,999,936 B2 * | 2/2006 | Sehr ............................. 705/5 |
| 7,044,362 B2 * | 5/2006 | Yu ............................. 235/375 |
| 7,083,081 B2 * | 8/2006 | McGee et al. .............. 235/375 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0713198 | 5/1996 |
| EP | 0823694 | 2/1998 |
| EP | 0823694 A1 | 2/1998 |
| EP | 0542298 | 4/1998 |
| EP | 0713198 A2 | 5/1998 |
| EP | 0843449 | 5/1998 |
| EP | 0843449 A2 | 5/1998 |
| EP | 0914001 | 5/1999 |
| EP | 0914001 A1 | 5/1999 |
| WO | WO 98/19237 | 5/1998 |
| WO | WO 98/19237 A1 | 5/1998 |
| WO | WO 98/33343 | 7/1998 |
| WO | WO 98/37526 | 8/1998 |

* cited by examiner

# Fig. 1

## A



## B



## C



# Fig. 2



# Fig. 3

A        B





Fig. 4



Fig. 5



Fig.6



Fig. 7

U.S. Patent     Feb. 26, 2008     Sheet 7 of 17     US 7,334,720 B2



Fig. 8

U.S. Patent

Feb. 26, 2008

Sheet 8 of 17

US 7,334,720 B2



Fig. 9



Fig. 10



**S10**
SMART FLASH CARD INSERTED INTO CONTENT ACCESS TERMINAL CARD INTERFACE

**S11**
SCHEME OWNER REGISTRATION WEB PAGE LOADED ONTO CONTENT ACCESS TERMINAL

**S12**
USER REGISTRATION DATA ENTERED INTO CONTENT ACCESS TERMINAL

**S13**
USER REGISTRATION DATA TRANSMITTED TO SCHEME OWNER

**S14**
PAYMENT REQUEST RECEIVED FROM SCHEME OWNER AT CONTENT ACCESS TERMINAL

**S15**
PAYMENT DATA ENTERED INTO CONTENT ACCESS TERMINAL AND TRANSMITTED TO SCHEME OWNER

**S16**
CARD VALUE DATA AND CARD VALUE ACCESS CODE RECEIVED BY CONTENT ACCESS TERMINAL FROM SCHEME OWNER

**S17**
CARD REGISTRATION DATA RECEIVED FROM SCHEME OWNER AND WRITTEN ONTO CARD

**S18**
VALUE DATA AND ACCESS CODE WRITTEN ONTO CARD AND OUTPUT TO USER

**S19**
CARD AVAILABLE FOR USE

Fig11a



S20
REQUEST FOR CARD REGISTRATION WEB PAGE RECEIVED FROM CONTENT ACCESS DEVICE
S21
TRANSMIT CARD REGISTRATION WEB PAGE TO CONTENT ACCESS DEVICE
S22
RECEIVE USER REGISTRATION DATA FROM CONTENT ACCESS TERMINAL AND STORE IN ACCESS CONTROL DATA STORE
S23
TRANSMIT PAYMENT REQUEST TO CONTENT ACCESS TERMINAL
S24
RECEIVE PAYMENT DATA FROM CONTENT ACCESS TERMINAL
S25
PAYMENT PROCESSOR VERIFIES PAYMENT DATA WITH PAYMENT SYSTEM
S26
PAYMENT PROCESSOR TRANSMITS VALUE DATA AND VALUE ACCESS CODE TO CONTENT ACCESS TERMINAL
S27
PAYMENT PROCESSOR UPDATES PAYMENT RECORD DATA STORE WITH TRANSACTION DATA
S28
CARD REGISTRATION DATA LOADED FROM ACCESS CONTROL DATA STORE AND TRANSMITTED TO CONTENT ACCESS TERMINAL
S29
TRANSACTION COMPLETE

Fig.11b



S30 INSERT CARD IN CONTENT ACCESS TERMINAL

S31 USER ENTERS PASSWORD INTO CONTENT ACCESS TERMINAL

S32 CONTENT ACCESS TERMINAL TRANSMITS PASSWORD TO CARD FOR VERIFICATION

S33 ACCESS PERMITTED? — NO → S34 DISPLAY WARNING AND INCREMENT TERMINAL ACCESS DENIED COUNT

YES

S40 LOAD OUTLINE CRM DATA FROM CARD

S35 READ CARD THRESHOLD AND TOTAL CARD ACCESS DENIED COUNT FROM CARD

S41 LOAD RETAILER DATA FROM RETAILER LAN / WAN

S36 CARD COUNT>(CARD THRESHOLD -3)? — NO

B

S42 DISPLAY MENU, RETAILER DATA AND OUTLINE CRM DATA ON CONTENT ACCESS TERMINAL

YES

S37 DISPLAY CONTENT ERASURE WARNING

S43 INPUT MENU OPTION (DOWNLOAD CONTENT; ADD MONETARY VALUE; CHECK / SPEND CRM VALUE; WEB SITE LINKS; EXIT)

S38 TERMINAL COUNT>TERMINAL THRESHOLD? — NO

DOWNLOAD CONTENT

YES

S44 LOAD SCHEME OWNER CONTENT ACCESS WEB PAGE ONTO CONTENT ACCESS TERMINAL

S39 OUTPUT ACCESS REFUSED MESSAGE AND AWAIT CARD REMOVAL

A

**Fig. 12a**



A
S45
CONTENT SEARCH REQUEST DATA INPUT AND TRANSMITTED TO SCHEME OWNER CONTENT DISTRIBUTION PROCESSOR
S46
CONTENT SEARCH RESULTS RECEIVED FROM CONTENT DISTRIBUTION PROCESSOR AND DISPLAYED ON CONTENT ACCESS TERMINAL
S47
CONTENT ITEM SELECTION DATA INPUT AND TRANSMITTED TO SCHEME OWNER
S48
CONTENT COST DATA, CONTENT USE RULES AND PURCHASE OPTIONS DATA RECEIVED FROM SCHEME OWNER
S49
PURCHASE OPTION SELECTION AND PURCHASE REQUEST INPUT OR EXIT TO MENU SELECTED
B
EXIT
S50
CARD VALUE AND CRM DATA READ FROM CARD
S51
CARD VALUE SUFFICIENT?
NO
S52
DISPLAY INSUFFICIENT VALUE WARNING
B
YES
S53
PAYMENT REQUEST TRANSMITTED TO CARD
C

Fig.12b



Fig.12c



S60
CONTENT ACCESS WEB PAGE REQUESTED AND TRANSMITTED TO CONTENT ACCESS TERMINAL
S61
CONTENT SEARCH REQUEST RECEIVED FROM CONTENT ACCESS TERMINAL
S62
CONTENT DISTRIBUTION PROCESSOR SEARCHES CONTENT ACCESS DATA STORE AND TRANSMITS SEARCH RESULTS TO CONTENT ACCESS TERMINAL
S63
CONTENT ITEM SELECTION RECEIVED FROM CONTENT ACCESS TERMINAL
S64
CONTENT ITEM PURCHASE DATA RETRIEVED FROM CONTENT ACCESS DATA STORE
S65
CONTENT PURCHASE DATA TRANSMITTED TO CONTENT ACCESS TERMINAL
S66
PAYMENT RECORD DATA, PURCHASE REQUEST DATA AND CARD REGISTRATION DATA RECEIVED FROM CONTENT ACCESS TERMINAL
S67
PAYMENT RECORD DATA VALIDATED WITH e-PAYMENT SYSTEM
D

Fig. 12d



D
S68
PAYMENT DISTRIBUTION DATA READ FROM CONTENT ACCESS DATA STORE
S69
PAYMENT DISTRIBUTION INSTRUCTION TRANSMITTED TO e-PAYMENT SYSTEM
S70
CONTENT ACCESS RULES FOR PURCHASED LEVEL OF SERVICE, CRM DATA AND CONTENT PROVIDER ID DATA READ FROM CONTENT ACCESS DATA STORE
S71
CONTENT ACCESS RULES TRANSMITTED TO CONTENT ACCESS TERMINAL
S72
DRM PROCESSOR TRANSMITS TRANSACTION REQUEST AND AUTHENTICATION TO CONTENT PROVIDER
S73
CONTENT ACCESS WEB SERVER RECEIVES PROTECTED CONTENT FROM CONTENT PROVIDER AND TRANSMITS CONTENT TO CONTENT ACCESS TERMINAL
S74
PURCHASE DATA AND CONTENT ACCESS RECORD WRITTEN TO PAYMENT RECORD DATA STORE
S75
USING STORED RULES UPDATED CRM DATA WRITTEN TO CONTENT ACCESS DATA STORE AND TRANSMITTED TO CONTENT ACCESS TERMINAL
S76
PROCESS ENDS

Fig. 12e



Fig. 13

**S77**
CARD INSERTED INTO PLAYER

**S78**
USER PASSWORD ENTERED INTO PLAYER AND TRANSMITTED TO CARD FOR VALIDATION

CONTENT ACCESS PERMITTED

**S79**
STORED CONTENT INDEX LOADED FROM CARD AND DISPLAYED WITH MENU (ACCESS CONTENT; CHECK VALUE; CHECK CRM; PLAY OPTIONS)

**S80**
SELECTION OF CONTENT ITEMS FOR ACCESS ENTERED INTO PLAYER

**S81**
CONTENT USE STATUS AND CONTENT USE RULES LOADED FROM CARD

**S82**
USE RULES AND USE STATUS COMPARED AND DISPLAYED WITH CONTENT PLAY MENU

**S83**
IS CONTENT USE PERMITTED?    NO

YES
PLAY

**S84**
CONTENT AND SUPPLEMENTARY DATA MADE AVAILABLE TO USER

PAUSE

**S85**
WRITE/READ CARDS PLAY STATUS DATA

CONT

PLAY COMPLETE

**S85**
UPDATED CONTENT USE DATA WRITTEN TO CARD

**S86**
CRM DATA AND CRM REWARD RULES LOADED FROM THE CARD AND UPDATED

US 7,334,720 B2

1

# DATA STORAGE AND ACCESS SYSTEMS

## BACKGROUND OF THE INVENTION

This invention is generally concerned with data storage and access systems. More particularly, it relates to a portable data carrier for storing and paying for data and to computer systems for providing access to data to be stored. The invention also includes corresponding methods and computer programs. The invention is particularly useful for managing stored audio and video data, but may also be applied to storage and access of text and software, including games, as well as other types of data.

One problem associated with the increasingly wide use of the internet is the growing prevalence of so-called data pirates. Such pirates obtain data either by unauthorized or legitimate means and then make this data available essentially world-wide over the internet without authorization. Data can be a very valuable commodity, but once it has been published on the internet it is difficult to police access to and use of it by Internet users who may not even realize that it is pirated. This is a particular problem with audio recordings, and, once the bandwidth becomes available, is also likely to be evident with video.

Over the past three or four years compressed audio sources have become increasingly widely available on web pages. One widely used audio data compression format is MP3 (MPEG—Audio Layer 3 of the MPEG1 compression algorithm), which is an internationally defined standard including a definition of compressed audio information such as speech or music. It relies on psycho-acoustic properties of human hearing to achieve very large data compression factors. It is thus feasible to download usefully long passages of music in a practically convenient short time. Pirate data suppliers have not been slow to realize the potential of this, and many unauthorized websites have sprung up offering popular music, including recent releases by world-famous bands. This has caused the recording industry considerable concern and there is an urgent need to find a way to address the problem of data piracy.

## SUMMARY OF THE INVENTION

According to the present invention there is therefore provided a method of providing portable data comprising providing a portable data storage device comprising downloaded data storage means and payment validation means; providing a terminal for internet access; coupling the portable data storage device to the terminal; reading payment information from the payment validation means using the terminal; validating the payment information; and downloading data into the portable storage device from a data supplier.

Another aspect of the invention provides a corresponding mobile data retrieval device for retrieving and outputting data such as stored music and/or noise from the data storage device.

The payment validation means is, for example, means to validate payment with an external authority such as a bank or building society. The combination of the payment validation means with the data storage means allows the access to the downloaded data which is to be stored by the data storage means, to be made conditional upon checked and validated payment being made for the data. Binding the data access and payment together allows the legitimate owners of

the data to make the data available themselves over the internet without fear of loss of revenue, thus undermining the position of data pirates.

A further advantage of the system is that it allows users under the age of 18 to make internet purchases. Currently internet users pay for goods and/or services by credit card. Since credit cards cannot legitimately be used by persons under the age of 18 (at least in the UK), a significant fraction of adventurous internet users are excluded from e-commerce, one of the most significant predicted uses of the internet. In one embodiment of the invention, however, the payment validation means comprises e-cash; that is, the payment validation means stores transaction value information on a cash value of transactions validatable by the data storage means. In simple terms, the data storage means can be a card which is charged up to a desired cash value (if necessary limited to a maximum value) at a suitable terminal. This might be an internet access terminal but could, more simply, be a device to accept the data storage card and to receive and count money deposited by the user to charge the card, writing update cash value information onto the card. More sophisticated ways of updating the cash value on the card are also possible, such as direct bank transfer. Since, with this type of embodiment, the data storage means is, essentially, precharged with cash rather than acting as a credit card, it can be used by young people without the risk of their incurring large debts.

In one embodiment the data storage means is powered by the retrieved device when it is connected to the device and retains a memory of the downloaded data when it is unpowered. This can be achieved by the use of Flash RAM or, more generally, any form of programmable read-only memory. Alternatively the data storage means may incorporate a rechargeable cell or capacitor and store information in battery backed-up static RAM.

The downloaded data may be entered into the data storage device by means of an interface such as a magnetically or capacitatively coupled connection or an optical connection, but preferably the interface comprises contacts for direct electrical connection to the storage means. The payment validation means may likewise have one of a variety of interfaces but again preferably comprises a set of electrical contacts. The payment validation means could, however, comprise a magnetic or holographic data-strip such as is known for use with credit cards and phone cards. The interface to receive the downloaded data may be separate from the interface to the payment validation means, to facilitate separate and simultaneous access to both these systems. In other embodiments a single interface may serve for both data storage and payment. Advantageously the payment validation means includes a memory storing information to identify the person who is paying for the downloaded data.

For additional security the downloaded data may be encrypted. In this case data decryption may be necessary at some stage, either in the data storage means or in the retrieval device or in an information delivering apparatus such as a data access terminal. Alternatively the data decryption function can be shared amongst one or more of these devices. The skilled person will be aware of a range of suitable encryption/decryption techniques, including Pretty Good Privacy (Registered Trade Mark) and PKI (Public Key Infrastructure). Normally when the downloaded data is encrypted a decryption key must be supplied. This can be generated automatically by the data access terminal or data

US 7,334,720 B2

3

access service provider or it can be entered by the user into the data access terminal or into the mobile data retrieval device.

The data storage means and/or the retrieval device can be provided with access control means to prevent unauthorized access to the downloaded data. Additionally or alternatively, use control means can be provided to stop or provide only limited access of the user to the downloaded data in accordance with the amount paid. These access and use control functions may in some embodiments be combined, permitted use controlling access or permitted access controlling use. Thus, for example, a complete set of data information relating to a particular topic, a particular music track, or a particular software package might be downloaded, although access to part of the data set might thereafter be controlled by payments made by a user at a later stage. In this way, a user could pay to enable an extra level on a game or to enable further tracks of an album.

In embodiments where the access or use control means is responsive to the payment validation means, access or use control information may be stored with the downloaded data or in a separate storage area, for example in the payment validation means. The user's access to the downloaded data could advantageously be responsive to the payment validation means, for example, by means of a control line coupling the payment validation means with a memory access or decryption control element.

In one embodiment the data storage means comprises an electronic memory card or smart card and the mobile data retrieval device is provided with a slot to receive the card. Preferably the card is a push-fit within the retrieval device, and retention of the card may be effected by pressure from electrical interface connections and/or resilience of the housing, or by using a resilient retaining means. In a preferred embodiment the retrieval device includes an audio output and a display, to play a downloaded track and to show information about the track and/or an accompanying video.

To download data onto the data storage means the user can employ a data access terminal coupled to the internet. The terminal can directly validate payment; for example in the case of a smart card charged with electronic cash it can deduct a cash value from the card. Alternatively it can communicate with a bank or other financial services provider to control payment. In a preferred embodiment, however, the terminal connects to a data access service provider which provides a portal to other sites and which validates payment and then forwards data from a data supplier to the user's local access terminal. The data access service provider may alternatively forward payment validation information and/or information from the payment validation authority to the data supplier for control by the supplier of the data supplied. Thus, access to the payment validation system and/or data for downloading may be entirely controlled by the data supplier.

Data held on the data storage means may advantageously include data relating to the user's or payer's usage of the system. This information may include, for example, information on a user's spending pattern, information on data suppliers used and information on the downloaded data. This information may be accessed by the data supplier and/or data access service provider and can be used for targeted marketing or loyalty-based incentive schemes such as air miles or the like.

The data access terminal may be a conventional computer or, alternatively, it may be a mobile phone. Wireless Application Protocol (WAP) and i-mode allow mobile phones to efficiently access the internet and this allows a mobile phone

4

to be used to download data to the data storage means, advantageously, directly. The data storage means can, if desired, incorporate the functionality of a mobile phone SIM (Subscriber Identity Module) card, which cards already include a user identification means, to allow user billing through the phone network operator.

In a preferred embodiment the downloaded data is MP3 or other encoded audio data, but the system finds more general application for other data types. For example, download data can include software, and particularly games, share price information, current news information, transport timetable information, weather information and catalog shopping information. The downloaded information may also include compressed video data. The storage capacity of the data storage means is adaptable to suit the type of data intended to be downloaded; for example, 32 megabytes is sufficient for CD quality music, but for video it is preferable that the data storage means has a capacity of 128 megabytes or greater.

In another aspect, the invention provides a portable data carrier comprising an interface for reading and writing data from and to the carrier; non-volatile data memory, coupled to the interface, for storing data on the carrier, non-volatile payment data memory, coupled to the interface, for providing payment data to an external device.

These features allow the data carrier to store both payment data and content data, thus providing the advantages outlined above. Depending upon the payment system used, the payment data memory may also store code for validating or confirming a payment to an external payment system. The payment data will normally be linked to a card or card holder identification data for payment by the card holder. The non-volatile memory ensures that stored content and payment data is retained in the data carrier when the data carrier is not receiving power from an external source. Thus "non-volatile" encompasses, for example, low-power memory whose contents are retained by a battery back-up system. In one embodiment the payment data memory comprises EEPROM and the content data memory comprises Flash memory, but other types of content data memory, such as optical, for example, holographic, data memory can also be used. The data carrier may also be integrated into other apparatus, such as a mobile communications device.

Preferably, the portable data carrier further comprises a program store for storing code implementable by a processor, and a processor, coupled to the content data memory, the payment data memory, the interface and to the program store for implementing code in the program store, wherein the code comprises code to output payment data from the payment data memory to the interface and code to provide external access to the data memory.

Normally, the (content) data memory allows both write and read access for both storing and retrieving data, but in some embodiments the content data memory may be read-only memory (ROM). In such embodiments, content may be pre-loaded onto the carrier and payment may then be made for permission to access the pre-loaded data.

Preferably, the data carrier also stores a record of access made to the content data and updates this in response to external access, preferably read access, made to the data memory. The carrier may also store content use rules pertaining to allowed use of stored data items. These use rules may be linked to payments made from the card to provide payment options such as access to buy content data outright; rental access to content data for a time period or for a specified number of access events; and/or rental/purchase,

**5**

for example where rental use is provided together with an option to purchase content data at the reduced price after rental access has expired.

Thus where the data carrier stores, for example, music, the purchase outright option may be equivalent to the purchase of a compact disc (CD), preferably with some form of content copy protection such as digital watermarking. In this example, the rental or subscription payment option may be a pay-per-play option, and with this option payment may either be before or after access to the stored data so that the carrier may operate in either a debit or credit payment mode.

The portability of the data carrier potentially allows it to be used to access content or, in the example, play music without the need to be linked to a communications system or to be on-line to the internet. By providing a use record memory on the data carrier, use of the stored data can be tracked while off-line and then any necessary payment can be made when the data carrier is next coupled to a communication system. This allows the data carrier to operate in a credit mode. In a debit mode, the additional storage of use rules facilitates the regulation of access to content data stored on the carrier without the need for further exchange of payment/use data with an external system to validate the use.

By combining digital rights management with content data storage using a single carrier, the stored content data becomes mobile and can be accessed anywhere while retaining control over the stored data for the data content provider or data copyright owner. Preferably, the data carrier also stores access control data, such as a user ID and a password, as the stored data may be valuable. The access control data may be combined with access control to the payment data, which is typically by means of a PIN (Personal Identification Number) to simplify access to valued content stored on the carrier.

In one embodiment the stored content data is encrypted and a unique password or PIN and/or biometric data is required for decryption. The data carrier may be arranged so that the content is erased after a predetermined number of incorrect access attempts. Additionally or alternatively, a permanently stored flag may be set and/or a hardware modification (such as a fusable link) may be made to prevent the data carrier from functioning for further data storage/retrieval. Preferably, however, access to any stored value/payment data is nevertheless retained.

Supplementary data may also be stored on the carrier in association with stored content data. This supplementary data may comprise customer reward management data and/or advertising data. The supplementary data may comprise a pointer to an external data source from which data is downloaded either to the data carrier or to a data access device or content player, so that advertising or other data can be displayed when reviewing or accessing the stored content.

Additional data security and/or a mechanism for rewarding operators at different levels in the data supply chain may be provided using a content synthesis function. The content synthesis function combines partial content information from two or more sources to provide content data items for storage and/or output. Thus, for example, a first percentage of a content data item could be provided by a content retailer, while a remaining percentage could be provided by an on-line data supplier. This would provide an incentive for a user to register with a content retailer or distributor as well as with an on-line system owner and so could encourage the use of existing retailers and could provide a mechanism for paying commission to such retailers. The two portions of

**6**

data combined to provide a content data item could comprise encryption data and a key but preferably comprise separate parts of a complete data item, for example, least significant bits and most significant bits or high frequencies and low frequencies (for audio). This arrangement also facilitates customer reward and loyalty management.

In one embodiment the data carrier further comprises memory for storing data for accessing a mobile communications network, for example to receive content data over the network. For such an embodiment, the data carrier may replace a SIM (Subscriber Identity Module) card in a mobile communications device, thus providing a single card for both network access and valued content retrieval and storage. Additionally or alternatively the card may also store the web address of a data supplier from whom data may be downloaded onto the carrier.

The data memory for storing content data may be optic, magnetic or semiconductor memory, but preferably comprises Flash memory. Preferably, the data memory has a large capacity for storing large data files such as compressed video data. Preferably, the data memory is partitioned for lock access, that is, for read and/or write access to blocks of, for example, 1 K, 4 K, 16 K or 64 K databytes for faster data access, particularly where the stored content data will normally be accessed serially, as is normally the case with audio and video data. Preferably the card is configured as an IC card or smart card and has a credit card-type format, although other formats such as the "memory stick" format may also be used. This provides a small and convenient portable format and facilitates removable interfacing with a variety of devices.

The invention also provides a related method of controlling access to data on a data carrier, the data carrier comprising non-volatile data memory and non-volatile parameter memory storing use status data and use rules, the method comprising receiving a data access request; reading the use status data and use rules from memory; and evaluating the use status data using the use rules to determine whether access to the stored data is permitted.

According to another aspect of the invention, there is provided a computer system for providing data to a data requester, the system comprising a communication interface; a data access data store for storing records of data items available from the system, each record comprising a data item description and a pointer to a data provider for the data item; a program store storing code implementable by a processor; a processor coupled to the communications interface, to the data access data store, and to the program store for implementing the stored code, the code comprising code to receive a request for a data item from the requester; code to receive from the communications interface payment data comprising data relating to payment for the requested data item; code responsive to the request and to the received payment data, to read data for the requested data item from a content provider; and code to transmit the read data to the requester over the communications interface.

The computer system is operated by a data supplier or data supply "system owner" for providing content data to the data carrier described above. The payment data received may either be data relating to an actual payment made to the data supplier, or it may be a record of a payment made to an e-payment system relating either to a payment to the data supplier, or to a payment to a third party. The data from the content provider, preferably without permanent (local) storage of the forwarded data, improves data security as the content provider retains control over a content data item, and the data supplier, a copy of a data item, is unable to supply data for the item without the content provider's assistance.

US 7,334,720 B2

7

The computer system may provide temporary storage for a requested data item, for example using a disk cache, but preferably the computer system does not store a complete data item, even temporarily.

Preferably, the computer system includes payment distribution information so that when payment is made for a data item, the payment can be distributed for reimbursing royalties and making other payments. Typically a large fraction of the payment for a data item will be transferred to a copyright owner or "content provider" for the item, while smaller payments will go to the artist and/or publisher and/or retailer/distributor. Payment may be made directly by the computer system to the computer systems of other relevant parties using, for example, a signature-transporting type e-payment system. Alternatively, the computer system can issue appropriate instructions to a third party e-payment system for making the transfers. The computer system allows automatic distribution of payments either before, during or after content data download, or after content data access by a user. Instructions for distributing the payments may be issued substantially simultaneously, thereby avoiding long delays in the payment of some parties; for example, it can presently take a year or more for an artist generating content to be paid by conventional methods.

Preferably the computer system also stores content data item access rule data, for downloading in association with a content data item. The rule data may be stored by a content provider but is preferably held by the computer system, and links a content identifier with an access rule, typically based upon a required payment value, as outlined above in the context of the data carrier. Normally, each content data item will have an associated access rule, but a single rule may apply to a large number of data items. The computer system also, preferably, stores requester reward data for customer reward/loyalty management. This data may again comprise one or more rules linking a payment value and/or content data item type to a specified reward, such as a number of air miles or retailer value points. The computer system preferably also keeps a record of an identified user's or data's carriers content item downloads and payments for market research purposes.

The computer system, in one embodiment, also stores access control data, such as an access request identity and password which can be employed, for example, to create an extranet of system users, which again can be linked to stored access record data for marketing purposes. When further linked to content item type data, such an arrangement can be used to construct a club of users of content data items of a particular type, for example country and western or rock and roll music. As described in connection with the portable data carrier, the computer system may also comprise content synthesis code for additional data security and for more secure management of payment distributions.

The invention also provides a related method of providing data to a data requester comprising receiving a request for a data item from the requester; receiving payment data from the requester relating to payment for the requested data; reading the requested data from a content provider responsive to the received payment data; and transmitting the read data to the requester.

According to a further aspect of the present invention, there is provided a data access terminal for retrieving data from a data supplier and providing the retrieved data to a data requester, the terminal comprising a first interface for communicating with the data supplier; a data carrier interface for interfacing with the data carrier; a program store

8

storing code implementable by a processor; and a processor, coupled to the first interface, the data carrier interface and to the program store for implementing the stored code, the code comprising: code to read payment data from the data carrier and to forward the payment data to a payment validation system; code to receive payment validation data from the payment validation system; code responsive to the payment validation data to retrieve data from the data supplier and to write the retrieved data into the data carrier.

This terminal can be used for retrieving data from the above-described computer system and for downloading the retrieved data to the above-described portable data carrier. As with the data supply computer system, it is preferable that there is no (local) storage of content item data forwarded from the data supplier to the data carrier. The data access terminal is not restricted to use with the above-described status supplier and could, for example, retrieve data for downloading to the data carrier from a local data source, such as a CD (Compact Disc) or DVD (Digital Versatile Disc), or from a third party such as a cable TV company.

The terminal reads payment data from the data carrier and transmits this to a payment validation system for validating the data and authorizing the payment. This may be part of the data supplier's computer system or it may be a separate system such as an e-payment system. Thus, the terminal operates with a data carrier storing payment (validation) data and, in some embodiments, additional payment validation code for validating payment to the payment validation system. Again, the terminal is preferably configured to provide a data item use rule to the carrier in conjunction with a data item. As before, the data item use rule will normally be dependent upon payment value information embodied in the payment data read from the data carrier. The terminal is preferably also configured for user input of access control data. This access control data may be forwarded to the data carrier for access permission verification and/or it may be passed to the data supplier computer system for a similar purpose. The terminal may be configured to warn a user of content access or data carrier function inhibition after a predetermined number of access requests have been refused. The terminal may also incorporate content synthesis code as described above.

The terminal may comprise code to output supplementary data when downloading data to the data carrier. Identity data on the data carrier can be used to retrieve the supplementary data, or a pointer to the supplementary data, from the data supplier computer system, or the supplementary data or a pointer thereto can be retrieved directly from the data carrier. Preferably, however, identification data on the card is used to retrieve characterizing data such as card user preference data from the data supplier computer system, and this characterizing data is then used by the terminal to retrieve and output supplementary data to a terminal user. When the terminal is associated with a contact distributor or retailer, the supplementary data may be retrieved over a network associated with the retailer/distributor such as a local area network (LAN), wide area network (WAN) or extranet.

The invention also provides a method of providing data from a data supplier to a data carrier, the method comprising reading payment data from the data carrier; forwarding the payment data to a payment validation system; retrieving data from the data supplier; and writing the retrieved data into the data carrier.

The payment validation system may be part of the data supplier's computer systems or it may be a separate e-payment system. In one embodiment the method further comprises receiving payment validation data from the payment

US 7,334,720 B2

**9**

validation system; and transmitting at least a portion of the payment validation data to the data supplier. Alternatively the payment validation system may comprise a payment processor at the data supplier or at a destination retrieved from the data supplier. The payment processor may also provide payment distribution data for distributing a payment represented by the payment data.

In a further aspect, the invention provides a data access device for retrieving stored data from a data carrier, the device comprising a user interface; a data carrier interface; a program store storing code implementable by a processor; and a processor coupled to the user interface, to the data carrier interface and to the program store for implementing the stored code, the code comprising code to retrieve use status data indicating a use status of data stored on the carrier, and use rules data indicating permissible use of data stored on the carrier; code to evaluate the use status data using the use rules data to determine whether access is permitted to the stored data; and code to access the stored data when access is permitted .

The data access device uses the use status data and use rules to determine what access is permitted to data stored on the data carrier. As described above, the use rules will normally be dependent upon payments made for data stored on the data carrier, but may also comprise access control employing a user identification and password. Since a single data carrier may have more than one user, the use status and use rules may be selected dependent upon a user identity. The data access device may also be configured to present supplementary data when presenting the content data, retrieved as described above, from the card, from a remote computer system or from some other source such as a cable TV network or off-air.

The invention also provides a related method of controlling access to data from a data carrier, comprising retrieving use status data from the data carrier indicating past use of the stored data; retrieving use rules from the data carrier; evaluating the use status data using the use rules to determine whether access to data stored on the carrier is permitted; and permitting access to the data on the data carrier dependent on the result of said evaluating.

According to a further aspect of the invention there is provided a data access system comprising a data supply computer system for forwarding data from a data provider to a data access terminal; a electronic payment system for confirming an electronic payment; a data access terminal for communicating with the data supply system to write data from the data supply system onto a data carrier; and a data carrier for storing data from the data supply system and payment data; wherein data is forwarded from the data provider to the data carrier on validation of payment data provided from the data carrier to the electronic payment system.

In a further aspect of the invention, there is provided a portable data carrier comprising an interface for sending and receiving data from and to the carrier; non-volatile data memory, coupled to the interface, for storing data on the carrier; and a digital rights management processor for controlling access to the stored data.

In a further aspect of the invention, there is provided a portable data carrier comprising an interface for sending and receiving data from and to the carrier; non-volatile data memory, coupled to the interface, for storing data on the carrier; and an access control processor; wherein the data memory is partitioned as data blocks and the access control processor controls external access to the data blocks.

**10**

In a further aspect of the invention, there is provided a computer system for providing data to a data requester, the system comprising a communication interface; a data access data store for storing records of data items available from the system, each record comprising a data item description and a resource locator; a data provider for the data item; a program store storing code implementable by a processor; a processor coupled to the communications interface, to the data access data store, and to the program store for implementing the stored code, the code comprising code to receive a request for a data item from the requester to receive from the communications interface payment data comprising data relating to payment for the requested data item; code, responsive to the request and to the received payment data, to output the item data to the requester over the communication interface; wherein said data access data store further comprises payment distribution information indicating to whom payments should be made for a data item; and further comprising code to output payment data for a data item for making payments for the item when the item is supplied to a requester.

In a further aspect of the invention, there is provided a computer system for providing data to a data requester, the system comprising a communication interface; a data access data store for storing records of data items available from the system, each record comprising a data item description and a printer location data identifying an electronic address for a provider for the data item; a program store storing code implementable by a processor; a processor coupled to the communications interface, to the data access data store, and to the program store for implementing the stored code, the code comprising code to receive a request for a data item from the requester to receive from the communications interface payment data comprising data relating to payment for the requested data item; code responsive to the request and to the received payment data to output the item data to the requester over the communication interface; wherein the data access data store further comprises data item access rule data for output to the requester with a data item; and further comprising code to select access rule data for output with a data item in response to the payment data.

In a yet further aspect of the invention, there is provided a method of providing data to a data requester comprising receiving a request for a data item from the requester; receiving payment data from the requester relating to payment for the requested data; transmitting the requested data to the requester; reading payment distribution information from a data store; and outputting payment data to a payment system for distributing the payment for the requested data.

In a still further aspect of the invention, there is provided a method of providing data to a data requester comprising receiving a request for a data item from the requester; receiving payment data from the requester relating to payment for the requested data; transmitting the requested data to the requester; and transmitting data access rule data to the requester with the read data.

These and other aspects of the invention will now be further described, by way of example only, with reference to the accompanying figures.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows a data access device a) from the top; b) from the front; and c) from the side;

FIG. **2** shows, conceptually, a portable data carrier;

FIGS. **3**a and b show exemplary data access terminals;

11

FIGS. **4**a and b show, respectively, a logical signal path between elements of a conceptual data access system; and a physical representation of a conceptual data access system;

FIG. **5** shows a content provision system;

FIG. **6** shows a data supply computer system;

FIG. **7** shows a variety of data access terminals;

FIG. **8** shows a schematic diagram of components of a data access terminal;

FIG. **9** shows a schematic diagram of components of a data carrier;

FIG. **10** shows a schematic diagram of components of a data access device;

FIGS. **11**a and **11**b are flow diagrams of a data carrier registration process;

FIGS. **12**a-c and **12**d-e show, respectively, a flow diagram of data access using a data access terminal; and a flow diagram of data supply using a data supply computer system; and

FIG. **13** shows a flow diagram of data retrieval using a data access device.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring to FIG. **1**, this shows a data access device for playing MP3 audio (**10**) with operator controls (**12**) and LCD display (**14**). The outline of a smart card data storage device is shown at (**16**). The operator controls allow a user to select and play tracks, while track information and still or video images are provided on display (**14**). A slot (**18**) is provided in the front of the device to receive a smart card-type data storage means. This smart card occupies space (**20**) and interfaces with resilient contacts (**24**); it is held in the data retrieval device against the contacts, by resilient housing element (**22**).

Referring now to FIG. **2**, this shows a portable data carrier (**30**) suitable for use with the device of FIG. **1**. The data storage means is based on a standard smart card; it is plastic, about the size of a standard credit card, and has some flexibility. On the card (**30**) are two sets of contacts, contacts (**32**) for interfacing with the payment validation means and contacts (**34**) for interfacing with the memory for storing downloaded data (although in other embodiments, a single set of contacts may be used for both). The surface of the card can be embellished with suitable graphics.

In one embodiment the smart card retains all its useable functionality as specified for standard Electronics Point of Sale Systems (EPOSS) and, if desired, the memory for storing the downloaded data can be electrically separate from this. However, it may be preferable to provide interaction between the standard smart card device and the data memory in order to accomplish the access control/decryption functions described above.

Referring now to FIG. **3**, an example of a data access terminal is shown at (**40**). This has a screen (**42**) and a slot (**44**) to receive the data carrier (**30**). Alternatively the data carrier may interface to the terminal via the data access device (**10**) and an interface (**46**) to the terminal (**40**). In FIG. **3**b a dedicated terminal (**50**) has a slot (**52**) to receive the data carrier, a display (**54**) and controls (**56**). Coins can be inserted into the terminal at (**58**) and notes at (**60**) to charge the data carrier with cash.

Referring now to FIG. **4**a, this illustrates conceptually the logical connections and data flow between data processing systems involved in payment validation, and data download to the carrier (**30**). A user connects the data carrier (**30**) to terminal (**40**) and logs on to a data web page of data supply

12

service provider (**60**). Either terminal (**40**) or service provider (**60**) then communicates via data paths (**62**) with a payment validation authority (**70**) to check and authorize the user's or payer's payment. In the case of electronic cash the terminal (**40**) may immediately validate the payment information, updating the service provider and/or payment validation authority (**70**) at a later stage. The logical connection (**64**) between the terminal and the service provider is preferably made over the internet.

The service provider may provide a direct portal to data providers (**80**) or may collect information from data suppliers (**80**) and provide a "front end" to present data from the suppliers to the terminal user. Alternatively, data supply service provider (**60**) may regulate direct access between terminal (**40**) and data providers (**80**), as shown by links (**66**), by communicating with the terminal and the data providers to provide communication regulation information to, for example, instruct data suppliers about what information the user of terminal (**40**) should have access to.

In a preferred embodiment, service provider (**60**) pays royalties at an agreed rate—for example, 10 pence per track or 10 pence per minute—to a computer system owned by a company or entity in the recording industry, such as a content provider or copyright owner, a content publisher or a content creator, and the user of terminal (**40**) effectively pays the service provider. Billing can also be regulated by bandwidth and/or data download time.

Preferably the service provider (**60**) monitors the user's access to the system and either stores or forwards to data providers (**80**), or downloads to the data carrier (**30**), usage information. In a preferred embodiment the service provider sends information via terminal (**40**) to data carrier (**30**) which can be used to determine incentives to be provided to users of the system.

FIG. **4**b shows a conceptual physical configuration of the system of FIG. **4**a in which a plurality of terminals (**40**), a plurality of service providers (**60**) and a plurality of data providers (**80**) all interact via the internet. The physical embodiment of the system is not critical and a skilled person will understand that the terminals, data processing systems and the like can all take a variety of forms.

Referring now to FIG. **5**, this shows a conceptual illustration of a content provision system **100**. Content creators **104**a, b generate or receive content data from artist terminals **102**a-d and store content data in databases **106**a, b. The content data stored in databases **106**a, b may comprise audio data, such as music, video data, such as films or TV programs, text, such as literary works, software, such as games software, or other data. Content creators **104**a, b are coupled to communications network **101** for communicating created content data over the network. Also coupled to communications network **101** are content publishers **110**a and **110**b, each of which is coupled to an associated stored content database, **112**a and **112**b respectively. The content publishers make their stored content available for controlled access using communications network **101**. In some instances, for example where the content data comprises computer games, the functions of content creator and content publisher may be provided by a single entity. Thus although conceptually illustrated as blocks in FIG. **5**, the content creator and content publisher typically each comprise a client server computer network.

The communications network **101** is typically a private communications network, such as an extranet, with security controlled access to entities connected to the network. Physically the network may comprise an internet protocol network or it may comprise, or consist of, dedicated point-

US 7,334,720 B2

**13**

to-point links. Thus, for example, a content creator **104** may be directly linked to a content publisher **110** and/or to other entities shown in FIG. **5** such as a content provider or content distributor.

The content provision system includes a plurality of content providers **108***a-e*, each coupled to the communications network **101**. In the illustrated system, the content providers own copyright is stored content data accessible over communications network **101** and may, in practice, also perform a content publication function. Five content providers own the copyright in over 80% of all world-wide music sales. The content providers are coupled to stored content databases **106** and **112** via communications network **101**, for supplying stored content data.

A gateway server **114** is also coupled to communications network **101** to link the communications network to other networks such as the internet and/or mobile communications networks. Gateway server **114** provides security and access control functions and firewalls. A second gateway, content distributor WAN gateway **116**, is also shown attached to communications network **101**. This provides similar security and firewall functions and coupled communications network **101** to distributor WAN (wide area network) **117**. Gateway **116** has logical access to one or more of a content creator, content publisher and content provider for accessing stored content data. Content distributor gateway **116** may be owned by a chain of record stores and provide content access terminals **118**, coupled to WAN **117**, in separate retail outlets. Content access terminals **118** have access, via gateway **116**, to stored content accessible over communications network **101**.

Referring now to FIG. **6**, this shows a data supply computer system **120**. In this embodiment, three content access terminals **118***a-c*, e-payment systems **121***a,b*, and content access web server **124** are all coupled to internet **142**. Data supply system **120** is coupled to the content provision system **100** illustrated in FIG. **5**. Where communications network **101** of FIG. **5** is an extranet, this extranet physically operates over internet **142**; where communications network **101** does not partly operate via internet **142**, a connection to internet **142** is established via gateway server **114** as shown in FIG. **5**. In this way content access terminals **118***a-c* are provided with controlled access to the stored content data of content provision system **100**.

E-payment systems **121***a* and **121***b* are coupled to banks **122***a, b* and *c, d* respectively. These provide an e-payment system according to, for example, MONDEX, Proton, and/ or Visa cash compliant standards. Preferably at least one of e-payment systems **121***a, b* provides a so-called "open purse" system in which the value is stored as a publicly verifiable digital signature issued by the e-payment system. In such a signature-transporting arrangement, payment data may be validated using public keys and thus payment authentication need not be performed by the e-payment system but may instead be performed by, for example, a data access terminal or data supply system computer, using payment management code. The authenticated signatures, which in effect perform a similar role to checks, are submitted to the relevant e-payment system after authentication for verification and reimbursement or transfer of monetary value. With such a system payments may be made anonymously and thus payer identification is not essential. Data carriers, such as data cards, may be issued with stored value or without value, in which latter case value (that is, a publicly verifiable digital signature) may be written onto the card during an on-line transaction.

**14**

In alternative embodiments, a data carrier such as the smart Flash card described below may be used to create value bearing digital signatures as is well-known to those familiar with e-money.

Content access web server **124** is also coupled to internet **142** for providing content access terminals **118***a-c* with access to content data. Content access web server **124** is typically owned by a content data supply "system owner" who acts as an intermediary between a content access terminal user and a content provider, forwarding content data provided (directly or indirectly) by a content provider to a content access terminal and then to a stored content data carrier. Web server **124** is coupled to web server code storage **126** storing Java code for generating web pages for interpretation by web browsers on content access terminals **111***a-c*. The web pages provide the content download, value add, CRM (customer reward management) value check/ spend and website link functions described below.

Web server **124** is coupled to payment processor **128**, Digital Rights Management (DRM) processor **130**, access control processor **132**, and content distribution processor **134**. Payment processor **128** includes payment management code storage **128***a* and is coupled to payment record data store **136**. Access control processor **132** includes access control code storage **132***a* and is coupled to access control data store **138**. DRM processor **130** includes DRM code storage **130***a* and is coupled to content access and DRM data store **140**. Content distribution processor **134** includes CRM (customer reward management) and payment distribution management code storage **134***a* and is also coupled to content access and DRM data store **140**. As shown in FIG. **6**, processors **128-134** are all in communication with one another.

Processors **128**, **130**, **132** and **134** may comprise separate application programs or a single computer program and may operate on a single physical computer, on which web server **124** may also be provided, or may operate on separate computers. Likewise data stores **136**, **138** and **140** may comprise a single physical data store or may be distributed over a plurality of physical devices and may even be at physically remote locations from processors **128-134** and coupled to these processors via internet **142**.

Web server **124** communicates with processors **128-134** by means of a CGI (common gateway interface) script and the code associated with processors **128-134** may be written in any conventional computer language such as C, C++, or Perl. However, in other embodiments one or more of the processors may be coupled to web server **124** via internet **142** and owned and operated by a separate entity, such as a financial institution. In this case conventional secure web-based communications may be operated between web server **124** and the relevant processor. In particular, payment processor **128** may be operated by one of the e-payment system providers **128***a, b*.

Payment management code **128***a* issues and authenticates payment data and stores an audit record in payment record data store **136**. Access control code **132***a* stores identification data (of a user or card) together with registration data provided by a user when registering with the system owner. This data comprises a user password for accessing stored content and/or payment data; user characterizing data, for example characterizing user preferences, for marketing purposes; data indicating an e-payment system to use; and in some embodiments, further general user related data such as card level data for identifying the provision of "gold" level services to selected users. A copy of the password is stored with the content data on the portable data carrier, as

15

described further below. Alternatively, one or both of the access control data store and portable data carrier may simply store data for verifying a user-entered password.

Content access and DRM data store **140** stores data related to content access and content use, but does not itself store content data items; these are instead provided via content provision system **100** described above. Data store **140** stores a plurality of records each comprising a data item identifier, a data item description, a data item type or genre, and location data comprising one or more pointers to a location or locations from where the data item can be downloaded. Associated with a data item is also a table of use rule data comprising a list of values (i.e. content data item prices) and corresponding levels of permitted usage. Thus a value of £1 might permit ten plays of a music track, while the value of £1 might permit an unlimited number of plays of the track and copying of the track for personal use.

Also associated with a data item is a table of payment distribution data comprising a list of recipients and corresponding fractions of the data item value each is to receive. Typically, the main recipient will be the copyright owner of the data item and other recipients will be selected from the content creator, the artist or artists, the system owner, the content publisher, and the retailer/distributor. The payment distribution proportions may be dependent upon the payment value, in which case a plurality of sets of payment distribution figures may be associated with each data item, each set of distribution figures corresponding to a payment value range. The payment data and distribution data is here termed DRM (Digital Rights Management) data.

Further associated with a data item is a table of CRM (Customer Reward Management) data, linked to the user rule data, comprising CRM rules to specify, for one or more data item use levels, a quantity of reward points and one or more recipients for the reward points (the recipients may include the card user and the retailer/distributor).

The CRM and payment distribution code **134**a operates with content access and DRM data store **140** to inform a system user of the description and value of a data item, to access and download a data item from the content provider system to a content access terminal, to provide content use rules with the data item, and to provide instructions either to payment processor **128** or to e-payment system **121** to distribute payments for the data item to the recipients identified by the data store **140** and to distribute CRM reward points.

The access control data store **138** holds a secure key, such as a secret "public" key in a public key cryptography system, for the system owner to authenticate its identity to a content provider. This data is held securely with other sensitive data in the access control data store **138**. As is described in more detail below, when data supply system **120** receives a request for a content data item from a content access terminal **118**, it looks up a location from which the data item is available using content access and DRM data store **140** and then determines the identity of the corresponding content provider. This identity is either stored in content access and DRM data store **140** or, as there are relatively few content providers, it may be hard written in DRM code **130**a. DRM code **130** then requests access control processor **132** to provide the secure system owner identifier from access control data store **138** to the relevant content provider and sets up a trusted connection between the content provider and content access web server **124** for downloading the data item to a content access terminal **118** and then to a portable data carrier.

16

Referring now to FIG. **7**, this shows a variety of content access terminals for accessing data supply computer system **120** over internet **142**. The terminals are provided with an interface to a portable data carrier or "smart Flash card" (SFC) as generally described with reference to FIG. **2** and as described in more detail below. In most embodiments of the terminal the SFC interface allows the smart Flash card data carrier to be inserted into and removed from the terminal, but in some embodiments the data carrier may be integral with the terminal.

Referring now to the specific embodiments illustrated in FIG. **7**, a simple content access terminal may comprise a home personal computer **144** with SFC interface **144**a. In another embodiment, a mobile communications device **152** is provided with a smart Flash card interface **152**a and is coupled to internet **142** via radio tower **150**, mobile communications system **148** and mobile communications internet gateway **146**.

In another embodiment, a smart Flash card interface is provided to a so-called "set top box" (STB) **154**. The set top box is, in effect, a receiver for television programs received on video input **154**b, which may comprise a satellite TV signal, a cable TV signal or an off-air TV signal. The video signal is provided from the set top box to television **156** or to some other home entertainment device such as a personal computer (not shown). In another embodiment, content access terminals **166** and **168** each with respective SFC interfaces **166**a and **168**a are coupled to a retailer local area network (LAN) **160** connected to internet **142** via retailer LAN server **158**. DVD player **164** is also coupled to LAN **160**. In a further embodiment a smart Flash card interface **170**a is provided for a CD/DVD player **170**.

In these latter three embodiments, content data for storage on the smart Flash card may be retrieved from broadcast video and/or a CD or DVD. In this case, the computer data supply system **120** illustrated in FIG. **6** may be used to provide use rule data for the content data stored on the smart Flash card, and to pay for data downloaded onto the card; the content data may be captured before or after the data supply system **120** is accessed to enable use of the stored data, but in a preferred embodiment content data written to the card from a supplier other than the content data supply computer system is not accessible to a user until corresponding use rule data has been downloaded from computer system **120**, which will normally be after receiving payment for the downloaded data.

Referring now to FIG. **8**, this shows a schematic diagram of one embodiment of a data access terminal **170**. The terminal comprises a general purpose computer including an audio/visual interface **184**, a keyboard **186** and a pointing device **188** for providing an interface to the user. The terminal has an internet interface **176**, for example a modem, and optionally a LAN/WAN interface **174** for connecting the terminal to a retailer or distributor LAN or WAN. The terminal also has an optional video input **178** for receiving broadcast video data and a media input device **180**, such as a CD or DVD drive. Further communications I/O ports **182** may also be provided. A portable data carrier or smart Flash card interface **190** is provided for interfacing to a smart Flash card. Optionally, a cash input and verification system **192**, such as is conventionally used in an automatic teller machine (ATM), may also be incorporated within the content access terminal. The terminal has working memory **194** such as RAM and program memory **196** which can comprise any conventional storage device such as RAM, ROM or a disk drive. Program code in program memory **196** may also be stored on removable disk **198**. A processor **200** loads and implements program code stored in program memory **196**.

17

All the components of the terminal are linked by a data and communications bus **172**.

More specifically, processor **200** loads and implements cash payment management code **200***a* for managing cash input data from cash input and verification system **192**, for adding value to a smart Flash card. Processor **200** also implements a web browser **200***b* for accessing system owner web pages and data exchange interface **200***c* for exchanging data between a smart Flash card interface to the terminal and data supply system **120**.

Processor **200** also implements off-line contents retrieval code **200***d* for retrieving data for storage on a smart Flash card from media input device **180** and/or video input **178** and/or LAN/WAN interface **174**. The processor implements a content sampler **200***e* for outputting small extracts of content data items to a user via audio/visual interface **184**. Such data item samples may be stored with the content description data in content access data store **140**. The processor also implements a smart Flash card interface driver **200***f*, user interface code **200***g* and additional communication drivers **200***h* for driving LAN/WAN interface **174** and/or comms I/O ports **182**.

Referring now to FIG. **9**, this shows a schematic diagram of components of a portable data carrier **202**, in the embodiment shown a so-called "smart Flash card". In this context, "smart Flash card" refers to an IC card similar in size to a plastic payment card incorporating a processor and Flash data memory, preferably of large capacity. For further details on smart cards, reference may be made to the ISO (International Standards Organization) series of standards, including ISO 7810, ISO 7811, ISO 7812, ISO 7813, ISO 7816, ISO 9992 and ISO 10102, which are hereby incorporated by reference.

Referring in more detail to FIG. **9**, a data and communications bus **204** links components of the card which include a processor **210**, working memory **212**, timing and control logic **208** and an external interface which may have contacts (ISO 7816) or be contactless (ISO 10536) for providing external access to a bus **204** for reading data from and writing data to the card **202**. Also coupled to bus **204** are permanent program memory **216**, non-volatile data memory **218** and non-volatile (Flash) content data memory **214**. Non-volatile data memory **218** may comprise EEPROM and permanent program memory **216** may comprise ROM, for example, mask-programmed ROM. All the components of FIG. **9** are mounted on a single substrate, in a preferred embodiment bearing contacts for external interface **206**.

Processor **200** loads and implements program code from permanent program memory **216**. This code comprises operating system code for providing the card with a basic operating system for at least external communications; payment management code for supplying payment data from non-volatile data memory **218** to pay for downloaded content; DRM (Digital Rights Management) and security code, including code to implement content data use rules and code for password controlled access to data and program functions; CRM code for implementing CRM-related rules; and content synthesis code for combining stored content data with additional data provided via external interface **206** for synthesizing complete content item data.

Non-volatile data memory **218** stores data including card identity data, access control data, including password data for validating a user password, access record data for storing a record of access attempts and their outcomes, and content supply data such as system owner website addresses and retailer/distributor website addresses.

18

Data memory **218** further stores card value data comprising e-money such as publicly verifiable digital signatures, and payment data for storing a payment audit trail including payment amounts and data on to whom payments have been made. The memory **218** also stores RFM (Recency Frequency Monetary) data to provide a record of transactions for market research and customer reward purposes, and CRM data storing customer reward points. Data memory **218** also stores an index of content data items stored in Flash memory **214** and associated content use rules, as well as DRM and royalty data for maintaining an audit trail of use history for rights management tracking. Optionally, data memory **218** may also store supply chain data specifying a supply chain route through which data has been obtained from a content provider, which may be used for rewarding supply chain intermediaries, for example on a commission or reward points basis.

Content data memory **214** preferably comprises at least 100 MB of data storage, partitioned as data blocks of a size selected to match the stored content type. For storing video data, Flash memory **214** comprises <1 GB data storage and the data blocks into which the data memory is partitioned are larger.

Referring now to FIG. **10**, this shows a schematic diagram of a data access device **220**, such as a portable audio/video player. The data access device **220** comprises a conventional dedicated computer system including a processor **238**, permanent program memory **236**, such as ROM, working memory **234**, such as RAM, and timing and control logic **226** all coupled by a data and communications bus **222**. Also coupled to the bus are an audio interface **228**, a display **230** and user controls **232**, for providing a user interface. A smart Flash card interface **224** is coupled to bus **222** for interfacing with a smart Flash card for retrieving and playing stored content data.

Permanent program memory **236** stores program code for implementation by processor **238**; this code may also be provided on a data carrier such as a ROM chip or disk **240**. Processor **238** implements an SFC interface **238***a*, a user interface **238***b*, a content player **238***d* for retrieving stored content data from a smart Flash card interfaced to the device and for outputting audio and/or video data derived from the retrieved content data (which may comprise compressed audio and/or video data) to a user of the device.

Processor **238** also implements use control **238***c* for controlling access to and use of contents stored on the smart Flash card by the content access device user. Use control routine **238***c* and/or DRM and security code in permanent memory **216** on the smart Flash card may also implement digital watermarking and other Secure Digital Music Initiative (SDMI) content protection code as specified in the SDMI portable device specification, part one, version 1.0 (see www.sdmi.org) which is hereby incorporated by reference.

FIGS. **11***a* and **11***b* show a flow diagram of a process for registering a data carrier or smart Flash card with a data supplier or system owner operating a data supply system as illustrated in FIG. **6**. A smart Flash card may be issued entirely blank, that is, with no prestored content or value, with prestored value but no prestored content, with prestored content but not prestored value (the content being provided free) or with both prestored value and prestored content. Thus, for example, a user may purchase a card with stored value but no stored content over the counter at a retailer. The process of FIGS. **11***a* and **11***b* illustrates the registration of a card with neither prestored content nor prestored value. As illustrated the registration process records user registration

**19**

data in the access control data store **138** of FIG. **6** and writes value data onto the blank card.

At step S**10** a smart Flash card is inserted into a content access terminal smart Flash card interface. The system owner web page is then loaded onto the content access terminal and displayed to the user (step S**11**). User registration data is then entered into the content access terminal (step S**12**) and transmitted to the system owner (S**13**). The user registration data may include a user identity, a preferred e-payment system to use and, optionally, a content access PIN or password, and a service level (for example bronze, silver or gold). The optional password may be a password required by the e-payment system for validation of a payment by the user with the card or it may be a password to protect unauthorized access to content on a smart Flash card to protect stored data in the event, for example, of the card being stolen, A single password may serve both these functions. The content access terminal web browser is configured so that all sensitive data passing between the terminal and the system owner is securely transmitted, for example by using a conventional encryption system such as PKI (Public Key Infrastructure).

At step S**14** a payment request is received from the system owner at the content access terminal and displayed to the user. At step S**15** the user enters payment data into the content access terminal and this payment data is transmitted to the system owner, for adding value to the card. This may, for example, be a credit card transaction as is conventionally used for purchase over the internet. Card value data and a card value access code is then received by the content access terminal from the system owner at step S**16**. The card value corresponds to the payment made by the user and the value access code may be a password entered by the user at step S**12** or may comprise a password for PIN created by payment processor **128** or e-payment system **121** as illustrated in FIG. **6**. In a preferred embodiment, the user pays the system owner and the system owner then directly provides digital signature data representing value to the content access terminal for writing onto the smart Flash card.

At step S**17**, card registration data is received from the system owner by the content access terminal and written onto the smart Flash card. This card registration data comprises user identity data, access control data, payment system specifying data, system owner access data, such as a system owner web page address and other dial-up information. At this stage other data may be entered by the user and written onto the card, including, for example, user preference data, retail outlet and CRM data (alternatively user preference data may be captured at step S**12**). At step S**18** the card value data and card value access code received at step S**16** is written onto the card and output to the user visually and, optionally, as a printed record. The card is then available for use, at step S**19**.

FIG. **11**b shows the corresponding registration steps performed by the system owner's data supply system **120**. At step S**20**, a request for a smart card registration web page is received from a content access device and, at step S**21**, transmitted to the device. User registration data is then received, at step S**22**, from the content access terminal and stored in content access control data store **138**. The system owner's computer system then transmits, at step S**23**, a payment request to the content access terminal and receives, at step S**24**, payment data in reply, this payment is then authenticated, at step S**25**, with an e-payment system such as payment system **121** a or b illustrated in FIG. **6**, and after verification the payment processor **128** of the computer system transmits, at step S**26**, value data and a value access

**20**

code to the content access terminal, for writing onto the smart Flash card. The payment processor then updates the payment record data store **136** with data relating to the transaction (step S**27**) and, at step S**28**, retrieves card registration data previously written into the access control data store and transmits this registration data to the content access terminal. At step S**29** the transaction is then complete.

Referring now to FIGS. **12**a-c, these illustrate a flow chart for downloading data to a smart Flash card using a data access terminal. At step S**30** the smart Flash card is inserted into the content access terminal and the user then enters, at step S**31**, their password for gaining access to the functionality of the smart Flash card. At step S**32**, the content access terminal transmits the password to the smart card for verification and the terminal checks, at step S**33**, whether access is permitted. If access is not permitted a warning is displayed by the terminal, at step S**34**, and an access denied count is implemented. A threshold count is then read from the card together with a count of the total number of times access to the card has been denied (step S**35**). At step S**36** the terminal checks whether the total number of denied accesses is within three of the card threshold, and if it is not, returns to step S**31**, while if it is, it proceeds to step S**37** where the terminal displays a warning that a further denied access is likely to result in erasure of content stored on the card. At step S**38** the terminal then checks whether its count of denied accesses is greater than its threshold value, returning to step S**31** if not, and displaying an access refused message at step S**39** if the total number of permitted accesses has been exceeded. The system then waits at step S**39** for removal of the smart Flash card from the content access terminal.

If access is permitted at step S**33**, the terminal loads outline CRM data from the card (step S**40**) and loads retail data, such as targeted advertising, from the retailer LAN/WAN (step S**41**). At step S**42**, the terminal then displays a menu of options, retail data such as advertising or CRM-related data and outline CRM data, such as a total number of reward points earned, on the content access terminal. Many options include download content (from a system owner), add monetary value (to the card), check/spend CRM value stored on the card, follow website links, and exit. At step S**43**, the user inputs a menu option which, in the illustrated flow chart, is the download option. The system thus passes to step S**44** and loads the system owner's content access web page onto the content access terminal and displays this to the user.

At step S**45**, the user enters a content search request, which is transmitted to the system owner content distributor processor **134**. Content search results are received back from the content distribution processor, including a content identifier, a brief description, and content cost data for at least one payment option, and these results are displayed on the user on the content access terminal. The user then selects one or more content items at step S**47** and the selection is transmitted to the content distribution processor **134** where further content cost data and purchase option data is retrieved from data store **140**. At step S**48**, this content cost and purchase data (including use rule data) is received from the system owner and displayed to the terminal user. The user then selects, at step S**49**, a purchase option and confirms a purchase request or, alternatively, selects "exit" to return to the menu display of step S**42**. After one or more content items have been selected, together with a purchase option, hard value and CRM data is read from the smart Flash card at step S**50**, and at step S**51** a check is made to determine whether the monetary and/or CRM (reward points) value stored on the smart Flash card is sufficient to purchase the

selected purchase data items. If the card value is insufficient, a warning is displayed at step S52 and the system returns to the menu display at step S42. If the card value is sufficient, at step S53 the content access terminal transmits a payment request to the smart Flash card.

Payment for the data item or items requested may either be made directly to the system owner or may be made to an e-payment system such as e-payment systems 121a and 121b of FIG. 6, with these systems then forwarding payment confirmation data to the system owner computer system. Alternatively, the content access terminal may transmit data to the card to set up a transaction directly with a content provider who, being the copyright owner, would normally receive the majority of the payment.

At step S54, payment data for making a payment to the system owner is received from the smart Flash card by the content access terminal and forwarded to an e-payment system such as e-payment system 121 in FIG. 6. Payment record data, validating payment by the card to the system owner, is then received back from the e-payment system at step S55 by the content access terminal and forwarded to the card for updating payment data on the card. In alternative embodiments, payment data from the card may be provided directly to the system owner's data supply computer for authentication and, optionally, further validation with an e-payment system by the system owner's computer.

Distribution of the payment received by the system owner from the card is performed by the system owner's computer system, as described elsewhere. Such payment distribution will normally provide a small percentage of the total payment to a "owner" or operator of the content access terminal, such as a retailer, distributor, or in other embodiments, mobile communications network operator or cable TV network operator.

In the presently described embodiment, payment record data received in step S55 is transmitted to the system owner to confirm payment by the card and thus it is the content access terminal, in the described embodiment, which authenticates a payment before confirming that the payment has been made to the system owner.

In step S56, together with the payment record data, purchase request and card registration data is transmitted to the system owner to identify one or more content data items for purchase and to identify the purchaser. Then, at step S57, the content access terminal sets up a transaction between the system owner data supply computer and the smart Flash card for download of the identified content items requests from the data supplier to the smart Flash card. The download is preferably arranged so that there is no permanent storage of downloaded data on the content access terminal (although temporary storage in a disk cache may be permissible), and there is further preferably no temporary storage on the content access terminal of complete data for a content data item. This provides data security and reassurance to the content providers.

In the same way as with card registration described with regard to FIG. 11, a secure and trusted link is set up between the content access terminal and/or the smart Flash card and the data supply computer in a conventional manner as is well known to those skilled in the art (for example, using public key data encryption). The data transaction may be set up directly between the smart Flash card and the data supply computer, in which case the content access terminal has no access to unencrypted content data, or it may be set up between the content access terminal and the data supply computer, in which case unencrypted data is written by the content access terminal to the smart Flash card. Standard

transmission protocols are used to ensure complete transmission of a content data item, for example by re-transmitting blocks of data which are not correctly received.

Also at step S57, one or more content access rules is received from the system owner data supply computer and written to the smart Flash card so that each content data item has an associated use rule to specify under what conditions a user of the smart Flash card is allowed access to the content data item.

At step S58 the content access terminal receives CRM data from the content distribution processor 134 of the system owner, for example specifying a number of reward points earned by downloading the selected content items. This CRM data will normally be written in the smart Flash card (step S59), but may additionally or alternatively be stored in the content access terminal or in a data store of the content access terminal owner so that the reward points are held by the distributor/retailer/cable TV operator. Finally, also at step S59, a complete record of details of the transactions between the smart Flash card and the content access terminal, the smart Flash card and the system owner, the smart Flash card and the e-payment system, and the content access terminal and the e-payment system and/or data supply computer is recorded on the smart Flash card to provide an audit trial. The system then returns to the menu display at step S42.

The add monetary value menu option provided by the menu operates in a similar manner to that described with regard to steps S15 and S16 of FIG. 11a and steps S24 to S27 of FIG. 11b. In embodiments of the system in which the smart Flash Card operates either in a debit (pre-pay) or credit mode, operating mode data may be loaded from the card together with outlying CRM data at step S40. If the card is operating in a credit mode then, at step S41, the content access terminal reads content use data records from the card and proceeds correspondingly to steps S47 and S48 to determine the value of the content accessed and then proceeds according to steps S15 and S16 of FIG. 11a and steps S24 to S27 of FIG. 11b to retrieve payment for the accessed content from the card owner. Where enhanced access control features are provided, access control data read from the smart Flash card or entered into the content access terminal at step S31 is used, in step S44, to access the system owner content access webpage and, in some embodiments, to set up a secure connection between the content access terminal and system owner data supply computer at step S44.

Referring now to FIGS. 12d and 12c, these show steps in a process implemented on the system owner's data supply computer for providing content data to a content access terminal and thence to a data carrier such as a smart Flash card. At step S60 the system owner's content access web page is requested by a content access terminal and transmitted to the requesting terminal. A search request for searching for a content data item is received, at step S61, from the content access terminal, and at step S62 content distribution processor 134 of the content supply system searches content access and DRM data store 140 and transmits the search results to the content access terminal. The search results will normally comprise a content item identifier, a content item description, optionally a content item sample, and at least one content item price, for example for a default payment option. The search results may comprise a set of content data items, either selected by type or artist or comprising some predetermined selection in a similar manner to a compilation of tracks on a CD.

A step S63 content item selection data identifying one or more content items is retrieved from the content access

23

terminal, and at step S**64** content item purchase data for the selected content items is retrieved from content access and DRM data store **140**. This purchase data will normally include, for each selected content item, one or more prices and purchase options. Purchase option data may simply comprise one of a set of standard options, for example "1" to purchase outright, "2" to rent for a period of time, "3" to rent for a number of plays, and "4" to rent with a final purchase option. The purchase option data may also indicate when a content item is available free.

At step S**65** the content purchase data is transmitted to the content access terminal, and at step S**66** payment record data, indicating a payment made from the smart Flash card to the system owner, purchase request data, card registration data and, optionally, access control data, is received from the content access terminal. The payment record data confirms a payment for the requested data items, the purchase request data specifies the payment option selected for the selected content items, and the card registration data provides data for keeping records of the transaction and providing reward points; the access control data may be required for additional data security. At step S**67** the payment record data, in the described embodiment of the system, is validated with an e-payment system such as e-payment system **121** of FIG. **6**. As illustrated in the flow chart, the data supply system computer checks with the e-payment system that a payment has in fact been made to the system owner. In other embodiments of the system, payment may be made directly to the system owner, and either concurrently with the content access and download process, or at some later stage, payment data received from the smart Flash card may be verified with the e-payment system for reimbursement of the system owner.

At step S**68**, payment distribution data is read from the content access data store **140**. This data will indicate how payment made by the card for the data is to be distributed among recipients. In one embodiment, recipients' payment fractions are specified in general terms in the content access data store, for example copyright owner 0.90, system owner 0.01, retailer/distributor 0.02, publisher 0.02, creator 0.05. Identification of who is the relevant copyright owner is stored in the data store together with the content item identifier, but may be selected from more than one possible content provider for the data item, and identification of who is the relevant retailer/distributor may be determined from, for example, content access identity information received from the content access terminal when the system owner content access web page is accessed at step S**60**. At step S**69**, payments are then distributed in accordance with the payment distribution data, either by direct distribution of value-bearing digital signature to the relevant parties, or by issuing a payment distribution instruction to e-payment system **121**. Preferably the data supply system stores records of individual card payments and, at intervals, combines the payment distribution data for a plurality of individual records to output payment data for distributing the total payment received by the data supply system from a batch of individual payments.

At step S**70**, content access rules for the purchased level of service are read from the content access data store. These rules could, for example, specify that only a predetermined number of accesses to the content are permitted, for example 10 plays. Alternatively, the rules could provide access for, say, one month from the download date. Other rules may provide unlimited plays but only on specified players, for example set top boxes owned by a particular cable TV network (as determined by content access device identifi-

24

cation data provided to a smart Flash card from a content access device). A content provider identification for the requested content data is also read from the content access data store at step S**70** together with CRM data for issuing reward points.

At step S**71**, content access rules for the requested content data items are retrieved from data store **140** and transmitted to the content access terminal. Then, at step S**72**, DRM processor **130** of the data supply system transmits a transaction request and authentication data to the content provider identified in step S**70**. This request identifies the system owner data supply system to the content provider in a secure manner, either by means of physical security, such as a dedicated connection from the system owner data supply system to the content provider, or by means of an electronically secure connection such as an encryption connection. Then, at step S**73**, the content access web server **124** receives protected content from the content provider, comprising the data items requested by the content access terminal, and transmits this protected content to the content access terminal. The content is preferably protected by data encryption but may be protected in other ways, for example, by digital watermarking or simply by the large number of other transactions taking place at any one time over the internet. The data supply system computer, at this point, essentially acts as a transparent data forwarder, forwarding data from the content provider to the content access terminal, which itself is preferably effectively transparent, using data exchange interface **200**c to transmit the protected content data directly to the smart Flash card. As described with regard to FIG. **12**d, the content download protocol includes error protection and transmission retry protocols to ensure substantially error-free data transmission.

Once content has been downloaded to the content access terminal (and, hence, to the smart Flash card) at step S**74** a record of the purchase data and content accessed is written to payment record data store **136**, to provide an audit trail. Then, at step S**75**, updated CRM data is written to the content access data store **140**, using rules stored in the content access data store, in conjunction with a record of the downloaded data items, to calculate the CRM data (i.e. reward points). The updated CRM data is then also transmitted to the content access terminal, where it can be forwarded to the smart Flash card. Then, at step S**76**, the process ends.

Referring now to FIG. **13**, this shows a flow cart for user access of stored data on a smart Flash card using a data access device such as the MP3 player of FIG. **1**. At step S**77** the smart Flash card is inserted into the player and, at step S**78**, the user enters a password into the player, which is transmitted to the smart Flash card for validation (this step is optional). If access to stored data on the card is permitted, the process proceeds to step S**79** where an index of content data items stored on the card is loaded from the card and displayed together with a menu. The menu provides options including access content, check value (stored on the card), check CRM data (such as reward points) stored on the card, and play options (such as no video, repeat play, random play, and the like). If the user wishes to access content data items stored on the smart Flash card, a user selection of such items is entered into the player at step S**80**, for example using cursor keys or a pointer, additionally or alternatively a default play option may be provided to, for example, play the most recently downloaded data.

At step S**81** content use status data for the selected content items is loaded from the smart Flash card together with associated content use rules. Then, at step S**82**, the use rules

and present use status for each selected content item are compared and the result is displayed together with a content play menu. The content play menu may comprise a simple list of the selected content items with items not available for access highlighted in, for example, red. Alternatively, more detailed content access permission data may be displayed such as the purchased contents use for a content data item, the actual use of the data item made so far, and the available remaining use. The, at step S83, the player determines whether content use is permitted. If use is not permitted, the process returns to step S79 to re-display the content use if permitted the system proceeds to step S84.

At step S84 the selected content data items whose use is permitted are retrieved sequentially from the card, decoded as necessary, and the decoded audio and/or video data is made available to the user, for example, by providing audio output at a headphone socket on the player and displaying video output on the player display. Preferably, the player also retrieves supplementary data stored in association with a content data item, such as advertising data, or for a web-enabled player, hot links to web sites for sale of goods or services, particularly those related to the accessed content data item or those identified to appeal to users accessing the data item (such as pop group merchandising or Harley Davidson (trade mark) motor bikes for rock music/video).

Preferably, the player is provided with "pause" and "continue" functions and corresponding user controls. When "pause" is selected the process passes to step S85 and writes a record to the smart Flash card comprising data specifying how much use has been made of the accessed content data item. In the case of music or video data, this may comprise start and end time markers or simply a play duration time (the start time being predetermined, for example at the start of the data item). In the case of a game the partial use data may comprise an elapsed play time or a number of lives left. In the case of a data item providing a service such as access to stock and share prices, or weather information, or a share dealing service, the partial use information may comprise a status record indicating the status of an interrupted transaction. When the "continue" function is selected on the player the process returns to step S84.

To allow for the smart Flash card being removed from the player between pause and continue events, a check may be made at step S78, by reading a partial use status data from the card, to determine whether a content data item was left in a pause state when the card was last used. If such a pause state is determined to exist for a content data item, the process may then jump directly to step S85 to allow a user to resume or continue with the content data item and proceed directly to step S84.

Once play is complete the process moves to step S85 where updated content use data is written to the smart Flash card. This updated use data provides a record of the use of a content made in step S84. This record can then be used in steps S81 and S83 to determine, on a subsequent occasion, whether further use of the content data item is permitted. Finally, at step S86, customer reward management reward rules are loaded from the smart Flash card together with CRM data stored on the card. The CRM data is then updated, using the CRM reward rules, to reflect the use of content data items made in step S84 and the updated data is written back to the smart Flash card.

In one embodiment the CRM reward rules are determined by the content access terminal owner (retailer/distributor/ cable or mobile network operator) and are written onto the card when registering the card. The updated CRM data may then be accessed by a content access terminal for spending

or other use when the smart Flash card is next inserted into a content access terminal. Once the CRM data has been updated, the process returns to step S79 to display the content index and menu.

The specific embodiments of the invention described above use communication over the internet and web-based technology but this is not essential, and the invention may be implemented using any electronic communications network, such as a wide area network, local area network, wireless network, or conventional land line network. Likewise, the invention is applicable to the internet, intranets, extranets, and other internet protocol networks.

The skilled person will understand that many variants to the system are possible and the invention is not limited to the described embodiments but encompasses modifications which lie within the spirit and scope of the present invention.

The invention claimed is:

1. A method of controlling access to content data on a data carrier, the data carrier comprising non-volatile data memory storing content memory and non-volatile parameter memory storing use status data and use rules, the method comprising:

receiving a data access request from a user for at least one content item of the content data stored in the non-volatile data memory;

reading the use status data and use rules from the parameter memory that pertain to use of the at least one requested content item;

evaluating the use status data using the use rules to determine whether access to the at least one requested content item stored in the content memory is permitted; and

displaying to the user whether access is permitted for each of the at least one requested content item stored in the non-volatile data memory.

2. A method as claimed in claim 1 wherein said parameter memory further stores payment data and further comprising selecting one of said use rules dependent upon said payment data.

3. A data access terminal for retrieving data from a data supplier and providing the retrieved data to a data carrier, the terminal comprising:

a first interface for communicating with the data supplier;

a data carrier interface for interfacing with the data carrier;

a program store storing code; and

a processor coupled to the first interface, the data carrier interface, and the program store for implementing the stored code, the code comprising:

code to read payment data from the data carrier and to forward the payment data to a payment validation system;

code to receive payment validation data from the payment validation system;

code responsive to the payment validation data to retrieve data from the data supplier and to write the retrieved data into the data carrier; and

code responsive to the payment validation data to receive at least one access rule from the data supplier and to write the at least one access rule into the data carrier, the at least one access rule specifying at least one condition for accessing the retrieved data written into the data carrier, the at least one condition being dependent upon the amount of payment associated with the payment data forwarded to the payment validation system.

27

**4**. A data access terminal as claimed in claim **3** further comprising code to transmit at least a portion of the payment validation data to the data supplier or to a destination received from the data supplier.

**5**. A data access terminal as claimed in claim **3** further comprising code to retrieve from the data supplier and output to a user stored data identifier data and associated value data and use rule data for a data item available from the data supplier.

**6**. A data access terminal as claimed in claim **5** further comprising code to write use rule data for a data item into the data carrier with the associated data item.

**7**. A data access terminal as claimed in claim **5** further comprising code to read a stored value from the data carrier, code to compare said stored value with said value data, and code to provide a modified output to a user of one or more of said stored data identifier data, said value data and said use rule data, in response to a result of the comparison.

**8**. A data access terminal according to claim **3** further comprising code for user input of access control data, code to output the access control data to the data carrier, and code to receive access permission data and output data to the user in response to the received access permission data.

**9**. A data access terminal as claimed in claim **8** further comprising code to output a data erasure warning in response to the received access permission data.

**10**. A data access terminal according to claim **3** further comprising code to read reward data from the data carrier and to write modified reward data to the data carrier in response to said retrieval of data from the data supplier.

**11**. A data access terminal according to claim **3** further comprising:

code to read identity data from the data carrier;

code to transmit the identity data to the data supplier;

code to receive user characterizing data from the data supplier;

code to retrieve supplementary data in response to said characterizing data; and

code to output the supplementary data.

**12**. A data access terminal according to claim **3** further comprising a cash input device coupled to the processor, to provide cash input value data; and code to update payment data in the data carrier, in accordance with the cash input value data.

28

**13**. A data access terminal according to claim **3** integrated with a mobile communication device, a personal computer, an audio/video player, and/or a cable or satellite television interface device.

**14**. A method of providing data from a data supplier to a data carrier, the method comprising:

reading payment data from the data carrier;

forwarding the payment data to a payment validation system;

retrieving data from the data supplier;

writing the retrieved data into the data carrier;

receiving at least one access rule from the data supplier; and

writing the at least one access rule into the data carrier, the at least one access rule specifying at least one condition for accessing the retrieved data written into the data carrier, the at least one condition being dependent upon the amount of payment associated with the payment data forwarded to the payment validation system.

**15**. A method of providing data from a data supplier according to claim **14** further comprising:

receiving payment validation data from the payment validation system; and

transmitting at least a portion of the payment validation data to the data supplier.

**16**. A method of providing data as claimed in claim **15**, wherein the payment validation system comprises a payment processor at the data supplier.

**17**. A method of providing data as claimed in claim **16**, further comprising:

reading a stored value from the data carrier;

comparing the stored value with said value data; and

outputting to a user information indicating the result of said comparing.

**18**. A method of providing data as claimed in claim **14**, further comprising:

retrieving from the data supplier a stored data item identifier and associated value data; and

writing the stored second data item identifier and associated value data for the data item into the data carrier.

*    *    *    *    *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.            : 7,334,720 B2                                    Page 1 of 1
APPLICATION NO. : 11/336758
DATED                   : February 26, 2008
INVENTOR(S)        : Hermen-ard Hulst and Patrick Sandor Racz

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the front of the patent, left column, under the Foreign Application Priority Data heading, the priority data is listed incorrectly.
Please delete "Nov. 25, 1999," and insert -- Oct. 25, 1999 --

Signed and Sealed this

Thirty-first Day of August, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*

(12) **United States Patent**

Racz et al.

(10) **Patent No.:** **US 8,118,221 B2**

(45) **Date of Patent:** *Feb. 21, 2012

(54) **DATA STORAGE AND ACCESS SYSTEMS**

(75) Inventors: **Patrick Racz**, Saint Heller (JE);
**Hermen-ard Hulst**, Amsterdam (NL)

(73) Assignee: **Smartflash Technologies Limited**,
Wickhams' Cay (VG)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

This patent is subject to a terminal dis-
claimer.

(21) Appl. No.: **12/943,872**

(22) Filed: **Nov. 10, 2010**

(65) **Prior Publication Data**

US 2011/0066525 A1    Mar. 17, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 12/014,558, filed on
Jan. 15, 2008, now Pat. No. 7,942,317, which is a
continuation of application No. 11/336,758, filed on
Jan. 19, 2006, now Pat. No. 7,334,720, which is a
continuation of application No. 10/111,716, filed as
application No. PCT/GB00/04110 on Oct. 25, 2000,
now abandoned.

(51) **Int. Cl.**
***G06K 5/00*** (2006.01)
(52) **U.S. Cl.** ........................................ **235/380**; 235/382
(58) **Field of Classification Search** ................. 235/380,
235/382, 492, 451; 711/100, 101, 103
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,341,951 | A | 7/1982 | Benton |
| 4,697,073 | A | 9/1987 | Hara |

| | | | |
|---|---|---|---|
| 5,226,145 | A | 7/1993 | Moronaga et al. |
| 5,367,150 | A | 11/1994 | Kitta et al. |
| 5,406,619 | A | 4/1995 | Akhteruzzaman et al. |
| 5,457,746 | A | 10/1995 | Dolphin |
| 5,532,466 | A | 7/1996 | Konno et al. |
| 5,588,146 | A | 12/1996 | Leroux |
| 5,677,953 | A | 10/1997 | Dolphin |
| 5,703,951 | A | 12/1997 | Dolphin |
| 5,740,369 | A | 4/1998 | Yokozawa et al. |
| 5,744,787 | A | 4/1998 | Teicher |

(Continued)

FOREIGN PATENT DOCUMENTS

EP         0 195 098      10/1990

(Continued)

*Primary Examiner* — Thien M Le

(74) *Attorney, Agent, or Firm* — Kilpatrick Townsend &
Stockton LLP

(57) **ABSTRACT**

Data storage and access systems enable downloading and
paying for data such as audio and video data, text, software,
games and other types of data. A portable data carrier has an
interface for sending and receiving data, data memory for
storing received content data, and payment validation
memory for providing payment validation data to an external
device. The carrier may also store a record of access made to
the stored content, and content use rules for controlling access
to the stored content. Embodiments store further access con-
trol data and supplementary data such as hot links to web sites
and/or advertising data. A complementary data access termi-
nal, data supply computer system, and data access device are
also described. The combination of payment data and stored
content data and use rule data helps reduce the risk of unau-
thorized access to data such as compressed music and video
data, especially over the Internet.

**33 Claims, 17 Drawing Sheets**



US 8,118,221 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,754,654 | A | 5/1998 | Hiroya et al. |
| 5,794,202 | A | 8/1998 | Kim |
| 5,809,241 | A | 9/1998 | Hanel et al. |
| 5,845,281 | A | 12/1998 | Benson et al. |
| 5,847,372 | A | 12/1998 | Kreft |
| 5,889,860 | A | 3/1999 | Eller et al. |
| 5,901,330 | A | 5/1999 | Sun et al. |
| 5,918,213 | A | 6/1999 | Bernard et al. |
| 5,923,884 | A | 7/1999 | Peyret et al. |
| 5,933,498 | A | 8/1999 | Schneck et al. |
| 5,936,220 | A | 8/1999 | Hoshino et al. |
| 6,012,634 | A | 1/2000 | Brogan et al. |
| 6,018,720 | A | 1/2000 | Fujimoto |
| 6,078,917 | A | 6/2000 | Paulsen et al. |
| 6,119,945 | A | 9/2000 | Muller et al. |
| 6,142,369 | A | 11/2000 | Jonstromer |
| 6,202,056 | B1 | 3/2001 | Nuttall |
| 6,385,731 | B2 | 5/2002 | Ananda |
| 6,415,156 | B1 | 7/2002 | Stadelmann |
| 6,424,975 | B1 | 7/2002 | Walter et al. |
| 6,442,570 | B1 | 8/2002 | Wu |
| 6,473,829 | B1 | 10/2002 | Dahman et al. |
| 6,510,236 | B1 | 1/2003 | Crane et al. |
| 6,553,413 | B1 | 4/2003 | Leighton et al. |
| 6,554,192 | B2 | 4/2003 | Tingl |
| 6,574,643 | B2 | 6/2003 | Walter et al. |
| 6,658,568 | B1 | 12/2003 | Ginter et al. |
| 6,747,930 | B1 | 6/2004 | Weldon et al. |
| 6,993,507 | B2 | 1/2006 | Meyer et al. |
| 6,999,936 | B2 | 2/2006 | Sehr |
| 7,000,836 | B2 | 2/2006 | Saeki |
| 7,044,362 | B2 | 5/2006 | Yu |
| 7,083,081 | B2 | 8/2006 | McGee et al. |
| 7,334,720 | B2 * | 2/2008 | Hulst et al. ...................... 235/380 |
| 7,677,446 | B2 | 3/2010 | Wise |
| 7,942,317 | B2 * | 5/2011 | Racz et al. ...................... 235/380 |
| 2003/0168515 | A1 | 9/2003 | Gray |
| 2006/0249570 | A1 | 11/2006 | Seifert et al. |
| 2008/0041938 | A1 | 2/2008 | Wise |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 713 198 A2 | 5/1996 |
| EP | 0 823 694 A1 | 2/1998 |
| EP | 0 542 298 | 4/1998 |
| EP | 0 843 449 A2 | 5/1998 |
| EP | 0 914 001 A1 | 5/1999 |
| JP | 10-269291 A | 10/1998 |
| JP | 11-53184 A | 2/1999 |
| JP | 11-212785 A | 8/1999 |
| JP | 11-213010 A | 8/1999 |
| JP | 11-272762 A | 10/1999 |
| WO | WO 98/19237 A1 | 5/1998 |
| WO | 98/33343 | 7/1998 |
| WO | 98/37526 | 8/1998 |

* cited by examiner

Case: 16-1059    Document: 30    Page: 245    Filed: 01/22/2016

# Fig. 1

A



B



C



Case: 16-1059    Document: 30    Page: 246    Filed: 01/22/2016

# Fig. 2



# Fig. 3

A                                    B



Fig. 4





Fig. 5



Fig.6



Fig. 7



INTERNET INTERFACE
176
MEDIA INPUT DEVICE
180
AUDIO/VISUAL INTERFACE
184
POINTING DEVICE
188
192
CASH INPUT AND VERIFICATION SYSTEM
174
LAN/WAN INTERFACE
178
VIDEO INPUT
182
COMMS I/O PORTS
186
KEYBOARD
190
SFC INTERFACE
172
BUS
194
WORKING MEMORY
196
PROGRAM MEMORY
SFC INTERFACE DRIVER CODE
WEB BROWSER CODE
DATA EXCHANGE INTERFACE CODE
OFF-LINE CONTENT RETRIEVAL CODE
CONTENT SAMPLE CODE
CASH PAYMENT MANAGEMENT CODE
USER INTERFACE CODE
OTHER COMMS DRIVERS
198
200
PROCESSOR
200a
CASH PAYMENT MANAGEMENT
WEB BROWSER
200b
200c
DATA EXCHANGE INTERFACE
200d
OFF-LINE CONTENT RETRIEVAL
CONTENT SAMPLER
200e
SFC INTERFACE DRIVER
200f
200g
USER INTERFACE CODE
COMMS DRIVERS
200h

Fig. 8

U.S. Patent

Feb. 21, 2012

Sheet 8 of 17

US 8,118,221 B2



Fig. 9

U.S. Patent    Feb. 21, 2012    Sheet 9 of 17    US 8,118,221 B2



Fig. 10



S10
SMART FLASH CARD INSERTED
INTO CONTENT ACCESS
TERMINAL CARD INTERFACE

S11
SCHEME OWNER REGISTRATION
WEB PAGE LOADED ONTO
CONTENT ACCESS TERMINAL

S12
USER REGISTRATION DATA
ENTERED INTO CONTENT ACCESS
TERMINAL

S13
USER REGISTRATION DATA
TRANSMITTED TO SCHEME OWNER

S14
PAYMENT REQUEST RECEIVED
FROM SCHEME OWNER AT
CONTENT ACCESS TERMINAL

S15
PAYMENT DATA ENTERED INTO
CONTENT ACCESS TERMINAL AND
TRANSMITTED TO SCHEME OWNER

S16
CARD VALUE DATA AND CARD
VALUE ACCESS CODE RECEIVED
BY CONTENT ACCESS TERMINAL
FROM SCHEME OWNER

S17
CARD REGISTRATION DATA
RECEIVED FROM SCHEME OWNER
AND WRITTEN ONTO CARD

S18
VALUE DATA AND ACCESS CODE
WRITTEN ONTO CARD AND
OUTPUT TO USER

S19
CARD AVAILABLE FOR USE

Fig11a



**S20**
REQUEST FOR CARD
REGISTRATION WEB PAGE
RECEIVED FROM CONTENT
ACCESS DEVICE

**S21**
TRANSMIT CARD REGISTRATION
WEB PAGE TO CONTENT
ACCESS DEVICE

**S22**
RECEIVE USER REGISTRATION
DATA FROM CONTENT ACCESS
TERMINAL AND STORE IN ACCESS
CONTROL DATA STORE

**S23**
TRANSMIT PAYMENT REQUEST TO
CONTENT ACCESS TERMINAL

**S24**
RECEIVE PAYMENT DATA FROM
CONTENT ACCESS TERMINAL

**S25**
PAYMENT PROCESSOR VERIFIES
PAYMENT DATA WITH PAYMENT
SYSTEM

**S26**
PAYMENT PROCESSOR
TRANSMITS VALUE DATA AND
VALUE ACCESS CODE TO
CONTENT ACCESS TERMINAL

Fig.11b

**S27**
PAYMENT PROCESSOR UPDATES
PAYMENT RECORD DATA STORE
WITH TRANSACTION DATA

**S28**
CARD REGISTRATION DATA
LOADED FROM ACCESS CONTROL
DATA STORE AND TRANSMITTED
TO CONTENT ACCESS TERMINAL

**S29**
TRANSACTION COMPLETE



S30
INSERT CARD IN CONTENT ACCESS TERMINAL
S31
USER ENTERS PASSWORD INTO CONTENT ACCESS TERMINAL
S32
CONTENT ACCESS TERMINAL TRANSMITS PASSWORD TO CARD FOR VERIFICATION
S33
ACCESS PERMITTED?
NO
YES
S34
DISPLAY WARNING AND INCREMENT TERMINAL ACCESS DENIED COUNT
S35
READ CARD THRESHOLD AND TOTAL CARD ACCESS DENIED COUNT FROM CARD
S36
CARD COUNT>(CARD THRESHOLD -3)?
NO
YES
S37
DISPLAY CONTENT ERASURE WARNING
S38
TERMINAL COUNT>TERMINAL THRESHOLD?
NO
YES
S39
OUTPUT ACCESS REFUSED MESSAGE AND AWAIT CARD REMOVAL
S40
LOAD OUTLINE CRM DATA FROM CARD
S41
LOAD RETAILER DATA FROM RETAILER LAN / WAN
B
S42
DISPLAY MENU, RETAILER DATA AND OUTLINE CRM DATA ON CONTENT ACCESS TERMINAL
S43
INPUT MENU OPTION (DOWNLOAD CONTENT; ADD MONETARY VALUE; CHECK / SPEND CRM VALUE; WEB SITE LINKS; EXIT)
DOWNLOAD CONTENT
S44
LOAD SCHEME OWNER CONTENT ACCESS WEB PAGE ONTO CONTENT ACCESS TERMINAL
A

Fig. 12a



A
S45
CONTENT SEARCH REQUEST DATA INPUT AND TRANSMITTED TO SCHEME OWNER CONTENT DISTRIBUTION PROCESSOR
S46
CONTENT SEARCH RESULTS RECEIVED FROM CONTENT DISTRIBUTION PROCESSOR AND DISPLAYED ON CONTENT ACCESS TERMINAL
S47
CONTENT ITEM SELECTION DATA INPUT AND TRANSMITTED TO SCHEME OWNER
S48
CONTENT COST DATA, CONTENT USE RULES AND PURCHASE OPTIONS DATA RECEIVED FROM SCHEME OWNER
S49
PURCHASE OPTION SELECTION AND PURCHASE REQUEST INPUT OR EXIT TO MENU SELECTED
B
EXIT
S50
CARD VALUE AND CRM DATA READ FROM CARD
S51
CARD VALUE SUFFICIENT?
NO
S52
DISPLAY INSUFFICIENT VALUE WARNING
B
YES
S53
PAYMENT REQUEST TRANSMITTED TO CARD
C

Fig.12b



C

**S54**

PAYMENT FOR SCHEME OWNER RECEIVED FROM CARD BY CONTENT ACCESS TERMINAL AND FORWARDED TO e-PAYMENT SYSTEM

**S55**

PAYMENT RECORD DATA RECEIVED FROM e-PAYMENT SYSTEM BY CONTENT ACCESS TERMINAL AND FORWARDED TO CARD

**S56**

PAYMENT RECORD DATA, PURCHASE REQUEST AND CARD REGISTRATION DATA TRANSMITTED TO SCHEME OWNER

**Fig.12c**

**S57**

CONTENT AND CONTENT ACCESS RULES DOWNLOADED TO CARD

**S58**

RECEIVE CRM DATA FROM CONTENT DISTRIBUTION PROCESSOR

**S59**

WRITE AUDIT TRAIL TO CARD AND UPDATE CARD CRM DATA

B



S60
CONTENT ACCESS WEB PAGE
REQUESTED AND TRANSMITTED
TO CONTENT ACCESS TERMINAL

S61
CONTENT SEARCH REQUEST
RECEIVED FROM CONTENT
ACCESS TERMINAL

S62
CONTENT DISTRIBUTION
PROCESSOR SEARCHES
CONTENT ACCESS DATA STORE
AND TRANSMITS SEARCH
RESULTS TO CONTENT ACCESS
TERMINAL

S63
CONTENT ITEM SELECTION
RECEIVED FROM CONTENT
ACCESS TERMINAL

Fig. 12d

S64
CONTENT ITEM PURCHASE DATA
RETRIEVED FROM CONTENT
ACCESS DATA STORE

S65
CONTENT PURCHASE DATA
TRANSMITTED TO CONTENT
ACCESS TERMINAL

S66
PAYMENT RECORD DATA,
PURCHASE REQUEST DATA AND
CARD REGISTRATION DATA
RECEIVED FROM CONTENT
ACCESS TERMINAL

S67
PAYMENT RECORD DATA
VALIDATED WITH e-PAYMENT
SYSTEM

(D)



(D)

S68
PAYMENT DISTRIBUTION DATA
READ FROM CONTENT ACCESS
DATA STORE

S69
PAYMENT DISTRIBUTION
INSTRUCTION TRANSMITTED TO
e-PAYMENT SYSTEM

S70
CONTENT ACCESS RULES FOR
PURCHASED LEVEL OF SERVICE,
CRM DATA AND CONTENT
PROVIDER ID DATA READ FROM
CONTENT ACCESS DATA STORE

S71
CONTENT ACCESS RULES
TRANSMITTED TO CONTENT
ACCESS TERMINAL

S72
DRM PROCESSOR TRANSMITS
TRANSACTION REQUEST AND
AUTHENTICATION TO CONTENT
PROVIDER

**Fig. 12e**

S73
CONTENT ACCESS WEB SERVER
RECEIVES PROTECTED CONTENT
FROM CONTENT PROVIDER AND
TRANSMITS CONTENT TO
CONTENT ACCESS TERMINAL

S74
PURCHASE DATA AND CONTENT
ACCESS RECORD WRITTEN TO
PAYMENT RECORD DATA STORE

S75
USING STORED RULES UPDATED
CRM DATA WRITTEN TO CONTENT
ACCESS DATA STORE AND
TRANSMITTED TO CONTENT
ACCESS TERMINAL

S76
PROCESS ENDS



S77
CARD INSERTED INTO PLAYER
S78
USER PASSWORD ENTERED INTO PLAYER AND TRANSMITTED TO CARD FOR VALIDATION
CONTENT ACCESS PERMITTED
S79
STORED CONTENT INDEX LOADED FROM CARD AND DISPLAYED WITH MENU (ACCESS CONTENT; CHECK VALUE; CHECK CRM; PLAY OPTIONS)
S80
SELECTION OF CONTENT ITEMS FOR ACCESS ENTERED INTO PLAYER
S81
CONTENT USE STATUS AND CONTENT USE RULES LOADED FROM CARD
S82
USE RULES AND USE STATUS COMPARED AND DISPLAYED WITH CONTENT PLAY MENU
S83
IS CONTENT USE PERMITTED?
NO
YES
PLAY
S84
CONTENT AND SUPPLEMENTARY DATA MADE AVAILABLE TO USER
PAUSE
S85
WRITE/READ CARDS PLAY STATUS DATA
CONT
PLAY COMPLETE
S85
UPDATED CONTENT USE DATA WRITTEN TO CARD
S86
CRM DATA AND CRM REWARD RULES LOADED FROM THE CARD AND UPDATED

Fig. 13

US 8,118,221 B2

1

# DATA STORAGE AND ACCESS SYSTEMS

## CROSS-REFERENCES TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 12/014,558, filed on Jan. 15, 2008, which is a continuation of U.S. patent application Ser. No. 11/336,758, filed on Jan. 19, 2006, now issued U.S. Pat. No. 7,334,720; which is a continuation of U.S. patent application Ser. No. 10/111,716, filed on Sep. 17, 2002, which application is a national stage application under 35 U.S.C. 371, claiming the priority of international PCT Application No. GB00104110, filed on Oct. 25, 2000; which claims priority to UK Application No. 9925227.2, filed on Oct. 25, 1999, each of which is incorporated by reference in its entirety for all purposes.

## BACKGROUND OF THE INVENTION

This invention is generally concerned with data storage and access systems. More particularly, it relates to a portable data carrier for storing and paying for data and to computer systems for providing access to data to be stored. The invention also includes corresponding methods and computer programs. The invention is particularly useful for managing stored audio and video data, but may also be applied to storage and access of text and software, including games, as well as other types of data.

One problem associated with the increasingly wide use of the internet is the growing prevalence of so-called data pirates. Such pirates obtain data either by unauthorized or legitimate means and then make this data available essentially world-wide over the internet without authorization. Data can be a very valuable commodity, but once it has been published on the internet it is difficult to police access to and use of it by internet users who may not even realize that it is pirated. This is a particular problem with audio recordings, and, once the bandwidth becomes available, is also likely to be evident with video.

Over the past three or four years compressed audio sources have become increasingly widely available on web pages. One widely used audio data compression format is MP3 (MPEG—Audio Layer 3 of the MPEG1 compression algorithm), which is an internationally defined standard including a definition of compressed audio information such as speech or music. It relies on psycho-acoustic properties of human hearing to achieve very large data compression factors. It is thus feasible to download usefully long passages of music in a practically convenient short time. Pirate data suppliers have not been slow to realize the potential of this, and many unauthorized websites have sprung up offering popular music, including recent releases by world-famous bands. This has caused the recording industry considerable concern and there is an urgent need to find a way to address the problem of data piracy.

## SUMMARY OF THE INVENTION

According to the present invention there is therefore provided a method of providing portable data comprising providing a portable data storage device comprising downloaded data storage means and payment validation means; providing a terminal for internet access; coupling the portable data storage device to the terminal; reading payment information from the payment validation means using the terminal; validating the payment information; and downloading data into the portable storage device from a data supplier.

2

Another aspect of the invention provides a corresponding mobile data retrieval device for retrieving and outputting data such as stored music and/or noise from the data storage device.

The payment validation means is, for example, means to validate payment with an external authority such as a bank or building society. The combination of the payment validation means with the data storage means allows the access to the downloaded data which is to be stored by the data storage means, to be made conditional upon checked and validated payment being made for the data. Binding the data access and payment together allows the legitimate owners of the data to make the data available themselves over the internet without fear of loss of revenue, thus undermining the position of data pirates.

A further advantage of the system is that it allows users under the age of 18 to make internet purchases. Currently internet users pay for goods and/or services by credit card. Since credit cards cannot legitimately be used by persons under the age of 18 (at least in the UK), a significant fraction of adventurous internet users are excluded from e-commerce, one of the most significant predicted uses of the internet. In one embodiment of the invention, however, the payment validation means comprises e-cash; that is, the payment validation means stores transaction value information on a cash value of transactions validatable by the data storage means. In simple terms, the data storage means can be a card which is charged up to a desired cash value (if necessary limited to a maximum value) at a suitable terminal. This might be an interne access terminal but could, more simply, be a device to accept the data storage card and to receive and count money deposited by the user to charge the card, writing update cash value information onto the card. More sophisticated ways of updating the cash value on the card are also possible, such as direct bank transfer. Since, with this type of embodiment, the data storage means is, essentially, precharged with cash rather than acting as a credit card, it can be used by young people without the risk of their incurring large debts.

In one embodiment the data storage means is powered by the retrieval device when it is connected to the device and retains a memory of the downloaded data when it is unpowered. This can be achieved by the use of Flash RAM or, more generally, any form of programmable read-only memory. Alternatively the data storage means may incorporate a rechargeable cell or capacitor and store information in battery backed-up static RAM.

The downloaded data may be entered into the data storage device by means of an interface such as a magnetically or capacitatively coupled connection or an optical connection, but preferably the interface comprises contacts for direct electrical connection to the storage means. The payment validation means may likewise have one of a variety of interfaces but again preferably comprises a set of electrical contacts. The payment validation means could, however, comprise a magnetic or holographic data-strip such as is known for use with credit cards and phone cards. The interface to receive the downloaded data may be separate from the interface to the payment validation means, to facilitate separate and simultaneous access to both these systems. In other embodiments a single interface may serve for both data storage and payment. Advantageously the payment validation means includes memory storing information to identify the person who is paying for the downloaded data.

For additional security the downloaded data may be encrypted. In this case data decryption may be necessary at some stage, either in the data storage means or in the retrieval device or in an information delivering apparatus such as a data

3

access terminal Alternatively the data decryption function can be shared amongst one or more of these devices. The skilled person will be aware of a range of suitable encryption/decryption techniques, including Pretty Good Privacy (Registered Trade Mark) and PKI (Public Key Infrastructure). Normally, when the downloaded data is encrypted, a decryption key must be supplied. This can be generated automatically by the data access terminal or data access service provider or it can be entered by the user into the data access terminal or into the mobile data retrieval device.

The data storage means and/or the retrieval device can be provided with access control means to prevent unauthorized access to the downloaded data. Additionally or alternatively, use control means can be provided to stop or provide only limited access of the user to the downloaded data in accordance with the amount paid. These access and use control functions may in some embodiments be combined, permitted use controlling access or permitted access controlling use. Thus, for example, a complete set of data information relating to a particular topic, a particular music track, or a particular software package might be downloaded, although access to part of the data set might thereafter be controlled by payments made by a user at a later stage. In this way, a user could pay to enable an extra level on a game or to enable further tracks of an album.

In embodiments where the access or use control means is responsive to the payment validation means, access or use control information may be stored with the downloaded data or in a separate storage area, for example in the payment validation means. The user's access to the downloaded data could advantageously be responsive to the payment validation means, for example, by means of a control line coupling the payment validation means with a memory access or decryption control element.

In one embodiment the data storage means comprises an electronic memory card or smart card and the mobile data retrieval device is provided with a slot to receive the card. Preferably the card is a push-fit within the retrieval device, and retention of the card may be effected by pressure from electrical interface connections and/or resilience of the housing, or by using a resilient retaining means. In a preferred embodiment the retrieval device includes an audio output and a display, to play a downloaded track and to show information about the track and/or an accompanying video.

To download data onto the data storage means the user can employ a data access terminal coupled to the internet. The terminal can directly validate payment; for example in the case of a smart card charged with electronic cash it can deduct a cash value from the card. Alternatively it can communicate with a bank or other financial services provider to control payment. In a preferred embodiment, however, the terminal connects to a data access service provider which provides a portal to other sites and which validates payment and then forwards data from a data supplier to the user's local access terminal. The data access service provider may alternatively forward payment validation information and/or information from the payment validation authority to the data supplier for control by the supplier of the data supplied. Thus, access to the payment validation system and/or data for downloading may be entirely controlled by the data supplier.

Data held on the data storage means may advantageously include data relating to the user's or payer's usage of the system. This information may include, for example, information on a user's spending pattern, information on data suppliers used and information on the downloaded data. This information may be accessed by the data supplier and/or data

4

access service provider and can be used for targeted marketing or loyalty-based incentive schemes such as air miles or the like.

The data access terminal may be a conventional computer or, alternatively, it may be a mobile phone. Wireless Application Protocol (WAP) and i-mode allow mobile phones to efficiently access the internet and this allows a mobile phone to be used to download data to the data storage means, advantageously, directly. The data storage means can, if desired, incorporate the functionality of a mobile phone SIM (Subscriber Identity Module) card, which cards already include a user identification means, to allow user billing through the phone network operator.

In a preferred embodiment the downloaded data is MP3 or other encoded audio data, but the system finds more general application for other data types. For example, download data can include software, and particularly games, share price information, current news information, transport timetable information, weather information and catalog shopping information. The downloaded information may also include compressed video data. The storage capacity of the data storage means is adaptable to suit the type of data intended to be downloaded; for example, 32 megabytes is sufficient for CD quality music, but for video it is preferable that the data storage means has a capacity of 128 megabytes or greater.

In another aspect, the invention provides a portable data carrier comprising an interface for reading and writing data from and to the carrier; non-volatile data memory, coupled to the interface, for storing data on the carrier; non-volatile payment data memory, coupled to the interface, for providing payment data to an external device.

These features allow the data carrier to store both payment data and content data, thus providing the advantages outlined above. Depending upon the payment system used, the payment data memory may also store code for validating or confirming a payment to an external payment system. The payment data will normally be linked to a card or card holder identification data for payment by the card holder. The non-volatile memory ensures that stored content and payment data is retained in the data carrier when the data carrier is not receiving power from an external source. Thus "non-volatile" encompasses, for example, low-power memory whose contents are retained by a battery back-up system. In one embodiment the payment data memory comprises EEPROM and the content data memory comprises Flash memory, but other types of content data memory, such as optical, for example, holographic, data memory can also be used. The data carrier may also be integrated into other apparatus, such as a mobile communications device.

Preferably, the portable data carrier further comprises a program store for storing code implementable by a processor; and a processor, coupled to the content data memory, the payment data memory, the interface and to the program store for implementing code in the program store, wherein the code comprises code to output payment data from the payment data memory to the interface and code to provide external access to the data memory.

Normally, the (content) data memory allows both write and read access for both storing and retrieving data, but in some embodiments the content data memory may be read-only memory (ROM). In such embodiments, content may be preloaded onto the carrier and payment may then be made for permission to access the pre-loaded data.

Preferably, the data carrier also stores a record of access made to the content data and updates this in response to external access, preferably read access, made to the data memory. The carrier may also store content use rules pertain-

US 8,118,221 B2

5                                                         6

ing to allowed use of stored data items. These use rules may be linked to payments made from the card to provide payment options such as access to buy content data outright; rental access to content data for a time period or for a specified number of access events; and/or rental/purchase, for example where rental use is provided together with an option to purchase content data at the reduced price after rental access has expired.

Thus where the data carrier stores, for example, music, the purchase outright option may be equivalent to the purchase of a compact disc (CD), preferably with some form of content copy protection such as digital watermarking. In this example, the rental or subscription payment option may be a pay-per-play option, and with this option payment may either be before or after access to the stored data so that the carrier may operate in either a debit or credit payment mode.

The portability of the data carrier potentially allows it to be used to access content or, in the example, play music without the need to be linked to a communications system or to be on-line to the internet. By providing a use record memory on the data carrier, use of the stored data can be tracked while off-line and then any necessary payment can be made when the data carrier is next coupled to a communication system. This allows the data carrier to operate in a credit mode. In a debit mode, the additional storage of use rules facilitates the regulation of access to content data stored on the carrier without the need for further exchange of payment/use data with an external system to validate the use.

By combining digital rights management with content data storage using a single carrier, the stored content data becomes mobile and can be accessed anywhere while retaining control over the stored data for the data content provider or data copyright owner. Preferably, the data carrier also stores access control data, such as a user ID and a password, as the stored data may be valuable. The access control data may be combined with access control to the payment data, which is typically by means of a PIN (Personal Identification Number) to simplify access to valued content stored on the carrier.

In one embodiment the stored content data is encrypted and a unique password or PIN and/or biometric data is required for decryption. The data carrier may be arranged so that the content is erased after a predetermined number of incorrect access attempts. Additionally or alternatively, a permanently stored flag may be set and/or a hardware modification (such as a fusable link) may be made to prevent the data carrier from functioning for further data storage/retrieval. Preferably, however, access to any stored value/payment data is nevertheless retained.

Supplementary data may also be stored on the carrier in association with stored content data. This supplementary data may comprise customer reward management data and/or advertising data. The supplementary data may comprise a pointer to an external data source from which data is downloaded either to the data carrier or to a data access device or content player, so that advertising or other data can be displayed when reviewing or accessing the stored content.

Additional data security and/or a mechanism for rewarding operators at different levels in the data supply chain may be provided using a content synthesis function. The content synthesis function combines partial content information from two or more sources to provide content data items for storage and/or output. Thus, for example, a first percentage of a content data item could be provided by a content retailer, while a remaining percentage could be provided by an on-line data supplier. This would provide an incentive for a user to register with a content retailer or distributor as well as with an on-line system owner and so could encourage the use of

existing retailers and could provide a mechanism for paying commission to such retailers. The two portions of data combined to provide a content data item could comprise encryption data and a key but preferably comprise separate parts of a complete data item, for example, least significant bits and most significant bits or high frequencies and low frequencies (for audio). This arrangement also facilitates customer reward and loyalty management.

In one embodiment the data carrier further comprises memory for storing data for accessing a mobile communications network, for example to receive content data over the network. For such an embodiment, the data carrier may replace a SIM (Subscriber Identity Module) card in a mobile communications device, thus providing a single card for both network access and valued content retrieval and storage. Additionally or alternatively the card may also store the web address of a data supplier from whom data may be downloaded onto the carrier.

The data memory for storing content data may be optic, magnetic or semiconductor memory, but preferably comprises Flash memory. Preferably, the data memory has a large capacity for storing large data files such as compressed video data. Preferably, the data memory is partitioned for lock access, that is, for read and/or write access to blocks of, for example, 1K, 4K, 16K or 64K databytes for faster data access, particularly where the stored content data will normally be accessed serially, as is normally the case with audio and video data. Preferably the card is configured as an IC card or smart card and has a credit card-type format, although other formats such as the "memory stick" format may also be used. This provides a small and convenient portable format and facilitates removable interfacing with a variety of devices.

The invention also provides a related method of controlling access to data on a data carrier, the data carrier comprising non-volatile data memory and non-volatile parameter memory storing use status data and use rules, the method comprising receiving a data access request; reading the use status data and use rules from memory; and evaluating the use status data using the use rules to determine whether access to the stored data is permitted.

According to another aspect of the invention, there is provided a computer system for providing data to a data requester, the system comprising a communication interface; a data access data store for storing records of data items available from the system, each record comprising a data item description and a pointer to a data provider for the data item; a program store storing code implementable by a processor; a processor coupled to the communications interface, to the data access data store, and to the program store for implementing the stored code, the code comprising code to receive a request for a data item from the requester; code to receive from the communications interface payment data comprising data relating to payment for the requested data item; code responsive to the request and to the received payment data, to read data for the requested data item from a content provider; and code to transmit the read data to the requester over the communications interface.

The computer system is operated by a data supplier or data supply "system owner" for providing content data to the data carrier described above. The payment data received may either be data relating to an actual payment made to the data supplier, or it may be a record of a payment made to an e-payment system relating either to a payment to the data supplier, or to a payment to a third party. The data from the content provider, preferably without permanent (local) storage of the forwarded data, improves data security as the content provider retains control over a content data item, and

**7**

the data supplier, a copy of a data item, is unable to supply data for the item without the content provider's assistance. The computer system may provide temporary storage for a requested data item, for example using a disk cache, but preferably the computer system does not store a complete data item, even temporarily.

Preferably, the computer system includes payment distribution information so that when payment is made for a data item, the payment can be distributed for reimbursing royalties and making other payments. Typically a large fraction of the payment for a data item will be transferred to a copyright owner or "content provider" for the item while smaller payments will go to the artist and/or publisher and/or retailer/distributor. Payment may be made directly by the computer system to the computer systems of other relevant parties using, for example, a signature-transporting type e-payment system. Alternatively, the computer system can issue appropriate instructions to a third party e-payment system for making the transfers. The computer system allows automatic distribution of payments either before, during or after content data download, or after content data access by a user. Instructions for distributing the payments may be issued substantially simultaneously, thereby avoiding long delays in the payment of some parties; for example, it can presently take a year or more for an artist generating content to be paid by conventional methods.

Preferably, the computer system also stores content data item access rule data, for downloading in association with a content data item. The rule data may be stored by a content provider but is preferably held by the computer system, and links a content identifier with an access rule, typically based upon a required payment value, as outlined above in the context of the data carrier. Normally, each content data item will have an associated access rule, but a single rule may apply to a large number of data items. The computer system also, preferably, stores requester reward data for customer reward/loyalty management. This data may again comprise one or more rules linking a payment value and/or content data item type to a specified reward, such as a number of air miles or retailer value points. The computer system preferably also keeps a record of an identified user's or data's carriers content item downloads and payments for market research purposes.

The computer system, in one embodiment, also stores access control data, such as an access request identity and password which can be employed, for example, to create an extranet of system users, which again can be linked to stored access record data for marketing purposes. When further linked to content item type data, such an arrangement can be used to construct a club of users of content data items of a particular type, for example country and western or rock and roll music. As described in connection with the portable data carrier, the computer system may also comprise content synthesis code for additional data security and for more secure management of payment distributions.

The invention also provides a related method of providing data to a data requester comprising receiving a request for a data item from the requester; receiving payment data from the requester relating to payment for the requested data; reading the requested data from a content provider responsive to the received payment data; and transmitting the read data to the requester.

According to a further aspect of the present invention, there is provided a data access terminal for retrieving data from a data supplier and providing the retrieved data to a data carrier, the terminal comprising a first interface for communicating with the data supplier; a data carrier interface for interfacing with the data carrier; a program store storing code implement-

**8**

able by a processor; and a processor, coupled to the first interface, to the data carrier interface and to the program store for implementing the stored code, the code comprising: code to read payment data from the data carrier and to forward the payment data to a payment validation system; code to receive payment validation data from the payment validation system; code responsive to the payment validation data to retrieve data from the data supplier and to write the retrieved data into the data carrier.

This terminal can be used for retrieving data from the above-described computer system and for downloading the retrieved data to the above-described portable data carrier. As with the data supply computer system, it is preferable that there is no (local) storage of content item data forwarded from the data supplier to the data carrier. The data access terminal is not restricted to use with the above-described status supplier and could, for example, retrieve data for downloading to the data carrier from a local data source, such as a CD (Compact Disc) or DVD (Digital Versatile Disc), or from a third party such as a cable TV company.

The terminal reads payment data from the data carrier and transmits this to a payment validation system for validating the data and authorizing the payment. This may be part of the data supplier's computer system or it may be a separate system such as an e-payment system. Thus, the terminal operates with a data carrier storing payment (validation) data and, in some embodiments, additional payment validation code for validating payment to the payment validation system. Again, the terminal is preferably configured to provide a data item use rule to the carrier in conjunction with a data item. As before, the data item use rule will normally be dependent upon payment value information embodied in the payment data read from the data carrier. The terminal is preferably also configured for user input of access control data. This access control data may be forwarded to the data carrier for access permission verification and/or it may be passed to the data supplier computer system for a similar purpose. The terminal may be configured to warn a user of content access or data carrier function inhibition after a predetermined number of access requests have been refused. The terminal may also incorporate content synthesis code as described above.

The terminal may comprise code to output supplementary data when downloading data to the data carrier. Identity data on the data carrier can be used to retrieve the supplementary data, or a pointer to the supplementary data, from the data supplier computer system, or the supplementary data or a pointer thereto can be retrieved directly from the data carrier. Preferably, however, identification data on the card is used to retrieve characterizing data such as card user preference data from the data supplier computer system, and this characterizing data is then used by the terminal to retrieve and output supplementary data to a terminal user. When the terminal is associated with a contact distributor or retailer, the supplementary data may be retrieved over a network associated with the retailer/distributor such as a local area network (LAN), wide area network (WAN) or extranet.

The invention also provides a method of providing data from a data supplier to a data carrier, the method comprising reading payment data from the data carrier; forwarding the payment data to a payment validation system; retrieving data from the data supplier; and writing the retrieved data into the date carrier.

The payment validation system may be part of the data supplier's computer systems or it may be a separate e-payment system. In one embodiment the method further comprises receiving payment validation data from the payment validation system; and transmitting at least a portion of the

US 8,118,221 B2

9

payment validation data to the data supplier. Alternatively the payment validation system may comprise a payment processor at the data supplier or at a destination retrieved from the data supplier. The payment processor may also provide payment distribution data for distributing a payment represented by the payment data.

In a further aspect, the invention provides a data access device for retrieving stored data from a data carrier, the device comprising a user interface; a data carrier interface; a program store storing code implementable by a processor; and a processor coupled to the user interface, to the data carrier interface and to the program store for implementing the stored code, the code comprising code to retrieve use status data indicating a use status of data stored on the carrier, and use rules data indicating permissible use of data stored on the carrier; code to evaluate the use status data using the use rules data to determine whether access is permitted to the stored data; and code to access the stored data when access is permitted.

The data access device uses the use status data and use rules to determine what access is permitted to data stored on the data carrier. As described above, the use rules will normally be dependent upon payments made for data stored on the data carrier, but may also comprise access control employing a user identification and password. Since a single data carrier may have more than one user, the use status and use rules may be selected dependent upon a user identity. The data access device may also be configured to present supplementary data when presenting the content data, retrieved as described above, from the card, from a remote computer system or from some other source such as a cable TV network or off-air.

The invention also provides a related method of controlling access to data from a data carrier, comprising retrieving use status data from the data carrier indicating past use of the stored data; retrieving use rules from the data carrier; evaluating the use status data using the use rules to determine whether access to data stored on the carrier is permitted; and permitting access to the data on the data carrier dependent on the result of said evaluating.

According to a further aspect of the invention there is provided a data access system comprising a data supply computer system for forwarding data from a data provider to a data access terminal; an electronic payment system for confirming an electronic payment; a data access terminal for communicating with the data supply system to write data from the data supply system onto a data carrier; and a data carrier for storing data from the data supply system and payment data; wherein data is forwarded from the data provider to the data carrier on validation of payment data provided from the data carrier to the electronic payment system.

In a further aspect of the invention, there is provided a portable data carrier comprising an interface for sending and receiving data from and to the carrier; non-volatile data memory, coupled to the interface, for storing data on the carrier; and a digital rights management processor for controlling access to the stored data.

In a further aspect of the invention, there is provided a portable data carrier comprising an interface for sending and receiving data from and to the carrier; non-volatile data memory, coupled to the interface, for storing data on the carrier; and an access control processor; wherein the data memory is partitioned as data blocks and the access control processor controls external access to the data blocks.

In a further aspect of the invention, there is provided a computer system for providing data to a data requester, the system comprising a communication interface; a data access data store for storing records of data items available from the

10

system, each record comprising a data item description and a resource locator; a data provider for the data item; a program store storing code implementable by a processor; a processor coupled to the communications interface, to the data access data store, and to the program store for implementing the stored code, the code comprising code to receive a request for a data item from the requester to receive from the communications interface payment data comprising data relating to payment for the requested data item; code, responsive to the request and to the received payment data, to output the item data to the requester over the communication interface; wherein said data access data store further comprises payment distribution information indicating to whom payments should be made for a data item; and further comprising code to output payment data for a data item for making payments for the item when the item is supplied to a requester.

In a further aspect of the invention, there is provided a computer system for providing data to a data requester, the system comprising a communication interface; a data access data store for storing records of data items available from the system, each record comprising a data item description and a printer location data identifying an electronic address for a provider for the data item; a program store storing code implementable by a processor; a processor coupled to the communications interface, to the data access data store, and to the program store for implementing the stored code, the code comprising code to receive a request for a data item from the requester to receive from the communications interface payment data comprising data relating to payment for the requested data item; code responsive to the request and to the received payment data to output the item data to the requester over the communication interface; wherein the data access data store further comprises data item access rule data for output to the requester with a data item; and further comprising code to select access rule data for output with a data item in response to the payment data.

In a yet further aspect of the invention, there is provided a method of providing data to a data requester comprising receiving a request for a data item from the requester; receiving payment data from the requester relating to payment for the requested data; transmitting the requested data to the requester; reading payment distribution information from a data store; and outputting payment data to a payment system for distributing the payment for the requested data.

In a still further aspect of the invention, there is provided a method of providing data to a data requester comprising receiving a request for a data item from the requester; receiving payment data from the requester relating to payment for the requested data; transmitting the requested data to the requester; and transmitting data access rule data to the requester with the read data.

These and other aspects of the invention will now be further described, by way of example only, with reference to the accompanying figures.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows a data access device a) from the top; b) from the front; and c) from the side;

FIG. **2** shows, conceptually, a portable data carrier;

FIGS. **3**a and b show exemplary data access terminals;

FIGS. **4**a and b show, respectively, a logical signal path between elements of a conceptual data access system; and a physical representation of a conceptual data access system;

FIG. **5** shows a content provision system;

FIG. **6** shows a data supply computer system;

FIG. **7** shows a variety of data access terminals;

US 8,118,221 B2

11

FIG. **8** shows a schematic diagram of components of a data access terminal;

FIG. **9** shows a schematic diagram of components of a data carrier;

FIG. **10** shows a schematic diagram of components of a data access device;

FIGS. **11**a and **11**b are flow diagrams of a data carrier registration process;

FIGS. **12**a-c and **12**d-e show, respectively, a flow diagram of data access using a data access terminal; and a flow diagram of data supply using a data supply computer system; and

FIG. **13** shows a flow diagram of data retrieval using a data access device.

DETAILED DESCRIPTION

Referring to FIG. **1**, this shows a data access device for playing MP3 audio (**10**) with operator controls (**12**) and LCD display (**14**). The outline of a smart card data storage device is shown at (**16**). The operator controls allow a user to select and play tracks, while track information and still or video images are provided on display (**14**). A slot (**18**) is provided in the front of the device to receive a smart card-type data storage means. This smart card occupies space (**20**) and interfaces with resilient contacts (**24**); it is held in the data retrieval device against the contacts, by resilient housing element (**22**).

Referring now to FIG. **2**, this shows a portable data carrier (**30**) suitable for use with the device of FIG. **1**. The data storage means is based on a standard smart card; it is plastic, about the size of a standard credit card, and has some flexibility. On the card (**30**) are two sets of contacts, contacts (**32**) for interfacing with the payment validation means and contacts (**34**) for interfacing with the memory for storing downloaded data (although in other embodiments, a single set of contacts may be used for both). The surface of the card can be embellished with suitable graphics.

In one embodiment the smart card retains all its useable functionality as specified for standard Electronics Point of Sale Systems (EPOSS) and, if desired, the memory for storing the downloaded data can be electrically separate from this. However, it may be preferable to provide interaction between the standard smart card device and the data memory in order to accomplish the access control/decryption functions described above.

Referring now to FIG. **3**, an example of a data access terminal is shown at (**40**). This has a screen (**42**) and a slot (**44**) to receive the data carrier (**30**). Alternatively the data carrier may interface to the terminal via the data access device (**10**) and an interface (**46**) to the terminal (**40**). In FIG. **3**b a dedicated terminal (**50**) has a slot (**52**) to receive the data carrier, a display (**54**) and controls (**56**). Coins can be inserted into the terminal at (**58**) and notes at (**60**) to charge the data carrier with cash.

Referring now to FIG. **4**a, this illustrates conceptually the logical connections and data flow between data processing systems involved in payment validation, and data download to the carrier (**30**). A user connects the data carrier (**30**) to terminal (**40**) and logs on to a data web page of data supply service provider (**60**). Either terminal (**40**) or service provider (**60**) then communicates via data paths (**62**) with a payment validation authority (**70**) to check and authorize the user's or payer's payment. In the case of electronic cash the terminal (**40**) may immediately validate the payment information, updating the service provider and/or payment validation authority (**70**) at a later stage. The logical connection (**64**) between the terminal and the service provider is preferably made over the internet.

12

The service provider may provide a direct portal to data providers (**80**) or may collect information from data suppliers (**80**) and provide a "front end" to present data from the suppliers to the terminal user. Alternatively, data supply service provider (**60**) may regulate direct access between terminal (**40**) and data providers (**80**), as shown by links (**66**), by communicating with the terminal and the data providers to provide communication regulation information to, for example, instruct data suppliers about what information the user of terminal (**40**) should have access to.

In a preferred embodiment, service provider (**60**) pays royalties at an agreed rate—for example, 10 pence per track or 10 pence per minute—to a computer system owned by a company or entity in the recording industry, such as a content provider or copyright owner, a content publisher or a content creator, and the user of terminal (**40**) effectively pays the service provider. Billing can also be regulated by bandwidth and/or data download time.

Preferably the service provider (**60**) monitors the user's access to the system and either stores or forwards to data providers (**80**), or downloads to the data carrier (**30**), usage information. In a preferred embodiment the service provider sends information via terminal (**40**) to data carrier (**30**) which can be used to determine incentives to be provided to users of the system.

FIG. **4**b shows a conceptual physical configuration of the system of FIG. **4**a in which a plurality of terminals (**40**), a plurality of service providers (**60**) and a plurality of data providers (**80**) all interact via the internet. The physical embodiment of the system is not critical and a skilled person will understand that the terminals, data processing systems and the like can all take a variety of forms.

Referring now to FIG. **5**, this shows a conceptual illustration of a content provision system **100**. Content creators **104**a, b generate or receive content data from artist terminals **102**a-d and store content data in databases **106**a, b. The content data stored in databases **106**a, b may comprise audio data, such as music, video data, such as films or TV programs, text, such as literary works, software, such as games software, or other data. Content creators **104**a, b are coupled to communications network **101** for communicating created content data over the network. Also coupled to communications network **101** are content publishers **110**a and **110**b, each of which is coupled to an associated stored content database, **112**a and **112**b respectively. The content publishers make their stored content available for controlled access using communications network **101**. In some instances, for example where the content data comprises computer games, the functions of content creator and content publisher may be provided by a single entity. Also although conceptually illustrated as blocks in FIG. **5**, the content creator and content publisher typically each comprise a client server computer network.

The communications network **101** is typically a private communications network, such as an extranet, with security controlled access to entities connected to the network. Physically the network may comprise an internet protocol network or it may comprise, or consist of, dedicated point-to-point links. Thus, for example, a content creator **104** may be directly linked to a content publisher **110** and/or to other entities shown in FIG. **5** such as a content provider or content distributor.

The content provision system includes a plurality of content providers **108**a-e, each coupled to the communications network **101**. In the illustrated system, the content providers own copyright in stored content data accessible over communications network **101** and may, in practice, also perform a

US 8,118,221 B2

13                                                    14

content publication function. Five content providers own the copyright in over 80% of all world-wide music sales. The content providers are coupled to stored content databases **106** and **112** via communications network **101**, for supplying stored content data.

A gateway server **114** is also coupled to communications network **101** to link the communications network to other networks such as the internet and/or mobile communications networks. Gateway server **114** provides security and access control functions and firewalls. A second gateway, content distributor WAN gateway **116**, is also shown attached to communications network **101**. This provides similar security and firewall functions and coupled communications network **101** to distributor WAN (wide area network) **117**. Gateway WAN **116** has logical access to one or more of a content creator, content publisher and content provider for accessing stored content data. Content distributor gateway **116** may be owned by a chain of record stores and provide content access terminals **118**, coupled to WAN **117**, in separate retail outlets. Content access terminals **118** have access, via gateway **116**, to stored content accessible over communications network **101**.

Referring now to FIG. **6**, this shows a data supply computer system **120**. In this embodiment, three content access terminals **118a-c**, e-payment systems **121a**, b, and content access web server **124** are all coupled to internet **142**. Data supply system **120** is coupled to the content provision system **100** illustrated in FIG. **5**. Where communications network **101** of FIG. **5** is an extranet, this extranet physically operates over internet **142**; where communications network **101** does not partly operate via internet **142**, a connection to internet **142** is established via gateway server **114** as shown in FIG. **5**. In this way content access terminals **118a-c** are provided with controlled access to the stored content data of content provision system **100**.

E-payment systems **121a** and **121b** are coupled to banks **122a**, b and c, d respectively. These provide an e-payment system according to, for example, MONDEX, Proton, and/or Visa cash compliant standards. Preferably at least one of e-payment systems **121a**, b operates a so-called "open purse" system in which the value is stored as a publicly verifiable digital signature issued by the e-payment system. In such a signature-transporting arrangement, payment data may be validated using public keys and thus payment authentication need not be performed by the e-payment system but may instead be performed by, for example, a data access terminal or data supply computer system, using payment management code. The authenticated signatures, which in effect perform a similar role to checks, are submitted to the relevant e-payment system after authentication for verification and reimbursement or transfer of monetary value. With such a system payments may be made anonymously and thus payer identification is not essential. Data carriers, such as data cards, may be issued with stored value or without value, in which latter case value (that is, a publicly verifiable digital signature) may be written onto the card during an on-line transaction.

In alternative embodiments, a data carrier such as the smart Flash card described below may be used to create value bearing digital signatures as is well-known to those familiar with e-money.

Content access web server **124** is also coupled to internet **142** for providing content access terminals **118a-c** with access to content data. Content access web server **124** is typically owned by a content data supply "system owner" who acts as an intermediary between a content access terminal user and a content provider, forwarding content data provided (directly or indirectly) by a content provider to a content access terminal and then to a stored content data carrier.

Web server **124** is coupled to web server code storage **126** storing Java code for generating web pages for interpretation by web browsers on content access terminals **111a-c**. The web pages provide the content download, value add, CRM (customer reward management) value check/spend and web-site link functions described below.

Web server **124** is coupled to payment processor **128**, Digital Rights Management (DRM) processor **130**, access control processor **132**, and content distribution processor **134**. Payment processor **128** includes payment management code storage **128a** and is coupled to payment record data store **136**. Access control processor **132** includes access control code storage **132a** and is coupled to access control data store **138**. DRM processor **130** includes DRM code storage **130a** and is coupled to content access and DRM data store **140**. Content distribution processor **134** includes CRM (customer reward management) and payment distribution management code storage **134a** and is also coupled to content access and DRM data store **140**. As shown in FIG. **6**, processors **128-134** are all in communication with one another.

Processors **128**, **130**, **132** and **134** may comprise separate application programs or a single computer program and may operate on a single physical computer, on which web server **124** may also be provided, or may operate on separate computers. Likewise data stores **136**, **138** and **140** may comprise a single physical data store or may be distributed over a plurality of physical devices and may even be at locations physically remote from processors **128-134** and coupled to these processors via internet **142**.

Web server **124** communicates with processors **128-134** by means of a CGI (common gateway interface) script and the code associated with processors **128-134** may be written in any conventional computer language such as C, C++, or Perl. However, in other embodiments one or more of the processors may be coupled to web server **124** via internet **142** and owned and operated by a separate entity, such as a financial institution. In this case conventional secure web-based communications may be operated between web server **124** and the relevant processor. In particular, payment processor **128** may be operated by one of the e-payment system providers **128a**, b.

Payment management code **128a** issues and authenticates payment data and stores an audit record in payment record data store **136**. Access control code **132a** stores identification data (of a user or card) together with registration data provided by a user when registering with the system owner. This data comprises a user password for accessing stored content and/or payment data; user characterizing data, for example characterizing user preferences, for marketing purposes; data indicating an e-payment system to use; and in some embodiments, further general user related data such as card level data for identifying the provision of "gold" level services to selected users. A copy of the password is stored with the content data on the portable data carrier, as described further below. Alternatively, one or both of the access control data store and portable data carrier may simply store data for verifying a user-entered password.

Content access and DRM data store **140** stores data related to content access and content use, but does not itself store content data items; these are instead provided via content provision system **100** described above. Data store **140** stores a plurality of records each comprising a data item identifier, a data item description, a data item type or genre, and location data comprising one or more pointers to a location or locations from where the data item can be downloaded. Associated with a data item is also a table of use rule data comprising a list of values (i.e. content data item prices) and correspond-

US 8,118,221 B2

15

16

ing levels of permitted usage. Thus a value of £1 might permit ten plays of a music track, while the value of £10 might permit an unlimited number of plays of the track and copying of the track for personal use.

Also associated with a data item is a table of payment distribution data comprising a list of recipients and corresponding fractions of the data item value each is to receive. Typically, the main recipient will be the copyright owner of the data item and other recipients will be selected from the content creator, the artist or artists, the system owner, the content publisher, and the retailer/distributor. The payment distribution proportions may be dependent upon the payment value, in which case a plurality of sets of payment distribution figures may be associated with each data item, each set of distribution figures corresponding to a payment value range. The payment data and distribution data is here termed DRM (Digital Rights Management) data.

Further associated with a data item is a table of CRM (Customer Reward Management) data, linked to the user rule data, comprising CRM rules to specify, for one or more data item use levels, a quantity of reward points and one or more recipients for the reward points (the recipients may include the card user and the retailer/distributor).

The CRM and payment distribution code **134a** operates with content access and DRM data store **140** to inform a system user of the description and value of a data item, to access and download a data item from the content provider system to a content access terminal, to provide content use rules with the data item, and to provide instructions either to payment processor **128** or to e-payment system **121** to distribute payments for the data item to the recipients identified by the data store **140** and to distribute CRM reward points.

The access control data store **138** holds a secure key, such as a secret "public" key in a public key cryptography system, for the system owner to authenticate its identity to a content provider. This data is held securely with other sensitive data in the access control data store **138**. As is described in more detail below, when data supply system **120** receives a request for a content data item from a content access terminal **118**, it looks up a location from which the data item is available using content access and DRM data store **140** and then determines the identity of the content provider. This identity is either stored in content access and DRM data store **140** or, as there are relatively few content providers, it may be hard written in DRM code **130a**. DRM code **130** then requests access control processor **132** to provide the secure system owner identifier from access control data store **138** to the relevant content provider and sets up a trusted connection between the content provider and content access web server **124** for downloading the data item to a content access terminal **118** and then to a portable data carrier.

Referring now to FIG. **7**, this shows a variety of content access terminals for accessing data supply computer system **120** over internet **142**. The terminals are provided with an interface to a portable data carrier or "smart Flash card" (SFC) as generally described with reference to FIG. **2** and as described in more detail below. In most embodiments of the terminal the SFC interface allows the smart Flash card data carrier to be inserted into and removed from the terminal, but in some embodiments the data carrier may be integral with the terminal.

Referring now to the specific embodiments illustrated in FIG. **7**, a simple content access terminal may comprise a home personal computer **144** with SFC interface **144a**. In another embodiment, a mobile communications device **152** is provided with a smart Flash card interface **152a** and is

coupled to internet **142** via radio tower **150**, mobile communications system **148** and mobile communications internet gateway **146**.

In another embodiment, a smart Flash card interface is provided to a so-called "set top box" (STB) **154**. The set top box is, in effect, a receiver for television programs received on video input **154b**, which may comprise a satellite TV signal, a cable TV signal or an off-air TV signal. The video signal is provided from the set top box to television **156** or to some other home entertainment device such as a personal computer (not shown). In another embodiment, content access terminals **166** and **168** each with respective SFC interfaces **166a** and **168a** are coupled to a retailer local area network (LAN) **160** connected to internet **142** via retailer LAN server **158**. DVD player **164** is also coupled to LAN **160**. In a further embodiment a smart Flash card interface **170a** is provided for a CD/DVD player **170**.

In these latter three embodiments, content data for storage on the smart Flash card may be retrieved from broadcast video and/or a CD or DVD. In this case, the computer data supply system **120** illustrated in FIG. **6** may be used to provide use rule data for the content data stored on the smart Flash card, and to pay for data downloaded onto the card; the content data may be captured before or after the data supply system **120** is accessed to enable use of the stored data, but in a preferred embodiment content data written to the card from a supplier other than the content data supply computer system is not accessible to a user until corresponding use rule data has been downloaded from computer system **120**, which will normally be after receiving payment for the downloaded data.

Referring now to FIG. **8**, this shows a schematic diagram of one embodiment of a data access terminal **170**. The terminal comprises a general purpose computer including an audio/ visual interface **184**, a keyboard **186** and a pointing device **188** for providing an interface to the user. The terminal has an internet interface **176**, for example a modem, and optionally a LAN/WAN interface **174** for connecting the terminal to a retailer or distributor LAN or WAN. The terminal also has an optional video input **178** for receiving broadcast video data and a media input device **180**, such as a CD or DVD drive. Further communications I/O ports **182** may also be provided. A portable data carrier or smart Flash card interface **190** is provided for interfacing to a smart Flash card. Optionally, a cash input and verification system **192**, such as is conventionally used in an automatic teller machine (ATM), may also be incorporated within the content access terminal. The terminal has working memory **194** such as RAM and program memory **196** which can comprise any conventional storage device such as RAM, ROM or a disk drive. Program code in program memory **196** may also be stored on removable disk **198**. A processor **200** loads and implements program code stored in program memory **196**. All the components of the terminal are linked by a data and communications bus **172**.

More specifically, processor **200** loads and implements cash payment management code **200a** for managing cash input data from cash input and verification system **192**, for adding value to a smart Flash card. Processor **200** also implements a web browser **200b** for accessing system owner web pages and data exchange interface **200c** for exchanging data between a smart Flash card interface to the terminal and data supply system **120**.

Processor **200** also implements off-line contents retrieval code **200d** for retrieving data for storage on a smart Flash card from media input device **180** and/or video input **178** and/or LAN/WAN interface **174**. The processor implements a content sampler **200e** for outputting small extracts of content data items to a user via audio/visual interface **184**. Such data item

**17**

samples may be stored with the content description data in content access data store **140**. The processor also implements a smart Flash card interface driver **200f**, user interface code **200g** and additional communication drivers **200h** for driving LAN/WAN interface **174** and/or comms I/O ports **182**.

Referring now to FIG. **9**, this shows a schematic diagram of components of a portable data carrier **202**, in the embodiment shown a so-called "smart Flash card". In this context, "smart Flash card" refers to an IC card similar in size to a plastic payment card incorporating a processor and Flash data memory, preferably of large capacity. For further details on smart cards, reference may be made to the ISO (International Standards Organization) series of standards, including ISO 7810, ISO 7811, ISO 7812, ISO 7813, ISO 7816, ISO 9992 and ISO 10102, which are hereby incorporated by reference.

Referring in more detail to FIG. **9**, a data and communications bus **204** links components of the card which include a processor **210**, working memory **212**, timing and control logic **208** and an external interface which may have contacts (ISO 7816) or be contactless (ISO 10536) for providing external access to a bus **204** for reading data from and writing data to the card **202**. Also coupled to bus **204** are permanent program memory **216**, non-volatile data memory **218** and non-volatile (Flash) content data memory **214**. Non-volatile data memory **218** may comprise EEPROM and permanent program memory **216** may comprise ROM, for example, mask-programmed ROM. All the components of FIG. **9** are mounted on a single substrate, in a preferred embodiment bearing contacts for external interface **206**.

Processor **200** loads and implements program code from permanent program memory **216**. This code comprises operating system code for providing the card with a basic operating system for at least external communications; payment management code for supplying payment data from non-volatile data memory **218** to pay for downloaded content; DRM (Digital Rights Management) and security code, including code to implement content data use rules and code for password controlled access to data and program functions; CRM code for implementing CRM-related rules; and content synthesis code for combining stored content data with additional data provided via external interface **206** for synthesizing complete content item data.

Non-volatile data memory **218** stores data including card identity data, access control data, including password data for validating a user password, access record data for storing a record of access attempts and their outcomes, and content supply data such as system owner website addresses and retailer/distributor website addresses.

Data memory **218** further stores card value data comprising e-money such as publicly verifiable digital signatures, and payment data for storing a payment audit trail including payment amounts and data on to whom payments have been made. The memory **218** also stores RFM (Recency Frequency Monetary) data to provide a record of transactions for market research and customer reward purposes, and CRM data storing customer reward points. Data memory **218** also stores an index of content data items stored in Flash memory **214** and associated content use rules, as well as DRM and royalty data for maintaining an audit trail of use history for rights management tracking. Optionally, data memory **218** may also store supply chain data specifying a supply chain route through which data has been obtained from a content provider, which may be used for rewarding supply chain intermediaries, for example on a commission or reward points basis.

Content data memory **214** preferably comprises at least 100 MB of data storage, partitioned as data blocks of a size

**18**

selected to match the stored content type. For storing video data, Flash memory **214** preferably comprises >1 GB data storage and the data blocks into which the data memory is partitioned are larger.

Referring now to FIG. **10**, this shows a schematic diagram of a data access device **220**, such as a portable audio/video player. The data access device **220** comprises a conventional dedicated computer system including a processor **238**, permanent program memory **236**, such as ROM, working memory **234**, such as RAM, and timing and control logic **226** all coupled by a data and communications bus **222**. Also coupled to the bus are an audio interface **228**, a display **230** and user controls **232**, for providing a user interface. A smart Flash card interface **224** is coupled to bus **222** for interfacing with a smart Flash card for retrieving and playing stored content data.

Permanent program memory **236** stores program code for implementation by processor **238**; this code may also be provided on a data carrier such as a ROM chip or disk **240**. Processor **238** implements an SFC interface **238a**, a user interface **238b**, a content player **238d** for retrieving stored content data from a smart Flash card interfaced to the device and for outputting audio and/or video data derived from the retrieved content data (which may comprise compressed audio and/or video data) to a user of the device.

Processor **238** also implements use control **238c** for controlling access to and use of contents stored on the smart Flash card by the content access device user. Use control routine **238c** and/or DRM and security code in permanent memory **216** on the smart Flash card may also implement digital watermarking and other Secure Digital Music Initiative (SDMI) content protection code as specified in the SDMI portable device specification, part one, version 1.0 (see www.sdmi.org) which is hereby incorporated by reference.

FIGS. **11a** and **11b** show a flow diagram of a process for registering a data carrier or smart Flash card with a data supplier or system owner operating a data supply system as illustrated in FIG. **6**. A smart Flash card may be issued entirely blank, that is, with no prestored content or value, with prestored value but no prestored content, with prestored content but no prestored value (the content being provided free) or with both prestored value and prestored content. Thus, for example, a user may purchase a card with stored value but no stored content over the counter at a retailer. The process of FIGS. **11a** and **11b** illustrates the registration of a card with neither prestored content nor prestored value. As illustrated the registration process records user registration data in the access control data store **138** of FIG. **6** and writes value data onto the blank card.

At step S**10** a smart Flash card is inserted into a content access terminal smart Flash card interface. The system owner web page is then loaded onto the content access terminal and displayed to the user (step S**11**). User registration data is then entered into the content access terminal (step S**12**) and transmitted to the system owner (S**13**). The user registration data may include a user identity, a preferred e-payment system to use and, optionally, a content access PIN or password, and a service level (for example bronze, silver or gold). The optional password may be a password required by the e-payment system for validation of a payment by the user with the card or it may be a password to protect unauthorized access to content on a smart Flash card to protect stored data in the event, for example, of the card being stolen. A single password may serve both these functions. The content access terminal web browser is configured so that all sensitive data passing between the terminal and the system owner is

US 8,118,221 B2

**19**

securely transmitted, for example by using a conventional encryption system such as PKI (Public Key Infrastructure).

At step S**14** a payment request is received from the system owner at the content access terminal and displayed to the user. At step S**15** the user enters payment data into the content access terminal and this payment data is transmitted to the system owner, for adding value to the card. This may, for example, be a credit card transaction as is conventionally used for purchase over the internet. Card value data and a card value access code is then received by the content access terminal from the system owner at step S**16**. The card value corresponds to the payment made by the user and the value access code may be a password entered by the user at step S**12** or may comprise a password or PIN created by payment processor **128** or e-payment system **121** as illustrated in FIG. **6**. In a preferred embodiment, the user pays the system owner and the system owner then directly provides digital signature data representing value to the content access terminal for writing onto the smart Flash card.

At step S**17**, card registration data is received from the system owner by the content access terminal and written onto the smart Flash card. This card registration data comprises user identity data, access control data, payment system specifying data, system owner access data, such as a system owner web page address and other dial-up information. At this stage other data may be entered by the user and written onto the card, including, for example, user preference data, retail outlet and CRM data (alternatively user preference data may be captured at step S**12**). At step S**18** the card value data and card value access code received at step S**16** is written onto the card and output to the user visually and, optionally, as a printed record. The card is then available for use, at step S**19**.

FIG. **11***b* shows the corresponding registration steps performed by the system owner's data supply system **120**. At step S**20**, a request for a smart card registration web page is received from a content access device and, at step S**21**, transmitted to the device. User registration data is then received, at step S**22**, from the content access terminal and stored in content access control data store **138**. The system owner's computer system then transmits, at step S**23**, a payment request to the content access terminal and receives, at step S**24**, payment data in reply, this payment is then authenticated, at step S**25**, with an e-payment system such as payment system **121***a* or *b* illustrated in FIG. **6**, and after verification the payment processor **128** of the computer system transmits, at step S**26**, value data and a value access code to the content access terminal, for writing onto the smart Flash card. The payment processor then updates the payment record data store **136** with data relating to the transaction (step S**27**) and, at step S**28**, retrieves card registration data previously written into the access control data store and transmits this registration data to the content access terminal. At step S**29** the transaction is then complete.

Referring now to FIGS. **12***a-c*, these illustrate a flow chart for downloading data to a smart Flash card using a data access terminal. At step S**30** the smart Flash card is inserted into the content access terminal and the user then enters, at step S**31**, their password for gaining access to the functionality of the smart Flash card. At step S**32**, the content access terminal transmits the password to the smart card for verification and the terminal checks, at step S**33**, whether access is permitted. If access is not permitted, a warning is displayed by the terminal, at step S**34**, and an access denied count is implemented. A threshold count is then read from the card together with a count of the total number of times access to the card has been denied (step S**35**). At step S**36** the terminal checks whether the total number of denied accesses is within three of

**20**

the card threshold, and if it is not, returns to step S**31**, while if it is, it proceeds to step S**37** where the terminal displays a warning that a further denied access is likely to result in erasure of content stored on the card. At step S**38** the terminal then checks whether its count of denied accesses is greater than its threshold value, returning to step S**31** if not, and displaying an access refused message at step S**39** if the total number of permitted accesses has been exceeded. The system then waits at step S**39** for removal of the smart Flash card from the content access terminal.

If access is permitted at step S**33**, the terminal loads outline CRM data from the card (step S**40**) and loads retail data, such as targeted advertising, from the retailer LAN/WAN (step S**41**). At step S**42**, the terminal then displays a menu of options, retail data such as advertising or CRM-related data and outline CRM data, such as a total number of reward points earned, on the content access terminal. Many options include download content (from a system owner), add monetary value (to the card), check/spend CRM value stored on the card, follow website links, and exit. At step S**43**, the user inputs a menu option which, in the illustrated flow chart, is the download option. The system thus passes to step S**44** and loads the system owner's content access web page onto the content access terminal and displays this to the user.

At step S**45**, the user enters a content search request, which is transmitted to the system owner content distributor processor **134**. Content search results are received back from the content distribution processor, including a content identifier, a brief description, and content cost data for at least one payment option, and these results are displayed on the user on the content access terminal. The user then selects one or more content items at step S**47** and the selection is transmitted to the content distribution processor **134** where further content cost data and purchase option data is retrieved from data store **140**. At step S**48**, this content cost and purchase data (including use rule data) is received from the system owner and displayed to the terminal user. The user then selects, at step S**49**, a purchase option and confirms a purchase request or, alternatively, selects "exit" to return to the menu display of step S**42**. After one or more content items have been selected, together with a purchase option, hard value and CRM data is read from the smart Flash card at step S**50**, and at step S**51** a check is made to determine whether the monetary and/or CRM (reward points) value stored on the smart Flash card is sufficient to purchase the selected purchase data items. If the card value is insufficient, a warning is displayed at step S**52** and the system returns to the menu display at step S**42**. If the card value is sufficient, at step S**53** the content access terminal transmits a payment request to the smart Flash card.

Payment for the data item or items requested may either be made directly to the system owner or may be made to an e-payment system such as e-payment systems **121***a* and **121***b* of FIG. **6**, with these systems then forwarding payment confirmation data to the system owner computer system. Alternatively, the content access terminal may transmit data to the card to set up a transaction directly with a content provider who, being the copyright owner, would normally receive the majority of the payment.

At step S**54**, payment data for making a payment to the system owner is received from the smart Flash card by the content access terminal and forwarded to an e-payment system such as e-payment system **121** in FIG. **6**. Payment record data, validating payment by the card to the system owner, is then received back from the e-payment system at step S**55** by the content access terminal and forwarded to the card for updating payment data on the card. In alternative embodiments, payment data from the card may be provided directly

to the system owner's data supply computer for authentication, and, optionally, further validation with an e-payment system by the system owner's computer.

Distribution of the payment received by the system owner from the card is performed by the system owner's computer system, as described elsewhere. Such payment distribution will normally provide a small percentage of the total payment to a "owner" or operator of the content access terminal, such as a retailer, distributor, or in other embodiments, mobile communications network operator or cable TV network operator.

In the presently described embodiment, payment record data received in step S55 is transmitted to the system owner to confirm payment by the card and thus it is the content access terminal, in the described embodiment, which authenticates a payment before confirming that the payment has been made to the system owner.

In step S56, together with the payment record data, purchase request and card registration data is transmitted to the system owner to identify one or more content data items for purchase and to identify the purchaser. Then, at step S57, the content access terminal sets up a transaction between the system owner data supply computer and the smart Flash card for download of the identified content items requested from the data supplier to the smart Flash card. The download is preferably arranged so that there is no permanent storage of downloaded data on the content access terminal (although temporary storage in a disk cache may be permissible), and there is further preferably no temporary storage on the content access terminal of complete data for a content data item. This provides data security and reassurance to the content providers.

In the same way as with card registration described with regard to FIG. 11, a secure and trusted link is set up between the content access terminal and/or the smart Flash card and the data supply computer in a conventional manner as is well known to those skilled in the art (for example, using public key data encryption). The data transaction may be set up directly between the smart Flash card and the data supply computer, in which case the content access terminal has no access to unencrypted content data, or it may be set up between the content access terminal and the data supply computer, in which case unencrypted data is written by the content access terminal to the smart Flash card. Standard transmission protocols are used to ensure complete transmission of a content data item, for example by re-transmitting blocks of data which are not correctly received.

Also at step S57, one or more content access rules are received from the system owner data supply computer and written to the smart Flash card so that each content data item has an associated use rule to specify under what conditions a user of the smart Flash card is allowed access to the content data item.

At step S58 the content access terminal receives CRM data from the content distribution processor 134 of the system owner, for example specifying a number of reward points earned by downloading the selected content items. This CRM data will normally be written to the smart Flash card (step S59), but may additionally or alternatively be stored in the content access terminal or in a data store of the content access terminal owner so that the reward points are held by the distributor/retailer/cable TV operator. Finally, also at step S59, a complete record of details of the transactions between the smart Flash card and the content access terminal, the smart Flash card and the system owner, the smart Flash card and the e-payment system, and the content access terminal and the e-payment system and/or data supply computer is

recorded on the smart Flash card to provide an audit trail. The system then returns to the menu display at step S42.

The add monetary value menu option provided by the menu operates in a similar manner to that described with regard to steps S15 and S16 of FIG. 11a and steps S24 to S27 of FIG. 11b. In embodiments of the system in which the smart Flash card operates either in a debit (pre-pay) or credit mode, operating mode data may be loaded from the card together with outlying CRM data at step S40. If the card is operating in a credit mode then, at step S41, the content access terminal reads content use data records from the card and proceeds correspondingly to steps S47 and S48 to determine the value of the content accessed and then proceeds according to steps S15 and S16 of FIG. 11a and steps S24 to S27 of FIG. 11b to retrieve payment for the accessed content from the card owner. Where enhanced access control features are provided, access control data read from the smart Flash card or entered into the content access terminal at step S31 is used, in step S44, to access the system owner content access webpage and, in some embodiments, to set up a secure connection between the content access terminal and system owner data supply computer at step S44.

Referring now to FIGS. 12d and 12e, these show steps in a process implemented on the system owner's data supply computer for providing content data to a content access terminal and hence to a data carrier such as a smart Flash card. At step S60 the system owner's content access web page is requested by a content access terminal and transmitted to the requesting terminal. A search request for searching for a content data item is received, at step S61, from the content access terminal, and at step S62 content distribution processor 134 of the content supply system searches content access and DRM data store 140 and transmits the search results to the content access terminal. The search results will normally comprise a content item identifier, a content item description, optionally a content item sample, and at least one content item price, for example for a default payment option. The search results may comprise a set of content data items, either selected by type or artist or comprising some predetermined selection in a similar manner to a compilation of tracks on a CD.

At step S63 content item selection data identifying one or more content items is retrieved from the content access terminal, and at step S64 content item purchase data for the selected content items is retrieved from content access and DRM data store 140. This purchase data will normally include, for each selected content item, one or more prices and purchase options. Purchase option data may simply comprise one of a set of standard options, for example "1" to purchase outright, "2" to rent for a period of time, "3" to rent for a number of plays, and "4" to rent with a final purchase option. The purchase option data may also indicate when a content item is available free.

At step S65 the content purchase data is transmitted to the content access terminal, and at step S66 payment record data, indicating a payment made from the smart Flash card to the system owner, purchase request data, card registration data and, optionally, access control data, is received from the content access terminal. The payment record data confirms a payment for the requested data items, the purchase request data specifies the payment option selected for the selected content items, and the card registration data provides data for keeping records of the transaction and providing reward points; the access control data may be required for additional data security. At step S67 the payment record data, in the described embodiment of the system, is validated with an e-payment system such as e-payment system 121 of FIG. 6. As illustrated in the flow chart, the data supply system com-

23

puter checks with the e-payment system that a payment has in fact been made to the system owner. In other embodiments of the system, payment may be made directly to the system owner, and either concurrently with the content access and download process, or, at some later stage, payment data received from the smart Flash card may be verified with the e-payment system for reimbursement of the system owner.

At step S68, payment distribution data is read from the content access data store 140. This data will indicate how payment made by the card for the data is to be distributed among recipients. In one embodiment, recipient's payment fractions are specified in general terms in the content access data store, for example copyright owner 0.90, system owner 0.01, retailer/distributor 0.02, publisher 0.02, creator 0.05. Identification of who is the relevant copyright owner is stored in the data store together with the content item identifier, but may be selected from more than one possible content provider for the data item, and identification of who is the relevant retailer/distributor may be determined from, for example, content access identity information received from the content access terminal when the system owner content access web page is accessed at step S60. At step S69, payments are then distributed in accordance with the payment distribution data, either by direct distribution of value-bearing digital signatures to the relevant parties, or by issuing a payment distribution instruction to e-payment system 121. Preferably the data supply system stores records of individual card payments and, at intervals, combines the payment distribution data for a plurality of individual records to output payment data for distributing the total payment received by the data supply system from a batch of individual payments.

At step S70, content access rules for the purchased level of service are read from the content access data store. These rules could, for example, specify that only a predetermined number of accesses to the content are permitted, for example 10 plays. Alternatively, the rules could provide access for, say, one month from the download date. Other rules may provide unlimited plays but only on specified players, for example set top boxes owned by a particular cable TV network (as determined by content access device identification data provided to a smart Flash card from a content access device). A content provider identification for the requested content data is also read from the content access data store at step S70 together with CRM data for issuing reward points.

At step S71, content access rules for the requested content data items are retrieved from data store 140 and transmitted to the content access terminal. Then, at step S72, DRM processor 130 of the data supply system transmits a transaction request and authentication data to the content provider identified in step S70. This request identifies the system owner data supply system to the content provider in a secure manner, either by means of physical security, such as a dedicated connection from the system owner data supply system to the content provider, or by means of an electronically secure connection such as an encryption connection. Then, at step S73, the content access web server 124 receives protected content from the content provider, comprising the data items requested by the content access terminal, and transmits this protected content to the content access terminal. The content is preferably protected by data encryption but may be protected in other ways, for example, by digital watermarking or simply by the large number of other transactions taking place at any one time over the internet. The data supply system computer, at this point, essentially acts as a transparent data forwarder, forwarding data from the content provider to the content access terminal, which itself is preferably effectively transparent, using data exchange interface 200c to transmit the protected content data directly to the smart Flash card. As described with regard to FIG. 12d, the content download

24

protocol includes error protection and transmission retry protocols to ensure substantially error-free data transmission.

Once content has been downloaded to the content access terminal (and, hence, to the smart Flash card) at step S74 a record of the purchase data and content accessed is written to payment record data store 136, to provide an audit trail. Then, at step S75, updated CRM data is written to the content access data store 140, using rules stored in the content access data store, in conjunction with a record of the downloaded data items, to calculate the CRM data (i.e. reward points). The updated CRM data is then also transmitted to the content access terminal, where it can be forwarded to the smart Flash card. Then, at step S76, the process ends.

Referring now to FIG. 13, this shows a flow chart for user access of stored data on a smart Flash card using a data access device such as the MP3 player of FIG. 1. At step S77 the smart Flash card is inserted into the player and, at step S78, the user enters a password into the player, which is transmitted to the smart Flash card for validation (this step is optional). If access to stored data on the card is permitted, the process proceeds to step S79 where an index of content data items stored on the card is loaded from the card and displayed together with a menu. The menu provides options including access content, check value (stored on the card), check CRM data (such as reward points) stored on the card, and play options (such as no video, repeat play, random play, and the like). If the user wishes to access content data items stored on the smart Flash card, a user selection of such items is entered into the player at step S80, for example using cursor keys or a pointer; additionally or alternatively a default play option may be provided to, for example, play the most recently downloaded data.

At step S81 content use status data for the selected content items is loaded from the smart Flash card together with associated content use rules. Then, at step S82, the use rules and present use status for each selected content item are compared and the result is displayed together with a content play menu. The content play menu may comprise a simple list of the selected content items with items not available for access highlighted in, for example, red. Alternatively, more detailed content access permission data may be displayed such as the purchased contents use for a content data item, the actual use of the data item made so far, and the available remaining use. Then, at step S83, the player determines whether content use is permitted. If use is not permitted, the process returns to step S79 to re-display the menu; if content use is permitted the system proceeds to step S84.

At step S84 the selected content data items whose use is permitted are retrieved sequentially from the card, decoded as necessary, and the decoded audio and/or video data is made available to the user, for example, by providing audio output at a headphone socket on the player and displaying video output on the player display. Preferably, the player also retrieves supplementary data stored in association with a content data item, such as advertising data, or for a web-enabled player, hot links to web sites for sale of goods or services, particularly those related to the accessed content data item or those identified to appeal to users accessing the data item (such as pop group merchandizing or Harley Davidson (trade mark) motor bikes for rock music/video).

Preferably, the player is provided with "pause" and "continue" functions and corresponding user controls. When "pause" is selected the process passes to step S85 and writes a record to the smart Flash card comprising data specifying how much use has been made of the accessed content data item. In the case of music or video data, this may comprise start and end time markers or simply a play duration time (the start time being predetermined, for example at the start of the data item). In the case of a game the partial use data may comprise an elapsed play time or a number of lives left. In the case of a data item providing a service such as access to stock

25

and share prices, or weather information, or a share dealing service, the partial use information may comprise a status record indicating the status of an interrupted transaction. When the "continue" function is selected on the player the process returns to step S**84**.

To allow for the smart Flash card being removed from the player between pause and continue events, a check may be made at step S**78**, by reading a partial use status data from the card, to determine whether a content data item was left in a pause state when the card was last used. If such a pause state is determined to exist for a content data item, the process may then jump directly to step S**85** to allow a user to resume or continue with the content data item and proceed directly to step S**84**.

Once play is complete the process moves to step S**85** where updated content use data is written to the smart Flash card. This updated use data provides a record of the use of a content made in step S**84**. This record can then be used in steps S**81** to S**83** to determine, on a subsequent occasion, whether further use of the content data item is permitted. Finally, at step S**86**, customer reward management reward rules are used to update the smart Flash card together with CRM data stored on the card. The CRM data is then updated, using the CRM reward rules, to reflect the use of content data items made in step S**84** and the updated data is written back to the smart Flash card.

In one embodiment the CRM reward rules are determined by the content access terminal owner (retailer/distributor/cable or mobile network operator) and are written onto the card when registering the card. The updated CRM data may then be accessed by a content access terminal for spending or other use when the smart Flash card is next inserted into a content access terminal. Once the CRM data has been updated, the process returns to step S**79** to display the content index and menu.

The specific embodiments of the invention described above use communication over the internet and web-based technology but this is not essential, and the invention may be implemented using any electronic communications network, such as a wide area network, local area network, wireless network, or conventional land line network. Likewise, the invention is applicable to the internet, intranets, extranets, and other internet protocol networks.

The skilled person will understand that many variants to the system are possible and the invention is not limited to the described embodiments but encompasses modifications which lie within the spirit and scope of the present invention.

What is claimed is:

**1**. A data access terminal for retrieving data from a data supplier and providing the retrieved data to a data carrier, the terminal comprising:

    a first interface for communicating with the data supplier;
    a data carrier interface for interfacing with the data carrier;
    a program store storing code implementable by a processor; and
    a processor, coupled to the first interface, to the data carrier interface and to the program store for implementing the stored code, the code comprising:
        code to read payment data from the data carrier and to forward the payment data to a payment validation system;
        code to receive payment validation data from the payment validation system;
        code responsive to the payment validation data to retrieve data from the data supplier and to write the retrieved data into the data carrier.

**2**. A data access terminal as claimed in claim **1**, further comprising code to transmit at least a portion of the payment validation data to the data supplier or to a destination received from the data supplier.

**3**. A data access terminal as claimed in claim **1**, further comprising code to retrieve from the data supplier and output

26

to a user-stored data identifier data and associated value data and use rule data for a data item available from the data supplier.

**4**. A data access terminal as claimed in claim **3**, further comprising code to write use rule data for a data item into the data carrier with the associated data item.

**5**. A data access terminal as claimed in claim **3**, further comprising code to read a stored value from the data carrier, code to compare said stored value with said value data; and code to provide a modified output to a user of one or more of said stored data identifier data, said value data and said use rule data, in response to a result of the comparison.

**6**. A data access terminal according to claim **1**, further comprising code for user input of access control data, code to output the access control data to the data carrier, code to receive access permission data from the card, and code to output data to the user in response to the received access permission data.

**7**. A data access terminal as claimed in claim **6**, further comprising code to output a data erasure warning in response to the received access permission data.

**8**. A data access terminal according to claim **1**, further comprising code to read reward data from the data carrier and to write modified reward data to the data carrier in response to said retrieval of data from the data supplier.

**9**. A data access terminal according to claim **1**, further comprising:

    code to read identity data from the data carrier;
    code to transmit the identity data to the data supplier;
    code to receive user characterizing data from the data supplier;
    code to retrieve supplementary data in response to said characterizing data; and
    code to output the supplementary data.

**10**. A data access terminal according to claim **1**, further comprising a cash input device coupled to the processor, to provide cash input value data, and code to update payment data in the data carrier, in accordance with the cash input value data.

**11**. A data access terminal according to claim **1** integrated with at least one of a mobile communication device, a personal computer, an audio/video player, and a cable or satellite television interface device.

**12**. A method of providing data from a data supplier to a data carrier, the method comprising:

    reading payment data from the data carrier;
    forwarding the payment data to a payment validation system;
    retrieving data from the data supplier; and
    writing the retrieved data into the date carrier.

**13**. A method of providing data from a data supplier according to claim **12**, further comprising:

    receiving payment validation data from the payment validation system; and
    transmitting at least a portion of the payment validation data to the data supplier.

**14**. A method of providing data as claimed in claim **13**, wherein the payment validation system comprises a payment processor at the data supplier.

**15**. A method of providing data as claimed in claim **14**, further comprising:

    reading a stored value from the data carrier;
    comparing the stored value with said value data; and
    outputting to a user information indicating the result of said comparing.

**16**. A method of providing data as claimed in claim **12**, further comprising:

    retrieving from the data supplier a stored data item identifier and associated value data and use rule data; and
    writing use rule data for the data item into the data carrier.

27

**17**. A data access device for retrieving stored data from a data carrier, the device comprising:

a user interface;

a data carrier interface;

a program store storing code implementable by a processor; and

a processor coupled to the user interface, to the data carrier interface and to the program store for implementing the stored code, the code comprising:

code to retrieve use status data indicating a use status of data stored on the carrier, and use rules data indicating permissible use of data stored on the carrier;

code to evaluate the use status data using the use rules data to determine whether access is permitted to the stored data; and

code to access the stored data when access is permitted.

**18**. A data access device according to claim **17**, further comprising code to write updated use status data to the carrier after user access to the stored data.

**19**. A data access device as claimed in claim **17**, further comprising user access control code to input user access data, to transmit the user access data to the carrier, and to receive from the carrier user access permission data.

**20**. A data access device according to claim **19**, further comprising code to select the use status and use rules data using the user access data.

**21**. A data access device as claimed in claim **19**, further comprising code to retrieve and output supplementary data to the user.

**22**. A data access device according to claim **17** wherein said use rules permit partial use of a data item stored on the carrier and further comprising code to write partial use status data to the data carrier when only part of a stored data item has been accessed.

**23**. A data access device according to claim **17** wherein the device is portable and the data carrier interface is configured for interfacing with a removable data carrier.

**24**. A method of controlling access to data from a data carrier, comprising:

retrieving use status data from the data carrier indicating past use of the stored data;

retrieving use rules from the data carrier;

evaluating the use status data using the use rules to determine whether access to data stored on the carrier is permitted; and

permitting access to the data on the data carrier dependent on the result of said evaluating.

**25**. A method of controlling access according to claim **24**, further comprising:

writing updated use status data to the carrier after an access attempt.

**26**. A method of controlling access according to claim **25**, wherein said use rules permit partial access to a data item and wherein said writing writes a record of what part of the data item has been accessed when only part of the data item has been accessed.

**27**. A method of controlling access according to claim **24**, further comprising:

inputting a user access data;

selecting the use rules dependent upon the user access data.

**28**. A data access system, comprising:

a data supply computer system for forwarding data from a data provider to a data access terminal;

28

an electronic payment system for confirming an electronic payment;

a data access terminal for communicating with the data supply system to write data from the data supply system onto a data carrier; and

a data carrier for storing data from the data supply system and payment data;

wherein data is forwarded from the data provider to the data carrier on validation of payment data provided from the data carrier to the electronic payment system.

**29**. A data access system according to claim **28**, further comprising a payment distribution store and wherein the electronic payment system makes payments according to data in the payment distribution store associated with the forwarded data on confirmation of the payment and/or provision of the forwarded data to the card.

**30**. A data access system according to claim **29**, further comprising a data use rule data store and wherein data use rule data is provided to the data carrier with the forwarded data for controlling user access to the forwarded data.

**31**. A data access system according to claim **30** wherein the data use rule data is selected dependent upon the payment data.

**32**. A data access terminal for retrieving data from a data supplier and providing the retrieved data to a data carrier, the terminal comprising:

a first interface for communicating with the data supplier;

a data carrier interface for interfacing with the data carrier;

a program store storing code; and

a processor coupled to the first interface, the data carrier interface, and the program store for implementing the stored code, the code comprising:

code to read payment data from the data carrier and to forward the payment data to a payment validation system;

code to receive payment validation data from the payment validation system;

code responsive to the payment validation data to retrieve data from the data supplier and to write the retrieved data into the data carrier;

code responsive to the payment validation data to receive at least one access rule from the data supplier and to write the at least one access rule into the data carrier, the at least one access rule specifying at least one condition for accessing the retrieved data written into the data carrier, the at least one condition being dependent upon the amount of payment associated with the payment data forwarded to the payment validation system; and

code to retrieve from the data supplier and output to a user-stored data identifier data and associated value data and use rule data for a data item available from the data supplier.

**33**. A data access terminal for retrieving data from a data supplier and providing the retrieved data to a data carrier, the terminal comprising:

a first interface for communicating with the data supplier;

a data carrier interface for interfacing with the data carrier;

a program store storing the code of claim **32**; and

a processor coupled to the first interface, the data carrier interface, and the program store for implementing the stored code.

*   *   *   *   *

(12) **United States Patent**
Racz et al.

(10) **Patent No.:** **US 8,336,772 B2**
(45) **Date of Patent:** ***Dec. 25, 2012**

(54) **DATA STORAGE AND ACCESS SYSTEMS**

(75) Inventors: **Patrick Racz**, Saint Heller (JE);
**Hermen-ard Hulst**, Amsterdam (NL)

(73) Assignee: **Smartflash Technologies Limited**, Road
Town, Tortola (VG)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

This patent is subject to a terminal dis-
claimer.

(21) Appl. No.: **13/212,047**

(22) Filed: **Aug. 17, 2011**

(65) **Prior Publication Data**

US 2011/0302054 A1    Dec. 8, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 12/943,872, filed on
Nov. 10, 2010, now Pat. No. 8,118,221, which is a
continuation of application No. 12/014,558, filed on
Jan. 15, 2008, now Pat. No. 7,942,317, which is a
continuation of application No. 11/336,758, filed on
Jan. 19, 2006, now Pat. No. 7,334,720, which is a
continuation of application No. 10/111,716, filed on
Sep. 17, 2002, now abandoned.

(51) **Int. Cl.**
*G06K 5/00* (2006.01)

(52) **U.S. Cl.** ........................................ **235/380**; 235/492

(58) **Field of Classification Search** .................. 235/380,
235/382, 492, 451, 486, 487
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,341,951 A | | 7/1982 | Benton |
| 4,590,365 A | * | 5/1986 | Okada ............................ 235/379 |
| 4,697,073 A | | 9/1987 | Hara |
| 5,148,432 A | | 9/1992 | Gordon et al. |
| 5,226,145 A | | 7/1993 | Moronaga et al. |
| 5,367,150 A | | 11/1994 | Kitta et al. |
| 5,406,619 A | | 4/1995 | Akhteruzzaman et al. |
| 5,457,746 A | | 10/1995 | Dolphin |
| 5,532,466 A | | 7/1996 | Konno et al. |
| 5,588,146 A | | 12/1996 | Leroux |
| 5,677,953 A | | 10/1997 | Dolphin |
| 5,682,027 A | * | 10/1997 | Bertina et al. ................ 235/380 |

(Continued)

FOREIGN PATENT DOCUMENTS

EP        0 195 098        10/1990

(Continued)

*Primary Examiner* — Thien M Le

(74) *Attorney, Agent, or Firm* — Kilpatrick Townsend &
Stockton LLP

(57) **ABSTRACT**

Data storage and access systems enable downloading and
paying for data such as audio and video data, text, software,
games and other types of data. A portable data carrier has an
interface for sending and receiving data, data memory for
storing received content data, and payment validation
memory for providing payment validation data to an external
device. The carrier may also store a record of access made to
the stored content, and content use rules for controlling access
to the stored content. Embodiments store further access con-
trol data and supplementary data such as hot links to web sites
and/or advertising data. A complementary data access termi-
nal, data supply computer system, and data access device are
also described. The combination of payment data and stored
content data and use rule data helps reduce the risk of unau-
thorized access to data such as compressed music and video
data, especially over the Internet.

**36 Claims, 17 Drawing Sheets**



**US 8,336,772 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,703,951 A | | 12/1997 | Dolphin |
| 5,740,369 A | | 4/1998 | Yokozawa et al. |
| 5,744,787 A | | 4/1998 | Teicher |
| 5,754,654 A | | 5/1998 | Hiroya et al. |
| 5,794,202 A | | 8/1998 | Kim |
| 5,809,241 A | | 9/1998 | Hanel et al. |
| 5,845,201 A | | 12/1998 | Funke et al. |
| 5,845,281 A | | 12/1998 | Benson et al. |
| 5,847,372 A | | 12/1998 | Kreft |
| 5,874,760 A | | 2/1999 | Burns et al. |
| 5,889,860 A | | 3/1999 | Eller et al. |
| 5,901,330 A | | 5/1999 | Sun et al. |
| 5,918,213 A | | 6/1999 | Bernard et al. |
| 5,923,884 A | | 7/1999 | Peyret et al. |
| 5,933,498 A | | 8/1999 | Schneck et al. |
| 5,936,220 A | | 8/1999 | Hoshino et al. |
| 6,012,634 A | | 1/2000 | Brogan et al. |
| 6,018,720 A | | 1/2000 | Fujimoto |
| 6,025,973 A | * | 2/2000 | Mizoshita et al. ......... 360/98.08 |
| 6,078,917 A | | 6/2000 | Paulsen et al. |
| 6,119,945 A | | 9/2000 | Muller et al. |
| 6,142,369 A | | 11/2000 | Jonstromer |
| 6,202,056 B1 | | 3/2001 | Nuttall |
| 6,385,731 B2 | | 5/2002 | Ananda |
| 6,415,156 B1 | | 7/2002 | Stadelmann |
| 6,424,975 B1 | | 7/2002 | Walter et al. |
| 6,442,570 B1 | | 8/2002 | Wu |
| 6,473,829 B1 | | 10/2002 | Dahman et al. |
| 6,510,236 B1 | | 1/2003 | Crane et al. |
| 6,553,413 B1 | | 4/2003 | Lewin et al. |
| 6,554,192 B2 | | 4/2003 | Tingl |
| 6,574,643 B2 | | 6/2003 | Walter et al. |
| 6,658,568 B1 | | 12/2003 | Ginter et al. |
| 6,721,749 B1 | | 4/2004 | Najm et al. |
| 6,747,930 B1 | | 6/2004 | Weldon et al. |
| 6,981,179 B1 | * | 12/2005 | Shigemasa et al. ............. 714/36 |
| 6,993,507 B2 | | 1/2006 | Meyer et al. |
| 6,999,936 B2 | | 2/2006 | Sehr |
| 7,000,836 B2 | | 2/2006 | Saeki |
| 7,044,362 B2 | | 5/2006 | Yu |
| 7,083,081 B2 | | 8/2006 | McGee et al. |
| 7,334,720 B2 | | 2/2008 | Hulst et al. |
| 7,677,446 B2 | | 3/2010 | Wise |
| 7,942,317 B2 | | 5/2011 | Racz et al. |
| 2003/0163594 A1 | | 8/2003 | Aasheim et al. |
| 2003/0168515 A1 | | 9/2003 | Gray |
| 2006/0179211 A1 | | 8/2006 | Aasheim et al. |
| 2006/0249570 A1 | | 11/2006 | Seifert et al. |
| 2007/0162300 A1 | | 7/2007 | Roever et al. |
| 2008/0041938 A1 | | 2/2008 | Wise |
| 2008/0314974 A1 | | 12/2008 | Hulst et al. |

## FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 713 198 | A2 | 5/1996 |
| EP | 0 823 694 | A1 | 2/1998 |
| EP | 0 542 298 | | 4/1998 |
| EP | 0 843 449 | A2 | 5/1998 |
| EP | 0 914 001 | A1 | 5/1999 |
| JP | 10-269291 | A | 10/1998 |
| JP | 11-53184 | A | 2/1999 |
| JP | 11-212785 | A | 8/1999 |
| JP | 11-213010 | A | 8/1999 |
| JP | 11-272762 | A | 10/1999 |
| WO | WO 98/19237 | A1 | 5/1998 |
| WO | WO 98/33343 | | 7/1998 |
| WO | WO 98/37526 | | 8/1998 |

* cited by examiner

# Fig. 1

## A



## B



## C



# Fig. 2



# Fig. 3



Case: 16-1059    Document: 30    Page: 280    Filed: 01/22/2016



Fig. 4



Fig. 5



Fig.6



Fig. 7



INTERNET INTERFACE
176
MEDIA INPUT DEVICE
180
AUDIO/VISUAL INTERFACE
184
POINTING DEVICE
188
CASH INPUT AND VERIFICATION SYSTEM
192
174
LAN/WAN INTERFACE
178
VIDEO INPUT
182
COMMS I/O PORTS
186
KEYBOARD
190
SFC INTERFACE
172
BUS
194
WORKING MEMORY
196
PROGRAM MEMORY
SFC INTERFACE DRIVER CODE
WEB BROWSER CODE
DATA EXCHANGE INTERFACE CODE
OFF-LINE CONTENT RETRIEVAL CODE
CONTENT SAMPLE CODE
CASH PAYMENT MANAGEMENT CODE
USER INTERFACE CODE
OTHER COMMS DRIVERS
198
200
PROCESSOR
200a
CASH PAYMENT MANAGEMENT
WEB BROWSER
200b
200c
DATA EXCHANGE INTERFACE
200d
OFF-LINE CONTENT RETRIEVAL
CONTENT SAMPLER
200e
SFC INTERFACE DRIVER
200f
200g
USER INTERFACE CODE
COMMS DRIVERS
200h

Fig. 8

U.S. Patent

Dec. 25, 2012

Sheet 8 of 17

US 8,336,772 B2



Fig. 9

U.S. Patent

Dec. 25, 2012

Sheet 9 of 17

US 8,336,772 B2



Fig. 10



S10
SMART FLASH CARD INSERTED
INTO CONTENT ACCESS
TERMINAL CARD INTERFACE

S11
SCHEME OWNER REGISTRATION
WEB PAGE LOADED ONTO
CONTENT ACCESS TERMINAL

S12
USER REGISTRATION DATA
ENTERED INTO CONTENT ACCESS
TERMINAL

S13
USER REGISTRATION DATA
TRANSMITTED TO SCHEME OWNER

S14
PAYMENT REQUEST RECEIVED
FROM SCHEME OWNER AT
CONTENT ACCESS TERMINAL

S15
PAYMENT DATA ENTERED INTO
CONTENT ACCESS TERMINAL AND
TRANSMITTED TO SCHEME OWNER

S16
CARD VALUE DATA AND CARD
VALUE ACCESS CODE RECEIVED
BY CONTENT ACCESS TERMINAL
FROM SCHEME OWNER

S17
CARD REGISTRATION DATA
RECEIVED FROM SCHEME OWNER
AND WRITTEN ONTO CARD

S18
VALUE DATA AND ACCESS CODE
WRITTEN ONTO CARD AND
OUTPUT TO USER

S19
CARD AVAILABLE FOR USE

Fig11a



S20
REQUEST FOR CARD REGISTRATION WEB PAGE RECEIVED FROM CONTENT ACCESS DEVICE
S21
TRANSMIT CARD REGISTRATION WEB PAGE TO CONTENT ACCESS DEVICE
S22
RECEIVE USER REGISTRATION DATA FROM CONTENT ACCESS TERMINAL AND STORE IN ACCESS CONTROL DATA STORE
S23
TRANSMIT PAYMENT REQUEST TO CONTENT ACCESS TERMINAL
S24
RECEIVE PAYMENT DATA FROM CONTENT ACCESS TERMINAL
S25
PAYMENT PROCESSOR VERIFIES PAYMENT DATA WITH PAYMENT SYSTEM
S26
PAYMENT PROCESSOR TRANSMITS VALUE DATA AND VALUE ACCESS CODE TO CONTENT ACCESS TERMINAL
S27
PAYMENT PROCESSOR UPDATES PAYMENT RECORD DATA STORE WITH TRANSACTION DATA
S28
CARD REGISTRATION DATA LOADED FROM ACCESS CONTROL DATA STORE AND TRANSMITTED TO CONTENT ACCESS TERMINAL
S29
TRANSACTION COMPLETE

Fig.11b



S30
INSERT CARD IN CONTENT ACCESS TERMINAL
S31
USER ENTERS PASSWORD INTO CONTENT ACCESS TERMINAL
S32
CONTENT ACCESS TERMINAL TRANSMITS PASSWORD TO CARD FOR VERIFICATION
S33
ACCESS PERMITTED?
NO
YES
S34
DISPLAY WARNING AND INCREMENT TERMINAL ACCESS DENIED COUNT
S35
READ CARD THRESHOLD AND TOTAL CARD ACCESS DENIED COUNT FROM CARD
S36
CARD COUNT>(CARD THRESHOLD -3)?
NO
YES
S37
DISPLAY CONTENT ERASURE WARNING
S38
TERMINAL COUNT>TERMINAL THRESHOLD?
NO
YES
S39
OUTPUT ACCESS REFUSED MESSAGE AND AWAIT CARD REMOVAL
S40
LOAD OUTLINE CRM DATA FROM CARD
S41
LOAD RETAILER DATA FROM RETAILER LAN / WAN
B
S42
DISPLAY MENU, RETAILER DATA AND OUTLINE CRM DATA ON CONTENT ACCESS TERMINAL
S43
INPUT MENU OPTION (DOWNLOAD CONTENT; ADD MONETARY VALUE; CHECK / SPEND CRM VALUE; WEB SITE LINKS; EXIT)
DOWNLOAD CONTENT
S44
LOAD SCHEME OWNER CONTENT ACCESS WEB PAGE ONTO CONTENT ACCESS TERMINAL
A

Fig. 12a



A
S45
CONTENT SEARCH REQUEST DATA INPUT AND TRANSMITTED TO SCHEME OWNER CONTENT DISTRIBUTION PROCESSOR
S46
CONTENT SEARCH RESULTS RECEIVED FROM CONTENT DISTRIBUTION PROCESSOR AND DISPLAYED ON CONTENT ACCESS TERMINAL
S47
CONTENT ITEM SELECTION DATA INPUT AND TRANSMITTED TO SCHEME OWNER
S48
CONTENT COST DATA, CONTENT USE RULES AND PURCHASE OPTIONS DATA RECEIVED FROM SCHEME OWNER
S49
PURCHASE OPTION SELECTION AND PURCHASE REQUEST INPUT OR EXIT TO MENU SELECTED
EXIT
B
S50
CARD VALUE AND CRM DATA READ FROM CARD
S51
CARD VALUE SUFFICIENT?
NO
S52
DISPLAY INSUFFICIENT VALUE WARNING
B
YES
S53
PAYMENT REQUEST TRANSMITTED TO CARD
C

Fig.12b



Fig.12c



Fig. 12d

S60
CONTENT ACCESS WEB PAGE REQUESTED AND TRANSMITTED TO CONTENT ACCESS TERMINAL

S61
CONTENT SEARCH REQUEST RECEIVED FROM CONTENT ACCESS TERMINAL

S62
CONTENT DISTRIBUTION PROCESSOR SEARCHES CONTENT ACCESS DATA STORE AND TRANSMITS SEARCH RESULTS TO CONTENT ACCESS TERMINAL

S63
CONTENT ITEM SELECTION RECEIVED FROM CONTENT ACCESS TERMINAL

S64
CONTENT ITEM PURCHASE DATA RETRIEVED FROM CONTENT ACCESS DATA STORE

S65
CONTENT PURCHASE DATA TRANSMITTED TO CONTENT ACCESS TERMINAL

S66
PAYMENT RECORD DATA, PURCHASE REQUEST DATA AND CARD REGISTRATION DATA RECEIVED FROM CONTENT ACCESS TERMINAL

S67
PAYMENT RECORD DATA VALIDATED WITH e-PAYMENT SYSTEM

D



( D )

**S68**
PAYMENT DISTRIBUTION DATA
READ FROM CONTENT ACCESS
DATA STORE

**S69**
PAYMENT DISTRIBUTION
INSTRUCTION TRANSMITTED TO
e-PAYMENT SYSTEM

**S70**
CONTENT ACCESS RULES FOR
PURCHASED LEVEL OF SERVICE,
CRM DATA AND CONTENT
PROVIDER ID DATA READ FROM
CONTENT ACCESS DATA STORE

**S71**
CONTENT ACCESS RULES
TRANSMITTED TO CONTENT
ACCESS TERMINAL

**S72**
DRM PROCESSOR TRANSMITS
TRANSACTION REQUEST AND
AUTHENTICATION TO CONTENT
PROVIDER

**S73**
CONTENT ACCESS WEB SERVER
RECEIVES PROTECTED CONTENT
FROM CONTENT PROVIDER AND
TRANSMITS CONTENT TO
CONTENT ACCESS TERMINAL

**S74**
PURCHASE DATA AND CONTENT
ACCESS RECORD WRITTEN TO
PAYMENT RECORD DATA STORE

**S75**
USING STORED RULES UPDATED
CRM DATA WRITTEN TO CONTENT
ACCESS DATA STORE AND
TRANSMITTED TO CONTENT
ACCESS TERMINAL

**S76**
PROCESS ENDS

Fig. 12e



S77
CARD INSERTED INTO PLAYER
S78
USER PASSWORD ENTERED INTO PLAYER AND TRANSMITTED TO CARD FOR VALIDATION
CONTENT ACCESS PERMITTED
S79
STORED CONTENT INDEX LOADED FROM CARD AND DISPLAYED WITH MENU (ACCESS CONTENT; CHECK VALUE; CHECK CRM; PLAY OPTIONS)
S80
SELECTION OF CONTENT ITEMS FOR ACCESS ENTERED INTO PLAYER
S81
CONTENT USE STATUS AND CONTENT USE RULES LOADED FROM CARD
S82
USE RULES AND USE STATUS COMPARED AND DISPLAYED WITH CONTENT PLAY MENU
S83
IS CONTENT USE PERMITTED?
NO
YES
PLAY
S84
CONTENT AND SUPPLEMENTARY DATA MADE AVAILABLE TO USER
PAUSE
S85
WRITE/READ CARDS PLAY STATUS DATA
CONT
PLAY COMPLETE
S85
UPDATED CONTENT USE DATA WRITTEN TO CARD
S86
CRM DATA AND CRM REWARD RULES LOADED FROM THE CARD AND UPDATED

Fig. 13

US 8,336,772 B2

1

## DATA STORAGE AND ACCESS SYSTEMS

### CROSS-REFERENCES TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 12/943,872, filed on Nov. 10, 2010; which is a continuation of U.S. patent application Ser. No. 12/014,558, filed on Jan. 15, 2008, now issued U.S. Pat. No. 7,942,317; which is a continuation of U.S. patent application Ser. No. 11/336,758, filed on Jan. 19, 2006, now issued U.S. Pat. No. 7,334,720; which is a continuation of U.S. patent application Ser. No. 10/111,716, filed on Sep. 17, 2002, which application is a national stage application under 35 U.S.C. 371, claiming the priority of international PCT Application No. GB00104110, filed on Oct. 25, 2000; which claims priority to UK Application No. 9925227.2, filed on Oct. 25, 1999, each of which is incorporated by reference in its entirety for all purposes.

### BACKGROUND OF THE INVENTION

This invention is generally concerned with data storage and access systems. More particularly, it relates to a portable data carrier for storing and paying for data and to computer systems for providing access to data to be stored. The invention also includes corresponding methods and computer programs. The invention is particularly useful for managing stored audio and video data, but may also be applied to storage and access of text and software, including games, as well as other types of data.

One problem associated with the increasingly wide use of the internet is the growing prevalence of so-called data pirates. Such pirates obtain data either by unauthorized or legitimate means and then make this data available essentially world-wide over the internet without authorization. Data can be a very valuable commodity, but once it has been published on the internet it is difficult to police access to and use of it by internet users who may not even realize that it is pirated. This is a particular problem with audio recordings, and, once the bandwidth becomes available, is also likely to be evident with video.

Over the past three or four years compressed audio data have become increasingly widely available on web pages. One widely used audio data compression format is MP3 (MPEG—Audio Layer 3 of the MPEG1 compression algorithm), which is an internationally defined standard including a definition of compressed audio information such as speech or music. It relies on psycho-acoustic properties of human hearing to achieve very large data compression factors. It is thus feasible to download usefully long passages of music in a practically convenient short time. Pirate data suppliers have not been slow to realize the potential of this, and many unauthorized websites have sprung up offering popular music, including recent releases by world-famous bands. This has caused the recording industry considerable concern and there is an urgent need to find a way to address the problem of data piracy.

### SUMMARY OF THE INVENTION

According to the present invention there is therefore provided a method of providing portable data comprising providing a portable data storage device comprising downloaded data storage means and payment validation means; providing a terminal for internet access; coupling the portable data storage device to the terminal; reading payment information

2

from the payment validation means using the terminal; validating the payment information; and downloading data into the portable storage device from a data supplier.

Another aspect of the invention provides a corresponding mobile data retrieval device for retrieving and outputting data such as stored music and/or noise from the data storage device.

The payment validation means is, for example, means to validate payment with an external authority such as a bank or building society. The combination of the payment validation means with the data storage means allows the access to the downloaded data which is to be stored by the data storage means, to be made conditional upon checked and validated payment being made for the data. Binding the data access and payment together allows the legitimate owners of the data to make the data available themselves over the internet without fear of loss of revenue, thus undermining the position of data pirates.

A further advantage of the system is that it allows users under the age of 18 to make internet purchases. Currently internet users pay for goods and/or services by credit card. Since credit cards cannot legitimately be used by persons under the age of 18 (at least in the UK), a significant fraction of adventurous internet users are excluded from e-commerce, one of the most significant predicted uses of the internet. In one embodiment of the invention, however, the payment validation means comprises e-cash; that is, the payment validation means stores transaction value information on a cash value of transactions validatable by the data storage means. In simple terms, the data storage means can be a card which is charged up to a desired cash value (if necessary limited to a maximum value) at a suitable terminal. This might be an internet access terminal but could, more simply, be a device to accept the data storage card and to receive and count money deposited by the user to charge the card, writing update cash value information onto the card. More sophisticated ways of updating the cash value on the card are also possible, such as direct bank transfer. Since, with this type of embodiment, the data storage means is, essentially, precharged with cash rather than acting as a credit card, it can be used by young people without the risk of their incurring large debts.

In one embodiment the data storage means is powered by the retrieval device when it is connected to the device and retains a memory of the downloaded data when it is unpowered. This can be achieved by the use of Flash RAM or, more generally, any form of programmable read-only memory. Alternatively the data storage means may incorporate a rechargeable cell or capacitor and store information in battery backed-up static RAM.

The downloaded data may be entered into the data storage device by means of an interface such as a magnetically or capacitatively coupled connection or an optical connection, but preferably the interface comprises contacts for direct electrical connection to the storage means. The payment validation means may likewise have one of a variety of interfaces but again preferably comprises a set of electrical contacts. The payment validation means could, however, comprise a magnetic or holographic data-strip such as is known for use with credit cards and phone cards. The interface to receive the downloaded data may be separate from the interface to the payment validation means, to facilitate separate and simultaneous access to both these systems. In other embodiments a single interface may serve for both data storage and payment. Advantageously the payment validation means includes memory storing information to identify the person who is paying for the downloaded data.

US 8,336,772 B2

3

For additional security the downloaded data may be encrypted. In this case data decryption may be necessary at some stage, either in the data storage means or in the retrieval device or in an information delivering apparatus such as a data access terminal. Alternatively the data decryption function can be shared amongst one or more of these devices. The skilled person will be aware of a range of suitable encryption/decryption techniques, including Pretty Good Privacy (Registered Trade Mark) and PKI (Public Key Infrastructure). Normally, when the downloaded data is encrypted, a decryption key must be supplied. This can be generated automatically by the data access terminal or data access service provider or it can be entered by the user into the data access terminal or into the mobile data retrieval device.

The data storage means and/or the retrieval device can be provided with access control means to prevent unauthorized access to the downloaded data. Additionally or alternatively, use control means can be provided to stop or provide only limited access of the user to the downloaded data in accordance with the amount paid. These access and use control functions may in some embodiments be combined, permitted use controlling access or permitted access controlling use. Thus, for example, a complete set of data information relating to a particular topic, a particular music track, or a particular software package might be downloaded, although access to part of the data set might thereafter be controlled by payments made by a user at a later stage. In this way, a user could pay to enable an extra level on a game or to enable further tracks of an album.

In embodiments where the access or use control means is responsive to the payment validation means, access or use control information may be stored with the downloaded data or in a separate storage area, for example in the payment validation means. The user's access to the downloaded data could advantageously be responsive to the payment validation means, for example, by means of a control line coupling the payment validation means with a memory access or decryption control element.

In one embodiment the data storage means comprises an electronic memory card or smart card and the mobile data retrieval device is provided with a slot to receive the card. Preferably the card is a push-fit within the retrieval device, and retention of the card may be effected by pressure from electrical interface connections and/or resilience of the housing, or by using a resilient retaining means. In a preferred embodiment the retrieval device includes an audio output and a display, to play a downloaded track and to show information about the track and/or an accompanying video.

To download data onto the data storage means the user can employ a data access terminal coupled to the interne. The terminal can directly validate payment; for example in the case of a smart card charged with electronic cash it can deduct a cash value from the card. Alternatively it can communicate with a bank or other financial services provider to control payment. In a preferred embodiment, however, the terminal connects to a data access service provider which provides a portal to other sites and which validates payment and then forwards data from a data supplier to the user's local access terminal. The data access service provider may alternatively forward payment validation information and/or information from the payment validation authority to the data supplier for control by the supplier of the data supplied. Thus, access to the payment validation system and control for downloading may be entirely controlled by the data supplier.

Data held on the data storage means may advantageously include data relating to the user's or payer's usage of the system. This information may include, for example, informa-

4

tion on a user's spending pattern, information on data suppliers used and information on the downloaded data. This information may be accessed by the data supplier and/or data access service provider and can be used for targeted marketing or loyalty-based incentive schemes such as air miles or the like.

The data access terminal may be a conventional computer or, alternatively, it may be a mobile phone. Wireless Application Protocol (WAP) and i-mode allow mobile phones to efficiently access the internet and this allows a mobile phone to be used to download data to the data storage means, advantageously, directly. The data storage means can, if desired, incorporate the functionality of a mobile phone SIM (Subscriber Identity Module) card, which cards already include a user identification means, to allow user billing through the phone network operator.

In a preferred embodiment the downloaded data is MP3 or other encoded audio data, but the system finds more general application for other data types. For example, download data can include software, and particularly games, share price information, current news information, transport timetable information, weather information and catalog shopping information. The downloaded information may also include compressed video data. The storage capacity of the data storage means is adaptable to suit the type of data intended to be downloaded; for example, 32 megabytes is sufficient for CD quality music, but for video it is preferable that the data storage means has a capacity of 128 megabytes or greater.

In another aspect, the invention provides a portable data carrier comprising an interface for reading and writing data from and to the carrier; non-volatile data memory, coupled to the interface, for storing data on the carrier; non-volatile payment data memory, coupled to the interface, for providing payment data to an external device.

These features allow the data carrier to store both payment data and content data, thus providing the advantages outlined above. Depending upon the payment system used, the payment data memory may also store code for validating or confirming a payment to an external payment system. The payment data will normally be linked to a card or card holder identification data for payment by the card holder. The non-volatile memory ensures that stored content and payment data is retained in the data carrier when the data carrier is not receiving power from an external source. Thus "non-volatile" encompasses, for example, low-power memory whose contents are retained by a battery back-up system. In one embodiment the payment data memory comprises EEPROM and the content data memory comprises Flash memory, but other types of content data memory, such as optical, for example, holographic, data memory can also be used. The data carrier may also be integrated into other apparatus, such as a mobile communications device.

Preferably, the portable data carrier further comprises a program store for storing code implementable by a processor; and a processor, coupled to the content data memory, the payment data memory, the interface and to the program store for implementing code in the program store, wherein the code comprises code to output payment data from the payment data memory to the interface and code to provide external access to the data memory.

Normally, the (content) data memory allows both write and read access for both storing and retrieving data, but in some embodiments the content data memory may be read-only memory (ROM). In such embodiments, content may be preloaded onto the carrier and payment may then be made for permission to access the pre-loaded data.

US 8,336,772 B2

**5**

Preferably, the data carrier also stores a record of access made to the content data and updates this in response to external access, preferably read access, made to the data memory. The carrier may also store content use rules pertaining to allowed use of stored data items. These use rules may be linked to payments made from the card to provide payment options such as access to buy content data outright; rental access to content data for a time period or for a specified number of access events; and/or rental/purchase, for example where rental use is provided together with an option to purchase content data at the reduced price after rental access has expired.

Thus where the data carrier stores, for example, music, the purchase outright option may be equivalent to the purchase of a compact disc (CD), preferably with some form of content copy protection such as digital watermarking. In this example, the rental or subscription payment option may be a pay-per-play option, and with this option payment may either be before or after access to the stored data so that the carrier may operate in either a debit or credit payment mode.

The portability of the data carrier potentially allows it to be used to access content or, in the example, play music without the need to be linked to a communications system or to be on-line to the internet. By providing a use record memory on the data carrier, use of the stored data can be tracked while off-line and then any necessary payment can be made when the data carrier is next coupled to a communication system. This allows the data carrier to operate in a credit mode. In a debit mode, the additional storage of use rules facilitates the regulation of access to content data stored on the carrier without the need for further exchange of payment/use data with an external system to validate the use.

By combining digital rights management with content data storage using a single carrier, the stored content data becomes mobile and can be accessed anywhere while retaining control over the stored data for the data content provider or data copyright owner. Preferably, the data carrier also stores access control data, such as a user ID and a password, as the stored data may be valuable. The access control data may be combined with access control to the payment data, which is typically by means of a PIN (Personal Identification Number) to simplify access to valued content stored on the carrier.

In one embodiment the stored content data is encrypted and a unique password or PIN and/or biometric data is required for decryption. The data carrier may be arranged so that the content is erased after a predetermined number of incorrect access attempts. Additionally or alternatively, a permanently stored flag may be set and/or a hardware modification (such as a fusable link) may be made to prevent the data carrier from functioning for further data storage/retrieval. Preferably, however, access to any stored value/payment data is nevertheless retained.

Supplementary data may also be stored on the carrier in association with stored content data. This supplementary data may comprise customer reward management data and/or advertising data. The supplementary data may comprise a pointer to an external data source from which data is downloaded either to the data carrier or to a data access device or content player, so that advertising or other data can be displayed when reviewing or accessing the stored content.

Additional data security and/or a mechanism for rewarding operators at different levels in the data supply chain may be provided using a content synthesis function. The content synthesis function combines partial content information from two or more sources to provide content data items for storage and/or output. Thus, for example, a first percentage of a content data item could be provided by a content retailer,

**6**

while a remaining percentage could be provided by an on-line data supplier. This would provide an incentive for a user to register with a content retailer or distributor as well as with an on-line system owner and so could encourage the use of existing retailers and could provide a mechanism for paying commission to such retailers. The two portions of data combined to provide a content data item could comprise encryption data and a key but preferably comprise separate parts of a complete data item, for example, least significant bits and most significant bits or high frequencies and low frequencies (for audio). This arrangement also facilitates customer reward and loyalty management.

In one embodiment the data carrier further comprises memory for storing data for accessing a mobile communications network, for example to receive content data over the network. For such an embodiment, the data carrier may replace a SIM (Subscriber Identity Module) card in a mobile communications device, thus providing a single card for both network access and valued content retrieval and storage. Additionally or alternatively the card may also store the web address of a data supplier from whom data may be downloaded onto the carrier.

The data memory for storing content data may be optic, magnetic or semiconductor memory, but preferably comprises Flash memory. Preferably, the data memory has a large capacity for storing large data files such as compressed video data. Preferably, the data memory is partitioned for lock access, that is, for read and/or write access to blocks of, for example, 1K, 4K, 16K or 64K databytes for faster data access, particularly where the stored content data will normally be accessed serially, as is normally the case with audio and video data. Preferably the card is configured as an IC card or smart card and has a credit card-type format, although other formats such as the "memory stick" format may also be used. This provides a small and convenient portable format and facilitates removable interfacing with a variety of devices.

The invention also provides a related method of controlling access to data on a data carrier, the data carrier comprising non-volatile data memory and non-volatile parameter memory storing use status data and use rules, the method comprising receiving a data access request; reading the use status data and use rules from memory; and evaluating the use status data using the use rules to determine whether access to the stored data is permitted.

According to another aspect of the invention, there is provided a computer system for providing data to a data requester, the system comprising a communication interface; a data access data store for storing records of data items available from the system, each record comprising a data item description and a pointer to a data provider for the data item; a program store storing code implementable by a processor; a processor coupled to the communications interface, to the data access data store, and to the program store for implementing the stored code, the code comprising code to receive a request for a data item from the requester; code to receive from the communications interface payment data comprising data relating to payment for the requested data item; code responsive to the request and to the received payment data, to read data for the requested data item from a content provider; and code to transmit the read data to the requester over the communications interface.

The computer system is operated by a data supplier or data supply "system owner" for providing content data to the data carrier described above. The payment data received may either be data relating to an actual payment made to the data supplier, or it may be a record of a payment made to an e-payment system relating either to a payment to the data

supplier, or to a payment to a third party. The data from the content provider, preferably without permanent (local) storage of the forwarded data, improves data security as the content provider retains control over a content data item, and the data supplier, a copy of a data item, is unable to supply data for the item without the content provider's assistance. The computer system may provide temporary storage for a requested data item, for example using a disk cache, but preferably the computer system does not store a complete data item, even temporarily.

Preferably, the computer system includes payment distribution information so that when payment is made for a data item, the payment can be distributed for reimbursing royalties and making other payments. Typically a large fraction of the payment for a data item will be transferred to a copyright owner or "content provider" for the item while smaller payments will go to the artist and/or publisher and/or retailer/distributor. Payment may be made directly by the computer system to the computer systems of other relevant parties using, for example, a signature-transporting type e-payment system. Alternatively, the computer system can issue appropriate instructions to a third party e-payment system for making the transfers. The computer system allows automatic distribution of payments either before, during or after content data download, or after content data access by a user. Instructions for distributing the payments may be issued substantially simultaneously, thereby avoiding long delays in the payment of some parties; for example, it can presently take a year or more for an artist generating content to be paid by conventional methods.

Preferably, the computer system also stores content data item access rule data, for downloading in association with a content data item. The rule data may be stored by a content provider but is preferably held by the computer system, and links a content identifier with an access rule, typically based upon a required payment value, as outlined above in the context of the data carrier. Normally, each content data item will have an associated access rule, but a single rule may apply to a large number of data items. The computer system also, preferably, stores requester reward data for customer reward/loyalty management. This data may again comprise one or more rules linking a payment value and/or content data item type to a specified reward, such as a number of air miles or retailer value points. The computer system preferably also keeps a record of an identified user's or data's carriers content item downloads and payments for market research purposes.

The computer system, in one embodiment, also stores access control data, such as an access request identity and password which can be employed, for example, to create an extranet of system users, which again can be linked to stored access record data for marketing purposes. When further linked to content item type data, such an arrangement can be used to construct a club of users of content data items of a particular type, for example country and western or rock and roll music. As described in connection with the portable data carrier, the computer system may also comprise content synthesis code for additional data security and for more secure management of payment distributions.

The invention also provides a related method of providing data to a data requester comprising receiving a request for a data item from the requester; receiving payment data from the requester relating to payment for the requested data; reading the requested data from a content provider responsive to the received payment data; and transmitting the read data to the requester.

According to a further aspect of the present invention, there is provided a data access terminal for retrieving data from a

data supplier and providing the retrieved data to a data carrier, the terminal comprising a first interface for communicating with the data supplier; a data carrier interface for interfacing with the data carrier; a program store storing code implementable by a processor; and a processor, coupled to the first interface, to the data carrier interface and to the program store for implementing the stored code, the code comprising: code to read payment data from the data carrier and to forward payment data to a payment validation system; code to receive payment validation data from the payment validation system; code responsive to the payment validation data to retrieve data from the data supplier and to write the retrieved data into the data carrier.

This terminal can be used for retrieving data from the above-described computer system and for downloading the retrieved data to the above-described portable data carrier. As with the data supply computer system, it is preferable that there is no (local) storage of content item data forwarded from the data supplier to the data carrier. The data access terminal is not restricted to use with the above-described status supplier and could, for example, retrieve data for downloading to the data carrier from a local data source, such as a CD (Compact Disc) or DVD (Digital Versatile Disc), or from a third party such as a cable TV company.

The terminal reads payment data from the data carrier and transmits this to a payment validation system for validating the data and authorizing the payment. This may be part of the data supplier's computer system or it may be a separate system such as an e-payment system. Thus, the terminal operates with a data carrier storing payment (validation) data and, in some embodiments, additional payment validation code for validating payment to the payment validation system. Again, the terminal is preferably configured to provide a data item use rule to the carrier in conjunction with a data item. As before, the data item use rule will normally be dependent upon payment value information embodied in the payment data read from the data carrier. The terminal is preferably also configured for user input of access control data. This access control data may be forwarded to the data carrier for access permission verification and/or it may be passed to the data supplier computer system for a similar purpose. The terminal may be configured to warn a user of content access or data carrier function inhibition after a predetermined number of access requests have been refused. The terminal may also incorporate content synthesis code as described above.

The terminal may comprise code to output supplementary data when downloading data to the data carrier. Identity data on the data carrier can be used to retrieve the supplementary data, or a pointer to the supplementary data, from the data supplier computer system, or the supplementary data or a pointer thereto can be retrieved directly from the data carrier. Preferably, however, identification data on the card is used to retrieve characterizing data such as card user preference data from the data supplier computer system, and this characterizing data is then used by the terminal to retrieve and output supplementary data to a terminal user. When the terminal is associated with a contact distributor or retailer, the supplementary data may be retrieved over a network associated with the retailer/distributor such as a local area network (LAN), wide area network (WAN) or extranet.

The invention also provides a method of providing data from a data supplier to a data carrier, the method comprising reading payment data from the data carrier; forwarding the payment data to a payment validation system; retrieving data from the data supplier; and writing the retrieved data into the date carrier.

US 8,336,772 B2

9                                  10

The payment validation system may be part of the data supplier's computer systems or it may be a separate e-payment system. In one embodiment the method further comprises receiving payment validation data from the payment validation system; and transmitting at least a portion of the payment validation data to the data supplier. Alternatively the payment validation system may comprise a payment processor at the data supplier or at a destination retrieved from the data supplier. The payment processor may also provide payment distribution data for distributing a payment represented by the payment data.

In a further aspect, the invention provides a data access device for retrieving stored data from a data carrier, the device comprising a user interface; a data carrier interface; a program store storing code implementable by a processor; and a processor coupled to the user interface, to the data carrier interface and to the program store for implementing the stored code, the code comprising code to retrieve use status data indicating a use status of data stored on the carrier, and use rules data indicating permissible use of data stored on the carrier; code to evaluate the use status data using the use rules data to determine whether access is permitted to the stored data; and code to access the stored data when access is permitted.

The data access device uses the use status data and use rules to determine what access is permitted to data stored on the data carrier. As described above, the use rules will normally be dependent upon payments made for data stored on the data carrier, but may also comprise access control employing a user identification and password. Since a single data carrier may have more than one user, the use status and use rules may be selected dependent upon a user identity. The data access device may also be configured to present supplementary data when presenting the content data, retrieved as described above, from the card, from a remote computer system or from some other source such as a cable TV network or off-air.

The invention also provides a related method of controlling access to data from a data carrier, comprising retrieving use status data from the data carrier indicating past use of the stored data; retrieving use rules from the data carrier; evaluating the use status data using the use rules to determine whether access to data stored on the carrier is permitted; and permitting access to the data on the data carrier dependent on the result of said evaluating.

According to a further aspect of the invention there is provided a data access system comprising a data supply computer system for forwarding data from a data provider to a data access terminal; an electronic payment system for confirming an electronic payment; a data access terminal for communicating with the data supply system to write data from the data supply system onto a data carrier; and a data carrier for storing data from the data supply system and payment data; wherein data is forwarded from the data provider to the data carrier on validation of payment data provided from the data carrier to the electronic payment system.

In a further aspect of the invention, there is provided a portable data carrier comprising an interface for sending and receiving data from and to the carrier; non-volatile data memory, coupled to the interface, for storing data on the carrier; and a digital rights management processor for controlling access to the stored data.

In a further aspect of the invention, there is provided a portable data carrier comprising an interface for sending and receiving data from and to the carrier; non-volatile data memory, coupled to the interface, for storing data on the carrier; and an access control processor; wherein the data

memory is partitioned as data blocks and the access control processor controls external access to the data blocks.

In a further aspect of the invention, there is provided a computer system for providing data to a data requester, the system comprising a communication interface; a data access data store for storing records of data items available from the system, each record comprising a data item description and a resource locator; a data provider for the data item; a program store storing code implementable by a processor; a processor coupled to the communications interface, to the data access data store, and to the program store for implementing the stored code, the code comprising code to receive a request for a data item from the requester to receive from the communications interface payment data comprising data relating to payment for the requested data item; code, responsive to the request and to the received payment data, to output the item data to the requester over the communication interface; wherein said data access data store further comprises payment distribution information indicating to whom payments should be made for a data item; and further comprising code to output payment data for a data item for making payments for the item when the item is supplied to a requester.

In a further aspect of the invention, there is provided a computer system for providing data to a data requester, the system comprising a communication interface; a data access data store for storing records of data items available from the system, each record comprising a data item description and a printer location data identifying an electronic address for a provider for the data item; a program store storing code implementable by a processor; a processor coupled to the communications interface, to the data access data store, and to the program store for implementing the stored code, the code comprising code to receive a request for a data item from the requester to receive from the communications interface payment data comprising data relating to payment for the requested data item; code responsive to the request and to the received payment data to output the item data to the requester over the communication interface; wherein the data access data store further comprises data item access rule data for output to the requester with a data item; and further comprising code to select access rule data for output with a data item in response to the payment data.

In a yet further aspect of the invention, there is provided a method of providing data to a data requester comprising receiving a request for a data item from the requester; receiving payment data from the requester relating to payment for the requested data; transmitting the requested data to the requester; reading payment distribution information from a data store; and outputting payment data to a payment system for distributing the payment for the requested data.

In a still further aspect of the invention, there is provided a method of providing data to a data requester comprising receiving a request for a data item from the requester; receiving payment data from the requester relating to payment for the requested data; transmitting the requested data to the requester; and transmitting data access rule data to the requester with the read data.

These and other aspects of the invention will now be further described, by way of example only, with reference to the accompanying figures.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows a data access device a) from the top; b) from the front; and c) from the side;

FIG. **2** shows, conceptually, a portable data carrier;

FIGS. **3**a and b show exemplary data access terminals;

FIGS. **4***a* and *b* show, respectively, a logical signal path between elements of a conceptual data access system; and a physical representation of a conceptual data access system;

FIG. **5** shows a content provision system;

FIG. **6** shows a data supply computer system;

FIG. **7** shows a variety of data access terminals;

FIG. **8** shows a schematic diagram of components of a data access terminal;

FIG. **9** shows a schematic diagram of components of a data carrier;

FIG. **10** shows a schematic diagram of components of a data access device;

FIGS. **11***a* and **11***b* are flow diagrams of a data carrier registration process;

FIGS. **12***a-c* and **12***d-e* show, respectively, a flow diagram of data access using a data access terminal; and a flow diagram of data supply using a data supply computer system; and

FIG. **13** shows a flow diagram of data retrieval using a data access device.

DETAILED DESCRIPTION

Referring to FIG. **1**, this shows a data access device for playing MP3 audio (**10**) with operator controls (**12**) and LCD display (**14**). The outline of a smart card data storage device is shown at (**16**). The operator controls allow a user to select and play tracks, while track information and still or video images are provided on display (**14**). A slot (**18**) is provided in the front of the device to receive a smart card-type data storage means. This smart card occupies space (**20**) and interfaces with resilient contacts (**24**); it is held in the data retrieval device against the contacts, by resilient housing element (**22**).

Referring now to FIG. **2**, this shows a portable data carrier (**30**) suitable for use with the device of FIG. **1**. The data storage means is based on a standard smart card; it is plastic, about the size of a standard credit card, and has some flexibility. On the card (**30**) are two sets of contacts, contacts (**32**) for interfacing with the payment validation means and contacts (**34**) for interfacing with the memory for storing downloaded data (although in other embodiments, a single set of contacts may be used for both). The surface of the card can be embellished with suitable graphics.

In one embodiment the smart card retains all its useable functionality as specified for standard Electronics Point of Sale Systems (EPOSS) and, if desired, the memory for storing the downloaded data can be electrically separate from this. However, it may be preferable to provide interaction between the standard smart card device and the data memory in order to accomplish the access control/decryption functions described above.

Referring now to FIG. **3**, an example of a data access terminal is shown at (**40**). This has a screen (**42**) and a slot (**44**) to receive the data carrier (**30**). Alternatively the data carrier may interface to the terminal via the data access device (**10**) and an interface (**46**) to the terminal (**40**). In FIG. **3***b* a dedicated terminal (**50**) has a slot (**52**) to receive the data carrier, a display (**54**) and controls (**56**). Coins can be inserted into the terminal at (**58**) and notes at (**60**) to charge the data carrier with cash.

Referring now to FIG. **4***a*, this illustrates conceptually the logical connections and data flow between data processing systems involved in payment validation, and data download to the carrier (**30**). A user connects the data carrier (**30**) to terminal (**40**) and logs on to a data web page of data supply service provider (**60**). Either terminal (**40**) or service provider (**60**) then communicates via data paths (**62**) with a payment validation authority (**70**) to check and authorize the user's or

payer's payment. In the case of electronic cash the terminal (**40**) may immediately validate the payment information, updating the service provider and/or payment validation authority (**70**) at a later stage. The logical connection (**64**) between the terminal and the service provider is preferably made over the internet.

The service provider may provide a direct portal to data providers (**80**) or may collect information from data suppliers (**80**) and provide a "front end" to present data from the suppliers to the terminal user. Alternatively, data supply service provider (**60**) may regulate direct access between terminal (**40**) and data providers (**80**), as shown by links (**66**), by communicating with the terminal and the data providers to provide communication regulation information to, for example, instruct data suppliers about what information the user of terminal (**40**) should have access to.

In a preferred embodiment, service provider (**60**) pays royalties at an agreed rate—for example, 10 pence per track or 10 pence per minute—to a computer system owned by a company or entity in the recording industry, such as a content provider or copyright owner, a content publisher or a content creator, and the user of terminal (**40**) effectively pays the service provider. Billing can also be regulated by bandwidth and/or data download time.

Preferably the service provider (**60**) monitors the user's access to the system and either stores or forwards to data providers (**80**), or downloads to the data carrier (**30**), usage information. In a preferred embodiment the service provider sends information via terminal (**40**) to data carrier (**30**) which can be used to determine incentives to be provided to users of the system.

FIG. **4***b* shows a conceptual physical configuration of the system of FIG. **4***a* in which a plurality of terminals (**40**), a plurality of service providers (**60**) and a plurality of data providers (**80**) all interact via the interne. The physical embodiment of the system is not critical and a skilled person will understand that the terminals, data processing systems and the like can all take a variety of forms.

Referring now to FIG. **5**, this shows a conceptual illustration of a content provision system **100**. Content creators **104***a*, *b* generate or receive content data from artist terminals **102***a-d* and store content data in databases **106***a*, *b*. The content data stored in databases **106***a*, *b* may comprise audio data, such as music, video data, such as films or TV programs, text, such as literary works, software, such as games software, or other data. Content creators **104***a*, *b* are coupled to communications network **101** for communicating created content data over the network. Also coupled to communications network **101** are content publishers **110***a* and **110***b*, each of which is coupled to an associated stored content database, **112***a* and **112***b* respectively. The content publishers make their stored content available for controlled access using communications network **101**. In some instances, for example where the content data comprises computer games, the functions of content creator and content publisher may be provided by a single entity. Also although conceptually illustrated as blocks in FIG. **5**, the content creator and content publisher typically each comprise a client server computer network.

The communications network **101** is typically a private communications network, such as an extranet, with security controlled access to entities connected to the network. Physically the network may comprise an internet protocol network or it may comprise, or consist, of dedicated point-to-point links. Thus, for example, a content creator **104** may be

13

directly linked to a content publisher **110** and/or to other entities shown in FIG. **5** such as a content provider or content distributor.

The content provision system includes a plurality of content providers **108***a-e*, each coupled to the communications network **101**. In the illustrated system, the content providers own copyright in stored content data accessible over communications network **101** and may, in practice, also perform a content publication function. Five content providers own the copyright in over 80% of all world-wide music sales. The content providers are coupled to stored content databases **106** and **112** via communications network **101**, for supplying stored content data.

A gateway server **114** is also coupled to communications network **101** to link the communications network to other networks such as the internet and/or mobile communications networks. Gateway server **114** provides security and access control functions and firewalls. A second gateway, content distributor WAN gateway **116**, is also shown attached to communications network **101**. This provides similar security and firewall functions and coupled communications network **101** to distributor WAN (wide area network) **117**. Gateway **116** has logical access to one or more of a content creator, content publisher and content provider for accessing stored content data. Content distributor gateway **116** may be owned by a chain of record stores and provide content access terminals **118**, coupled to WAN **117**, in separate retail outlets. Content access terminals **118** have access, via gateway **116**, to stored content accessible over communications network **101**.

Referring now to FIG. **6**, this shows a data supply computer system **120**. In this embodiment, three content access terminals **118***a-c*, e-payment systems **121***a*, b, and content access web server **124** are all coupled to internet **142**. Data supply system **120** is coupled to the content provision system **100** illustrated in FIG. **5**. Where communications network **101** of FIG. **5** is an extranet, this extranet physically operates over internet **142**; where communications network **101** does not partly operate via internet **142**, a connection to internet **142** is established via gateway server **114** as shown in FIG. **5**. In this way content access terminals **118***a-c* are provided with controlled access to the stored content data of content provision system **100**.

E-payment systems **121***a* and **121***b* are coupled to banks **122***a, b* and *c, d* respectively. These provide an e-payment system according to, for example, MONDEX, Proton, and/or Visa cash compliant standards. Preferably at least one of e-payment systems **121***a, b* operates a so-called "open purse" system in which the value is stored as a publicly verifiable digital signature issued by the e-payment system. In such a signature-transporting arrangement, payment data may be validated using public keys and thus payment authentication need not be performed by the e-payment system but may instead be performed by, for example, a data access terminal or data supply system computer, using payment management code. The authenticated signatures, which in effect perform a similar role to checks, are submitted to the relevant e-payment system after authentication for verification and reimbursement or transfer of monetary value. With such a system payments may be made anonymously and thus payer identification is not essential. Data carriers, such as data cards, may be issued with stored value or without value, in which latter case value (that is, a publicly verifiable digital signature) may be written onto the card during an on-line transaction.

In alternative embodiments, a data carrier such as the smart Flash card described below may be used to create value bearing digital signatures as is well-known to those familiar with e-money.

14

Content access web server **124** is also coupled to internet **142** for providing content access terminals **142***a-c* with access to content data. Content access web server **124** is typically owned by a content data supply "system owner" who acts as an intermediary between a content access terminal user and a content provider, forwarding content data provided (directly or indirectly) by a content provider to a content access terminal and then to a stored content data carrier. Web server **124** is coupled to web server code storage **126** storing Java code for generating web pages for interpretation by web browsers on content access terminals **111***a-c*. The web pages provide the content download, value add, CRM (customer reward management) value check/spend and website link functions described below.

Web server **124** is coupled to payment processor **128**, Digital Rights Management (DRM) processor **130**, access control processor **132**, and content distribution processor **134**. Payment processor **128** includes payment management code storage **128***a* and is coupled to payment record data store **136**. Access control processor **132** includes access control code storage **132***a* and is coupled to access control data store **138**. DRM processor **130** includes DRM code storage **130***a* and is coupled to content access and DRM data store **140**. Content distribution processor **134** includes CRM (customer reward management) and payment distribution management code storage **134***a* and is also coupled to content access and DRM data store **140**. As shown in FIG. **6**, processors **128-134** are all in communication with one another.

Processors **128**, **130**, **132** and **134** may comprise separate application programs or a single computer program and may operate on a single physical computer, on which web server **124** may also be provided, or may operate on separate computers. Likewise data stores **136**, **138** and **140** may comprise a single physical data store or may be distributed over a plurality of physical devices and may even be at locations physically remote from processors **128-134** and coupled to these processors via internet **142**.

Web server **124** communicates with processors **128-134** by means of a CGI (common gateway interface) script and the code associated with processors **128-134** may be written in any conventional computer language such as C, C++, or Perl. However, in other embodiments one or more of the processors may be coupled to web server **124** via internet **142** and owned and operated by a separate entity, such as a financial institution. In this case conventional secure web-based communications may be operated between web server **124** and the relevant processor. In particular, payment processor **128** may be operated by one of the e-payment system providers **128***a, b*.

Payment management code **128***a* issues and authenticates payment data and stores an audit record in payment record data store **136**. Access control code **132***a* stores identification data (of a user or card) together with registration data provided by a user when registering with the system owner. This data comprises a user password for accessing stored content and/or payment data; user characterizing data, for example characterizing user preferences, for marketing purposes; data indicating an e-payment system to use; and in some embodiments, further general user related data such as card level data for identifying the provision of "gold" level services to selected users. A copy of the password is stored with the content data on the portable data carrier, as described further below. Alternatively, one or both of the access control data store and portable data carrier may simply store data for verifying a user-entered password.

Content access and DRM data store **140** stores data related to content access and content use, but does not itself store

15

content data items; these are instead provided via content provision system **100** described above. Data store **140** stores a plurality of records each comprising a data item identifier, a data item description, a data item type or genre, and location data comprising one or more pointers to a location or locations from where the data item can be downloaded. Associated with a data item is also a table of use rule data comprising a list of values (i.e. content data item prices) and corresponding levels of permitted usage. Thus a value of £1 might permit ten plays of a music track, while the value of £10 might permit an unlimited number of plays of the track and copying of the track for personal use.

Also associated with a data item is a table of payment distribution data comprising a list of recipients and corresponding fractions of the data item value each is to receive. Typically, the main recipient will be the copyright owner of the data item and other recipients will be selected from the content creator, the artist or artists, the system owner, the content publisher, and the retailer/distributor. The payment distribution proportions may be dependent upon the payment value, in which case a plurality of sets of payment distribution figures may be associated with each data item, each set of distribution figures corresponding to a payment value range. The payment data and distribution data is here termed DRM (Digital Rights Management) data.

Further associated with a data item is a table of CRM (Customer Reward Management) data, linked to the user rule data, comprising CRM rules to specify, for one or more data item use levels, a quantity of reward points and one or more recipients for the reward points (the recipients may include the card user and the retailer/distributor).

The CRM and payment distribution code **134a** operates with content access and DRM data store **140** to inform a system user of the description and value of a data item, to access and download a data item from the content provider system to a content access terminal, to provide content use rules with the data item, and to provide instructions either to payment processor **128** or to e-payment system **121** to distribute payments for the data item to the recipients identified by the data store **140** and to distribute CRM reward points.

The access control data store **138** holds a secure key, such as a secret "public" key in a public key cryptography system, for the system owner to authenticate its identity to a content provider. This data is held securely with other sensitive data in the access control data store **138**. As is described in more detail below, when data supply system **120** receives a request for a content data item from a content access terminal **118**, it looks up a location from which the data item is available using content access and DRM data store **140** and then determines the identity of the corresponding content provider. This identity is either stored in content access and DRM data store **140** or, as there are relatively few content providers, it may be hard written in DRM code **130a**. DRM code **130** then requests access control processor **132** to provide the secure system owner identifier from access control data store **138** to the relevant content provider and sets up a trusted connection between the content provider and content access web server **124** for downloading the data item to a content access terminal **118** and then to a portable data carrier.

Referring now to FIG. 7, this shows a variety of content access terminals for accessing data supply computer system **120** over internet **142**. The terminals are provided with an interface to a portable data carrier or "smart Flash card" (SFC) as generally described with reference to FIG. 2 and as described in more detail below. In most embodiments of the terminal the SFC interface allows the smart Flash card data

16

carrier to be inserted into and removed from the terminal, but in some embodiments the data carrier may be integral with the terminal.

Referring now to the specific embodiments illustrated in FIG. 7, a simple content access terminal may comprise a home personal computer **144** with SFC interface **144a**. In another embodiment, a mobile communications device **152** is provided with a smart Flash card interface **152a** and is coupled to internet **142** via radio tower **150**, mobile communications system **148** and mobile communications internet gateway **146**.

In another embodiment, a smart Flash card interface is provided to a so-called "set top box" (STB) **154**. The set top box is, in effect, a receiver for television programs received on video input **154b**, which may comprise a satellite TV signal, a cable TV signal or an off-air TV signal. The video signal is provided from the set top box to television **156** or to some other home entertainment device such as a personal computer (not shown). In another embodiment, content access terminals **166** and **168** each with respective SFC interfaces **166a** and **168a** are coupled to a retailer local area network (LAN) **160** connected to internet **142** via retailer LAN server **158**. DVD player **164** is also coupled to LAN **160**. In a further embodiment a smart Flash card interface **170a** is provided for a CD/DVD player **170**.

In these latter three embodiments, content data for storage on the smart Flash card may be retrieved from broadcast video and/or a CD or DVD. In this case, the computer data supply system **120** illustrated in FIG. 6 may be used to provide use rule data for the content data stored on the smart Flash card, and to pay for data downloaded onto the card; the content data may be captured before or after the data supply system **120** is accessed to enable use of the stored data, but in a preferred embodiment content data written to the card from a supplier other than the content data supply computer system is not accessible to a user until corresponding use rule data has been downloaded from computer system **120**, which will normally be after receiving payment for the downloaded data.

Referring now to FIG. 8, this shows a schematic diagram of one embodiment of a data access terminal **170**. The terminal comprises a general purpose computer including an audio/visual interface **184**, a keyboard **186** and a pointing device **188** for providing an interface to the user. The terminal has an interne interface **176**, for example a modem, and optionally a LAN/WAN interface **174** for connecting the terminal to a retailer or distributor LAN or WAN. The terminal also has an optional video input **178** for receiving broadcast video data and a media input device **180**, such as a CD or DVD drive. Further communications I/O ports **182** may also be provided. A portable data carrier or smart Flash card interface **190** is provided for interfacing to a smart Flash card. Optionally, a cash input and verification system **192**, such as is conventionally used in an automatic teller machine (ATM), may also be incorporated within the content access terminal. The terminal has working memory **194** such as RAM and program memory **196** which can comprise any conventional storage device such as RAM, ROM or a disk drive. Program code in program memory **196** may also be stored on removable disk **198**. A processor **200** loads and implements program code stored in program memory **196**. All the components of the terminal are linked by a data and communications bus **172**.

More specifically, processor **200** loads and implements cash payment management code **200a** for managing cash input data from cash input and verification system **192**, for adding value to a smart Flash card. Processor **200** also implements a web browser **200b** for accessing system owner web

17

pages and data exchange interface **200**c for exchanging data between a smart Flash card interface to the terminal and data supply system **120**.

Processor **200** also implements off-line contents retrieval code **200**d for retrieving data for storage on a smart Flash card from media input device **180** and/or video input **178** and/or LAN/WAN interface **174**. The processor implements a content sampler **200**e for outputting small extracts of content data items to a user via audio/visual interface **184**. Such data item samples may be stored with the content description data in content access data store **140**. The processor also implements a smart Flash card interface driver **200**f, user interface code **200**g and additional communication drivers **200**h for driving LAN/WAN interface **174** and/or comms I/O ports **182**.

Referring now to FIG. **9**, this shows a schematic diagram of components of a portable data carrier **202**, in the embodiment shown a so-called "smart Flash card". In this context, "smart Flash card" refers to an IC card similar in size to a plastic payment card incorporating a processor and Flash data memory, preferably of large capacity. For further details on smart cards, reference may be made to the ISO (International Standards Organization) series of standards, including ISO 7810, ISO 7811, ISO 7812, ISO 7813, ISO 7816, ISO 9992 and ISO 10102, which are hereby incorporated by reference.

Referring in more detail to FIG. **9**, a data and communications bus **204** links components of the card which include a processor **210**, working memory **212**, timing and control logic **208** and an external interface which may have contacts (ISO 7816) or be contactless (ISO 10536) for providing external access to a bus **204** for reading data from and writing data to the card **202**. Also coupled to bus **204** are permanent program memory **216**, non-volatile data memory **218** and non-volatile (Flash) content data memory **214**. Non-volatile data memory **218** may comprise EEPROM and permanent program memory **216** may comprise ROM, for example, mask-programmed ROM. All the components of FIG. **9** are mounted on a single substrate, in a preferred embodiment bearing contacts for external interface **206**.

Processor **200** loads and implements program code from permanent program memory **216**. This code comprises operating system code for providing the card with a basic operating system for at least external communications; payment management code for supplying payment data from nonvolatile data memory **218** to pay for downloaded content; DRM (Digital Rights Management) and security code, including code to implement content data use rules and code for password controlled access to data and program functions; CRM code for implementing CRM-related rules; and content synthesis code for combining stored content data with additional data provided via external interface **206** for synthesizing complete content item data.

Non-volatile data memory **218** stores data including card identity data, access control data, including password data for validating a user password, access record data for storing a record of access attempts and their outcomes, and content supply data such as system owner website addresses and retailer/distributor website addresses.

Data memory **218** further stores card value data comprising e-money such as publicly verifiable digital signatures, and payment data for storing a payment audit trail including payment amounts and data on to whom payments have been made. The memory **218** also stores RFM (Recency Frequency Monetary) data to provide a record of transactions for market research and customer reward purposes, and CRM data storing customer reward points. Data memory **218** also stores an index of content data items stored in Flash memory **214** and associated content use rules, as well as DRM and

18

royalty data for maintaining an audit trail of use history for rights management tracking. Optionally, data memory **218** may also store supply chain data specifying a supply chain route through which data has been obtained from a content provider, which may be used for rewarding supply chain intermediaries, for example on a commission or reward points basis.

Content data memory **214** preferably comprises at least 100 MB of data storage, partitioned as data blocks of a size selected to match the stored content type. For storing video data, Flash memory **214** preferably comprises >1 GB data storage and the data blocks into which the data memory is partitioned are larger.

Referring now to FIG. **10**, this shows a schematic diagram of a data access device **220**, such as a portable audio/video player. The data access device **220** comprises a conventional dedicated computer system including a processor **238**, permanent program memory **236**, such as ROM, working memory **234**, such as RAM, and timing and control logic **226** all coupled by a data and communications bus **222**. Also coupled to the bus are an audio interface **228**, a display **230** and user controls **232**, for providing a user interface. A smart Flash card interface **224** is coupled to bus **222** for interfacing with a smart Flash card for retrieving and playing stored content data.

Permanent program memory **236** stores program code for implementation by processor **238**; this code may also be provided on a data carrier such as a ROM chip or disk **240**. Processor **238** implements an SFC interface **238**a, a user interface **238**b, a content player **238**d for retrieving stored content data from a smart Flash card interfaced to the device and for outputting audio and/or video data derived from the retrieved content data (which may comprise compressed audio and/or video data) to a user of the device.

Processor **238** also implements use control **238**c for controlling access to and use of contents stored on the smart Flash card by the content access device user. Use control routine **238**c and/or DRM and security code in permanent memory **216** on the smart Flash card may also implement digital watermarking and other Secure Digital Music Initiative (SDMI) content protection code as specified in the SDMI portable device specification, part one, version 1.0 (see www.sdmi.org) which is hereby incorporated by reference.

FIGS. **11**a and **11**b show a flow diagram of a process for registering a data carrier or smart Flash card with a data supplier or system owner operating a data supply system as illustrated in FIG. **6**. A smart Flash card may be issued entirely blank, that is, with no prestored content or value, with prestored value but no prestored content, with prestored content but no prestored value (the content being provided free) or with both prestored value and prestored content. Thus, for example, a user may purchase a card with stored value but no stored content over the counter at a retailer. The process of FIGS. **11**a and **11**b illustrates the registration of a card with neither prestored content nor prestored value. As illustrated the registration process records user registration data in the access control data store **138** of FIG. **6** and writes value data onto the blank card.

At step S**10** a smart Flash card is inserted into a content access terminal smart Flash card interface. The system owner web page is then loaded onto the content access terminal and displayed to the user (step S**11**). User registration data is then entered into the content access terminal (step S**12**) and transmitted to the system owner (S**13**). The user registration data may include a user identity, a preferred e-payment system to use and, optionally, a content access PIN or password, and a service level (for example bronze, silver or gold). The

US 8,336,772 B2

**19**

optional password may be a password required by the e-payment system for validation of a payment by the user with the card or it may be a password to protect unauthorized access to content on a smart Flash card to protect stored data in the event, for example, of the card being stolen. A single password may serve both these functions. The content access terminal web browser is configured so that all sensitive data passing between the terminal and the system owner is securely transmitted, for example by using a conventional encryption system such as PKI (Public Key Infrastructure).

At step S14 a payment request is received from the system owner at the content access terminal and displayed to the user. At step S15 the user enters payment data into the content access terminal and this payment data is transmitted to the system owner, for adding value to the card. This may, for example, be a credit card transaction as is conventionally used for purchase over the internet. Card value data and a card value access code is then received by the content access terminal from the system owner at step S16. The card value corresponds to the payment made by the user and the value access code may be a password entered by the user at step S12 or may comprise a password or PIN created by payment processor 128 or e-payment system 121 as illustrated in FIG. 6. In a preferred embodiment, the user pays the system owner and the system owner then directly provides digital signature data representing value to the content access terminal for writing onto the smart Flash card.

At step S17, card registration data is received from the system owner by the content access terminal and written onto the smart Flash card. This card registration data comprises user identity data, access control data, payment system specifying data, system owner access data, such as a system owner web page address and other dial-up information. At this stage other data may be entered by the user and written onto the card, including, for example, user preference data, retail outlet and CRM data (alternatively user preference data may be captured at step S12). At step S18 the card value data and card value access code received at step S16 is written onto the card and output to the user visually and, optionally, as a printed record. The card is then available for use, at step S19.

FIG. 11b shows the corresponding registration steps performed by the system owner's data supply system 120. At step S20, a request for a smart card registration web page is received from a content access device and, at step S21, transmitted to the device. User registration data is then received, at step S22, from the content access terminal and stored in content access control data store 138. The system owner's computer system then transmits, at step S23, a payment request to the content access terminal and receives, at step S24, payment data in reply, this payment is then authenticated, at step S25, with an e-payment system such as payment system 121a or b illustrated in FIG. 6, and after verification the payment processor 128 of the computer system transmits, at step S26, value data and a value access code to the content access terminal, for writing onto the smart Flash card. The payment processor then updates the payment record data store 136 with data relating to the transaction (step S27) and, at step S28, retrieves card registration data previously written into the access control data store and transmits this registration data to the content access terminal. At step S29 the transaction is then complete.

Referring now to FIGS. 12a-c, these illustrate a flow chart for downloading data to a smart Flash card using a data access terminal. At step S30 the smart Flash card is inserted into the content access terminal and the user then enters, at step S31, their password for gaining access to the functionality of the smart Flash card. At step S32, the content access terminal

**20**

transmits the password to the smart card for verification and the terminal checks, at step S33, whether access is permitted. If access is not permitted, a warning is displayed by the terminal, at step S34, and an access denied count is implemented. A threshold count is then read from the card together with a count of the total number of times access to the card has been denied (step S35). At step S36 the terminal checks whether the total number of denied accesses is within three of the card threshold, and if it is not, returns to step S31, while if it is, it proceeds to step S37 where the terminal displays a warning that a further denied access is likely to result in erasure of content stored on the card. At step S38 the terminal then checks whether its count of denied accesses is greater than its threshold value, returning to step S31 if not, and displaying an access refused message at step S39 if the total number of permitted accesses has been exceeded. The system then waits at step S39 for removal of the smart Flash card from the content access terminal.

If access is permitted at step S33, the terminal loads outline CRM data from the card (step S40) and loads retail data, such as targeted advertising, from the retailer LAN/WAN (step S41). At step S42, the terminal then displays a menu of options, retail data such as advertising or CRM-related data and outline CRM data, such as a total number of reward points earned, on the content access terminal. Many options include download content (from a system owner), add monetary value (to the card), check/spend CRM value stored on the card, follow website links, and exit. At step S43, the user inputs a menu option which, in the illustrated flow chart, is the download option. The system thus passes to step S44 and loads the system owner's content access web page onto the content access terminal and displays this to the user.

At step S45, the user enters a content search request, which is transmitted to the system owner content distributor processor 134. Content search results are received back from the content distribution processor, including a content identifier, a brief description, and content cost data for at least one payment option, and these results are displayed on the user on the content access terminal. The user then selects one or more content items at step S47 and the selection is transmitted to the content distribution processor 134 where further content cost data and purchase option data is retrieved from data store 140. At step S48, this content cost and purchase data (including use rule data) is received from the system owner and displayed to the terminal user. The user then selects, at step S49, a purchase option and confirms a purchase request or, alternatively, selects "exit" to return to the menu display of step S42. After one or more content items have been selected, together with a purchase option, hard value and CRM data is read from the smart Flash card at step S50, and at step S51 a check is made to determine whether the monetary and/or CRM (reward points) value stored on the smart Flash card is sufficient to purchase the selected purchase data items. If the card value is insufficient, a warning is displayed at step S52 and the system returns to the menu display at step S42. If the card value is sufficient, at step S53 the content access terminal transmits a payment request to the smart Flash card.

Payment for the data item or items requested may either be made directly to the system owner or may be made to an e-payment system such as e-payment systems 121a and 121b of FIG. 6, with these systems then forwarding payment confirmation data to the system owner computer system. Alternatively, the content access terminal may transmit data to the card to set up a transaction directly with a content provider who, being the copyright owner, would normally receive the majority of the payment.

21

At step S**54**, payment data for making a payment to the system owner is received from the smart Flash card by the content access terminal and forwarded to an e-payment system such as e-payment system **121** in FIG. **6**. Payment record data, validating payment by the card to the system owner, is then received back from the e-payment system at step S**55** by the content access terminal and forwarded to the card for updating payment data on the card. In alternative embodiments, payment data from the card may be provided directly to the system owner's data supply computer for authentication and, optionally, further validation with an e-payment system by the system owner's computer.

Distribution of the payment received by the system owner from the card is performed by the system owner's computer system, as described elsewhere. Such payment distribution will normally provide a small percentage of the total payment to a "owner" or operator of the content access terminal, such as a retailer, distributor, or in other embodiments, mobile communications network operator or cable TV network operator.

In the presently described embodiment, payment record data received in step S**55** is transmitted to the system owner to confirm payment by the card and thus it is the content access terminal, in the described embodiment, which authenticates a payment before confirming that the payment has been made to the system owner.

In step S**56**, together with the payment record data, purchase request and card registration data is transmitted to the system owner to identify one or more content data items for purchase and to identify the purchaser. Then, at step S**57**, the content access terminal sets up a transaction between the system owner data supply computer and the smart Flash card for download of the identified content items requested from the data supplier to the smart Flash card. The download is preferably arranged so that there is no permanent storage of downloaded data on the content access terminal (although temporary storage in a disk cache may be permissible), and there is further preferably no temporary storage on the content access terminal of complete data for a content data item. This provides data security and reassurance to the content providers.

In the same way as with card registration described with regard to FIG. **11**, a secure and trusted link is set up between the content access terminal and/or the smart Flash card and the data supply computer in a conventional manner as is well known to those skilled in the art (for example, using public key data encryption). The data transaction may be set up directly between the smart Flash card and the data supply computer, in which case the content access terminal has no access to unencrypted content data, or it may be set up between the content access terminal and the data supply computer, in which case unencrypted data is written by the content access terminal to the smart Flash card. Standard transmission protocols are used to ensure complete transmission of a content data item, for example by re-transmitting blocks of data which are not correctly received.

Also at step S**57**, one or more content access rules are received from the system owner data supply computer and written to the smart Flash card so that each content data item has an associated use rule to specify under what conditions a user of the smart Flash card is allowed access to the content data item.

At step S**58** the content access terminal receives CRM data from the content distribution processor **134** of the system owner, for example specifying a number of reward points earned by downloading the selected content items. This CRM data will normally be written to the smart Flash card (step

22

S**59**), but may additionally or alternatively be stored in the content access terminal or in a data store of the content access terminal owner so that the reward points are held by the distributor/retailer/cable TV operator. Finally, also at step S**59**, a complete record of details of the transactions between the smart Flash card and the content access terminal, the smart Flash card and the system owner, the smart Flash card and the e-payment system, and the content access terminal and the e-payment system and/or data supply computer is recorded on the smart Flash card to provide an audit trail. The system then returns to the menu display at step S**42**.

The add monetary value menu option provided by the menu operates in a similar manner to that described with regard to steps S**15** and S**16** of FIG. **11***a* and steps S**24** to S**27** of FIG. **11***b*. In embodiments of the system in which the smart Flash card operates either in a debit (pre-pay) or credit mode, operating mode data may be loaded from the card together with outlying CRM data at step S**40**. If the card is operating in a credit mode then, at step S**41**, the content access terminal reads content use data records from the card and proceeds correspondingly to steps S**47** and S**48** to determine the value of the content accessed and then proceeds according to steps S**15** and S**16** of FIG. **11***a* and steps S**24** to S**27** of FIG. **11***b* to retrieve payment for the accessed content from the card owner. Where enhanced access control features are provided, access control data read from the smart Flash card or entered into the content access terminal at step S**31** is used, in step S**44**, to access the system owner content access webpage and, in some embodiments, to set up a secure connection between the content access terminal and system owner data supply computer at step S**44**.

Referring now to FIGS. **12***d* and **12***e*, these show steps in a process implemented on the system owner's data supply computer for providing content data to a content access terminal and hence to a data carrier such as a smart Flash card. At step S**60** the system owner's content access web page is requested by a content access terminal and transmitted to the requesting terminal. A search request for searching for a content data item is received, at step S**61**, from the content access terminal, and at step S**62** content distribution processor **134** of the content supply system searches content access and DRM data store **140** and transmits the search results to the content access terminal. The search results will normally comprise a content item identifier, a content item description, optionally a content item sample, and at least one content item price, for example for a default payment option. The search results may comprise a set of content data items, either selected by type or artist or comprising some predetermined selection in a similar manner to a compilation of tracks on a CD.

At step S**63** content item selection data identifying one or more content items is retrieved from the content access terminal, and at step S**64** content item purchase data for the selected content items is retrieved from content access and DRM data store **140**. This purchase data will normally include, for each selected content item, one or more prices and purchase options. Purchase option data may simply comprise one of a set of standard options, for example "1" to purchase outright, "2" to rent for a period of time, "3" to rent for a number of plays, and "4" to rent with a final purchase option. The purchase option data may also indicate when a content item is available free.

At step S**65** the content purchase data is transmitted to the content access terminal, and at step S**66** payment record data, indicating a payment made from the smart Flash card to the system owner, purchase request data, card registration data and, optionally, access control data, is received from the content access terminal. The payment record data confirms a

US 8,336,772 B2

<table>
<tr><td>23</td><td>24</td></tr>
</table>

payment for the requested data items, the purchase request data specifies the payment option selected for the selected content items, and the card registration data provides data for keeping records of the transaction and providing reward points; the access control data may be required for additional data security. At step S67 the payment record data, in the described embodiment of the system, is validated with an e-payment system such as e-payment system **121** of FIG. **6**. As illustrated in the flow chart, the data supply system computer checks with the e-payment system that a payment has in fact been made to the system owner. In other embodiments of the system, payment may be made directly to the system owner, and either concurrently with the content access and download process, or, at some later stage, payment data received from the smart Flash card may be verified with the e-payment system for reimbursement of the system owner.

At step S68, payment distribution data is read from the content access data store **140**. This data will indicate how payment made by the card for the data is to be distributed among recipients. In one embodiment, recipient's payment fractions are specified in general terms in the content access data store, for example copyright owner 0.90, system owner 0.01, retailer/distributor 0.02, publisher 0.02, creator 0.05. Identification of who is the relevant copyright owner is stored in the data store together with the content item identifier, but may be selected from more than one possible content provider for the data item, and identification of who is the relevant retailer/distributor may be determined from, for example, content access identity information received from the content access terminal when the system owner content access web page is accessed at step S60. At step S69, payments are then distributed in accordance with the payment distribution data, either by direct distribution of value-bearing digital signatures to the relevant parties, or by issuing a payment distribution instruction to e-payment system **121**. Preferably the data supply system stores records of individual card payments and, at intervals, combines the payment distribution data for a plurality of individual records to output payment data for distributing the total payment received by the data supply system from a batch of individual payments.

At step S70, content access rules for the purchased level of service are read from the content access data store. These rules could, for example, specify that only a predetermined number of accesses to the content are permitted, for example 10 plays. Alternatively, the rules could provide access for, say, one month from the download date. Other rules may provide unlimited plays but only on specified players, for example set top boxes owned by a particular cable TV network (as determined by content access device identification data provided to a smart Flash card from a content access device). A content provider identification for the requested content data is also read from the content access data store at step S70 together with CRM data for issuing reward points.

At step S71, content access rules for the requested content data items are retrieved from data store **140** and transmitted to the content access terminal. Then, at step S72, DRM processor **130** of the data supply system transmits a transaction request and authentication data to the content provider identified in step S70. This request identifies the system owner data supply system to the content provider in a secure manner, either by means of physical security, such as a dedicated connection from the system owner data supply system to the content provider, or by means of an electronically secure connection such as an encryption connection. Then, at step S73, the content access web server **124** receives protected content from the content provider, comprising the data items requested by the content access terminal, and transmits this

protected content to the content access terminal. The content is preferably protected by data encryption but may be protected in other ways, for example, by digital watermarking or simply by the large number of other transactions taking place at any one time over the internet. The data supply system computer, at this point, essentially acts as a transparent data forwarder, forwarding data from the content provider to the content access terminal, which itself is preferably effectively transparent, using data exchange interface **200**c to transmit the protected content data directly to the smart Flash card. As described with regard to FIG. **12**d, the content download protocol includes error protection and transmission retry protocols to ensure substantially error-free data transmission.

Once content has been downloaded to the content access terminal (and, hence, to the smart Flash card) at step S74 a record of the purchase data and content accessed is written to payment record data store **136**, to provide an audit trail. Then, at step S75, updated CRM data is written to the content access data store **140**, using rules stored in the content access data store, in conjunction with a record of the downloaded data items, to calculate the CRM data (i.e. reward points). The updated CRM data is then also transmitted to the content access terminal, where it can be forwarded to the smart Flash card. Then, at step S76, the process ends.

Referring now to FIG. **13**, this shows a flow chart for user access of stored data on a smart Flash card using a data access device such as the MP3 player of FIG. **1**. At step S77 the smart Flash card is inserted into the player and, at step S78, the user enters a password into the player, which is transmitted to the smart Flash card for validation (this step is optional). If access to stored data on the card is permitted, the process proceeds to step S79 where an index of content data items stored on the card is loaded from the card and displayed together with a menu. The menu provides options including access content, check value (stored on the card), check CRM data (such as reward points) stored on the card, and play options (such as no video, repeat play, random play, and the like). If the user wishes to access content data items stored on the smart Flash card, a user selection of such items is entered into the player at step S80, for example using cursor keys or a pointer; additionally or alternatively a default play option may be provided to, for example, play the most recently downloaded data.

At step S81 content use status data for the selected content items is loaded from the smart Flash card together with associated content use rules. Then, at step S82, the use rules and present use status for each selected content item are compared and the result is displayed together with a content play menu. The content play menu may comprise a simple list of the selected content items with items not available for access highlighted in, for example, red. Alternatively, more detailed content access permission data may be displayed such as the purchased contents use for a content data item, the actual use of the data item made so far, and the available remaining use. Then, at step S83, the player determines whether content use is permitted. If use is not permitted, the process returns to step S79 to re-display the menu; if content use is permitted the system proceeds to step S84.

At step S84 the selected content data items whose use is permitted are retrieved sequentially from the card, decoded as necessary, and the decoded audio and/or video data is made available to the user, for example, by providing audio output at a headphone socket on the player and displaying video output on the player display. Preferably, the player also retrieves supplementary data stored in association with a content data item, such as advertising data, or for a web-enabled player, hot links to web sites for sale of goods or services,

**25**

particularly those related to the accessed content data item or those identified to appeal to users accessing the data item (such as pop group merchandizing or Harley Davidson (trade mark) motor bikes for rock music/video).

Preferably, the player is provided with "pause" and "continue" functions and corresponding user controls. When "pause" is selected the process passes to step **S85** and writes a record to the smart Flash card comprising data specifying how much use has been made of the accessed content data item. In the case of music or video data, this may comprise start and end time markers or simply a play duration time (the start time being predetermined, for example at the start of the data item). In the case of a game the partial use data may comprise an elapsed play time or a number of lives left. In the case of a data item providing a service such as access to stock and share prices, or weather information, or a share dealing service, the partial use information may comprise a status record indicating the status of an interrupted transaction. When the "continue" function is selected on the player the process returns to step **S84**.

To allow for the smart Flash card being removed from the player between pause and continue events, a check may be made at step **S78**, by reading a partial use status data from the card, to determine whether a content data item was left in a pause state when the card was last used. If such a pause state is determined to exist for a content data item, the process may then jump directly to step **S85** to allow a user to resume or continue with the content data item and proceed directly to step **S84**.

Once play is complete the process moves to step **S85** where updated content use data is written to the smart Flash card. This updated use data provides a record of the use of a content made in step **S84**. This record can then be used in steps **S81** to **S83** to determine, on a subsequent occasion, whether further use of the content data item is permitted. Finally, at step **S86**, customer reward management reward rules are loaded from the smart Flash card together with CRM data stored on the card. The CRM data is then updated, using the CRM reward rules, to reflect the use of content data items made in step **S84** and the updated data is written back to the smart Flash card.

In one embodiment the CRM reward rules are determined by the content access terminal owner (retailer/distributor/cable or mobile network operator) and are written onto the card when registering the card. The updated CRM data may then be accessed by a content access terminal for spending or other use when the smart Flash card is next inserted into a content access terminal. Once the CRM data has been updated, the process returns to step **S79** to display the content index and menu.

The specific embodiments of the invention described above use communication over the internet and web-based technology but this is not essential, and the invention may be implemented using any electronic communications network, such as a wide area network, local area network, wireless network, or conventional land line network. Likewise, the invention is applicable to the internet, intranets, extranets, and other internet protocol networks.

The skilled person will understand that many variants to the system are possible and the invention is not limited to the described embodiments but encompasses modifications which lie within the spirit and scope of the present invention.

What is claimed is:

**1**. A handheld multimedia terminal, comprising:
a wireless interface configured to interface with a wireless network for accessing a remote computer system;

**26**

non-volatile memory configured to store multimedia content, wherein said multimedia content comprises one or more of music data, video data and computer game data;
a program store storing processor control code;
a processor coupled to said non-volatile memory, said program store, said wireless interface and
a user interface to allow a user to select and play said multimedia content;
a display for displaying one or both of said played multimedia content and data relating to said played multimedia content;
wherein the processor control code comprises:
    code to request identifier data identifying one or more items of multimedia content stored in the non-volatile memory;
    code to receive said identifier data;
    code to present to a user on said display said identified one or more items of multimedia content available from the non-volatile memory;
    code to receive a user selection to select at least one of said one or more of said stored items of multimedia content;
    code responsive to said user selection of said at least one selected item of multimedia content to transmit payment data relating to payment for said at least one selected item of multimedia content via said wireless interface for validation by a payment validation system;
    code to receive payment validation data via said wireless interface defining if said payment validation system has validated payment for said at least one selected item of multimedia content; and
    code to control access to said at least one selected item of multimedia content on said terminal responsive to said payment validation data,
wherein said user interface is operable to enable a user to select said at least one item of multimedia content available from said non-volatile memory; and
wherein said user interface is operable to enable a user to access said at least one selected item of multimedia content responsive to said code to control access permitting access to said at least one selected item of multimedia content.

**2**. A handheld multimedia terminal as claimed in claim **1**, wherein the code to control access to said at least one selected item of multimedia content on said terminal responsive to said payment validation data comprises code to modify use control data stored in said non-volatile memory to enable access to said at least one selected item of multimedia content.

**3**. A handheld multimedia terminal as claimed in claim **1**, further comprising code to request content cost data via said wireless interface for said identified one or more items of multimedia content, and further comprising code to receive said requested content cost data via said wireless interface for said identified one or more items of multimedia content.

**4**. A handheld multimedia terminal as claimed in claim **1**, wherein said code responsive to said user selection of said at least one selected item of multimedia content to transmit payment data relating to payment for said at least one selected item of multimedia content via said wireless interface for validation by a payment validation system comprises transmitting said payment data to a data access service provider.

**5**. A handheld multimedia terminal as claimed in claim **1**, further comprising code to retrieve supplementary data via said wireless interface and output said supplementary data to said user using said display.

**6**. A handheld multimedia terminal as claimed in claim **1**, further comprising:

code to read use status data and use rules from said non-volatile memory pertaining to said at least one selected item of multimedia content; and

wherein said code to control access to said selected item of multimedia content further comprises code to evaluate said use status data and said use rules to determine whether access is permitted to said at least one selected item of multimedia content.

**7**. A handheld multimedia terminal as claimed in claim **1**, wherein said at least one selected items of multimedia content comprises additional multimedia content for another stored item of multimedia content.

**8**. A data access terminal for controlling access to one or more content data items stored on a data carrier, the data access terminal comprising:

a user interface;

a data carrier interface;

a program store storing code implementable by a processor; and

a processor coupled to the user interface, to the data carrier interface and to the program store for implementing the stored code, the code comprising:

code to request identifier data identifying one or more content data items stored on the data carrier;

code to receive said identifier data;

code to present to a user via said user interface said identified one or more content data items available from the data carrier;

code to receive a user selection selecting at least one of said one or more of said stored content data items;

code responsive to said user selection of said selected content data item to transmit payment data relating to payment for said selected content item for validation by a payment validation system;

code to receive payment validation data defining if said payment validation system has validated payment for said content data item; and

code to control access to said selected content data item responsive to the payment validation data.

**9**. A data access terminal as claimed in claim **8**, wherein said data carrier is integrated into the data access terminal, and wherein said data carrier comprises flash memory.

**10**. A data access terminal as claimed in claim **8**, wherein said data access terminal is integrated with a mobile communications device and audio/video player.

**11**. A data access terminal as claimed in claim **8**, wherein said data access terminal is integrated with a set top box.

**12**. A data access terminal as claimed in claim **8**, wherein the content data item comprises additional content data for another stored content data item.

**13**. A data access terminal as claimed in claim **12**, wherein the additional content data comprises a level on a game.

**14**. A handheld multimedia terminal, comprising:

a wireless interface configured to interface with a wireless network for communicating with a data supplier;

non-volatile memory configured to store multimedia content, wherein said multimedia content comprises one or more of music data, video data and computer game data;

a program store storing processor control code;

a processor coupled to said non-volatile memory, said program store, said wireless interface and a user interface to allow a user to select and play said multimedia content;

a display for displaying one or both of said played multimedia content and data relating to said played multimedia content;

wherein the processor control code comprises:

code to request identifier data identifying one or more items of multimedia content available for retrieving via said wireless interface;

code to receive said identifier data via said wireless interface, said identifier data identifying said one or more items of multimedia content available for retrieving via said wireless interface;

code to request content information via said wireless interface, wherein said content information comprises one or more of description data and cost data pertaining to at least one of said one or more items of multimedia content identified by said identifier data;

code to receive said content information via said wireless interface;

code to present said content information pertaining to said identified one or more items of multimedia content available for retrieving to a user on said display;

code to receive a user selection selecting at least one of said one or more items of multimedia content available for retrieving;

code responsive to said user selection of said selected at least one item of multimedia content to transmit payment data relating to payment for said selected at least one item of multimedia content via said wireless interface for validation by a payment validation system;

code to receive payment validation data via said wireless interface defining if said payment validation system has validated payment for said selected at least one item of multimedia content; and

code responsive to said payment validation data to retrieve said selected at least one item of multimedia content via said wireless interface from a data supplier and to write said retrieved at least one item of multimedia content into said non-volatile memory,

wherein said user interface is operable to enable a user to select said selected at least one item of multimedia content available for retrieving.

**15**. A handheld multimedia terminal as claimed in claim **14**, wherein said code to request content information comprises code to request said content information from a content access web server.

**16**. A handheld multimedia terminal as claimed in claim **14**, wherein said code to receive said content data item comprises code to retrieve said content data item from a content provider.

**17**. A handheld multimedia terminal as claimed in claim **14**, wherein said identifier data is retrieved from a data supplier.

**18**. A handheld multimedia terminal as claimed in claim **14**, further comprising code to transmit at least a portion of said payment validation data to a data supplier or to a destination received from said data supplier.

**19**. A data access terminal for retrieving a content data item from a data supplier and providing the retrieved data item to a data carrier, the data access terminal comprising:

a first interface for communicating with the data supplier;

a user interface;

a data carrier interface;

a program store storing code implementable by a processor; and

a processor coupled to the user interface, to the data carrier interface and to the program store for implementing the stored code, the code comprising:

code to request identifier data identifying one or more content data items available for retrieving;

**29**

code to receive said identifier data identifying said one or more content data items available for retrieving;

code to request content information pertaining to at least one of said one or more content data items identified by said identified data;

code to receive said content information;

code to present said content information to a user via said user interface pertaining to said identified one or more content data items available for retrieving;

code to receive a user selection selecting at least one of said one or more of said content data items available for retrieving;

code responsive to said user selection of said selected at least one content data item to transmit payment data relating to payment for said selected at least one content item for validation by a payment validation system;

code to receive payment validation data defining if said payment validation system has validated payment for said selected at least one content data item; and

code responsive to the payment validation data to retrieve said selected at least one content data item from a data supplier and to write said retrieved at least one content data item into said data carrier.

**20**. A data access terminal as claimed in claim **19**, wherein said content information comprises at least one of a content data item description and content cost data.

**21**. A data access terminal as claimed in claim **19**, wherein said data carrier is integrated into said data access terminal, and wherein said data carrier comprises flash memory.

**22**. A data access terminal as claimed in claim **19**, wherein said data access terminal is integrated with a mobile communications device and audio/video player.

**23**. A data access terminal as claimed in claim **19**, wherein said data access terminal is integrated with a set top box.

**24**. A data access terminal as claimed in claim **19**, wherein the content data item comprises one or more of music, films, TV programs, text, software, or games software.

**25**. A handheld multimedia terminal for retrieving and accessing protected multimedia content, comprising:

a wireless interface configured to interface with a wireless network for communicating with a data supplier;

non-volatile memory configured to store multimedia content, wherein said multimedia content comprises one or more of music data, video data and computer game data;

a program store storing processor control code;

a processor coupled to said non-volatile memory, said program store, said wireless interface and

a user interface to allow a user to select and play said multimedia content;

a display for displaying one or both of said played multimedia content and data relating to said played multimedia content;

wherein the processor control code comprises:

code to request identifier data identifying one or more items of multimedia content available for retrieving via said wireless interface;

code to receive said identifier data via said wireless interface, said identifier data identifying said one or more items of multimedia content available for retrieving via said wireless interface;

code to request content information via said wireless interface, wherein said content information comprises one or more of description data and cost data pertaining to at least one of said one or more items of multimedia content identified by said identifier data;

**30**

code to receive said content information via said wireless interface;

code to present said content information pertaining to said identified one or more items of multimedia content available for retrieving to a user on said display;

code to receive a first user selection selecting at least one of said one or more items of multimedia content available for retrieving;

code responsive to said first user selection of said selected at least one item of multimedia content to transmit payment data relating to payment for said selected at least one item of multimedia content via said wireless interface for validation by a payment validation system;

code to receive payment validation data via said wireless interface defining if said payment validation system has validated payment for said selected at least one item of multimedia content; and

code responsive to said payment validation data to retrieve said selected at least one item of multimedia content via said wireless interface from a data supplier and to write said retrieved at least one item of multimedia content into said non-volatile memory, code to receive a second user selection selecting one or more of said items of retrieved multimedia content to access;

code to read use status data and use rules from said non-volatile memory pertaining to said second selected one or more items of retrieved multimedia content; and

code to evaluate said use status data and use rules to determine whether access is permitted to said second selected one or more items of retrieved multimedia content,

wherein said user interface is operable to enable a user to make said first user selection of said selected at least one item of multimedia content available for retrieving,

wherein said user interface is operable to enable a user to make said second user selection of said one or more items of retrieved multimedia content available for accessing, and

wherein said user interface is operable to enable a user to access said second user selection of said one or more item of retrieved multimedia content responsive to said code to control access permitting access to said second selected one or more items of retrieved multimedia content.

**26**. A handheld multimedia terminal as claimed in claim **25**, further comprising code to present said second selected one or more items of retrieved multimedia content to a user via said display if access is permitted.

**27**. A handheld multimedia terminal as claimed in claim **25**, wherein the rules comprise one or more of purchase rules, rental rules and subscription rules for said second selected one or more items of retrieved multimedia content.

**28**. A handheld multimedia terminal as claimed in claim **25**, further comprising code to write updated use status data to said non volatile memory after user access to the second selected one or more items of retrieved multimedia content.

**29**. A handheld multimedia as claimed in claim **28**, further comprising code to write partial use status data to said non volatile memory when only part of one of said second selected one or more items of retrieved multimedia content has been accessed.

**30**. A data access terminal for controlling access to one or more content data items stored on a data carrier, the data access terminal comprising:

US 8,336,772 B2

**31**

a user interface;

a data carrier interface;

a program store storing code implementable by a processor; and

a processor coupled to the user interface, to the data carrier interface and to the program store for implementing the stored code, the code comprising:

    code to request identifier data identifying one or more content data items available for retrieving;

    code to receive said identifier data identifying said one or more content data items available for retrieving;

    code to request content information pertaining to at least one of said one or more content data items identified by said identified data;

    code to receive said content information;

    code to present said content information to a user via said user interface pertaining to said identified one or more content data items available for retrieving;

    code to receive a first user selection selecting at least one of said one or more of said content data items available for retrieving;

    code responsive to said first user selection of said selected at least one content data item to transmit payment data relating to payment for said selected at least one content item for validation by a payment validation system;

    code to receive payment validation data defining if said payment validation system has validated payment for said selected at least one content data item;

    code responsive to the payment validation data to retrieve said selected at least one content data item from a data supplier and to write said retrieved at least one content data item into said data carrier;

    code to receive a second user selection selecting one of said one or more of said retrieved content data items to access;

    code to read use status data and use rules from said data carrier pertaining to said second selected one or more retrieved content data items; and

    code to evaluate said use status data and use rules to determine whether access is permitted to said second selected one or more retrieved content data items.

**31**. A data access terminal as claimed in claim **30**, wherein said data carrier is integrated into said data access terminal, and wherein said data carrier comprises flash memory.

**32**. A data access terminal as claimed in claim **30**, wherein said data access terminal is integrated with a mobile communications device and audio/video player.

**33**. A data access terminal as claimed in claim **30**, wherein said data access terminal is integrated with a set top box.

**34**. A data access terminal as claimed in claim **30**, wherein the content data item comprises one or more of music, films, TV programs, text, software, or games software.

**35**. A data access terminal for retrieving data from a data supplier and providing the retrieved data to a data carrier, the terminal comprising:

    a first interface for communicating with the data supplier;

**32**

    a data carrier interface for interfacing with the data carrier;

a program store storing code; and

a processor coupled to the first interface, the data carrier interface, and the program store for implementing the stored code,

the code comprising:

    code to read payment data from the data carrier and to forward the payment data to a payment validation system;

    code to receive payment validation data from the payment validation system;

    code responsive to the payment validation data to retrieve data from the data supplier and to write the retrieved data into the data carrier;

    code responsive to the payment validation data to receive at least one access rule from the data supplier and to write the at least one access rule into the data carrier, the at least one access rule specifying at least one condition for accessing the retrieved data written into the data carrier, the at least one condition being dependent upon the amount of payment associated with the payment data forwarded to the payment validation system;

    code to retrieve from the data supplier and output to a user stored data identifier data and associated value data and use rule data for a data item available from the data supplier; and

    code to write use rule data for a data item into the data carrier with the associated data item,

    wherein the data access terminal is integrated with a mobile communication device, a personal computer, an audio/video player, and/or a set top box.

**36**. A data access device for retrieving stored data from a data carrier, the device comprising:

a user interface;

a data carrier interface;

a program store storing code implementable by a processor; and

a processor coupled to the user interface, to the data carrier interface and to the program store for implementing the stored code,

the code comprising:

    code to retrieve use status data indicating a use status of data stored on the carrier, and use rules data indicating permissible use of data stored on the carrier;

    code to evaluate the use status data using the use rules data to determine whether access is permitted to the stored data;

    code to access the stored data when access is permitted; and

    code to write partial use status data to the data carrier when only part of a stored data item has been accessed,

wherein the data access terminal is integrated with a mobile communication device, a personal computer, an audio/video player, and/or a set top box.

\* \* \* \* \*

## CERTIFICATE OF SERVICE

I, Mark A. Perry, hereby certify that that I caused the foregoing to be filed via the Court's CM/ECF system and served on counsel of record who have registered for such service on January 22, 2016.


<u>/s/ Mark A. Perry</u>
Mark A. Perry

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,714 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point.

/s/ Mark A. Perry
Mark A. Perry